# Exhibit F

**FINRA DISPUTE RESOLUTION**
**ARBITRATION PROCEEDING**

DAVID JANNETTI, SARAH LYN JANNETTI,                CASE NO.:   23-01342
ADAM JANNETTI, AND LEAH JANNETTI,

      Claimants,

v.

STIFEL, NICOLAUS & CO., INC.,

      Respondent.

_____/

# <u>CLAIMANTS' PRE-HEARING BRIEF</u>

EREZ LAW, PLLC
*Attorneys for Claimants*
1 SE 3rd Avenue, Suite 1670
Miami, FL   33131
Telephone Number: (305) 728-3320
Toll Free Number:   (888) 840-1571
Facsimile Number:  (786) 842-7549

**FINRA DISPUTE RESOLUTION**
**ARBITRATION PROCEEDING**

DAVID JANNETTI, SARAH LYN JANNETTI,          CASE NO.:  23-01342
ADAM JANNETTI, AND LEAH JANNETTI,

      Claimants,

v.

STIFEL, NICOLAUS & CO., INC.,

      Respondent.

_____/

## <u>TABLE OF CONTENTS</u>

I.    Introduction…...………………………………………………...……………….. p. 1

II.   Facts………….……………………………………...…………………….. p. 11

    a.  Roberts lured David to become a client by misrepresenting his structured note strategy………………….…………………………….......................... p. 11

    b.  Roberts misrepresented the structured note strategy at issue as conservative, bond-like strategy…………………..……………………………………  p. 12

    c.  Contrary to Roberts' misrepresentations, the structured notes and structured note strategy are speculative and high risk…………………………….……… p. 13

    d.  Roberts needlessly magnified the already significant risks that David was exposed to by implementing a recklessly concentrated structured note strategy……………..…………………………………………………… p. 17

    e.  Roberts knowingly and intentionally violated Stifel's strict prohibition against conducting business with clients through unmonitored and unsupervised text messages on his personal mobile device to evade supervision by Stifel………………………………………………………………….…. p. 18

    f.  Roberts' designed a self-serving business model of selling the same auto-callable structured notes to his clients in order to generate enormous commissions for himself at his clients' expense ……………………..……… p. 22

    g.  Roberts recommended the excessive and unsuitable use of leverage, which only further magnified the risks associated with his speculative structured note strategy……………………………………………………………….. p. 24

h.  As the structured notes declined in value, Roberts recommend David continue to hold his structured notes and continue with the leveraged strategy ……………………………………………………………...…………… p. 26

i.  Roberts implemented a high-risk discretionary investment strategy in David's managed accounts that was completely contrary to the strategy that Stifel approved and David agreed to …………………………………….…………… p. 27

j.  Roberts and Stifel caused David to suffer significant losses …………….... p. 31

k.  Roberts' misconduct and David's losses were the predictable result of Stifel's failure to adequately supervise Roberts despite having actual knowledge of Roberts' disturbing history of misconduct…………………………………… p. 32

III.  Florida Law Governs This Proceeding……………………………………….  p. 36

IV.  The burden of proof for David to prevail on his claims is a "preponderance of the evidence"…………………………………………………………………….... p. 37

V.  Roberts and Stifel owed David a duty to act in David's best interest……….  p. 38

VI.  Stifel is liable to David for violation of the Florida Securities and Investor Protection Act…………………………………………………………...…………………… p. 39

a.  David is not required to prove "scienter" because the standard for establishing a violation of Fla. Stat. §517.301 is "mere negligence"….. p. 41

b.  David is not required to prove loss causation in order to prevail on his claim for violations of Fla. Stat. §517.301…………………………...………….. p. 42

c.  David is not required to prove reliance in order to prevail on his claim for violation of Fla. Stat. §517.301………………………………………...….. p. 43

d.  Once this Panel determines that Stifel violated the Fla. Stat. §517.301, David is entitled to statutory damages pursuant to the formula set forth in Fla. Stat. §517.211……………………………………………………… p. 44

e.  The Florida Securities and Investor Protection Act requires that David must be awarded attorney's fees……………………………………...……… p. 45

VII.  Stifel is liable for breach of fiduciary duty………………………………………… p. 46

a.  Stifel and Roberts are liable for breaching the common law fiduciary duties they owed David in his non-discretionary accounts…………………….... p. 46

b.  Stifel and Roberts breached the statutory fiduciary duty they owed David in the discretionary Solutions Program account...……………………… p. 47

VIII.  Stifel is liable for negligence……………………………………..………………… p. 49

a.  FINRA rules, SEC rules, securities laws and Stifel's own compliance policies are evidence of the applicable standard of care for David's common law tort claims…………………………………………………………… p. 50

b.  Roberts violated the reasonable basis suitability, customer specific suitability and quantitative suitability obligations of FINRA Rule 2111... p. 52

c.  Roberts and Stifel violated FINRA rules, were negligent and breached their fiduciary duties by making misrepresentations and material omissions to David…………………………………………………………………… p. 54

d.  Roberts and Stifel violated Reg BI by recommending a recklessly concentrated investment strategy that was not in David's best interest and was designed to enrich Roberts and Stifel at David's expense……….. p. 55

e.  Stifel and Roberts violated their duty of fair dealing…………………….. p. 56

f.  Roberts violated FINRA rules by making unbalanced and misleading sales presentations and representations……………………………………….. p. 57

g.  Roberts violated FINRA rules and Stifel's own compliance rules by making false, exaggerated, unwarranted and misleading statements and prohibited predictions and projections…………………………………………... p. 58

IX.  Stifel is liable for negligent supervision…………………………………………. p. 60

X.  Stifel is liable for fraud………………………………………………………. p. 64

XI.  Stifel is liable for breach of contract…………………………………………… p. 65

XII.  Delivery of written disclosures cannot cure Roberts' misrepresentations and material omissions………………………………………………………… p. 67

a.  FINRA has repeatedly emphasized that misrepresentations and omissions cannot be cured by the delivery of a written risk disclosure……………. p. 67

b.  The SEC emphatically rejects Stifel's erroneous defense that written risk disclosures can be used to cure Roberts' misrepresentations………… p. 69

c.  The law is equally clear that written risk disclosures cannot cure a broker's misrepresentations and material omissions……………………..… p. 70

XIII.   Stifel is not permitted to offset David's statutory losses with gains from profitable transactions……………….……………………………………………………..…... p. 72

XIV.   The out-of-pocket measure of damages is not the correct measure of damages in this case…………………………………………………………………………….. p. 75

XV.   David is entitled to benefit of the bargain damages………………..…………... p. 76

XVI.   Stifel's defenses rely on erroneous and legally unsupportable arguments…... p. 79

     a.   Stifel's claim for attorney's fees violates FINRA policy…………………. p. 79

     b.   Stifel's ratification defense is directly contradicted by the law…..……… p. 80

XVII.   Stifel's conduct was willful, wanton and demands an award of punitive damages……………………………………………………………………………… p. 82

## EXHIBIT INDEX

**EXHIBIT**

A.      Chuck Roberts' text messages with David Jannetti

B.      Chuck Roberts' text messages about the structured notes at issue

C.      SEC Order Instituting Administrative Cease and Desist Proceedings

D.      Chuck Roberts' text message about chiseling his clients

E.      Chuck Roberts' CRD

F.      Stifel's Structured Investments | Branch Manager Guide (relevant sections)

G.      Chuck Roberts' Structured Note Allocations

H.      David Jannetti's Solutions Program Client Agreement

I.      Philosophy Statement for the Solutions Program Strategic Allocation Model

J.      Chuck Roberts' Letter of Acceptance, Waiver and Consent

K.      Colorado Division of Securities' and New Jersey Bureau of Securities' heightened supervision requirements for Chuck Roberts

L.      FINRA Dispute Resolution Services Arbitrator's Guide (relevant sections)

M.       Regulation Best Interest

N.       Stifel's Policies and Procedures Manual (relevant excerpts)

**FINRA DISPUTE RESOLUTION**
**ARBITRATION PROCEEDING**

DAVID JANNETTI, SARAH LYN JANNETTI,              CASE NO.:  23-01342
ADAM JANNETTI, AND LEAH JANNETTI,

      Claimants,

v.

STIFEL, NICOLAUS & CO., INC.,

      Respondent.

_____/

## CLAIMANTS' PRE-HEARING BRIEF

Claimants, DAVID JANNETTI, SARAH LYN JANNETTI, ADAM JANNETTI and

LEAH JANNETTI, by and through undersigned counsel, hereby file their Pre-Hearing

Brief and state as follows:

### I. INTRODUCTION

STIFEL, NICOLAUS & CO., INC., ("STIFEL") is liable to the Claimants, DAVID

JANNETTI ("DAVID"), SARAH LYN JANNETTI ("SARAH"), ADAM JANNETTI ("ADAM")

and LEAH JANNETTI ("LEAH") (hereinafter may be referred to collectively as the

"JANETTIS")[1] for its own wrongdoing and the appalling misconduct of its employee,

Chuck Roberts' ("Roberts") in connection with: (i) DAVID'S structured note accounts; (ii)

DAVID'S Solutions Program account which were managed by Roberts on a discretionary

---

[1] Sarah, Adam, and Leah are David's children. As explained more fully herein, David was the primary point of contact with Stifel. For the purposes of this brief, reference to David and the Jannettis may be used interchangeably.



One Downtown | 1 SE 3rd Ave. | Suite 1670 | Miami FL 33131
Phone: 305.728.3320 / 1.888.840.1571 | Fax: 786.842.7549

basis; and (iii) the excessive and unsuitable use of leverage which only further magnified the risks to which DAVID was exposed.

Roberts is a broker with a disturbing history of misconduct who violated his fiduciary duty by misrepresenting his speculative and self-serving structured note strategy in order to generate massive commissions at the expense of his STIFEL customers.[2]

Roberts misrepresented his structured note strategy as a conservative, bond-like strategy that would generate an average yield of 12.25-13% while preserving capital. Contrary to Roberts' representations, it was actually a dangerously concentrated strategy involving high-risk structured notes.

Roberts' own text messages reveal that he misrepresented his structured notes and structured note strategy to DAVID as, amongst other things:

   i. "**I think they all are solid**";

   ii. "#4 and # 2 are **very solid**";

   iii. "**For your eyes only** my friend. Striking Friday. **I think these are super solid**";

   iv. "**You send me the $15MM, I will double the whole ball of wax in less than 5 years**"; and

   v. "**I always told you, the long term average will be around 12.25%**. If you cherry pick them, you will be above 13%."

Examples of Roberts' text messages to DAVID are attached hereto as Exhibit "A".

In fact, Roberts' own notes describe the structured notes as a "prudent" strategy for DAVID'S children.

---

[2] As explained more fully herein, Roberts himself actually created the structured notes at issue.



Roberts' verbal misrepresentations to DAVID are consistent with Roberts' misrepresentations about the structured notes to his other customers as, amongst other things:

i. "These notes are **money good**"[3];

ii. "This is really straight forward at this point…**the notes are money good**."

iii. "**The notes are slow and steady. Solid!**";

iv. "The strategy has performed exactly as advertised… **slow and steady for your retirement accounts**";

v. "**like watching paint dry making 3% per quarter**";

vi. "**there are some types of notes that are risky** and do not have full transparency. **Not what we are in**."

vii. "I'm going to opt towards **more conservative** for now";

viii. "trying to make you **a conservative double digits**";

ix. "**You will like 15% when the market goes through rough periods**… Its almost **like a substitution for bonds**… at 15%";

x. "**they are paying over 11%.** This is my way of balancing the account, making you double digits and **tempering volatility. This is the way I do it. Please trust me**.";

xi. "**average yield in the mid-12s with extra protection**"; and

---

[3] "Money good" is a term commonly used in the securities industry to describe an investment where the purchaser is assured of receiving 100% of their principal back. <u>See</u> <u>https://www.morningstar.com/funds/four-levels-income</u> ("Preservation Investments: Bonds, notes, cash… Not at risk/slightly at risk. Preservation is the simplest investment strategy. Buy a fixed-income security that will redeem at par on the maturity date, while providing cash along the way. If the issuer's credit remains intact--**meaning, in the vernacular, that the bonds are 'money good'--the buy-and-hold investor faces no price risk when purchasing the bonds, notes, or cash directly. Every penny paid will be returned**.")(Emphasis added.)



One Downtown | 1 SE 3rd Ave. | Suite 1670 | Miami FL 33131
Phone: 305.728.3320 / 1.888.840.1571 | Fax: 786.842.7549

xii. "**Paying 15% with lots of downside protection**"; (Emphasis added.)

Examples of Roberts' text messages are attached hereto as composite Exhibit "B".

Contrary to Roberts' misrepresentations, the structured notes at issue are not "solid", "slow and steady", "like watching paint dry", "money good", or "like a substitution for bonds at 15%"; the structured note strategy does not generate "a conservative double digit" returns or "temper volatility"; does not pay "15% when the market goes through rough periods", and does not have "a long-term average" of 12.25-13%, an "average yield in the mid-12s with extra protection", or an "average yield of 11.9%", as falsely represented by Roberts.

The structured notes at issue do not pay a predetermined yield. Instead, the notes offer contingent coupon payments that are only paid under specific circumstances based upon complex formulas linked to the performance of high-risk stocks and volatile equity market indices and sector indices. It is impossible to know in advance whether the structured notes will actually pay their contingent coupon payments because the notes' contingent coupon payments can only be determined at specific observation dates. As such, the structured notes' yield can only be calculated after the notes have matured or been called away.

Roberts' verbal misrepresentations to DAVID are consistent with his text messages to his other customers. In fact, Roberts recently testified, amongst other things that he did not represent to his STIFEL customers that the structured notes at issue were high risk, and that the above referenced text messages accurately reflect what Roberts



believed to be true about the structured notes at the time, that his verbal representations to his customers were consistent with those beliefs, and that his verbal representations to customers included the same or similar language and terminology as the above referenced text messages.

Roberts' text messages are the best and most credible evidence of what Roberts believed and represented about the material risks of structured notes and structured note strategy at issue. Despite the fact that Roberts sent tens of thousands of text messages about the structured notes at issue to his STIFEL customers and colleagues, none of Roberts' text messages refer to the notes as speculative or high-risk. On the contrary, Roberts' text messages convey just the opposite. Not only do Roberts' text messages establish that he misrepresented the structured note strategy to his customers, they also establish that Roberts failed to adequately understand or appreciate the risks of the structured note strategy he recommended, which in and of itself is a violation of the FINRA suitability rule.

This case is not a "he said, she said." There will be no credible dispute as to what Roberts represented to his STIFEL customers, including DAVID, about the structured notes at issue. DAVID accepted, believed and relied on Roberts' misrepresentations when investing in the structured notes at issue. At the final hearing, STIFEL will attempt to argue, as part of its defense, that DAVID should have known better than to believe and rely on the representations of his STIFEL advisor. In other words, STIFEL'S defense in this case is that brokerage firm customers like DAVID are required understand the material risks of an investment strategy better than their own STIFEL financial advisor

who recommended the strategy to them. STIFEL'S defense is untenable, unsupportable and directly contradicted by FINRA and the law.

Roberts made the above referenced misrepresentations, and countless others, through unmonitored and unsupervised text messages from his personal mobile device, which is strictly prohibited by STIFEL.[4] Roberts' violation of STIFEL'S prohibition against conducting business on his personal mobile device is not merely a technical rule violation, it is a substantive violation of a centrally important compliance rule designed to detect and prevent the very misconduct at issue in this case. By using his personal mobile device to conduct business with STIFEL clients in this clandestine manner, Roberts successfully and intentionally evaded supervision of his communications with STIFEL customers, including DAVID. As a result, Roberts' rampant misrepresentations went completely unsupervised and continued unabated for years.

In fact, on September 24, 2024, STIFEL agreed to pay **$35 million** to resolve charges by the Securities and Exchange Commission (SEC) and admitted to violating federal securities laws in connection with the exact same misconduct and supervisory failures at issue in this case, including "**Stifel's widespread failure to implement its policies and procedures that prohibit such communications**." A copy of the SEC Order Instituting Administrative Cease and Desist Proceedings is attached hereto as Exhibit "C".

---

[4] For the purposes of this brief, SMS messages and WhatsApp messages may be collectively referred to as "text messages."

Roberts conducted business from his personal mobile device under the erroneous belief that his text messages would never see the light of day. Roberts' text messages are nothing short of a proverbial smoking gun which reveal the truth about his verbal and written misrepresentations and his true financial motivation for implementing this reckless and self-serving strategy.

At the final hearing, STIFEL will attempt obstruct the admission of Roberts' own contemporaneous text messages about the structured notes at issue into evidence, then minimize and deflect attention away from Roberts' false and deceptive text messages. However, Roberts' text messages prove, in his own contemporaneous words, that he engaged in rampant misrepresentations about the structured note strategy at issue in order to enrich himself and STIFEL at the expense of his STIFEL customers. These text messages eliminate any doubts about the deceptive and misleading manner in which Roberts marketed and sold the structured note strategy at issue to his clients, including DAVID. It is not mere coincidence that Roberts limited his false representations about the structured notes to text messages from his personal mobile device, which he knew were not being monitored or supervised by STIFEL.

In addition to the substantial losses in structured notes, Roberts also caused DAVID to suffer significant losses in his Solutions Program account, which Roberts managed on a discretionary basis. As explained more fully herein, Roberts implemented a speculative investment strategy that was completely contrary to the Solutions Program investment philosophy that STIFEL approved and DAVID agreed to.

In just three years, STIFEL and Roberts' breach of fiduciary duty, negligence, negligent supervision, fraud, breach of contract and violation of the Florida Securities and Investor Protection Act caused DAVID to suffer a capital loss of **$19,526,603**.[5] DAVID'S statutory damages for violation of the Florida Securities and Investor Protection Act is **$26,504,291**.[6] DAVID'S benefit of the bargain damages are **$23,128,793**.[7] STIFEL and Roberts caused these losses by, amongst other things:

    i.   misrepresenting the structured note strategy as a conservative, bond-like strategy that will generate a yield of approximately 12.25-13% per year and preserve principal, when in reality it was a speculative, dangerously concentrated and excessively leveraged strategy involving high risk structured notes whose coupon payments and principal protections were entirely contingent on formulas linked to the performance of high risk stocks and volatile equity market indices (also known as the notes' "reference assets");

    ii.   misrepresenting and soliciting the sale of structured notes through unmonitored and unsupervised text messages from his personal mobile device in order avoid supervision by STIFEL, in violation of STIFEL'S own compliance policies;

    iii.   dangerously concentrating DAVID'S accounts with Roberts in high-risk and unsuitable structured notes;

    iv.   recklessly concentrating the DAVID'S structured notes linked to the same underlying reference assets;

---

[5] David's capital loss of **$19,526,603** is comprised of a capital loss of **$16,389,390** in the structured notes at issue and a **$3,137,213** capital loss in the Solutions Program account from inception through sale.

[6] As explained more fully herein, Fla. Stat. §517.211 provides a specific formula for the calculation of damages for violation of Fla. Stat. § 517.301.

[7] David's benefit of the bargain damages of **$23,128,793** are comprised of **$20,567,173** in the structured note accounts and **$2,516,622** in the Solutions Program account.



EREZ LAW
PROFESSIONAL LIMITED LIABILITY CORPORATION

One Downtown | 1 SE 3rd Ave. | Suite 1670 | Miami FL 33131
Phone: 305.728.3320 / 1.888.840.1571 | Fax: 786.842.7549

v.     recommending the excessive and unsuitable use of leverage, which only further magnified the already significant risks associated with Roberts' speculative and concentrated structured note strategy;

vi.    placing their own financial self-interest ahead of his customers in order to generate lucrative commissions and fees at the expense of his customers, including DAVID;

vii.   investing DAVID'S managed and discretionary Solutions Program account in a manner that was completely contrary to the Solutions Program model and philosophy that was approved by STIFEL and agreed to by DAVID; and

viii.  failing to adequately supervise Roberts despite having actual knowledge of his disturbing history of misconduct.

As explained more fully herein, Roberts and STIFEL owed DAVID a common law fiduciary duty in their non-discretionary accounts; a statutory fiduciary duty under the Investment Advisers Act of 1940 in the discretionary Solutions Program account; and a duty to act in DAVID'S best interest under SEC Regulation Best Interest (Reg BI) in all of their accounts. Roberts and STIFEL violated their duties and instead pursued their own financial interest at DAVID'S expense. During the three-year period from March 2021 to April 2023, Roberts sold DAVID **$68.4 million** of structured notes, generating in excess of **$1.2 million** in gross commissions.

Roberts has admitted to violating his fiduciary duty and pursuing his own financial self-interest at the expense of his clients' best interest. In a shockingly candid text message to his partner, Roberts stated: "**[Customer Name Redacted] gladly did this**



round of notes... **I'm calling and chiseling every motherf\*\*ker**."[8] (Emphasis added.) A copy of Roberts' text message is attached hereto as Exhibit "D". There can be no dispute that Roberts violated his duty to his clients when he admitted in his own words to "chiseling" them.

Regrettably, this case is not an isolated incident. Roberts' fraudulent and misleading sale of structured notes generated enormous commissions for himself and STIFEL. From 2016 to 2023, Roberts sold in excess of **$3.7 billion** of the structured notes at issue to his STIFEL clients, generating nearly **$61.4 million** in gross commissions.[9] Not surprisingly, Roberts is currently the subject of at least **18** strikingly similar customer complaints and/or FINRA arbitration claims involving the same structured notes and structured note strategy at issue. A copy of Roberts' CRD is attached hereto as Exhibit "E".

At the final hearing, it is anticipated that STIFEL will attempt to deflect attention away from Roberts' illicit conduct by emphasizing DAVID'S wealth, as if an investor's wealth gives a financial advisor a license to misrepresent the investments they recommend.

At the final hearing, the evidence will prove that STIFEL and Roberts' misconduct was financially motivated, willful, wanton and demands an award of punitive damages.

---

[8] Merriam-Websters defines "chiseling" as: "to employ shrewd or unfair practices on in order to obtain one's end."
[9] These figures represent only Roberts' sales of the structured notes that were sold to David and the other former Roberts customers who are also represented by Claimants' counsel, and do not reflect all of Roberts' sales of structured notes to all of Roberts' customers.

## II. <u>FACTS</u>

### a.  <u>Roberts lured David to become a client by misrepresenting his structured note strategy</u>

DAVID is a 57 year-old father of three. SARAH is 24 years old and is a recent college graduate. ADAM is 22 years old and also a recent college graduate. LEAH is 19 years old and is a college student.

DAVID founded a company called AT Conference which provides audio conferencing and web conferencing. DAVID sold AT Conference in 2016.

In or about early 2020, DAVID was introduced to Roberts through a mutual friend. DAVID informed Roberts that he had sold his business in 2016, and that he was no longer generating employment income.

Roberts solicited DAVID as a customer by touting the purported benefits of investing in Roberts' custom structured note strategy, and by touting his success in implementing his structured note strategy for his other clients. Roberts misrepresented his structured note strategy to DAVID as a conservative strategy that will generate an average "yield" of approximately 12.25-13%.

Based on Roberts' representations, DAVID agreed to invest with Roberts and ultimately opened the following accounts:

| ACCOUNT OWNER | ACCOUNT NUMBER |
|---|---|
| David Jannetti | XXXX-5990 |
| David Jannetti | XXXX-2778 |
| David Jannetti IRA | XXXX-9520 |
| David Jannetti and Sarah Lyn Jannetti | XXXX-1824 |
| David Jannetti C/F Leah Jannetti UTMA | XXXX-0689 |
| David Jannetti C/F Adam Jannetti UTMA | XXXX-0753 |



One Downtown | 1 SE 3rd Ave. | Suite 1670 | Miami FL 33131
Phone: 305.728.3320 / 1.888.840.1571 | Fax: 786.842.7549

| ACCOUNT OWNER | ACCOUNT NUMBER |
|---|---|
| David Jannetti and Adam Jannetti | XXXX-9502[10] |
| David Jannetti C/F Leah Jannetti Roth IRA | XXXX-7996 |
| Sarah Lyn Jannetti Roth IRA | XXXX-4870 |
| Adam Jannetti Roth IRA | XXXX-6794 |

### b. Roberts misrepresented the structured note strategy at issue as a conservative, bond-like strategy

Roberts targeted high net worth investors like DAVID for his self-serving and highly lucrative structured note strategy. Roberts falsely presented his structured note strategy to DAVID as a conservative, bond-like strategy that paid an average yield of 12.25-13%. See Exhibit "A". ("**I always told you, the long term average will be around 12.25%. If you cherry pick them, you will be above 13%.**")(Emphasis added.)

Roberts employed the same sales tactics and presented the structured notes at issue in the same deceptive and misleading the same way to virtually all his clients. Roberts' verbal misrepresentations to DAVID are consistent with the way Roberts misrepresented his structured note strategy to his other clients in clandestine and unsupervised text messages as described above. See Exhibit "B".

Roberts either failed to understand and appreciate the risks of the structured notes he sold, or he intentionally misrepresented them. Either way, Roberts violated his duties to his clients, including DAVID.

---

[10] Assets received via transfer from Account No.: XXXX-0753 on November 3, 2021.



One Downtown | 1 SE 3rd Ave. | Suite 1670 | Miami FL 33131
Phone: 305.728.3320 / 1.888.840.1571 | Fax: 786.842.7549

**c. Contrary to Roberts' misrepresentations, the structured notes and structured note strategy are speculative and high risk**

Contrary to Roberts' representations, the structured notes he recommended and sold to his customers, including DAVID, involved a high degree of risk and were not conservative, "prudent", "super solid", "money good" or "slow and steady", and were not like a substitute for bonds. Structured notes are a highly complex type of security that involves a debt instrument combined with a derivative (*i.e.* option) component. The derivative component is based upon a complex formula linked to the performance of one or more securities known as the "reference asset."[11] This formula determines whether the investor receives the structured note's scheduled contingent coupon payments at certain predetermined intervals, and also determines whether the investor receives the return of their principal upon maturity.

Structured notes typically offer some form of limited downside protection. For example, in the instant case, many of the structured notes at issue offered downside protection of 30%[12], which means that if the underlying reference asset has declined by *less* than 30% as of the quarterly "observation date", the investor receives the contingent coupon payment for that period. If the underlying reference asset has declined by *more* than 30% from the price on the date the note was issued, the investor does <u>not</u> receive

---

[11] A structured note's reference asset can be one or more individual stocks or exchange traded funds (ETF) that track the performance of an equity market index or equity sector index.

[12] Each structured note has its own unique terms, however the most common coupon barriers and maturity barriers for the structured notes at issue were between 25-30%.



One Downtown | 1 SE 3rd Ave. | Suite 1670 | Miami FL 33131
Phone: 305.728.3320 / 1.888.840.1571 | Fax: 786.842.7549

the contingent coupon payment for that period. This threshold is commonly referred to as the "coupon barrier."

Similarly, if the underlying reference asset has declined by *less* than 30% as of the structured note's maturity date, the investor receives 100% of their principle upon maturity. If, on the maturity date, the reference asset has declined by *more* than 30% from its price on the date the note was issued, the investor does <u>not</u> receive 100% of their principal upon maturity, and instead participates fully in the downside performance of the reference asset. For example, if the reference asset has declined by 40% as of the maturity date, the investor realizes a 40% loss and receives only 60% of their principal back at maturity. This threshold is commonly referred to as the "final barrier" or "maturity barrier."

Importantly, all of the structured notes that Roberts created and sold to his clients are known as "auto-callable" notes, which means that if, on any of the eight quarterly observation dates, the underlying stock or index has appreciated <u>at all</u> from its price on the date the note was issued, the structured note is automatically called away by the issuer and the investor receives the return of their principal but does not receive any further contingent coupon payments. This is commonly referred to as the "auto-call trigger."

In other words, there is only one specific circumstance where an investor receives all eight of the quarterly contingent coupon payments and the full return of their principal at maturity: if the underlying stock or index does not appreciate in price at all for two years

from the date of issuance through maturity, and also has not declined in price below the coupon barrier/ maturity barrier.

This auto-call feature is highly lucrative for Roberts and STIFEL because each time a structured note is called away by the issuer, the funds are then re-deployed into the purchase of a new structured note generating a new 1.75% commission for Roberts and STIFEL.

These kinds of structured notes are often described as offering investors the worst of both worlds, because if the underlying stock or index appreciates in value, the investor does not participate in the stock or index's upside performance; whereas if the underlying stock or index suffers a significant decline below the barrier threshold, the investor does not receive their contingent coupon payments and participates fully in the stock or index's downside performance.

In the instant case, the overwhelming majority of structured notes at issue fell into one of two categories: (i) structured notes linked to highly speculative and volatile technology related stocks such as Palantir, Dynatrace, Square, Match and DocuSign; and (ii) structured notes linked to complex formulas based upon the "worst performing" of three (3) exchange traded funds (ETFs) that tracked the performance of highly volatile equity sector indices such as the S&P Biotechnology Index (XBI) and S&P Regional Banking Index (KRE.)[13]

---

[13] As explained more fully herein, as of June 2021, **75.9%** of David's structured note holdings were linked to XBI and KRE.

These structured notes are known as "worst of" notes because the coupon barrier and maturity barrier are based on the "worst" performing of the three (3) underlying reference assets.

In the instant case, the structured notes at issue were custom products created by Roberts in conjunction with STIFEL'S structured note desk. In other words, Roberts personally selected the specific terms for the structured notes at issue, including the underlying stocks and indices, the coupon barriers and maturity barriers. Roberts created these custom structured notes for the specific purpose of selling them to his customers and generating staggering commissions for himself in the process.

Roberts repeatedly misrepresented to DAVID that the structured note strategy was a conservative strategy that would generate a long term average "yield" of approximately 12.25-13%. See Exhibit "A". ("**I always told you, the long term average will be around 12.25%. If you cherry pick them, you will be above 13%.**")(Emphasis added.)

As explained above, structured notes do not pay a predetermined "yield." It is impossible for Roberts or anyone else to know in advance whether a particular structured note will actually make some or all of its contingent coupon payments and whether the investor's principal will be preserved. Roberts' representations to DAVID that the structured notes would generate a long term average "yield" of 12.25-13% was pure speculation and a prohibited projection about the future performance of the notes and their underlying stocks and indices, all of which is strictly prohibited by FINRA and STIFEL. Contrary to Roberts' representations, DAVID did not receive the 12.25-13% yield that Roberts represented his structured note strategy would generate.

**d. Roberts needlessly magnified the already significant risks David was exposed to by implementing a recklessly concentrated structured note strategy**

Roberts needless magnified the already significant risks associated with his structured notes by implementing a recklessly concentrated strategy. Roberts did this in two ways: (i) by dangerously concentrating the DAVID'S STIFEL accounts in high-risk auto-callable structured notes; and (ii) by needlessly concentrating DAVID'S structured note holdings in notes that were linked to the same highly volatile stocks and indices.

For example, as of June 2021, Roberts concentrated **72.5%** of the assets in DAVID'S STIFEL accounts in high-risk auto-callable structured notes. Roberts' reckless concentration in structured notes violated STIFEL'S own internal policy which states:

> **Structured Investments should not make up more than 10% of assets in a conservative portfolio, 20% for moderate and 30% for aggressive**." (Emphasis added.)

A copy of the above referenced section of STIFEL'S Structured Investments | Branch Manager Guide is attached hereto as Exhibit "F".

Furthermore, Roberts recklessly concentrated DAVID'S structured note holdings in notes linked to XBI, an ETF that seeks to replicate the performance of the highly volatile S&P Biotechnology Index, and KRE, an ETF that seeks to replicate the performance of the volatile S&P Regional Banking Index.

As of June 2021, DAVID'S accounts with Roberts held **$16.56 million** of high-risk auto-callable structured notes, **75.9%** of which was concentrated in auto-callable worst of notes linked to XBI and KRE. Roberts' recklessly concentrated strategy only further magnified the already enormous risks DAVID was exposed to.



**e. Roberts knowingly and intentionally violated Stifel's strict prohibition against conducting business with clients through unmonitored and unsupervised text messages on his personal mobile device to evade supervision by Stifel**

Roberts conducted business with his STIFEL clients, including DAVID, through unsupervised and unmonitored text messages on his personal mobile device, which is strictly prohibited by STIFEL and prevented STIFEL from adequately supervising Roberts and detecting his rampant misconduct.

STIFEL has an obligation to supervise all business communications with its customers. Without access to Roberts' communications with customers, STIFEL cannot possibly supervise Roberts' dealings with those customers.

FINRA and SEC record retention rules and federal securities laws require broker-dealers like STIFEL to maintain copies of its employees' communications with their customers. The SEC has repeatedly emphasized that these record retention obligations are "**essential to investor protection**." See Exhibit "C". When STIFEL employees like Roberts use unmonitored and unsupervised personal mobile devices to engage in "off-channel" text message communications with their STIFEL clients, STIFEL does not have access to those communications, cannot supervise those communications, does not maintain copies of these communications and therefore violates its record retention obligations under FINRA rules, SEC rules and federal securities laws.

It is for precisely these reasons that STIFEL explicitly prohibits its employees from using their personal mobile devices to communicate with their STIFEL customers via text message. In fact, STIFEL'S Policies and Procedures Manual states, amongst other things:

EREZ LAW

> [p]lease remember that all business-related electronic communications must be conducted through your stifel.com or other approved e-mail address so that the Firm has proper retention of the communication and reviews can be conducted. **This means that you are prohibited from using SMS and/or text messaging for business-related communications**. (Emphasis added.)

Roberts' violation of STIFEL'S rules is not a mere technical violation, it is a substantive violation of essential compliance rules that exist to prevent the very misconduct at issue in this case.

In the instant case, Roberts knowingly and intentionally violated STIFEL'S prohibition against texting on personal mobile devices in order to avoid scrutiny and supervision by STIFEL, as evidenced by the fact that Roberts did *not* make these false and misleading representations to clients from this STIFEL email account which he knew was monitored and supervised by STIFEL. Instead, Roberts made these false and misleading statements exclusively through unmonitored and unsupervised text messages from his personal mobile device, which he knew was not being monitored or supervised.

In fact, Roberts recently testified that that he knowingly and intentionally violated STIFEL'S prohibition against texting with clients on his personal mobile device, and that he repeatedly made knowingly false representations to STIFEL that he was not conducting firm business on his personal mobile device.

On September 24, 2024, STIFEL agreed to pay **$35 million** to resolve charges by the SEC and admitted to violating federal securities laws in connection with this exact misconduct. Specifically, the SEC Order Instituting Administrative Cease and Desist Proceedings states:



**Respondent admits the facts set forth in Section III below, acknowledges that its conduct violated the federal securities laws**…

III.

On the basis of this Order and Respondent's Offer, the Commission finds that…

**The federal securities laws impose recordkeeping requirements on broker-dealers** and registered investment advisers to ensure that they responsibly discharge their crucial role in our markets. **The Commission has long said that compliance with these requirements is essential to investor protection** and the Commission's efforts to further its mandate of protecting investors…

These proceedings arise out of the **widespread and longstanding failure of Stifel's personnel, including at senior levels, to adhere to certain of these essential requirements and Stifel's own policies and procedures.** Using their personal devices, these personnel communicated both internally and externally by text messages…

**Stifel's supervisors, who were responsible for supervising junior personnel, routinely communicated off-channel using their personal devices**…

**Stifel's <u>widespread failure</u> to implement its policies and procedures that prohibit such communications led to its <u>failure to reasonably supervise its personnel</u>** within the meaning of Section 15(b)(4)(E) of the Exchange Act and Section 203(e)(6) of the Advisers Act…

**Stifel's personnel were advised that the use of unapproved electronic communications methods, including on their personal devices, was not permitted**, and they should not use personal email, chats or text messaging applications for business purposes…

**Stifel failed to implement a system reasonably expected to determine whether all personnel, including supervisors, were following Stifel's policies and procedures**. While permitting personnel to use approved communications methods for business



One Downtown | 1 SE 3rd Ave. | Suite 1670 | Miami FL 33131
Phone: 305.728.3320 / 1.888.840.1571 | Fax: 786.842.7549

communications, **Stifel failed to implement sufficient monitoring to ensure that its recordkeeping and communications policies were being followed**…

As a result of the conduct described above, **Stifel willfully violated Section 17(a) of the Exchange Act and Rule 17a-4(b)(4)**…

As a result of the conduct described above, **Stifel failed reasonably to supervise its personne**l with a view to preventing or detecting certain of its supervised persons' aiding and abetting violations of Section 17(a) of the Exchange Act and Rule 17a-4(b)(4)…

As a result of the conduct described above, **Stifel willfully violated Section 204 of the Advisers Act and Rule 204-2(a)(7)**…

As a result of the conduct described above, **Stifel failed reasonably to supervise its personnel** with a view to preventing or detecting certain of its supervised persons' aiding and abetting violations of Section 204 of the Advisers Act and Rule 204-2(a)(7)…

Respondent shall, within 14 days of the entry of this Order, pay a **civil money penalty in the amount of $35,000,000** to the Securities and Exchange Commission… (Emphasis added.)

See Exhibit "C".

As clearly illustrated above, the SEC's investigation determined that STIFEL and its employees, including supervisors, engaged in "widespread" misconduct, failed to reasonably supervise STIFEL employees, failed to maintain an adequate system of supervision and willfully violated federal securities laws.

In the instant case, Roberts sent these false and misleading text messages under the mistaken belief that his clandestine communications would never see the light of day. Roberts' text messages reveal precisely how he misrepresented the structured notes and structured note strategy at issue to DAVID and his other STIFEL clients. Had STIFEL



been supervising its employees, Roberts' false and misleading representations could have been detected and DAVID'S losses could have been avoided.

### f. Roberts' designed a self-serving business model of selling the same auto-callable structured notes to his clients in order to generate enormous commissions for himself at his clients' expense

Roberts' structured note strategy at issue was not unique to DAVID, but rather was just one example of Roberts' business model of selling the same auto-callable structured notes to his STIFEL clients in order to enrich himself at his clients' expense.

The structured notes at issue were customized notes created by Roberts, in coordination with STIFEL'S structured products desk, for the express purpose of selling the structured notes to Roberts' STIFEL clients. Roberts selected the structured notes' underlying reference asset(s), coupon barrier and maturity barrier to create structured notes that Roberts then sold to his clients. Roberts created a new "round" or "batch" of structured notes approximately once per month to sell to as many customers as he could.

For each new batch of notes, Roberts created a generic model allocation of the newly created notes which he used as a template to sell an identical allocation of notes from that batch to his STIFEL customers, regardless of their age, investment objectives, risk tolerance, employment status, tax status, net worth or other customer specific suitability factors. Examples of Roberts' generic structured note allocation templates are attached hereto as Exhibit "G."

Roberts' structured note strategy was incredibly lucrative for Roberts and STIFEL. From 2016 to 2023, Roberts sold in excess of **$3.7 billion** of structured notes to his STIFEL clients, generating nearly **$61.4 million** in gross commissions. These figures

represent only Roberts' sales of the structured notes sold to DAVID and the other former Roberts customers who are represented by Claimants' counsel. In other words, these figures represent only a portion of Roberts' total sales of structured notes during this period.

In 2021 alone, Roberts sold nearly **$1.3 billion** of structured notes to his STIFEL customers, generating gross commissions in excess of **$21.4 million**.[14]

In his internal communications with STIFEL colleagues, Roberts referred to the highly lucrative monthly or bimonthly issuance and sale of each new batch of structured notes as "note week." Roberts' text messages reveal his true motivation for his business model of aggressively soliciting and implementing the same auto-callable structured notes to his customers. For example, when discussing his successful solicitation of a new round of structured notes with a colleague, Roberts stated:

> **Looks like we will get filled on that note with KRE. Another sick month**. (Emphasis added.)

The "sick month" Roberts was referring to in this text message is June 2021, when Roberts sold in excess of **$143 million** of structured notes to his STIFEL clients, generating gross commissions in excess of **$2.5 million**.

---

[14] As stated above, these figures represent only Roberts' sales of the structured notes sold to David and the other former Roberts customers who are represented by Claimants' counsel. In other words, these figures represent only a portion of Roberts' total sales of structured notes during this period.

Roberts himself admitted that he misled and took advantage of his clients for his own benefit. For example, in a moment of complete candor, Roberts sent the following text message to a colleague about a newly created batch of structured notes:

> **[Customer Name Redacted] gladly did this round of notes**… **I'm calling and chiseling every motherf\*\*ker**. (Emphasis added.)

See Exhibit "D". This text message by Roberts is a vile but candid admission in Roberts' own words, that Roberts' business model was to aggressively prioritize his own financial self-interest and reveals Roberts' disregard for the best interest of his clients.

### g. Roberts recommended the excessive and unsuitable use of leverage, which only further magnified the risks associated with his speculative structured note strategy

Roberts recommended the excessive and unsuitable leveraged strategy, which served to magnify the level of risk to which DAVID was exposed and also further increased the amount of commissions that Roberts generated from DAVID'S accounts. Roberts recommended that DAVID borrow the funds on margin: (i) to invest in structured notes that Roberts recommended; and (ii) to pay capital calls. Roberts represented that DAVID could use his brokerage accounts as collateral, borrow at a low interest rate and earn the difference or spread between the return on the structured notes and other investments Roberts recommended, and the interest rate on the margin loan. Regrettably, DAVID followed Roberts' recommendation.

In addition, Roberts recommended DAVID invest **$5.6 million** of mortgage proceeds, which Roberts used to purchase additional structured notes. Roberts violated



STIFEL compliance policies by failing to have this highly aggressive strategy reviewed by his supervisors.

Roberts' excessively leveraged strategy was unsuitable because, amongst other things, DAVID had a very limited ability to meet material margin calls in the event his accounts declined in value, which is exactly what ultimately occurred. At its peak in 2022, DAVID'S margin loan balance exceeded **$12.6 million**. As a matter of common sense, the only reason DAVID agreed to Roberts' recommendation to use this amount of leverage, is because of Roberts' repeated misrepresentations that the structured note strategy he recommended was conservative.

Roberts' dangerously concentrated and excessively leveraged strategy resulted in a dangerously precarious portfolio that allowed almost no room for error and created a virtual tinderbox that would cause DAVID to suffer devastating losses in the event the underlying stocks or indices experienced significant volatility, which is exactly what occurred.

Furthermore, when interest rates increased, the interest that STIFEL charged DAVID on the margin loan also increased. In total, STIFEL charged DAVID **$336,834** in margin interest in just three years.

EREZ LAW
PROFESSIONAL LIABILITY CORPORATION

### h. As the structured notes declined in value, Roberts recommended David continue to hold his structured notes and continue with the leveraged strategy

As Roberts' structured note strategy began to incur losses, Roberts recommended DAVID continue to hold his structured notes and continue with Roberts excessively leveraged and concentrated structured note strategy.

For example, as DAVID'S accounts declined in value, Roberts repeatedly reassured DAVID that recent market volatility was a "**classic head fake**" that was "**washing out the weak people in the market**", "**a temporary blip**" and "**We will look back in 6 months and realize this downturn was just one big damn head fake**." (Emphasis added.)

Roberts repeatedly told DAVID and his other customers not to worry, that everything would be fine, and reassured them that they had not actually suffered any losses because the structured notes would repay the investors' principal upon maturity, which was still many months away.

For example, as the structured notes continued to decline in value, Roberts repeatedly reassured his clients by stating, amongst other things: "if the markets go down, **the notes don't reflect the downside protection. We are all good**"; "**I'm confident we are not going down 25-30%. A 10-12% correction can happen any time. Our notes are fine**"; "**All good pal. The notes are doing what they are supposed to be doing. We have nothing maturing until 2023 so nothing to worry about**"; "**I repeat, no money has been lost as of yet in the notes and when we make a purchase each time, they are to be held until maturity for 2 years**…"; "**it's not a real decline**"; and



One Downtown | 1 SE 3rd Ave. | Suite 1670 | Miami FL 33131
Phone: 305.728.3320 / 1.888.840.1571 | Fax: 786.842.7549

"**We have not lost any money unless you sell**. **Which would *not* be the right move**…" (Emphasis added.)

Roberts' text messages are consistent with his verbal recommendations and representations to DAVID. Roberts recommended that DAVID continue to hold his structured notes and continue with the leveraged strategy. Roberts repeatedly reassured DAVID not to worry about price fluctuations in the structured notes because he would purportedly receive the full return of his principal upon maturity. In reality, once the reference asset's price declines below the coupon/maturity barrier, the structured note stops paying its contingent coupon payments and provides no principal protection. Regrettably, DAVID followed Roberts' recommendation and sustained massive losses.

### i. Roberts implemented a high-risk discretionary investment strategy in David's managed accounts that was completely contrary to the strategy that Stifel approved and David agreed to

DAVID maintained an account enrolled in STIFEL'S discretionary "Solutions" program, which is a managed account platform wherein his STIFEL adviser, Roberts, had discretionary trading authorization over the account. In the instant case, DAVID'S Solutions account was managed by Roberts, which means that Roberts managed the accounts and entered trades without DAVID'S prior knowledge or authorization.

DAVID was enrolled in a model-based strategy whereby the adviser develops an investment strategy in which the accounts are managed pursuant to a specific investment portfolio in accordance with the model's stated philosophy. Solutions Program portfolios must be vetted and approved by STIFEL before they can be implemented in customers' accounts.

STIFEL describes its Solutions Program as follows:

> The **Stifel Solutions Program** is designed for investors looking for the convenience of individualized investment management services offered directly through their trusted Stifel Financial Advisor.
>
> **In this program, approved Stifel Financial Advisors manage your assets <u>on a discretionary basis</u> through the consistent application of a <u>pre-screened investment process</u>** that may use a variety of investment styles, from conservative to aggressive. **Advisors in this program <u>must</u> meet the strict criteria of Stifel's Investment Review Committee** before receiving authorization to personally manage your investments. **Once approved, <u>the advisor must adhere to specific program parameters</u> that help ensure portfolio diversification.**
>
> **All investment decisions in a Solutions account are made by the Stifel Financial Advisor on your behalf <u>without receiving prior approval</u>**, allowing us to react quickly to market conditions in order to execute the investment strategy…

Despite STIFEL'S representation that Solutions advisors "must adhere to specific program parameters that help ensure portfolio diversification", Roberts flagrantly violated STIFEL'S own "strict" criteria.

Specifically, DAVID enrolled in a model called CR Group Strategic Allocation ("Strategic Allocation")[15] which involves an investment philosophy using a blend of equity and fixed income, and approximately 75% of the account is invested with third party managers, who will primarily invest in mutual funds and ETFs. A copy of DAVID'S Client Agreement Confirmation reflecting their enrollment in the Strategic Allocation portfolio is attached hereto as Exhibit "H".

---

[15] The "CR Group" is a reference to Chuck Roberts and his team at Stifel.



One Downtown | 1 SE 3rd Ave. | Suite 1670 | Miami FL 33131
Phone: 305.728.3320 / 1.888.840.1571 | Fax: 786.842.7549

When applying for STIFEL'S approval of a Solutions Program portfolio, advisors are required to submit an "Investment Philosophy Statement" that provides specific details about the proposed portfolio's investment philosophy and strategy. In the instant case, the Strategic Allocation portfolio's Investment Philosophy Statement that was approved by STIFEL describes the Strategic Allocation portfolio as follows:

**This Philosophy Statement is a way in which to document the investment process that will be utilized with your new model**

**INVESTMENT PHILOSOPHY**
1. Please indicate which strategy you will be implementing…

**Portfolio Strategy**
☐ Equity Only (Should not include Fixed income Securities)
☐ Fixed Income Only (Should not include Equity Securities)
✓ **Blended Portfolio**…

**Target number of holdings: 40-50**

3. Please provide a general description of your strategy, including the appropriate style description.
     ... Our portfolio is about **75% 3rd party money managers**… We typically rebalance our portfolio once a quarter.

4. Please describe **the objective of your strategy** along with how you would position it within a client's investable assets.
     Typically, our allocation falls in a **moderate growth risk bucket**… **The overall objective is to mitigate portfolio risk via diversification** but maintain solid/stable long term returns…

6. Please describe your portfolio construction process and describe how positions will be allocated within a portfolio.
     Please see questions 5 as **we primarily use 3rd party managers (Mutual Funds/ETFs)**…

12. What is the appropriate **benchmark for this model?**
     **Blended: S&P 500 (40%), Russell 2000 (15%), EAFE (10%), EM (5%), Barclays AGG (30%)**



A copy of the Investment Philosophy Statement for the Strategic Allocation Model is attached hereto as Exhibit "I".

Despite the fact that DAVID agreed to invest his Solutions Program account in a "**blended portfolio**" of "**75% 3rd party money managers**" who primarily invest in "**mutual funds or ETFs**" with an "**overall objective to mitigate risk via portfolio diversification**", the strategy that Roberts actually implemented in DAVID'S Solutions Program account bore no resemblance to the Strategic Allocation model that was vetted and approved by STIFEL.

Specifically, Roberts implemented a speculative strategy of investing virtually 100% of DAVID'S Solutions Program account in individual stocks, the majority of which were concentrated in the volatile technology sector. For example, as of June 2022, **76%** of DAVID'S Solutions Program account concentrated in just three high risk stocks: the information technology company Datadog, the defunct cryptocurrency lender Silvergate Capital[16] and the cybersecurity technology company Crowdstrike.

Roberts' speculative and concentrated equity strategy was completely contrary to, and significantly riskier than, the Strategic Allocation strategy approved by STIFEL and authorized by DAVID. STIFEL either failed to realize that Roberts' investment strategy deviated radically from the Strategic Allocation philosophy, or did realize and failed to take any corrective action. In either event, STIFEL'S supervisory failure is inexcusable and indefensible.

---

[16] In March 2023, Silvergate Capital entered into a Consent Order with the Federal Reserve whereby it agreed to undergo a "voluntary liquidation."

**EREZ LAW**
PROFESSIONAL LIMITED LIABILITY CORPORATION

To make matters worse, Roberts' speculative trading in DAVID'S Solutions Program account caused DAVID'S Solutions Program account to be flagged numerous times by STIFEL for exceeding STIFEL'S own sector concentration and security concentration limits. Despite repeatedly generating internal alerts for violation of STIFEL'S own concentration limits, STIFEL failed to take corrective action and conducted no meaningful supervision of Roberts' handling of DAVID'S Solutions Program account.

### j. Roberts and Stifel caused David to suffer significant losses

In 2022, Roberts stopped selling structured notes linked to individual stocks and XBI. In fact, Roberts recently testified that in January 2022, he made a reasonable basis suitability determination to no longer offer structured notes linked to individual stocks and XBI to any of his customers. Roberts concealed from DAVID that he no longer considered structured notes linked to individual stocks or XBI to be suitable for any customer to invest in.

In 2022, DAVID'S accounts plummeted in value, triggering a series of margin calls that resulted in DAVID realizing enormous losses.

For example, in May 2022, Roberts' excessively leveraged strategy caused DAVID'S account to experience a margin call. In order to meet the margin call, DAVID was forced to liquidate two structured notes for a realized a loss of **$2,211,512**.

In June 2022, Roberts' excessively leveraged strategy caused DAVID'S account to generate another margin call, forcing DAVID to deposit additional funds into his account.

In September 2022, Roberts' excessively leveraged strategy caused DAVID'S account experience additional margin calls, forcing DAVID to liquidate structured notes and stocks for a realized loss of **$7,460,000**.

In October 2022,  Roberts' excessively leveraged strategy caused DAVID'S account to generate additional margin calls, forcing DAVID to liquidate stock and structured notes for a realized loss of **$1,278,175**.

In November 2022,  Roberts' excessively leveraged strategy caused DAVID'S account to generate additional margin calls, forcing DAVID to liquidate additional structured notes and stocks for a total realized loss of **$2,990,085**.

From February 2020 to April 2023, Roberts' risky and unsuitable investment strategies caused DAVID to suffer a capital loss of **$19,526,603** and benefit of the bargain damages of **$23,128,793**. Roberts caused these losses while generating in excess of **$1.2 million** in commissions and fees for himself and STIFEL, at DAVID'S expense.

DAVID'S statutory damages pursuant to the Florida Securities and Investor Protection Act (Fla. Stat. §517.301) are **$26,504,291**.

### k. Roberts' misconduct and David's losses are the predictable result of Stifel's failure to adequately supervise Roberts despite having actual knowledge of Roberts' disturbing history of misconduct

DAVID'S losses are the predictable result of STIFEL'S failure to adequately supervise Roberts despite having actual knowledge of his disturbing history of misconduct.

STIFEL knew of Roberts' troubling past when it hired him in 2016 and chose to take a calculated risk by hiring a known bad actor in the hopes of enhancing profits.



Roberts' misconduct at issue is the entirely foreseeable result of STIFEL'S decision to prioritize profits over customer protection.

Roberts' disturbing pattern of misconduct dates spans virtually his entire professional career. In 1994 Roberts was the subject of a customer complaint while employed at PaineWebber. Nine months later, Roberts received a second customer complaint for unauthorized trading and was permitted to "resign" from PaineWebber that same day. In 2000, Roberts was the subject of an arbitration claim alleging failure to diversify, improper use of margin debt and unsuitability. In 2003, Roberts was the subject of another arbitration claim alleging misrepresentations, over concentration and unsuitability. In 2004, Roberts was the subject of another customer complaint for unauthorized trading. In 2008 Roberts was the subject of another arbitration claim alleging misrepresentations, over concentration, unsuitability and fraud. In 2010 Roberts was the subject of yet another arbitration claim involving allegations of unauthorized trading, fraudulent misrepresentations, fraudulent concealment, unsuitable investments and the excessive use of margin. In 2013, a FINRA arbitration found Roberts personally liable for **$185,848** in that matter.

In total, Roberts had been the subject of at least **seven (7)** lawsuits and/or customer complaints resulting in at least **$986,000** in arbitration awards and settlements at the time he was hired by STIFEL. See Exhibit "E".

In addition to his extensive history of customer complaints and lawsuits, Roberts also had an extensive regulatory history at the time he was hired by STIFEL. In 2007, Roberts was suspended for 30 days and placed on heightened supervision for 12 months

by his employer, Morgan Stanley, for: (i) improperly altering customer email addresses in Morgan Stanley's records so that trade confirmations and other email communications intended for Roberts' customers were instead sent to Roberts' sales assistant; and (ii) improperly purchasing 45 initial public offerings (IPO) in accounts maintained in his mother-in-law's name and concealing her relationship to him from his employer.

In 2010, Roberts was censured, suspended for 28 days and fined **$40,000** by FINRA in connection with the same misconduct. Specifically, Roberts' Letter of Acceptance, Waiver and Consent (AWC) states:

### A. <u>FACTS AND VIOLATIVE CONDUCT</u>

### <u>Altering Customer E-Mail Addresses</u>

… In or about March of 2005, the Group… **replaced a total of 51 customer email addresses with the Sales Assistant's Firm e-mail address**… Respondents had knowledge of this conduct at the time that it occurred.

### <u>Trading in IPOs-Roberts</u>

… **Roberts did not disclose to the Firm that the individual who owned the accounts was his mother-in-law**… immediately after Robert's mother-in-law opened her accounts… **she was allocated shares with respect to 45 IPOs**…

### <u>Discipline Imposed and Remedial Steps<br>Taken bv the Firm</u>

**Respondents were each suspended for 30 days without pay. Additionally, Respondents were both placed on special supervision for a period of 12 months**…



One Downtown | 1 SE 3rd Ave. | Suite 1670 | Miami FL 33131
Phone: 305.728.3320 / 1.888.840.1571 | Fax: 786.842.7549

## B. <u>SANCTIONS</u>

… **Roberts – A censure; a four week suspension from association with any FINRA member in any capacity and a fine of $40,000**. (Emphasis added.)

A copy of Roberts' AWC is attached hereto as Exhibit "J".

In 2010, the Illinois Secretary of State sought to revoke Roberts' license to sell securities in Illinois before ultimately agreeing to a fine and an agreement that Roberts would conform with all restrictions imposed by his employer and FINRA. <u>See</u> Exhibit "E".

All of these incidents occurred *prior* to STIFEL hiring Roberts. STIFEL cannot now deny that it had actual knowledge of Roberts' disturbing history of misconduct when it hired him in 2016.

Furthermore, immediately upon being hired by STIFEL, the Colorado Division of Securities and New Jersey Bureau of Securities each separately required Roberts to be subject to heightened supervision restrictions for a period of two years, in order to be granted a conditional license to sell securities in Colorado and New Jersey. Copies of STIFEL'S internal memoranda documenting Roberts' registration conditions and heightened supervisory requirements by the Colorado Division of Securities and New Jersey Bureau of Securities are attached hereto as composite Exhibit "K".

In December 2018, STIFEL itself placed Roberts under similar heightened supervision restrictions, but inexplicably lifted the restrictions shortly thereafter.

Roberts' customers' accounts, including DAVID'S, generated a significant number of internal compliance alerts for violations of STIFEL'S own internal policies regarding concentration limits. Despite the fact that Roberts' customers' accounts were generating

a high volume of internal compliance alerts, STIFEL failed to take any meaningful corrective action.

In 2020, Roberts moved to Miami. Despite Roberts' disturbing history of misconduct, STIFEL permitted Roberts to work remotely from Miami while being supervised from over 1,000 miles away by his former branch manager in New York City. According to recent testimony from Roberts' own team member and head of due diligence who followed Roberts to Miami from New York, Roberts worked remotely from home approximately 75% of time in Miami.

Despite Roberts' documented pattern of customer complaints, FINRA rule violations, employment suspensions, regulatory sanctions and heightened supervision requirements, Roberts' STIFEL supervisors in New York did not make a single visit to Miami to supervise Roberts in 2020, 2021 or 2022.

Roberts' misconduct and DAVID'S losses are the entirely predictable and foreseeable result of STIFEL'S decision to hire a known bad actor and permit him to operate without any meaningful oversight or supervision.

### III. <u>FLORIDA LAW GOVERNS THIS PROCEEDING</u>[17]

Florida law governs this proceeding because, amongst other things: (i) this proceeding is venued in Florida; (ii) DAVID and Roberts were both Florida residents during the relevant time period; (iii) DAVID'S accounts were maintained at STIFEL'S

---

[17] In 1981, the Fifth Circuit Court of Appeals Reorganization Act created the Eleventh Circuit Court of Appeals and transferred the judicial districts of Alabama, Georgia, and Florida to the newly created Eleventh Circuit. Fifth Circuit decisions made prior to October 1, 1981, are binding and controlling on the Eleventh Circuit.

Miami, Florida branch; DAVID'S relationship with Roberts and STIFEL was centered in Florida; (iv) Roberts' misrepresentations, unsuitable recommendations and other wrongful conduct at issue occurred in Florida; and (v) DAVID'S losses at issue were suffered in Florida. <u>See</u> <u>Open Sea Distribution Corp. v. Artemis Distribution, LLC</u>, 692 F.Supp.3d 1151 at 1174 (M.D. Fla. 2023)("The court also applies the choice-of-law rules of the forum state."); <u>See</u> <u>also</u>, <u>Trumpet Vine Investments, v. Union Capital Partners I, Inc.</u>, 92 F.3d 1110 (11th Cir. 1996)("[a]s to tort claims, the Florida Supreme Court has abandoned the traditional *lex loci delicti* rule in favor of the 'most significant relationship' test… Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered."); and <u>Lambert v. Melia Hotels Int'l</u>, 526 F.Supp.3d 1207 1224 (S.D. 2021)("Generally, in tort cases, the location where the injury occurred is the decisive consideration in determining the applicable choice of law.")

### IV. <u>THE BURDEN OF PROOF FOR DAVID TO PREVAIL ON HIS CLAIMS IS A "PREPONDERANCE OF THE EVIDENCE"</u>

The burden of proof for DAVID to prevail in this FINRA arbitration is a "preponderance of the evidence", *i.e.* more likely than not. <u>See</u> FINRA Office of Dispute Resolution Arbitrator's Guide, p. 66 (March 2024 Ed.)("**If the panel is satisfied by a preponderance of the evidence** that the respondent is liable for the alleged loss, the panel should determine an appropriate remedy.")(Emphasis added.) A copy of the above



referenced section of the FINRA Arbitrator's Guide is attached hereto as Exhibit "L". <u>See</u> also, <u>South Florida Water Management Dist. V. RLI Live Oak, LLC</u>, 139 So.2d 869 at 872 (Fla. 2014)("[a] preponderance of the evidence standard is the applicable burden of proof in civil cases…**[a] 'preponderance' of the evidence is defined as 'the greater weight of the evidence**…")(Emphasis added.); <u>See</u> <u>also</u>, <u>In re: Kutchins</u>, 2008 WL 5633634 at *4 (M.D. Fla. 2008)("**<u>The preponderance of the evidence standard is the lowest standard of proof</u> in a civil proceeding**... **To prevail, a party need only have stronger evidence 'however slight the edge may be**.'")(Emphasis added.)

In the instant case, a preponderance of the evidence will prove that STIFEL is liable to DAVID for its fraudulent and reckless misconduct, breach of fiduciary duty, negligence, violation of its contractual obligations, violation of Florida securities laws, supervisory failures and other wrongdoing which caused DAVID to suffer a capital loss of **<u>$19,526,603</u>** and benefit of the bargain damages of **<u>$23,128,793</u>**.

## V. <u>ROBERTS AND STIFEL OWED DAVID A DUTY<br>TO ACT IN DAVID"S BEST INTEREST</u>

Roberts and STIFEL owed DAVID a duty to act in DAVID'S best interest. Specifically, in June 2020, SEC Regulation Best Interest went into effect. Reg BI provides, in relevant part:

> **§ 240.15l-1 Regulation best interest.**
>
> **(a) Best interest obligation.**
> (1) **A broker, dealer, or a natural person who is an associated person of a broker or dealer**, when making a recommendation of any securities transaction or investment strategy involving securities (including account recommendations) to a retail customer, **shall act in the best interest of the retail customer** at the time the



EREZ LAW
PROFESSIONAL LIMITED LIABILITY CORPORATION

One Downtown | 1 SE 3rd Ave. | Suite 1670 | Miami FL 33131
Phone: 305.728.3320 / 1.888.840.1571 | Fax: 786.842.7549

recommendation is made, **without placing the financial or other interest of the broker, dealer, or natural person who is an associated person of a broker or dealer making the recommendation ahead of the interest of the retail customer**. (Emphasis added.)

A copy of Reg BI is attached hereto as Exhibit "M".

As clearly illustrated above, Reg BI required Roberts and STIFEL to act in DAVID'S best interest and prohibited them from placing their own financial self-interest ahead of DAVID'S best interest. Regrettably, Roberts and STIFEL placed their own financial interest ahead of their clients and violated their obligations under Reg BI.

## VI. STIFEL IS LIABLE TO DAVID FOR VIOLATION OF THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT

Roberts' misrepresentations, material omissions and other wrongful conduct in connection with the sale of securities to DAVID constitute violations of the Florida Securities and Investor Protection Act. Florida law is clear that where a broker is untruthful in the sale of securities, the investor can rescind the transactions. In E.F. Hutton & Company, Inc. v. Rousseff, 537 So.2d 978 (Fla. 1989) the Supreme Court of Florida held that in order to succeed on a claim under the Florida Securities and Investor Protection Act, an investor must prove the following: "**Section 517.211 says that if a seller (or buyer) is untruthful in a sale, the buyer (or seller) can rescind the transaction and get his money back**." Id. at 981. (Emphasis added.) The Supreme Court of Florida's holding in Rousseff merely condensed Fla. Stat. §517.301 which states:

(1) **It is unlawful and a violation of the provisions of this chapter for a person**:



(a) **In connection with the rendering of any investment advice or in connection with the offer, sale, or purchase of any investment or security**, including any security exempted under the provisions of s. 517.051 and including any security sold in a transaction exempted under the provisions of s. 517.061, directly or indirectly:

1. **To employ any device, scheme, or artifice to defraud**;

2. **To obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading**; **or**

3. **To engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person**.

Id. (Emphasis added.)

In the instant case, Roberts rendered investment advice and sold securities to DAVID by means of untrue statements of material fact and omissions of material facts. As such, STIFEL is liable for violations of the Florida Securities and Investor Protection Act.

The law is also clear that unsuitable recommendations are also a violation of Fla. Stat. §517.301.. See Newsom v. Dean Witter Reynolds, Inc., 558 So.2d 1076 at 1077 (Fla. 1st DCA 1990)("Contrary to appellee's argument, **an unsuitable trading violation of Section 517.301(1), Florida Statutes, is not merely technical. Just like churning, it is statutory fraud**.")(Emphasis added.)

As explained more fully below, the Florida Securities and Investor Protection Act is clear that once this Panel determines that STIFEL violated Fla. Stat. §517.301, DAVID



is entitled to statutory damages in the amount of **$26,504,291**[18] plus attorney's fees

pursuant to Fla. Stat. §517.211.

### a. David is not required to prove "scienter" because the standard for establishing a violation of Fla. Stat. §517.301 is "mere negligence"

DAVID is not required to establish scienter (*i.e.* the intent to deceive) in order to

prevail on his claim for violation of Fla. Stat. §517.301. In <u>Merrill Lynch v. Byrne</u>, 320 So.

2d 436 (Fla. 3rd DCA 1975), an investor brought suit against his broker-dealer for violation

of Fla. Sta. §517.301 after the broker-dealer executed a trade that was markedly different

that the transaction the investor had authorized. <u>Id</u>. The trial court ruled in favor of the

investor and the broker-dealer appealed. <u>Id</u>. On appeal, the Court held:

> **We think the better Federal decisions and the clear weight of authority is that <u>scienter is not necessary to recovery</u>**.

<u>Id.</u> at 440 (Emphasis added.)

The law is equally clear that the standard for establishing a violation of Fla. Stat.

§517.301 is "mere negligence". When addressing this issue in <u>Gochnauer v. A.G.</u>

<u>Edwards & Sons</u>, 810 F.2d 1042 (11th Cir. 1987) the Eleventh Circuit Court of Appeal

held:

> The Florida statutory requirements [517.301] are identical to Rule 10b-5… except that **the scienter requirement under Florida law is satisfied by a showing of mere negligence**...

<u>Id</u>. at 1046.(Emphasis added). <u>See</u> <u>also</u>, <u>Grippo v. Perazzo</u>, 357 F.3d 1218 at 1222 (11th

Cir. 2004)("The elements of a cause of action under § 517.301 are identical to those under

---

[18] David's statutory damages of **$26,504,291** are comprised of **$21,175,600** in the structured note accounts and **$5,328,692** in the Solutions Program account.



One Downtown | 1 SE 3rd Ave. | Suite 1670 | Miami FL 33131
Phone: 305.728.3320 / 1.888.840.1571 | Fax: 786.842.7549

the Federal Rule 10b–5, except that **the scienter requirement under Florida law is satisfied by showing of mere negligence**.")(Emphasis added.); and <u>Arnold v. McFall</u>, 839 F.Supp.2d 1281 at 1286 (S.D. Fla. 2011) ("The elements of a cause of action under Section 301 are identical to those under Rule 10b–5 of the Exchange Act, 'except that **the scienter requirement under Florida law is satisfied by [a] showing of mere negligence**…")(Emphasis added.)

Similarly, in the instant case, DAVID is not required to prove that Roberts intended to deceive him in order to prevail on his claim for violations of Fla. Stat. §517.301. In other words, once a negligent misrepresentation or material omission is established, liability under Fla. Stat. §517.301 is triggered.

**b. <u>David is not required to prove loss causation in order to prevail on his claim for violations of Fla. Stat. §517.301</u>**

DAVID is not required to prove that Roberts' fraud, misrepresentations, material omissions or deceit caused their losses in order to prevail on his claim for violation of Fla. Stat. §517.301. In <u>E. F. Hutton & Co., Inc., et al. v. Rousseff</u>, 537 So. 2d 978 (Fla. 1989) the appellate court certified the question to the Florida Supreme Court, of whether Fla. Stat. §517.301 requires proof of loss causation. <u>Id.</u> When answering this question, the Florida Supreme Court held:

> **Proof of loss causation is not mentioned in sections 517.211 or 517.301**, nor is it required under section 12(2), which is the comparable federal law, or under the common law cause of action from which the state and federal laws derived.  **Accordingly, we hold that <u>proof of loss causation is not required</u> in a civil securities proceeding under sections 517.211 and 517.301**…



One Downtown | 1 SE 3rd Ave. | Suite 1670 | Miami FL 33131
Phone: 305.728.3320 / 1.888.840.1571 | Fax: 786.842.7549

Id. at 981. (Emphasis added.); See also, Arnold v. McFail, 839 F.Supp.2d 1281 at 1286 (S.D. Fla. 2011)("**[a] plaintiff does not need to prove loss causation under Florida law**…")(Emphasis added.); and Seal v. SFPC Holding Co., 2014 WL 12378803 at *6 (N.D. Fla. 2014)("**A claim under Florida Statute Section 517.301 consists of the same elements except that the scienter requirement may be satisfied by a showing of negligence, and there is no requirement of loss causation**.")(Emphasis added.)

Similarly, in the instant case, DAVID does not have to prove that his losses were caused by Roberts' wrongdoing in order to prevail on his claim for violation of the Florida Securities and Investor Protection Act.

### c. David is not required to prove reliance in order to prevail on his claims for violation of Fla. Stat. §517.301

DAVID is not required to prove reliance in order to prevail on his claim for violation of the Florida Securities and Investor Protection Act. In Waters v. International Precious Metals Corporation, 172 F.R.D. 479 (S.D. Fl. 1996), a group of investors brought suit for violation of Fla. Stat. §517.301. When addressing the issue of reliance, the U.S. District Court for the Southern District of Florida held:

### B. Reliance Is Not An Element Of A Claim Under Florida's Boiler Room Statute

… **Nowhere in the statute is it provided that a plaintiff proceeding with a cause of action for a violation of Florida's Boiler Room statute must prove reliance**…

**Finally, this Court finds that there is no reason why a plaintiff proceeding under a 517.211 cause of action for violations of 517.301 should be required to prove reliance.**



One Downtown | 1 SE 3rd Ave. | Suite 1670 | Miami FL 33131
Phone: 305.728.3320 / 1.888.840.1571 | Fax: 786.842.7549

> **Like loss causation, <u>nothing in the statute suggests that reliance is an element</u>** of a claim brought under it. And, in light of the fact that the *Rousseff* courts held that loss causation is not an element, **it logically follows that <u>reliance should not be required</u>, as the two concepts are so closely related**.

<u>Id</u>. at 494-496.(Emphasis added.)

Similarly, in the instant case, DAVID is not required to prove reliance on Roberts' misrepresentations, material omissions and other deceptive conduct in order to prevail on his claim under Fla. Stat. §517.301.

### d. <u>Once this Panel determines that Stifel violated the Fla. Stat. §517.301, David is entitled to statutory damages pursuant to the formula set forth in Fla. Stat.  §517.211</u>

Fla. Stat.  §517.211 provides a specific formula for the calculation of damages for violation of Fla. Stat. §517.301. In other words, once this Panel determines that STIFEL violated Fla. Stat. §517.301, it must award DAVID damages pursuant to the formula set forth in Fla. Stat.  §517.211.

Specifically, Fla. Stat.  §517.211 provides in relevant part:

> **517.211. Remedies available in cases of unlawful sale**
>
> (2) Any person purchasing or selling a security in violation of s. 517.301… is jointly and severally liable to the person selling the security to or purchasing the security from such person in an action for rescission, if the plaintiff still owns the security, or for damages, if the plaintiff has sold the security.
>
> **(4) In an action for damages brought by a purchaser of a security or investment, the plaintiff <u>shall</u> recover an amount equal to the difference between**:
>
> **(a) The consideration paid for the security or investment**, **plus interest thereon at the legal rate from the date of purchase**; and



One Downtown | 1 SE 3rd Ave. | Suite 1670 | Miami FL 33131
Phone: 305.728.3320 / 1.888.840.1571 | Fax: 786.842.7549

**(b) The value of the security or investment at the time it was disposed of by the plaintiff, plus the amount of any income received on the security or investment by the plaintiff**. (Emphasis added.)

As clearly illustrated above, once this Panel determines that STIFEL violated Fla. Stat. §517.301, the Panel must award DAVID recessionary damages pursuant to Fla. Stat. §517.211(3)(a). In the instant case, DAVID'S damages pursuant to Fla. Stat §517.211(3)(a) are **$26,504,291**.

### e. The Florida Securities and Investor Protection Act requires that David must be awarded attorney's fees

The Florida Securities and Investor Protection Act requires that once this Panel determines that STIFEL is liable for violation of Fla. Stat. §517.301, DAVID must also be awarded attorney's fees as the prevailing party. Specifically, Fla. Stat. §517.211(6) states:

(6) **In any action brought under this section, including an appeal, the court <u>shall</u> award reasonable attorneys' fees to the prevailing party**...

As clearly illustrated above, Fla. Stat. §517.211(6) expressly requires that once this Panel determines that STIFEL violated the Florida Securities and Investor Protection Act, this Panel "shall" award reasonable attorney's fees to DAVID as the prevailing party.

As such, once this Panel determines that STIFEL is liable for violation of the Florida Securities and Investor Protection Act, this Panel is required to enter an award of attorney's fees and is explicitly authorized by Florida law to enter an award of costs and punitive damages.



## VII. <u>STIFEL IS LIABLE FOR BREACH OF FIDUCIARY DUTY</u>

### a. <u>Stifel and Roberts are liable for breaching the common law fiduciary duties they owed David in his non-discretionary accounts</u>

STIFEL and Roberts owed DAVID a fiduciary duty under Florida law. In <u>Gochnauer v. A.G. Edwards</u>, 810 F.2d 1042 (11th Cir. 1987) investors with *non-discretionary* brokerage accounts filed suit against their broker and brokerage firm for breach of fiduciary duty. On appeal, the Eleventh Circuit Court of Appeal addressed the fiduciary duties owed in non-discretionary brokerage accounts and held:

> **The law is clear that a broker owes a fiduciary duty of care and loyalty to a securities investor**...
>
> Lester's fiduciary responsibilities in the one-time "*non-discretionary*" decision... were:
>
> (1) **the duty to recommend [investments] only after studying it sufficiently to become informed as to its nature**, price, and financial prognosis; (2) the duty to perform the customer's orders promptly in a manner best suited to serve the customer's interests; (3) **the duty to inform the customer of the risks involved in purchasing or selling a particular security;** (4) **the duty to refrain from self-dealing**...; (5) **the duty not to misrepresent any material fact to the transaction**; and (6) **the duty to transact business only after receiving approval from the customer**…
>
> The trial court found that the Gochnauers were not totally novice investors, but neither were they highly sophisticated. **Even though the Gochnauers signed an agreement stating that they understood the risks of option trading, it was incumbent upon Lester to fully explain the risks** of options trading. (Emphasis added.)

<u>Id.</u> at 1049. <u>See</u> <u>also</u>, <u>Ward v. Atlantic Sec. Bank</u>, 777 So.2d 1144 at 1147 (Fla. 3rd DCA 2001)("**In general, a stockbroker must deal with its clients in good faith and owes them a fiduciary duty of loyalty and care**… **These duties include**... **the duty to inform**



**EREZ LAW**
PROFESSIONAL LIMITED LIABILITY CORPORATION

One Downtown | 1 SE 3rd Ave. | Suite 1670 | Miami FL 33131
Phone: 305.728.3320 / 1.888.840.1571 | Fax: 786.842.7549

the customer of the risks involved in purchasing or selling a particular security... the duty not to misrepresent any material fact to the transaction...")(Emphasis added.); First Union Discount Brokerage Services, Inc. v. Milos, 997 F.2d 835 at 845 (11th Cir. 1993)("As a broker, First Union owed the Miloses a fiduciary duty of care and loyalty.")(Emphasis added.); and Don Slack Ins., Inc. v. Fidelity & Casualty Co. of New York, 385 So.2d 1061 at 1063 (Fla. 5th DCA 1980)("A person acting in a fiduciary or confidential capacity has a duty to make a full and fair disclosure of material facts to a person reposing confidence in him...")(Emphasis added.)

Similarly, in the instant case, STIFEL and Roberts owed DAVID a fiduciary duty to not misrepresent the structured notes and structured note strategy at issue, they also owed DAVID an affirmative duty to inform him of the structured notes' and structured note strategy's material terms, features and risks.

In the instant case, STIFEL and Roberts breached their common law fiduciary duties to DAVID by, amongst other things, making misrepresentations, material omissions and unsuitable recommendations to DAVID.

b. **Stifel and Roberts breached the statutory fiduciary duty they owed David in his in discretionary Solutions Program account**

STIFEL and Roberts owed DAVID a statutory fiduciary duty under the Investment Advisers Act of 1940 in connection with DAVID'S discretionary accounts enrolled in STIFEL'S Solutions Program.

STIFEL charged DAVID an advisory fee in connection with their Solutions Program account. Financial advisors who charge a fee based on assets under management (as

EREZ LAW
PROFESSIONAL LIMITED LIABILITY CORPORATION

One Downtown | 1 SE 3rd Ave. | Suite 1670 | Miami FL 33131
Phone: 305.728.3320 / 1.888.840.1571 | Fax: 786.842.7549

opposed to commissions generated on each individual transaction) are deemed to be acting as investment advisers under the Investment Advisers of 1940 which creates a heightened legal duty of care known as a "fiduciary duty" and encumbers the advisor with certain explicit legal obligations.[19]

The Investment Adviser's Act of 1940 imposes a fiduciary duty upon investment advisers to, amongst other things, disclose all material facts to clients, avoid misleading their clients and place their clients' interests ahead of their own. See SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 194, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963) ("**Courts have imposed on a fiduciary an affirmative duty of utmost good faith, and full and fair disclosure of all material facts,** as well as an **affirmative obligation to employ reasonable care to avoid misleading his clients**.")(Emphasis added.); See also, SEC v. Nutmeg Group, LLC, 162 F.Supp.3d 754, 778 (N.D. Ill. 2016)("This Section establishes a **statutory fiduciary duty for investment advisers. This duty can be violated by what is done, what is said, and what is *not* said. Investment advisers must act in their clients' best interest. Relatedly, they must employ reasonable care to avoid misleading clients. And, finally, they must fully and frankly disclose all material facts**.")(Emphasis added.); See also, Belmont v. MB Inv. Partners, Inc., 708 F.3d 470, 503 (3rd Cir.2013)("**The federal fiduciary standard requires that an investment adviser act in the "best interest" of its advisory client**.")(Emphasis added.); and SEC

---

[19] Stifel and Roberts' fiduciary duties pursuant to the Investment Advisers Act of 1940 are separate and independent of the common law fiduciary duties they owed to David under Florida law.

v. Moran, 922 F. Supp. 867, 896 (S.D.N.Y. 1996)("…**[T]he court interprets Section 206 to establish a fiduciary duty which in addition to applying to misrepresentations and omission, also requires the investment advisor to act in the best interests of his clients**.")(Emphasis added.)

In fact, STIFEL'S own website states:

### Our Responsibilities as an Investment Adviser

**When serving as an investment adviser to Advisory Clients, <u>we are acting as a fiduciary</u>** with respect to the assets held in accounts covered by the Advisory Agreement. In our capacity as an investment adviser, **we are held to the legal standards set forth in the Investment Advisers Act of 1940 (the "Advisers Act"), certain state laws, and common law standards applicable to fiduciaries**… **Such standards include the duty of care, including the obligation to have a reasonable basis for believing that our investment recommendations are suitable and consistent with Client's stated objectives and goals** (including any restrictions placed on the account by the Client) **and the duty of loyalty,** including the obligation to provide Clients with full disclosure of material conflicts of interest. (Emphasis added.)

In the instant case, STIFEL and Roberts violated their fiduciary duties under the Investment Advisors Act of 1940 in DAVID Solutions accounts by, amongst other things, implementing an aggressive equity strategy involving high risk stocks concentrated in the technology sector, which was completely contrary to the Strategic Allocation model that STIFEL approved and DAVID agreed to enroll in.

### VIII. <u>STIFEL IS LIABLE FOR NEGLIGENCE</u>

STIFEL and Roberts' wrongful conduct constitutes negligence. Under Florida law, the elements for establishing a cause of action for negligence are: (i) the defendant owed a duty of care; (ii) the defendant breached their duty of care; and (iii) the defendant's



breach caused the plaintiff damages. <u>Florida Dept. of Corrections v. Abril</u>, 969 So.2d 201, 204 (Fla. 2007). In Broker Dealer Law and Regulation (3d Ed. 2002 Supp.), at page 2 - 51, Professor Poser recognizes that:

> Regardless of any agreement between a broker and its customer establishing the parties' duties and expectations, **the duty placed on a broker to exercise reasonable care and professional skill overlays a distinct dimension designed to protect larger societal interests** and ends that may extend beyond those of particular litigants. (Emphasis added.)

In the instant case, DAVID has suffered significant losses as a result of STIFEL and Roberts' negligence and other tortious conduct including, amongst other things, making misrepresentations, material omissions and unsuitable recommendations regarding the structured notes, structured note strategy and Solutions Program account.

### a. **FINRA rules, SEC rules, securities laws and Stifel's own compliance policies are evidence of the applicable standard of care for David's common law tort claims**

One of the central elements of DAVID'S tort claims against STIFEL is the existence of a duty on the part of STIFEL and its employees to conform to a certain standard of conduct. In securities cases, FINRA rules, SEC rules, securities laws and STIFEL'S own compliance policies are evidence of the standard of care that STIFEL owed to DAVID. In other words, once this Panel determines that STIFEL violated FINRA rules, SEC rules, securities laws or STIFEL'S own compliance policies, STIFEL'S violations are also evidence that it violated the applicable standard of care duty it owed to DAVID.

The seminal case addressing this issue is <u>Miley v. Oppenheimer & Co.</u>, 637 F.2d 318 (5th Cir. 1981), where the Fifth Circuit Court of Appeals held:



> **Moreover, these NYSE and NASD rules are excellent tools against which to assess in part the reasonableness or excessiveness of a broker's handling of an investor's account. It was both proper and beneficial for Judge Mahon to include a reference to the rules in this charge**. (Emphasis added.)

<u>Id.</u> at 333; <u>See also</u>, <u>Csordas v. Smith Barney</u>, 1992 WL 426460 at *2 (Fla. 9th Cir. 1992)("While there is no cause of action for violation of agency rules such as the NYSE "know your customer" rule... or a brokerage firm's internal compliance memoranda, **these matters may be used considered on the issue of the scope and extent of a broker's duty of care owed to his customer**.")(Emphasis added.); and <u>Boll v. Merrill Lynch</u>, 2004 WL 5589731 at *9 (S.D. Fla. 2004)("[t]here is case authority across the nation that finds violations of the NASD Conduct Rules and NYSE Rules to be separate causes of action… other courts take a slightly different view, namely, that the rule violations are breaches of the standard of care for liability… Thus, **whether the NASD Conduct Rule or the NYSE Rule breaches were separate causes of action or a violated standard of care under the fiduciary or fraud laws, the result is the same: liability for violations**.")(Emphasis added.)

Florida law is equally clear that a brokerage firm's internal policies and procedures are evidence of the standard of care in the securities industry. <u>See</u> <u>Prager v. FMS Bonds, Inc.</u>, 2010 WL 2950065 at *8 (S.D. Fla. 2010) ("**Under Florida law, internal rules and procedures governing employees may be used as evidence to determine the correct standard of care in a negligence cause of action**.")(Emphasis added.); <u>See</u> also, <u>Dean Witter Reynolds, Inc. v. Hammock</u>, 489 So.2d 761 at 768 (Fla. 1st DCA 1986)("**Hammock**... **urges evidence of violation of DWR's in-house regulations is**



**admissible as evidence of negligence. Again we agree**. **Case law is clear that evidence of violation of industry standards is admissible as non-conclusive evidence of negligence**.")(Emphasis added.)

In the instant case, STIFEL violated FINRA rules, SEC rules, securities laws and STIFEL'S own internal compliance policies, all of which are evidence of the applicable standard of care in the securities industry.

**b. Roberts violated the reasonable basis suitability, customer specific suitability and quantitative suitability obligations of FINRA Rule 2111**

FINRA Rule 2111 (Suitability) has three requirements: (i) reasonable basis suitability; (ii) customer specific suitability; and (iii) quantitative suitability. In the instant case, Roberts violated all three of the suitability requirements under Rule 2111.

The reasonable basis suitability obligation requires brokers to understand the material risks of the investments they recommend. A broker's failure to understand the risks of the investments and strategies they recommend is a violation of Rule 2111. Specifically, FINRA Rule 2111 states:

> **A member's or associated person's reasonable diligence must provide the member or associated person with an understanding of the potential risks and rewards associated with the recommended security or strategy. The lack of such an understanding when recommending a security or strategy violates the suitability rule**. (Emphasis added.)

In the instant case, Roberts' text messages, if accepted at face value, reflect a fundamental failure to understand and appreciate the risks associated with the structured notes and structured note strategy he recommended. The simple truth is that Roberts was so overconfident in his own ability to create custom structured notes, which he



erroneously believed could generate higher returns with less risk, that he failed to adequately understand and appreciate the enormity of the risks in his strategy. As such, Roberts violated his reasonable basis suitability obligations duties under FINRA Rule 2111.

Furthermore, Roberts himself recently testified that in January 2022, when the inherent risks in the individual stock and XBI notes materialized, Roberts made a reasonable basis suitability determination to cease offering structured notes linked to individual stocks and XBI to any of his STIFEL customers. Roberts concealed from DAVID that he no longer considered structured notes linked to individual stocks or XBI to be suitable for any of his customers to invest in.

The customer specific suitability obligation requires brokers to recommend investments that are suitable for the customer's investment objectives and risk tolerance. Based on Roberts' misrepresentations that the structured notes were low risk, bond-like investments, DAVID was interested in the conservative bond-like investments that Roberts described. Contrary to Roberts' representations, the structured notes and structured note strategy implemented in DAVID'S accounts were speculative and high risk. Similarly, based on Roberts' representations, DAVID was seeking to invest in a Solutions Program strategy that involved third party managers who primarily invested in mutual funds. The strategy Roberts implemented in his Solutions Program account bore no resemblance to the strategy DAVID agreed to and was significantly riskier. As such, Roberts violated his customer specific suitability obligations under Rule 2111.

Finally, the quantitative suitability obligation requires that a series of recommended transactions, even if suitable when viewed in isolation, is not excessive and unsuitable. In the instant case, Roberts violated his quantitative suitability obligations by recommending a dangerously concentrated and excessively leveraged strategy of concentrating more than **78%** DAVID'S account holdings in structured notes and concentrating in excess of **75%** of DAVID'S structured note holdings in notes linked to XBI and/or KRE, in a portfolio that was excessively and dangerously leveraged.

### c. Roberts and Stifel violated FINRA rules, were negligent and breached their fiduciary duties by making misrepresentations and material omissions to David

Roberts violated FINRA rules by making misrepresentations and material omissions to DAVID about the structured notes' material terms, features and risks.

FINRA rules explicitly prohibit the use of deceptive, fraudulent or manipulative tactics when making investment recommendations. For example, FINRA rule 2020 states:

> **2020. Use of Manipulative, Deceptive or Other Fraudulent Devices**
>
> **No member shall effect any transaction in, or induce the purchase or sale of, any security by means of any manipulative, deceptive or other fraudulent device or contrivance**. (Emphasis added.)

In the instant case, Roberts violated FINRA Rule 2020 by, amongst other things, misrepresenting that the structured notes and structured note strategy as a conservative, bond-like strategy. These are just a few examples of Roberts' misrepresentations and material omissions regarding the structured notes at issue.



**d. Roberts and Stifel violated Reg BI by recommending a recklessly concentrated investment strategy that was not in David's best interest and was designed to enrich Roberts and Stifel at David's expense**

Roberts and STIFEL violated Reg BI by recommending a recklessly concentrated investment strategy that was not in DAVID'S best interest.

For example, as of September 2021, DAVID'S accounts with Roberts were **77%** concentrated in high-risk auto-callable structured notes. As of June 2021, DAVID'S accounts with Roberts held **$16.49 million** of high-risk auto-callable structured notes, **75.7%** of which was concentrated in auto-callable worst of notes linked to XBI and KRE. Roberts' recklessly concentrated strategy only further magnified the already significant risks associated with the structured notes he sold to DAVID.

Furthermore, Roberts self-serving structured note strategy was designed to enrich Roberts and STIFEL at the expense of their STIFEL customers. In just three years, Roberts and STIFEL generated **$1.2 million** in commissions and fees for themselves at DAVID'S expense. Regrettably, DAVID is just one example of Roberts' profiteering at his customers' expense. From 2016 to 2023, Roberts sold in excess of **$3.7 billion** worth of structured notes to this STIFEL customers, generating gross commissions of nearly **$61.4 million**.[20] As clearly illustrated above, STIFEL and Roberts violated Reg BI by recommending a recklessly concentrated investment strategy that was not in DAVID'S

---

[20] These figures represent only Roberts' sales of the structured notes that were sold to David and the other former Roberts customers who are also represented by Claimants' counsel. These figures do not reflect all of Roberts' sales of structured notes to all of his customers. In other words, These figures represent only a portion of the enormous commission revenues and other compensation Roberts received during this period.

 EREZ LAW
PROFESSIONAL LIMITED LIABILITY CORPORATION

best interest and by placing their own financial interest ahead of the best interest of DAVID'S.

Roberts also dangerously concentrated virtually 100% of DAVID'S Solutions Program account in individual stocks, the majority of which were concentrated in the volatile technology sector. For example, as of June 2022, **76%** of DAVID'S Solutions Program account was concentrated in just three high risk stocks: the information technology company Datadog, the defunct cryptocurrency lender Silvergate Capital and the cybersecurity technology company Crowdstrike. This level of concentration was reckless and not in DAVID'S best interest.

### e. Stifel and Roberts violated their duty of fair dealing

STIFEL and Roberts violated their duty of fair dealing. FINRA rules explicitly state that STIFEL and its employees owe a fundamental duty of fair dealing when dealing with customers such as DAVID. For example, FINRA IM-2310 provides:

### IM-2310-2. Fair Dealing with Customers

(a)(1) **Implicit in all member and registered representative relationships with customers and others is the fundamental responsibility for fair dealing**. Sales efforts must therefore be undertaken only on a basis that can be judged as being within the ethical standards of the Association's Rules, with **particular emphasis on the requirement to deal fairly with the public**.

Some practices that have resulted in disciplinary action and that clearly violate this responsibility for fair dealing are set forth below, as a guide to members:

(4) Fraudulent Activity...

(B) In addition, other fraudulent activities, such as forgery, **non-disclosure or misstatement of material facts**, **manipulations and**



**various deceptions**, have been found in violation of Association Rules. These same activities are also subject to the civil and criminal laws and sanctions of federal and state governments. (Emphasis added.)

In the instant case, Roberts' misrepresentations and material omissions violated STIFEL'S fundamental responsibility for fair dealing by failing to provide DAVID with critically important information necessary to make an informed decision about his investments in the structured notes at issue. Roberts concealed material information and misled DAVID to believe that the structured notes were conservative, bond-like investments, when in reality they were high-risk investments whose coupon payments and principal protection were entirely dependent upon the performance of the stock market.

### f. Roberts violated FINRA rules by making unbalanced and misleading sales presentations and representations

Roberts violated FINRA rules by making unbalanced and misleading sales presentations which minimized and misrepresented the enormous risks associated with the structured notes and structured note strategy he recommended.

FINRA has repeatedly warned member firms, including STIFEL that unbalanced and misleading sales presentations which fail to adequately disclose the risks of an investment and misleading representations that investments offer protection against declining markets constitute a violation of FINRA rules and a violation of the duties FINRA members owe to their customers. For example, when addressing this issue, FINRA Notice to Members 03-71 states:



> **Sales materials and oral presentations regarding NCIs [non-conventional investments] must present a fair and balanced picture regarding both the risks and benefits of investing in these products**…
>
> **Moreover, in light of the fact that investors may be turning to these products as an alternative to traditional equity and fixed income investments, it is crucial for registered persons to provide a full and balanced disclosure regarding both the risks and the rewards of these products.** (Emphasis added.)

In the instant case, Roberts misleading sales presentations and disclosures failed to provide a balanced disclosure of the risks and are exactly the kind of incomplete, unbalanced and misleading presentation that is expressly prohibited by FINRA and constitutes a violation of the common law duties owed to DAVID.

### g. Roberts violated FINRA rules and Stifel's own compliance rules by making false, exaggerated, unwarranted and misleading statements and prohibited predictions and projections

FINRA rules and STIFEL'S own compliance rules prohibit misleading communications and false, exaggerated, unwarranted or misleading claims and prohibited predictions and projections. For example, FINRA Rule 2210 states in relevant part:

> **2210. Communications with the Public**…
>
> **(B) No member may make any false, exaggerated, unwarranted, promissory or misleading statement or claim** in any communication. No member may publish, circulate or distribute any communication that the member knows or has reason to know contains any untrue statement of a material fact or is otherwise false or misleading…
>
> **(D) Members must ensure that statements are clear and not misleading within the context in which they are made, and that they provide balanced treatment of risks and potential benefits.**



**Communications must be consistent with the risks of fluctuating prices and the uncertainty of dividends, rates of return and yield inherent to investments**…

**(F) Communications may not predict or project performance, imply that past performance will recur or make any exaggerated or unwarranted claim, opinion or forecast**… (Emphasis added.)

STIFEL'S own compliance policies also strictly prohibit Roberts from making false, or unwarranted claims, predicting or projecting future performance or making unwarranted claims opinions or forecasts. For example, STIFEL'S Policies and Procedures Manual states in relevant part:

**8.3.1 General Guidelines**
Retail communications must meet the general standards of good taste and accuracy and should fairly represent the products or services included in the retail communication. **Promissory, exaggerated, misleading, or false statements, as well as language inferring guarantees, are not permitted**. No qualification or fact should be omitted that would cause the retail communication to be misleading. **Projections, predictions, and opinions are not permitted**. **Promises of specific results, either profits or protections against losses, are strictly prohibited**…

**8.3.2 Content Guidelines**
Items to consider when preparing and reviewing any communication with the public should consider the following:
• **Truthfulness and good taste are required**.
• **Communications must reflect the high standards of integrity and professionalism of Stifel**.
• **Exaggerated, unwarranted, or misleading statements or claims are prohibited**.
• Promises or guarantees: past performance may not be used to promise, guarantee, or imply future profits or income from securities.
• **Projections and predictions pertaining to investment results are not permitted.** (Emphasis added.)

A copy of the above referenced section of STIFEL'S Policies and Procedures Manual is attached hereto as Exhibit "N".



In the instant case, Roberts violated FINRA rules and STIFEL'S own compliance rules by making misleading, exaggerated and unwarranted statements and prohibited predictions and projections regarding the purported returns on the structured notes at issue.

Roberts misrepresented that the structured notes were low risk investments that would generate an average yield of 12.25-13% and preserve DAVID'S principal. In reality, the structured notes were high risk investments that often did not pay their contingent coupon payments or return investors' principal.

## IX. STIFEL IS LIABLE FOR NEGLIGENT SUPERVISION

DAVID'S losses were caused by STIFEL'S failure to adequately supervise its employees, including Roberts. The elements of a cause of action for negligent supervision are: (1) the existence of a relationship giving rise to a legal duty to supervise; (2) negligent breach of that duty; and (3) that the negligence was the proximate cause of the plaintiff's injury. Nationwide Mut. Co. v. Ft. Myers Total Rehab Center, Inc., 657 F.Supp.2d 1279 at 1291 (M.D. Fla. 2009)

In the instant case, STIFEL owed a duty to its customers, including DAVID, to supervise Roberts. STIFEL breached its duty by failing to adequately supervise Roberts, who engaged in rampant violations of FINRA rules and STIFEL'S own internal compliance rules. STIFEL'S failure to adequately supervise Roberts proximately caused DAVID'S losses.

STIFEL'S failure to adequately supervise Roberts is especially egregious in light of the fact that STIFEL had actual knowledge of Roberts' extensive history of customer

complaints, lawsuits, employment suspensions, regulatory investigations and heightened supervision mandates when it hired him in 2016.

Despite Roberts' extensive history of misconduct, in 2020 STIFEL permitted Roberts to work in Miami while continuing to be supervised remotely by his branch manager from over 1,000 miles away in New York. In reality, STIFEL'S supervision of Roberts from 2020 forward was virtually non-existent. Roberts' supervisors in New York did not make a single visit to Miami to supervise Roberts in 2020, 2021 or 2022.

As stated more fully above, Roberts conducted business with his STIFEL customers, including DAVID, through the use of unmonitored and unsupervised text messages from his personal mobile device in order to successfully evade supervision by STIFEL. Roberts violated STIFEL'S own internal compliance rules and prevented STIFEL from supervising his misrepresentations and material omissions to his STIFEL customers. STIFEL cannot now credibly claim that it adequately supervised Roberts.

STIFEL violated FINRA rules by, amongst other things, failing to adequately supervise its employees, including Roberts. FINRA rules require STIFEL to supervise the conduct of its employees. For example, FINRA Rule 3110 requires STIFEL to, amongst other things, maintain an adequate system of supervision and review correspondence and internal communications related to STIFEL'S securities business.

Had STIFEL been adequately discharging its supervisory obligations, it would have learned that Roberts was violating FINRA rules[21] and STIFEL'S own compliance policies

---

[21] FINRA Rule 2210 requires Stifel to maintain copies of its employees' communications with customers.

by conducting business through clandestine, unmonitored and unsupervised text messages from his personal mobile device. Likewise, if STIFEL was adequately discharging its supervisory obligations, it would have learned that Roberts was making blatant misrepresentations and material omissions about the material terms, features and risks of the structured notes, and presenting STIFEL clients with an unbalanced and one-sided description of the structured notes that improperly minimized the risks while giving the false impression that the structured notes were conservative, bond-like investments.

In addition to failing to adequately supervise Roberts' communications, STIFEL also failed to adequately supervise Roberts' recklessly concentrated investment strategy. As of September 2021, DAVID'S accounts with Roberts were **77%** concentrated in high-risk auto-callable structured notes. Furthermore, as of September 2021, DAVID'S structured note holdings were **75.7%** concentrated in auto-callable worst of notes linked to XBI and KRE.

STIFEL'S supervisory failures are especially egregious in light of the fact that Roberts' recklessly concentrated strategy violated STIFEL'S own internal concentration limits for structured notes. For example, STIFEL'S Structured Investments | Branch Manager Guide states, amongst other things:

> **SUPERVISION**…
>
> ***Concentration***: **Review both by issuer <u>and underlying exposure</u>** especially with regards to single stocks and client holdings outside the firm. **Structured Investments should not make up more than <u>10%</u> of assets in a conservative portfolio, <u>20%</u> for moderate and <u>30%</u> for aggressive**. (Emphasis added.)

<u>See</u> Exhibit "F".

In the instant case, Roberts blatantly violated STIFEL'S own structured note concentration limits. Had STIFEL simply supervised Roberts' violations of STIFEL'S own concentration limits, DAVID'S losses could have been largely avoided.

In addition, STIFEL failed to adequately supervise Roberts' blatant violation of STIFEL'S own policies requiring Solutions Programs to adhere to one of STIFEL'S approved portfolios. Specifically, DAVID enrolled in a Solutions Program portfolio called Strategic Allocation which was required to invest in a blend of equity and fixed income, with approximately **75%** of the account being invested with third party managers who invested primarily in mutual funds and ETFs. The strategy that Roberts actually implemented in their Solutions Program account bore no resemblance whatsoever to the Strategic Allocation portfolio that was vetted and approved by STIFEL. Instead, Roberts implemented a speculative and concentrated investment strategy of investing in a handful of high-risk stocks, primarily from the volatile technology sector. Roberts' investment strategy in DAVID'S Solutions Program account was completely contrary to and significantly riskier than the Strategic Allocation strategy approved by STIFEL and agreed to by DAVID. As of June 2022, **76%** of DAVID'S Solutions Program account concentrated in just three speculative and volatile stocks: Datadog, Silvergate Capital and Crowdstrike.

DAVID'S Solutions Program account also generated a significant number of internal alerts for violation of STIFEL'S own sector concentration and security concentration limits. Regrettably, despite having actual knowledge that Roberts was in flagrant violation of STIFEL'S own concentration restrictions, STIFEL failed to take any meaningful corrective action to supervise Roberts and allowed his misconduct to continue



One Downtown | 1 SE 3rd Ave. | Suite 1670 | Miami FL 33131
Phone: 305.728.3320 / 1.888.840.1571 | Fax: 786.842.7549

unabated. Had STIFEL adequately supervised Roberts, DAVID'S losses in his Solutions Program account also could have been avoided.

These are just a few examples of STIFEL'S numerous supervisory failures which resulted in DAVID'S significant losses.

## X. <u>STIFEL IS LIABLE FOR FRAUD</u>

Roberts' affirmative misrepresentations and failure to disclose material facts regarding the structured notes and structured note strategy he recommended constitutes fraud, particularly when considered in light of the fiduciary duties STIFEL and Roberts owed to DAVID.

The law is clear that fraud may be either an affirmative misrepresentation or a material omission, and that a breach of fiduciary duty arising from a material omission may constitute fraud due to the fiduciary's heightened duty of disclosure. For example, in <u>S.E.C. v. Zandford</u>, 535 U.S. 813 at 822 (U.S. 2002) the Supreme Court of the United States held: "**any distinction between omissions and misrepresentations is illusory in the context of a broker who has a fiduciary duty to her clients**." (Emphasis added.); <u>See</u> <u>also</u>, <u>Ward</u> at 1147 ("**Fraud also includes the intentional omission of a material fact**... **Here, Stockholder has properly alleged common law fraud. Stockholder's fraud allegation is not based on what the Bank representative told Stockholder about APEF's future potential, but about what the Bank representative failed to tell Stockholder** about APEF's present condition.")(Emphasis added.); <u>Wilder v. Meyer</u>, 779 F.Supp. 164 at 168-169 (S.D. Fla. 1991)("**The existence of a fiduciary relationship between the Plaintiff and the Defendant, and silence on the part of the Defendant**

when there is a duty to disclose facts, can constitute a fraudulent withholding of facts.")(Emphasis added.);and <u>Behrman v. Allstate Ins. Co.</u>, 388 F.Supp.2d 1346 at 1351 (S.D. Fla. 2005)("**A defendant's knowing concealment or non-disclosure of a material fact may**... **support an action for fraud where there is a duty to disclose**... **[S]uch duty arises when one party has information that the other party has a right to know because of a fiduciary or other relation of trust or confidence between them**.")(Emphasis added.)

In the instant case, STIFEL and Roberts owed DAVID a duty to disclose, amongst other things, that the structured notes and structured note strategy were speculative and high-risk. Roberts' failure to adequately disclose these risks constitutes both fraud and a breach of fiduciary duty.

Roberts misled DAVID about the structured notes and structured note strategy. DAVID relied on Roberts' misrepresentations and material omissions and has suffered significant damages as a result. As such, STIFEL is liable for fraud.

## XI. <u>STIFEL IS LIABLE FOR BREACH OF CONTRACT</u>

STIFEL breached its contracts with DAVID. The *prima facie* elements of a cause of action for breach of contract are: (i) a valid contract; (ii) a breach of the contract; and (iii) damages. The elements of a breach of contract action are: (1) a valid contract; (2) a material breach; and (3) damages. <u>Barbara G. Banks, P.A. v. Thomas D. Lardin, P.A.</u>, 938 So.2d 571, 575 (Fla. 4th DCA 2006); and <u>Knowles v. C.I.T. Corp.</u>, 346 So.2d 1042, 1043 (Fla. 1st DCA 1977). When DAVID established his accounts with STIFEL he entered into a contract with STIFEL. DAVID'S contracts with STIFEL provide, amongst other

things, that STIFEL was contractually obligated to abide by NASD/FINRA, SEC, NYSE and all other applicable securities rules and regulations in the handling of DAVID'S accounts.

For example, STIFEL'S contract with DAVID states:

> **All transactions in your Securities Account are subject to applicable laws and to the constitution, rules, regulations, customs, and usages of the exchange or market and its clearinghouses where such transactions are executed by Stifel and its agents**…

As clearly illustrated above, STIFEL'S contract with DAVID required STIFEL to comply with NASD/FINRA and SEC rules. STIFEL'S numerous violations of NASD/FINRA and SEC rules constitute a breach of STIFEL'S contract with DAVID. See Iowa Grain v. Farmers Grain and Feed, 293 N.W. 2d 22 (S.Ct. Iowa 1980)("**A broker's covenant with its customer that it will follow exchange rules and customs establishes a contractual duty to the customer**.")(Emphasis added.); See also, First Mid America, Inc. v. Palmer, 248 N.W.2d 34-35 (Neb. 1976)("**The plaintiff in its agreement specifically represented and agreed that it would follow exchange rules. Failure to follow these rules was thus a breach of the plaintiff's contractual duty owed the defendant**.")(Emphasis added.); and Hoffmayer v. Dean Witter & Co., 459 F.Supp. 733, 739 (N.D.Cal. 1978)("This claim should properly have been separated into two counts, for it alleges both a breach of contract, resulting from a provision in the contract requiring Dean Witter to abide by the rules of any exchange or market where transactions are executed, and an independent claim arising from the violation of the rules.")



One Downtown | 1 SE 3rd Ave. | Suite 1670 | Miami FL 33131
Phone: 305.728.3320 / 1.888.840.1571 | Fax: 786.842.7549

DAVID has suffered damages as a result of STIFEL'S violations of FINRA and SEC rules and, as such, STIFEL is liable for breach of contract. Similarly, STIFEL was contractually obligated to deal fairly with DAVID, and to have reasonable grounds for believing that any investment recommendations were suitable for DAVID.

The evidence in this case is overwhelmingly clear that STIFEL breached its contractual obligations. STIFEL'S breaches of its contractual obligations has caused DAVID to suffer significant damages. As such, STIFEL is liable to DAVID for breach of contract.

## XII. DELIVERY OF WRITTEN RISK DISCLOSURES CANNOT CURE ROBERTS' MISREPRESENTATIONS AND MATERIAL OMISSIONS

In its Answer, STIFEL misguidedly argues that it should be absolved of liability for Roberts' misrepresentations, material omissions and other wrongful conduct because DAVID received written risk disclosures regarding the structured notes. To accept STIFEL'S disingenuous argument that STIFEL can cure Roberts' misrepresentations by simply providing boilerplate written disclosures would be tantamount to giving STIFEL a license to defraud its customers. As explained below, this baseless argument has been explicitly and emphatically rejected by FINRA, the SEC and the courts.

### a. FINRA has repeatedly emphasized that misrepresentations and omissions cannot be cured by the delivery of a written risk disclosure

FINRA has repeatedly and explicitly instructed member firms that oral representations which contradict written disclosures provided to the customer will nullify the effect of written risk disclosures and expose the firm to civil liability to investors. For example, FINRA *Notice to Members 94-16* states:



Members are also advised that, although the prospectus and sales material of a fund include disclosures on many matters, **oral representations by sales personnel that contradict the disclosures in the prospectus or sale literature may nullify the effect of the written disclosures and may make the member liable for rule violations and civil damages to the customers** that result from such oral representations. (Emphasis added.)

In 2004, FINRA reiterated its longstanding position and again reminded its member firms that merely providing a written disclosure does not cure misrepresentations or omissions made in the sale of an investment. FINRA *Notice to Members 04-30* states:

Firms offering bonds and bond funds should provide the investors with any prospectus and other disclosure material provided by the issuer or the sponsor. However, NASD reminds firms that **simply providing a prospectus does not cure unfair or unbalanced sales or promotional materials**, whether prepared by the member, sponsor, or issuer. (Emphasis added.)

In 2009, FINRA again reiterated its position and reminded its member firms, including STIFEL that providing a written risk disclosure does not cure misrepresentations or omissions made in the sale of an investment. FINRA *Notice to Members 09-31* states:

**Firms are further reminded that providing risk disclosure in a prospectus or product description does not cure otherwise deficient disclosure**... (Emphasis added.)

FINRA has repeatedly reiterated this position in Disciplinary Proceedings involving financial advisors attempting to rely on the same erroneous defense. See In the Matter of Department of Enforcement v. Ryan Mark Reynolds 2001 WL 791703 (N.A.S.D.R.)("**[a] registered representative may be found in violation of the NASD's rules and the federal securities laws for failure to fully disclose risks to customers even though such risks may have been discussed in a prospectus delivered to the**



One Downtown | 1 SE 3rd Ave. | Suite 1670 | Miami FL 33131
Phone: 305.728.3320 / 1.888.840.1571 | Fax: 786.842.7549

**customers**.")(Emphasis added.); <u>See</u> also, <u>In the Matter of District Business Conduct Committee for District No. 8 v. Miguel Angel Cruz</u>, 1997 WL 33101218 (N.A.S.D.R.)("[t]he fact that an unsophisticated **customer receives a prospectus disclosing the nature of the product is no defense to allegations of misrepresentation or unsuitability**.")("Emphasis added.)

As clearly illustrated above, any attempt by STIFEL to avoid liability for Roberts' misrepresentations and omissions by relying upon the fact that DAVID may have been provided with written materials risk disclosures, has been emphatically and repeatedly rejected by FINRA.

### b. The SEC emphatically rejects Stifel's erroneous defense that written risk disclosures can be used to cure Roberts' misrepresentations

The SEC has similarly emphasized that the delivery of a risk disclosure document cannot exculpate a broker-dealer for misrepresentations or material omissions made in the sale of securities. For example, in <u>In the Matter of Ross Securities, Inc.</u>, 41 SEC 509 at 510 (1963) the SEC stated:

> <u>**At the expense of restating the obvious**</u>**, we emphasize that**... **delivery of a prospectus or offering circular does not, however, license broker-dealers or their salesmen to indulge in false or fanciful oral representations to their customers**.
>
> **The anti-fraud provisions of the Securities Act and the Securities Exchange Act apply to all representations whether made orally or in writing, during or after the distribution**...
>
> This obligation is not adminished [*sic*] because a prospectus or offering circular has been or is to be delivered. **Such information furnishes the background against which the salesman's representations may be tested. <u>Those who sell securities by</u>**



**EREZ LAW**
PROFESSIONAL LIMITED LIABILITY CORPORATION

One Downtown | 1 SE 3rd Ave. | Suite 1670 | Miami FL 33131
Phone: 305.728.3320 / 1.888.840.1571 | Fax: 786.842.7549

**means of representations inconsistent with it do so at their peril**.

Id. at *2. (Emphasis added.) See also, In re: Robert Foster, 51 SEC 1211 at *1 (1994)("**Foster sent his customers prospectuses which disclosed the risk**... **Notwithstanding his distribution of prospectuses, the Commission found that Foster violated the antifraud provisions by making oral misrepresentations to his customers. In this regard, the Commission set forth its view that investors in private actions also should be able to rely on the oral representations of their brokers**.")(Emphasis added.); and In re Larry Ira Klein, 52 SEC 1030 at *6 (1996)("**Klein's delivery of a prospectus to Towster does not excuse his failure to inform her fully of the risks of the investment package he proposed**.")(Emphasis added.)

### c. The law is equally clear that written risk disclosures cannot cure a broker's misrepresentations and material omissions

The law is clear that written risk disclosures cannot be used to cure a broker's misrepresentations or material omissions to an investor, regardless of an investor's wealth. The seminal Florida case on this issue is Clayton Brokerage Co. of St. Louis, Inc. v. Commodity Futures Trading Comm'n, 794 F.2d 573 at 580 (11th Cir. 1986). In Clayton, a broker appealed a verdict in favor of an investor on the grounds that the investor's losses could not have been caused by the broker's misrepresentations because the investor signed a risk disclosure document. Id. at 578. When rejecting the broker's argument, the Eleventh Circuit Court of Appeals held:

> **Clayton also argues that the risk disclosure statement signed by Sturcken**... **was sufficient to inform Sturcken of the risk of**



**trading. This suggestion is without merit. In the first place, presentation of the risk disclosure statement does not relieve a broker of any obligation under the CEA to disclose all material information about risk to customers**...

**Oral representations may effectively nullify the warnings in the statement by discounting its general significance and its relevance to the customer's particular situation**. (Emphasis added.)

The Eleventh Circuit reaffirmed this holding in <u>Commodity Futures Trading Commission v. Sidoti</u>, 178 F.3d 1132 (11th Cir. 1999) where it held: "**We seriously doubt whether boilerplate risk disclosure language could ever render an earlier material misrepresentation immaterial**."(Emphasis added.); <u>See</u> also, <u>Stier v. Smith</u>, 473 F.2d 1205 (5th Cir. 1973)("**We hold that Appellant was entitled to judgment as a matter of law because sophisticated investors, like all others, are entitled to the truth**...")(Emphasis added.); <u>JCC, Inc. v. Commodity Futures Trading Commission</u>, 63 F.3d 1557 (11th Cir. 1995)("...**the fact that prospective FLT customers were provided with the Risk Disclosure Statement**... **is insufficient to relieve Kahn of liability here as the Risk Disclosure Statement was coupled with material omissions and affirmative misrepresentations about risk**.")(Emphasis added.); <u>C.F.T.C. v. First American Inv. Services, Inc.</u>, 2006 WL 2054078 (S.D. Fla. 2006)("**To the extent that Allotta, Savitsky, Mills and Eulo claim that they provided their customers with the Commission's standard risk disclosure**… **such statements are no defense to their misconduct**. **It is well settled that wildly unrealistic predictions of profit cannot be cured by the Commission's mandated risk disclosures**.")(Emphasis added.); and <u>Amusement Industry, Inc. v. Buchanan Ingersoll & Rooney, P.C.</u>, 2013 WL 628533 at *14



**EREZ LAW**
PROFESSIONAL LIMITED LIABILITY CORPORATION

One Downtown | 1 SE 3rd Ave. | Suite 1670 | Miami FL 33131
Phone: 305.728.3320 / 1.888.840.1571 | Fax: 786.842.7549

(S.D.N.Y. 2013)("**[e]ven a sophisticated party may justifiably rely upon a fiduciary to represent the truth and disclose all material facts**.")(Emphasis added.)

As clearly illustrated above, STIFEL cannot absolve itself of liability for Roberts' misrepresentations and omissions by relying on the fact that DAVID may have been provided with or even signed boilerplate risk disclosures. As such, any attempt by STIFEL to rely on the delivery of written materials containing risk disclosures to cure Roberts' misrepresentations and omissions, is directly contradicted by FINRA, the SEC and the law, and should not even be entertained by this Panel.

## XIII. <u>STIFEL IS NOT PERMITTED TO OFFSET DAVID'S STATUTORY LOSSES WITH GAINS FROM PROFITABLE TRANSACTIONS</u>

STIFEL will undoubtedly seek to avoid liability for its misconduct by attempting to offset DAVID'S statutory losses in the structured notes with gains from profitable structured note transactions. Any such argument by STIFEL is expressly prohibited by law because to do so would give STIFEL a "license to defraud" its customers up to the point where the customer's wrongfully caused losses caused equal their gains in other transactions.

The seminal case on this issue is <u>Kane v. Shearson</u>, 916 F.2d 643 (11th Cir. 1990). In <u>Kane</u>, a brokerage firm recommended an investment that resulted in a realized gain, then recommended the investor make an additional investment in the same security, resulting in a realized loss of $137,796. An arbitration panel found the brokerage firm liable for violation of the Florida Securities and Investor Protection Act but only awarded $28,322 in damages due to the customer's gain in the prior transaction. The customer

appealed the award to the district court, which held that the customer should recover the entire $137,797 plus pre-judgment interest. Id. at 645.

On appeal to the Eleventh Circuit Court of Appeals, the brokerage firm argued that it should be entitled to offset the customer's losses in the transaction at issue, against gains the customer previously realized in his prior transactions in this same security. When rejecting this argument, the court held:

> **Kane [customer] is correct when he states that there is no support to be bound under federal or Florida law for the "netting" theory** Shearson [broker-dealer] argues for here. What is found, under both federal and Florida law, is the intent to have securities antifraud provisions enforced stringently to deter fraud... **If the**... **methodology espoused by [Shearson] were adopted, it could serve as a license for broker-dealers to defraud their customers with impunity up to the point where losses equaled prior gains**. (Emphasis added)

Kane is one of the many decisions that follow Randall v. Loftsgaarden, 478 U.S. 647 (U.S. 1986), wherein the Supreme Court of the United States held that the tax benefits received by an investor could not be used to offset the investor's losses and that the investor was still entitled to rescission. Specifically, the Supreme Court of the United States held: "**The effect of allowing a tax benefit offset would often be substantially to insulate those who commit securities frauds from any appreciable liability to defrauded investors**." (Emphasis added.)

Courts throughout the country have similarly adopted the Supreme Court's holding in Randall v. Loftsgaarden. For example, when rejecting this argument in Davis v. RBC, 906 F.2d 1206 at 1219 (8th Cir. 1990), the Eighth Circuit Court of Appeals held:



EREZ LAW
PROFESSIONAL LIMITED LIABILITY CORPORATION

One Downtown | 1 SE 3rd Ave. | Suite 1670 | Miami FL 33131
Phone: 305.728.3320 / 1.888.840.1571 | Fax: 786.842.7549

**The implications of this argument are disturbing. If we were to adopt RBC's view, securities brokers would be free to churn their customers' accounts with impunity so long as the net value of the account did not fall below the amount originally invested**.")(Emphasis added.)

See also, Merchant v. Oppenheimer & Co., 568 F. Supp. 639 (E.D. Va. 1983)("**There is no reason in logic or in law why either the buyer or the seller should be required to deal with each such violation in the same manner or be required to aggregate them**...")(Emphasis added.); Burke v. Ruttenberg, 102 F. Supp.2d 1280, 1302 n.32 (N.D. Ala. 2000)("**Michael's alleged gains during the early period of his trading cannot be offset against his purported losses**.")(Emphasis added.); and In re Clinton Oil Co. Sec. Litigation, 1977 WL 1010 (D. Kan. 1977)("**[p]rofit/loss margins on sales of shares obtained in separate and independent purchase transactions should not be offset for the purpose of reaching a net figure**.")(Emphasis added.)

In the instant case, DAVID suffered statutory damages of **$21,175,600** in the structured notes that Roberts recommended and sold to him.[22] STIFEL undoubtedly will attempt to argue that it should be permitted to offset DAVID'S losses in the structured notes with gains and income he received in profitable transactions. As clearly illustrated above, the courts explicitly prohibit any such netting of losses against income and gains realized in profitable transactions.

---

[22] David also suffered statutory damages of **$5,328,692** in the Solutions Program account. David's total statutory damages are **$26,504,291**.



One Downtown | 1 SE 3rd Ave. | Suite 1670 | Miami FL 33131
Phone: 305.728.3320 / 1.888.840.1571 | Fax: 786.842.7549

As explained above, to permit STIFEL to net out DAVID'S losses against gains or income he received in profitable transactions, is tantamount to granting STIFEL a "license to defraud" up to the point where losses equal gains and is strictly prohibited by law.

## XIV. <u>THE "OUT-OF-POCKET" MEASURE OF DAMAGES IS NOT THE CORRECT MEASURE OF DAMAGES IN THIS CASE</u>

At the final hearing, STIFEL may seek to avoid full liability for its appalling misconduct by asking this Panel to apply a damages methodology that flies in the face of common sense. The "net-out-of-pocket" (NOP) measure of damages[23] is not an appropriate measure of damages in this case because it fails to adequately compensate DAVID for his losses and fails to account for the universally recognized concept that there is a time value to money. The purpose of awarding compensatory damages is to restore the restore the victim to the position they would have been in if the wrongful conduct had not occurred. See <u>Morgan Stanley & Co. v. Coleman (Parent) Holdings Inc.</u>, 955 So.2d 1124 (Fla. 4th DCA 2007)("**In tort actions, the goal is to restore the injured party to the position it would have been in had the wrong not been committed**.")(Emphasis added.)

DAVID is entitled to recover his lost principal of **$19,526,603**. The net-out-pocket measure of damages which STIFEL seeks to apply in this case improperly attempts to reduce DAVID'S damages by offsetting his principal loss with income received from the investments. As a matter of common sense, DAVID could have received comparable

---

[23] The net-out-of-pocket measure of damages is calculated by taking David's principal investment, and subtracting any dividends, interest and sales proceeds he received.



EREZ LAW
PROFESSIONAL LIMITED LIABILITY CORPORATION

One Downtown | 1 SE 3rd Ave. | Suite 1670 | Miami FL 33131
Phone: 305.728.3320 / 1.888.840.1571 | Fax: 786.842.7549

income from any number of any number of investments without employing Roberts' speculative and recklessly concentrated strategy which needlessly exposed him an extraordinary and unsuitable degree of risk.

The net out-of-pocket calculation fundamentally ignores the essential legal requirement of damages analysis (to place the injured party in the position they would have been in "but for" the wrongful conduct at issue) because it deprives the investor of any return on their principal during the period the wrongful conduct was occurring.

Courts have properly rejected the net-out-of-pocket measure as a legitimate basis for computing damages. See  Kane v. Shearson Lehman Hutton, Inc., 916 F.2d 643, 646 (11th Cir. 1990) ("**if the [net out-of-pocket]... methodology espoused by Shearson [the brokerage firm] were adopted, it could serve as a license for broker-dealers to defraud their customers with impunity up to the point where losses equaled prior gains**.")(Emphasis added.) The net-out-of-pocket measure of damages fails to accomplish the basic objective of compensatory damages, which is to place the investor in the position they would have been in, had the wrongful conduct had not occurred. As explained below, the appropriate measure of damages in this case is to award statutory damages as required by the Florida Securities and Investor Protection Act, capital losses or benefit of the bargain damages, as authorized by FINRA.

## XV. <u>DAVID IS ENTITLED TO BENEFIT OF THE BARGAIN DAMAGES</u>

FINRA and the law are clear that DAVID is entitled to recover "benefit of the bargain" damages. Pursuant to the benefit of the bargain measure of damages, the

defrauded purchaser is entitled to recover the difference between the actual value of the purchased item and its value had the seller's representations been true.

FINRA and the law authorize this Panel to award benefit of the bargain damages. For example, FINRA explicitly instructs arbitrators that they are authorized to award benefit of the bargain damages. Specifically, the FINRA Arbitrator's Guide states:

> **Types of Remedies**
> Depending upon the relief parties request, **there are several types of remedies arbitrators may consider**. If the panel is satisfied by a preponderance of the evidence that the respondent is liable for the alleged loss, the panel should determine an appropriate remedy. **Remedies may include**…
>
> **Benefit of the Bargain**
> **The benefit of the bargain measure seeks to give the claimant the expected value of the investment. For example, the claimant's measure of damages would be the amount the investment would have been worth if the respondent's misrepresentation had been true, less what the investment is actually worth**… (Emphasis added.)

See Exhibit "L".

The law in Florida is equally clear that benefit of the bargain damages is the appropriate measure of damages in this case. In <u>Laney v. American Equity Inv. Life Ins. Co.</u>, 243 F.Supp.2d 1347 (M.D. Fla. 2003), the court reaffirmed Florida's longstanding rule that courts may award benefit of the bargain damages and held:

> The purpose of compensatory damages in a tort case is to restore the injured party to the position it would have been had the wrong not been committed... **Florida tort law allows one of two measures of damages to accomplish this purpose in a fraud case**…The first measure of damages is known as the "out-of-pocket-rule."... The out-of-pocket-rule allows for recovery of amounts that the plaintiff actually lost… **The second measure of damage is known as the "benefit-of-the-bargain-rule"** and is utilized when the out-of-



One Downtown | 1 SE 3rd Ave. | Suite 1670 | Miami FL 33131
Phone: 305.728.3320 / 1.888.840.1571 | Fax: 786.842.7549

pocket-rule does not fully compensate the plaintiff… **Under the benefit-of--bargain-rule, the plaintiff is entitled to the loss of its bargain, similar to a recovery on a warranty.**

**The two measures of damages are utilized together in what is known as the "flexibility theory."**… Under the flexibility theory:

(1) if the defrauded party is content with recovery of only the amount he actually lost, his damages will be measured under [the out-of-pocket-rule]; (2) **if the fraudulent representation also amounts to a warranty, recovery may be had for the loss of the bargain, because a fraud accompanied by a broken promise should cost the wrongdoer as much as the latter alone**; (3) where the circumstances disclosed by the proof are so vague as to cast virtually no light upon the value of the property had it conformed to the representations, the court will award damages equal only to the loss sustained; and (4) **where the damages under the 'benefit of the bargain' rule are proved with sufficient certainty, that rule will be employed**. (Emphasis added.)

In the instant case, Roberts made misrepresentations to DAVID and other customers that Roberts' structured note strategy would generate an average yield of 12.25-13% and preserve their principal. Had Roberts' representations been true, DAVID would have received all of the interest payments that Roberts represented and would not have sustained any loss of capital in the structured notes.

Similarly, STIFEL and Roberts represented that the Solutions Program portfolio that DAVID agreed to invest in was a "**blended portfolio**" of "**75% 3rd party money managers**" who primarily invest in "**mutual funds or ETFs**" with an "**overall objective to mitigate risk via portfolio diversification**." Had Roberts and STIFEL'S representations been true, DAVID'S Solutions Program account would have been allocated approximately: 40% in the S&P 500 index, 30% in the Barclays Aggregate Bond



One Downtown | 1 SE 3rd Ave. | Suite 1670 | Miami FL 33131
Phone: 305.728.3320 / 1.888.840.1571 | Fax: 786.842.7549

index, 15% in the Russell 2000 index, 10% in the EAFE index[24] and 5% in the Emerging Markets index. See Exhibit "I". As such, DAVID is entitled to benefit of the bargain damages of **$23,128,793**, which is comprised of **$20,567,172** in his structured note accounts and **$2,561,622** in his Solutions Program account.

## XVI. STIFEL'S DEFENSES RELY ON ERRONEOUS AND LEGALLY UNSUPPORTABLE ARGUMENTS

### a. Stifel's claim for attorney's fees violates FINRA policy

STIFEL'S claim for attorney's fees pursuant to DAVID'S customer agreement is also invalid. In its Answer, STIFEL asserts that it is entitled to attorney's fees pursuant to the terms of its customer agreement which states: "Any expense, including attorney's fees, incurred by Stifel in defense in an action brought by you seeking rescission of any agreement between you and Stifel or to recover damages for the activities of Stifel or its agents or employees in handling any of your accounts shall be borne solely by the account, or by you as the case may be, should Stifel prevail."

STIFEL'S one-way attorney's fee provision is contrary to public policy, FINRA policy and the law because it has a chilling effect on customers considering pursuing claims and affords STIFEL rights it would not otherwise be entitled to under state law while curtailing DAVID'S rights that they would otherwise have. See A.G.Edwards & Sons, AWC No. EAF0400790002 (Sept. 25, 2006) (disciplining member firm for including in its customer agreements a provision that provided the customer would be responsible for

---

[24] "EAFE" is an acronym that stands for Europe, Australia, and the Far East. The EAFE index is a stock market index that measures the performance of large and mid-cap companies across 21 developed markets outside the U.S. and Canada.



member firm's costs and attorney's fees in the event a customer brings a claim against the firm.); <u>See</u> also, NASD Notice to Members 95-85 ("Agreements cannot be used to curtail any rights that a party may otherwise have had in a judicial forum."); and <u>Layman v. Combs</u>, 994 F.2d 1344 ("A person who contracts to pay an opponent's attorneys' fees if she sues unsuccessfully is agreeing to a departure from the standard American rule that a party prevailing in a lawsuit is not entitled to recover fees from the loser.")

### b. <u>Stifel's ratification defense is directly contradicted by the law</u>

It is anticipated that STIFEL will attempt to avoid liability for its wrongful conduct by erroneously asserting that DAVID ratified Roberts' unauthorized trades and trading strategy. As explained below, any such assertion by STIFEL is directly contradicted by the law which explicitly provides that until an investors learns the truth about the risks of the investments that were misrepresented or purchased without authorization, they cannot be said to have ratified the transaction.

For example, in <u>Clayton Brokerage v. CFTC</u>, 794 F.2d 573 a commodities trading firm sought to set aside an award on the grounds that, amongst other things, the investor signed a risk disclosure and ratified the unauthorized transactions. <u>Id.</u> 578. When rejecting this argument, the Eleventh Circuit Court of Appeals held:

> It follows that **until a customer learns of the risk of trading, his or her continued trading is premised on reliance upon the failure to disclose or misrepresentations about the risk involved, and the broker will be liable for losses resulting therefrom**. *See Myron v. Hauser*, 673 F.2d 994, 1006 (8th Cir.1982); *Crook v. Shearson Loeb Rhoades, Inc.*, 591 F.Supp. 40 (N.D.Ind.1983); *cf., Karlen v. Ray E. Friedman & Co. Commodities*, 688 F.2d 1193,1198–1200 (8th Cir.1982) (**customer who lacked sophistication and experience in commodity futures trading and who relied on**



One Downtown | 1 SE 3rd Ave. | Suite 1670 | Miami FL 33131
Phone: 305.728.3320 / 1.888.840.1571 | Fax: 786.842.7549

**expertise of broker could not knowingly ratify unauthorized trades**)…

**We are unwilling to conclude, as a matter of law, that Sturcken should have seen through Gotthelf's excuses and assurances** to understand that the losses he had experienced reflected the true risk of commodity futures trading…

**Clayton also argues that the risk disclosure statement signed by Sturcken, as required by 17 C.R.F. § 1.55, was sufficient to inform Sturcken of the risk of trading**. **This suggestion is without merit**… It does not warn the customer to disbelieve representations that certain trading strategies can limit losses… **The customer may be led to believe that the course of trading on which he or she embarks is not susceptible to the extreme risk that the statement warns "can" or "may" accompany trading**.

Further, the statement uses terms of art that require explanation, without which the significance of the warning to the particular customer may not be understood. **Thus, it is not logically inconsistent to believe the warning on the risk disclosure statement while at the same time believing representations such as were made by Gotthelf**…

**Gotthelf's overarching misrepresentations made Sturcken incapable of entering into trades knowledgeably. He was therefore legally incapable of authorizing or ratifying the transactions**.  (Emphasis added.)

Id. at 578-581; See also, In re CJ Wright & Co., Inc., 162 B.R. 597 at 608 (M.D. Fla. 1993)

("**Under Florida law, a principal can ratify its agent's unauthorized acts only upon full knowledge**… **If an act is ratified based upon the suppression of a material fact or an unknown fact then the ratification is invalid being based on fraud**.")(Emphasis added.)



Similarly, in the instant case Roberts' misrepresentations and material omissions rendered DAVID legally incapable of ratifying Roberts' transactions.  As clearly illustrated above, STIFEL'S ratification defense is directly contradicted by the law.

## XVII. STIFEL'S CONDUCT WAS WILLFUL, WANTON AND DEMANDS AN AWARD OF PUNITIVE DAMAGES

The extent and scope of Roberts and STIFEL'S fraud is alarming. Roberts misled DAVID that his structured note strategy was a conservative bond-like strategy that generated an average annual yield of 12.25-13% and preserved principal.

FINRA has clearly stated that this Panel has the authority to punish UBS by entering an award of punitive damages. For example, the FINRA Arbitrator's Manual states: "**Arbitrators may consider punitive damages as a remedy**."   (Emphasis added.)

Furthermore, the Supreme Court of the United States has explicitly held that FINRA arbitration panels have the inherent authority to enter an award of punitive damages regardless of whether punitive damages are prohibited by state law. Specifically, in Mastrobuono v. Shearson Lehman Hutton, 514 U.S. 52 (U.S. 1995) an arbitration panel entered an award of punitive damages against the brokerage firm sought to vacate the award on the grounds that New York law prohibited arbitrators from awarding punitive damages. When rejecting this argument, the Supreme Court of the United States held:

> **The arbitral award should have been enforced as within the scope of the contract between the parties**...

EREZ LAW
PROFESSIONAL LIMITED LIABILITY CORPORATION

One Downtown | 1 SE 3rd Ave. | Suite 1670 | Miami FL 33131
Phone: 305.728.3320 / 1.888.840.1571 | Fax: 786.842.7549

> **[i]f contracting parties agree to include punitive damages claims within the issues to be arbitrated, the FAA ensures that their agreement will be enforced according to its terms even if a rule of state law would otherwise exclude such claims from arbitration**.
>
> Shearson's standard-form "Client Agreement," ... provides that "any controversy" arising out of the transactions between the parties "shall be settled by arbitration" in accordance with the rules of the National Association of Securities Dealers (NASD)...
>
> We hold that the Court of Appeals misinterpreted the parties' agreement. **The arbitral award should have been enforced** as within the scope of the contract. The judgment of the Court of Appeals is, therefore, reversed.

Id. at 52-63. (Emphasis added.) See also, Bonar v. Dean Witter Reynolds, 835 F.2d 1378 (11th Cir. 1988)(FAA permits an award of punitive damages); and Masey v. Humana, Inc., 2007 WL 2788612 (M.D. Fla. 2007)(a finding of a breach of fiduciary duty will justify an award of punitive damages.)

Florida law is equally clear that this Panel has the authority to enter an award of punitive damages. Florida Statutes §768.737 provides as follows:

> **768.737 Punitive damages; application in arbitration.**
>
> Where punitive damages are available as a remedy in an arbitration proceeding, ss. 768.72, 768.725, and 768.73 apply. When an award of punitive damages is made in an arbitration proceeding, the arbitrator who renders the award must issue a written opinion setting forth the conduct which gave rise to the award and how the arbitrator applied the standards in s. 768.72 to such conduct. (Emphasis added.)

Florida Statutes §768.72 specifically authorizes this Panel to enter an award of punitive damages against STIFEL for its own illicit conduct, and for the illicit conduct of its employee, Roberts. Florida Statutes §768.72 states:



One Downtown | 1 SE 3rd Ave. | Suite 1670 | Miami FL 33131
Phone: 305.728.3320 / 1.888.840.1571 | Fax: 786.842.7549

(2) A defendant may be held liable for punitive damages only if the trier of fact, based on clear and convincing evidence, finds that the defendant was personally guilty of **intentional misconduct or gross negligence**…

(b) **"Gross negligence" means that the defendant's conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct**.

(3) **In the case of an employer, principal, corporation, or other legal entity, punitive damages may be imposed for the conduct of an employee or agent only if the conduct of the employee or agent meets the criteria specified in subsection (2) and**:

(a) The employer, principal, corporation, or other legal entity actively and knowingly **participated in such conduct**;

(b) The officers, directors, or managers of the employer, principal, corporation, or other legal entity knowingly **condoned, ratified, or consented to such conduct**; **or**

(c) **The employer, principal, corporation, or other legal entity engaged in conduct that constituted gross negligence and that contributed to the loss**, damages, or injury suffered by the claimant. (Emphasis added.)

In the instant case, Roberts engaged in intentional misconduct and gross negligence by amongst other things:

  i. falsely and misleadingly representing that the structured notes and structured note strategy was conservative, bond-like strategy that would generate an average yield of 12.25-13% and preserve principal;

  ii. recklessly concentrating DAVID'S accounts in structured notes and concentrating DAVID'S structured note holdings in notes linked to the same highly volatile reference assets;

  iii. conducting business through unmonitored and unsupervised text messages on his personal mobile device in order to evade supervision by STIFEL;



iv. exercising discretionary trading authority in DAVID'S managed Solutions Program account to implement an investment strategy that was completely contrary to the Strategic Allocation model that STIFEL approved and DAVID agreed to; and

v. placing their own financial interest ahead of DAVID'S best interest;

These are just a few examples of Roberts' intentional misconduct and gross negligence.

As Roberts' employer, STIFEL is liable for punitive damages because it condoned Roberts' conduct and engaged in gross negligence that contributed to DAVID'S losses.

Despite having actual knowledge of Roberts' disturbing pattern of misconduct, STIFEL chose to permit Roberts to work in Miami while being supervised remotely by branch managers who were over 1,000 miles away in New York City.

STIFEL ignored numerous internal compliance alerts triggered by Roberts' violations of STIFEL'S own concentration limits. Despite having actual knowledge of Roberts' recklessly concentrated investment strategy in DAVID'S accounts, STIFEL failed to take any meaningful action in response.

In addition, STIFEL failed to detect, or detected and failed to respond to the fact that Roberts' investment strategy in DAVID'S Solutions Program account was completely contrary to the Strategic Allocation philosophy that STIFEL approved and DAVID agreed to.

STIFEL did not merely condone Roberts' illicit conduct at issue, it continues to aggressively defend Roberts' misconduct in this very proceeding. In fact, as of the filing

of this pre-hearing brief Roberts continues to be a STIFEL employee and has yet to face any discipline for his egregious misconduct at issue in this case. Had STIFEL been adequately supervising Roberts, DAVID'S losses could have been largely avoided. As clearly illustrated above, STIFEL'S gross negligence in failing to adequately supervise Roberts directly contributed to DAVID'S losses.

STIFEL'S conduct is particularly egregious in light of the sacred fiduciary duty that it owed to DAVID. DAVID placed his trust and confidence in STIFEL to provide them with truthful and unbiased investment advice. STIFEL'S deceitful and illicit conduct was willful, wanton and demands an award of punitive damages. This Panel must send a message to STIFEL that such outrageous misconduct will not be tolerated.

## <u>CERTIFICATE OF SERVICE</u>

       I HEREBY CERTIFY that a true copy of the foregoing was furnished via the FINRA Portal to:  Cassandra Bartlett, Case Administrator, Financial Industry Regulatory Authority, Boca Center - Tower 1, 5200 Town Center Circle, Suite 200, Boca Raton, FL 33486, Cassandra.Bartlett@finra.org; fl-main@finra.org; and G. Wayne Hillis, Jr., Esq., Bradley, Arant, Boult, Cummings LLP, Promenade Tower, 1230 Peachtree Street NE, Atlanta, Georgia 30309, whillis@bradley.com, on this 27th day of September, 2024.

> EREZ LAW, PLLC
> *Counsel for Claimants*
> One Downtown
> 1 SE 3rd Avenue, Suite 1670
> Miami, FL  33131
> Telephone Number: (305) 728-3320
> Toll Free Number:   (888) 840-1571
>
> By: _____
>        Jeffrey Erez, Esq.
>        Florida Bar No.: 0102369
>        jerez@erezlaw.com
>        Stefan Apotheker, Esq.
>        Florida Bar No.: 0012502
>        sapotheker@erezlaw.com