# Exhibit N-11

**In the Matter Of:**

JANNETTI V. STIFEL, NICOLAUS & CO.

23-01342

---

**HEARING**

*January 24, 2025*

---



800.211.DEPO (3376)
EsquireSolutions.com

```
 1          FINANCIAL INDUSTRY REGULATORY AUTHORITY

 2                  DISPUTE RESOLUTION

 3               FINRA ARB. NO. 23-01342

 4

 5   In the Matter of Arbitration Between:

 6

 7   DAVID JANNETTI, SARAH LYN JANNETTI,

 8   ADAM JANNETTI AND LEAH JANNETTI,

 9          Claimants,

10   v.

11   STIFEL, NICOLAUS & CO., INC.,

12          Respondent.

13   _____/

14

15                  January 24, 2025

16

17      5200 Town Center Circle, Tower 1, Suite 200

18                  Boca Raton, Florida

19

20

21

22   THE PANEL:

23   Monica I. Salis, Chairperson

24   Stephanie Jeannette Charny, Public Arbitrator

25   Marc Elias Narotsky, Public Arbitrator
```



```
 1                        APPEARANCES

 2

 3    ON BEHALF OF THE CLAIMANTS:

 4    Jeffrey Erez, Esq.

 5    Erez Law, PLLC

 6    1 SE 3rd Ave Ste 1670

 7    Miami, FL 33131-1714

 8    305-728-3320

 9    Jerez@erezlaw.com

10    Sapotheker@erezlaw.com

11

12    ON BEHALF OF THE RESPONDENT:

13    G. Wayne Hillis, Jr., Esq.

14    Scott Zweigel, Esq.

15    V. Justin Arpey, Esq.

16    Britney M. Crawford, Esq.

17    Bradley Arant Boult Cummings LLP

18    Promenade Tower 1230 Peachtree Street NE

19    Atlanta, GA 30309

20    404-868-2100

21    Whillis@bradley.com

22    Szweigel@bradley.com

23    Jarpey@bradley.com

24    Bcrawford@bradley.com

25
```



```
 1   REPORTED BY:

 2   Lisa MacDonald, Court Reporter

 3   Notary Public No. HH-472774

 4   J11808223

 5

 6   ALSO PRESENT:

 7   Rosangela Diaz

 8   David Jannetti

 9   Jonathan Heller

10   Edward Rose

11

12   John W. Mitchell, Esq.

13   Peter Kennedy

14   Kjell Ekdahl

15

16

17

18

19

20

21

22

23

24

25
```



```
 1                    INDEX OF PROCEEDINGS

 2                                                      PAGE

 3    CLOSING STATEMENTS:

 4         By Claimants, Mr. Erez                          5

 5         By Respondent, Mr. Hillis                     103

 6         By Claimants, Mr. Erez                        239

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



 1 | (Proceedings commenced at 8:08 a.m.)

 2 |         CHAIRPERSON SALIS:  And we're starting at

 3 | 8:08.

 4 |               CLAIMANTS' CLOSING STATEMENT

 5 |         MR. EREZ:  Good morning, members of the

 6 | panel.  This was Day 19 of the final hearing.  And I,

 7 | obviously, on behalf of both sides, want to thank you

 8 | for your perseverance, your attention to detail, your

 9 | professionalism and your service on this panel.  We

10 | know it's a sacrifice to be here and I'm sure both

11 | sides thank you for your commitment to this longer-

12 | than-expected case.

13 |         The burden of proof on the Claimant is 50

14 | percent plus one.  Anything that tips the scales to

15 | more than 50 percent, to the extent there is a

16 | question of fact, and we will submit to you that there

17 | are sufficient admissions by Respondents that there

18 | are not factual determinations that have to be made

19 | for the Claimants to prevail, but to the extent that

20 | there are, the burden of proof is 50 percent plus one,

21 | what is more likely?

22 |         And to the extent that there are factual

23 | determinations, we believe the evidence will support

24 | that the Claimants' factual assertions have been

25 | proven in this case.



1          Stifel has a burden of proof on its

2     affirmative defenses.  So to the extent you hear any

3     affirmative defenses from Stifel in this case, that is

4     their burden of proof.  And we submit to you, they

5     have not met their burden of proof on any of their

6     defenses.

7          It's been a little while since Chuck Roberts

8     was here, but this case is very much about Chuck

9     Roberts.  And Chuck Roberts could only sell over $3.5

10    billion of structured notes, that's billion dollars

11    with a B, and earn $48 million in gross revenue in

12    2021, one year, by misrepresenting his custom

13    structured note strategy to investors just like and

14    especially Mr. Jannetti.

15         Chuck Roberts placed his financial interest

16    ahead of his clients.  He even said the quiet part out

17    loud to his partner, David Stone, I'm calling and

18    chiseling every mother f in a text message that he

19    believed would never see the light of day, which

20    always his excuse for that text message and many

21    others, it was just a private conversation between me

22    and my best friend.

23         Well, if you don't get more candid and

24    honest than when you're having what you believe is a

25    private conversation with your best friend.



1        Stifel knew that Chuck Roberts was a bad

2   actor when they hired him.  He had a checkered

3   history, double-heightened supervision when they hired

4   him.  They took a calculated risk in hiring him, and

5   now the bill has come due.

6        Stifel's entire defense for 19 days has been

7   to make one excuse after another for Mr. Roberts's

8   egregious misconduct.  And even after two

9   adjudications, two adjudications, even after the

10  filing of 18 customer complaints, Stifel continues to

11  employ Mr. Roberts.

12       They will do nothing to discipline him or

13  stop him because he makes too much money for the firm,

14  and they are blinded by the revenue that he generates

15  for them.

16       Evidence was that Stifel has no interest in

17  actually supervising Mr. Roberts, and they were unable

18  to supervise Mr. Roberts, a bad actor that

19  intentionally sought to evade supervision by

20  intentionally, knowingly sending text messages to the

21  tune of tens of thousands, not only writing text

22  messages, but writing text messages with content that

23  he knew was prohibited, intentionally sending

24  prohibited information on a prohibited means of

25  communication, thinking nobody would ever see it.



1          They are unable to supervise that person,

2    and their own expert admitted it.  In a glance of

3    honesty from Mr. Kennedy, he said he's not eligible

4    for hire.  In a moment of clarity, he could not even

5    utter another misrepresentation to this panel.  He had

6    to tell the truth.

7          Even though Stevenson said he's eligible for

8    hire, you heard it from their own $90,000 expert

9    witness.  Not eligible for hire.  That tells you

10   everything you need to know because despite their

11   denials and Mr. Kennedy's own denials that they did

12   nothing wrong, when they hired him, they did nothing

13   wrong, when he was employed there, Chuck Roberts did

14   nothing wrong, the supervision was perfect, when I

15   asked them the ultimate question, not eligible for

16   hire.  Contradicted and eviscerated his entire prior

17   testimony.

18         Chuck Roberts and Stifel, in this case, over

19   the course of 18 days, are trying to do to you what

20   Chuck Roberts did to David Jannetti.  Let me repeat

21   that again.  Nothing could be more important.  Chuck

22   Roberts and Stifel, in this case, over the course of

23   18 days, are trying to do to you what Chuck Roberts

24   did to David Jannetti, convince you that the

25   structured notes that were sold to David Jannetti, the



1   XBI, KRE, and single stock notes are not high risk.

2              That's what they're trying to do in this

3   case, convince you, as they convinced David Jannetti,

4   as Mr. Roberts did, that it's not high risk.  That is

5   the core misrepresentation by Mr. Roberts, and that is

6   the core misrepresentation that continues into this

7   trial -- into this trial.  That is fraud.

8              Stifel chastised Mr. Jannetti for not

9   understanding that the higher potential yields and

10  coupons meant higher risk and the same time telling

11  you that a structured note with a 15 percent

12  contingent coupon is not high risk.

13             So Mr. Jannetti, you should have known

14  better that if you can get 15 percent, it's high risk,

15  but by the way, members of the panel, it's not high

16  risk.  Speaking out of both sides of the mouth, and

17  you can't have it both ways.

18             So here's what's happened in this case.

19  When the answer was filed, they said the structured

20  note fit Claimant perfectly, and that the Claimant was

21  interested in speculation and a high degree of risk.

22  And the structured note fit the high degree of risk

23  perfectly.

24             So in their answer, before the award in

25  Muhlbauer came out, before the award in DeLuca came



```
 1   out, that's their position.  Then in the cases, before

 2   the awards came out, Mr. Roberts says structured

 3   notes, high risk.  High risk.  Mr. Stevenson, before

 4   the award came out in DeLuca and Muhlbauer, before

 5   this case started, high risk.  Mr. Roberts, in the

 6   Muhlbauer case, structured notes, high risk.  Mr.

 7   Roberts, in the Muhlbauer case, high risk.

 8          Stifel, Mr. Roberts, Mr. Stevenson, across

 9   the board, the structured notes were high risk.  Then

10   the award in DeLuca comes out.  What happens?

11   Stifel's opening statement -- which is not the highest

12   risk 7 of the investment pyramid.  They deny that the

13   structured notes are high risk, Mr. Hillis in opening

14   statement.

15          Mr. Roberts, in his testimony in this case,

16   they're not high risk.  Do I think it's high risk?

17   No.  Mr. Roberts, in this case, I wouldn't consider

18   them high risk.  Mr. Stevenson, in this case, before I

19   impeached him, I do not believe they're high risk.

20          So before the DeLuca award, everything is

21   high risk, even the answer in this case.  After the

22   DeLuca award, not high risk.

23          Now, what is for you to carefully pay

24   attention to is the coordination effort between

25   Stifel's counsel and Mr. Roberts.  And pay attention
```



```
 1   to the words because we went back and got the
 2   transcript of the opening statement, and we juxtaposed
 3   it to Mr. Roberts's testimony to show you that not
 4   only was there a complete reversal and change of sworn
 5   testimony and position, but that it was a coordinated
 6   effort by counsel and Chuck Roberts to change their
 7   story and give you false testimonies and evidence.
 8              And here it is, Stifel's opening statement.
 9   What words do they use?  We'll talk about the
10   investment pyramid.  At the highest risk are
11   commodities, futures, CDs, treasuries; stocks are
12   somewhere in the middle because it's all stock market
13   risk, which is -- you're talking about the segment of
14   the stock market, which is not the highest risk of the
15   investment pyramid, commodities.
16              Track that exact language to what Mr.
17   Roberts testified in this case.  In this case, he uses
18   the word commodity, medium risk, stocks with medium
19   risk, the pyramid down the middle.  He uses and tracks
20   the exact same language because when they prepared for
21   hours on end, they decided that the strategy that they
22   used to defend in DeLuca and Muhlbauer should not be
23   replicated.  So they changed their testimony on the
24   core issue of this case, on the core issue of the
25   case.
```



 1          Look at the words, and we'll talk about the
 2   investment pyramid at the highest risk commodities
 3   future, lowest risk, CD and treasury stocks are in the
 4   middle.  Mr. Roberts, I think in terms of the pyramid,
 5   I would call it all the most conservative to the most
 6   aggressive.  I think this is kind of down the middle.
 7          They track each other perfectly because they
 8   spent hours preparing and hours preparing to deceive
 9   this panel.  It is a shameful, reprehensible effort
10   that Stifel, these folks right here, represent an
11   $11.7 billion publicly traded company.
12          The CEO was here.  New York Stock Exchange
13   listed company, $11.7 billion market cap, and they
14   reached a level of desperation to win this case at all
15   costs that they have absolutely given you false
16   testimony in a very coordinated effort.
17          And how do you know what they're saying is
18   not true?  Because even in this case, Mr. Jannetti --
19   I'm sorry -- Mr. Roberts, at one point, had to admit
20   that the notes were speculative.  Even in this case,
21   he couldn't keep his lie going for long enough.  He
22   says, yes, you believe they were speculative?  I
23   believe they were speculative.
24          Just for a moment, he slipped, and then he
25   went back into that role of saying they're not high



 1   risk.  Lori Lucarelli, the manager, in this case, they

 2   are aggressive.  Ron Krichevsky, in what could be one

 3   of the most telling moments in the whole case, I said,

 4   Mr. Krichevsky, you're familiar with Mr. Jannetti?  I

 5   am.

 6           Are you familiar with the single stock notes

 7   that were sold to Mr. Jannetti?  I am.  Objection.

 8   Objection.  Overruled.  Answer.  Were they high risk?

 9   Objection.  Overruled.  Answer.  He's getting angry.

10   He doesn't want to answer.  Mr. Hillis is getting

11   nervous.  Finally, he blurts out in a very angry tone,

12   obviously high risk.

13           What's Stifel's entire defense in this case?

14   They're not high risk.  You have the CEO of Stifel

15   contradicting Stifel's own position in this case.  You

16   have Lori Lucarelli contradicting the position in this

17   case.

18           You had two experts this week in impeachment

19   contradict the position in this case because what do

20   they know?  If you accept that the structured notes

21   were high risk, Claimants prevail on all claims

22   regarding the structured notes.  The Claimants prevail

23   and prove their case on all claims.

24           That's why they manufactured a story,

25   changed their sworn testimony, changed their position



```
1    from their answer.  Not only were the structured notes
2    in and of themselves linked to single stocks like
3    Dynatrace, Palantir, Twilio, DocuSign, and XBI high
4    risk, but when you combine it, $27 million of notes,
5    90 percent of household assets, that increases risk.
6           And then when you concentrate 45 percent in
7    XBI, that increases risk.  And when you concentrate 50
8    percent in single stock notes, that increases risk.
9    When you put the margin of $10 million, that increases
10   risk.  And then when you use the mortgage funds that
11   were used to invest, that increases risk.
12          All of that, even according to their own
13   experts, they admit everything I just told you
14   yesterday and the day before, all of that makes this
15   portfolio, the structured note strategy, rank
16   speculation, the highest level of risk.
17          And you know how you know it was the highest
18   level of risk?  Because just a small downturn in the
19   underlying caused margin call after margin call after
20   margin call and a complete wipeout and an 87 percent
21   negative return in the structured note account in
22   2022.
23          FINRA securities rules and Stifel compliance
24   rules, we spend a lot of time on FINRA rules and
25   Stifel rules.  And you know what those rules are
```



1   designed to protect against?  This.  Exactly what

2   happened here is what the FINRA rules and the Stifel

3   compliance rules are designed to protect against this.

4   This should never have happened.  This only happened

5   because Mr. Roberts flagrantly and intentionally

6   violated multiple Stifel rules, multiple FINRA rules,

7   and Stifel did nothing to supervise or prevent it.

8            This is what happens when the rules are not

9   followed.  This is what happens when the rule designed

10  to prevent against giving someone a projected return,

11  misrepresenting yield, misrepresenting risk, not being

12  allowed to tax, Reg BI 2111, the rule that requires

13  you to do due diligence, understand the risk of the

14  product.  All of those rules are designed to prevent

15  against Mr. Jannetti's experience in three years of

16  losing $16 million.

17           From the testimony and the evidence, a lot

18  of which we will continue to go through right now, the

19  Claimants have met their burden.  And what I want to

20  focus on while I go through this is not only have they

21  met their burden, they've met their burden largely

22  with Stifel's own admissions.

23           If you just focus on the admissions that

24  they made, you will see that there is sufficient

25  evidence to find on behalf of Claimants on all claims.



1    I want to start on Tab 37 because on Tab 37

2    is what I call the statistics or the stats.  These are

3    the stats in this case.  So Tab 37, I'm going to go

4    kind of fast, but here it is.

5         The first page is all the accounts

6    performance From February 2020, August 2023, you see a

7    loss of 15 at the bottom, $15,981,330.  That's the

8    cumulative loss between February 2020 and August 2023.

9    You could see the month by month, you could see the

10   margin loan.  Margin loan exceeds $11 million in early

11   2022.  There's also the mortgage loan of $5.6 million.

12   That is the big picture.

13        Turning the page.  Next page is structured

14   products only.  And on the structured products only,

15   if you turn to the second page, the cumulative loss is

16   $13.1 million.  And you could also see on the account

17   value column to the left, that there's a high

18   watermark of $28 million of structured notes.  Those

19   are the statistics.

20        Going to the next page.  This is from their

21   internal document.  David Jannetti return on

22   investment, commission as a percentage of total

23   account value, 4.67 percent.  Why don't you start

24   highlighting those numbers, please?

25        4.67 percent.  That is the return on



1  investment.  That is what Mr. Roberts was able to

2  make, 4.6 percent, on the assets in the structured

3  note account in terms of commissions.  Next page.

4           I wanted to show you structured note by

5  structured note what the losses were, just so you see

6  it again.  The first note, Palantir, $2.9 million

7  loss; second note, Dynatrace, $2.3 million loss;

8  third note, Square, $1.5 million; fourth note, XBI,

9  $1.6 million.  You have there on a note-by-note basis,

10 so you could see what the losses were.  Next page.

11          The Solutions account.  The Solutions

12 account.  These are the individual losses in the

13 discretionary managed account starting with Aurinia,

14 $611,000 loss; Silvergate, $542,000 loss.  These are

15 massive losses, massive losses.

16          Next page.  I'm sorry, two pages down.  We

17 show you the structured note missed $3.7 million in

18 interest payments.  This is a schedule where you see

19 pink at a zero, that's where the coupons aren't being

20 paid.  And the coupons that were represented as a

21 yield and were not paid, $3.7 million.

22          Next page.  Concentration in XBI, 45 percent

23 of the structured notes are concentrated in XBI.  Why

24 is David Jannetti, who knows nothing about the biotech

25 sector, having 45 percent of $28 million invested in



 1   XBI, a high risk sector structured note?

 2           Then you see KRE, 50 percent, but that's

 3   because the KRE and the XBI were in the same note.

 4   But as you heard yesterday, it's the XBI that caused

 5   the losses.

 6           Next page.  You see here the XBI holding 45

 7   percent at the end of 2021, which is the critical

 8   period.

 9           Next page, you see the concentration in

10   structured notes.  This is on a gross basis.  So this

11   number is going to be lower than what you see in

12   Stifel's own reporting because this doesn't adjust for

13   the margin.  So this is on a gross basis.

14           The concentration is actually higher.  And

15   even according to this, it's 76 -- 78 percent in

16   structured note.  Their maximum on their internal

17   guidelines is 30 percent.  Those rules are designed to

18   protect against this.

19           Next page.  March 18, 2021, structured

20   products to the right, second to the right column, as

21   a percentage of household assets, 94 percent, over

22   triple, over triple their own guideline.

23           Next page shows you the household structured

24   products at 77 percent.  Different point in time.

25           Next page, December 2021 shows you to the



 1  right column -- to the right column structured

 2  products, 89 percent as a percentage of household

 3  assets, which is the metric they used, which is the

 4  metric they used.

 5          Next page.  They're showing you the

 6  performance in the notes account since inception since

 7  inception, negative 86 percent annualized return.

 8          Next page.  To the extent that they want to

 9  blame the market, we put all of the accounts and

10  showed you -- compared to the S&P, the S&P would have

11  made $5 million while these accounts lost $15.9

12  million.  The difference between how the accounts

13  performed versus the market, $21 million, $21 million.

14  Those are the critical statistics in this case.

15          Stifel charged $336,000 in margin interest,

16  $85,000 in Solutions account fees.  In total, charged

17  Mr. Jannetti $1.2 million in commissions on structured

18  notes alone.  No fewer than six margin calls.

19          The evidence in this case has proven that

20  every single structured note was solicited and

21  recommended by Mr. Roberts and that the Solutions

22  account was a discretionary account managed by Mr.

23  Roberts, they showed one or two trades where Mr.

24  Jannetti was involved in those trades.  All the others

25  in the Solutions account were total discretion, and



1   we'll talk about that more in a moment.

2              Now I want to go to what's in our closing

3   binder at Tab 1, and we've seen these throughout the

4   case.  And these are the text messages.  I want to

5   spend a moment revisiting the text messages in this

6   case.

7              And I want to start with the text to Mr.

8   Jannetti every single month, every single month,

9   sending him a structured note allocation that he was

10  prohibited from sending.  He knew it was a violation.

11  He sent it anyway.

12             And it had a yield column, which

13  communicated to David Jannetti the level of certainty

14  that Mr. Roberts felt that those payments would be

15  made.  It reinforced and created an expectation.

16             Now, when we talk about the risk and why

17  high risk versus not high risk is so critical because

18  you'll see heavy representation by Mr. Roberts

19  communicating low risk or communicating two things.

20  One, you're going to get your coupon.  Two, you're

21  going to get your money back in maturity.

22             That's what low risk, solid, very solid, not

23  risky, almost like a (inaudible) bond.  That's what

24  all of that is communicating.  It's not just you're

25  not going to lose money at the end.  It's you're going



 1    to get your coupon.

 2            Then we spent a lot of time going over these

 3    text messages.  The type of representations that Mr.

 4    Roberts made to his clients, including Mr. Jannetti,

 5    but also critically, the beliefs that Mr. Roberts says

 6    he had at the time, which are reflected in those text

 7    messages.

 8            And under Rule 2111, under Reg BI, if Mr.

 9    Roberts fails to understand the risk, just like their

10    experts admitted, Mr. Heller said it, too, if he fails

11    to understand the level of risk, if he thinks it's not

12    high risk and it is high risk, he fails suitability.

13    He fails Reg BI.  He fails his disclosure obligation.

14            So the evidence is these are high risk

15    investments.  It's been admitted to by the CEO, Mr.

16    Roberts, everybody.  None of these representations are

17    consistent with high risk.

18            You tell someone I'm going to go more

19    conservative to more notes, it's like watching paint

20    dry, conservative double digits, making you double

21    digits and tempering volatility, slow and steady,

22    solid, money good.  I mean, we've seen these

23    throughout the course of the case.  All of these are

24    communicating low risk, safe, conservative.  He uses

25    the word conservative.



1          We go on.  This is why they objected so

2    strenuously to these text messages.  We'll talk about

3    that in a minute.  Money good, slow and steady for

4    your retirement account, the J Jannetti, very solid,

5    making you double digits.  Tells David Jannetti, if

6    you cherry pick them above 13 percent, like watching

7    paint dry, 15 percent yield with protection is really

8    good.

9          You'll like 15 percent when the market goes

10   through rough periods, almost like a substitution for

11   bonds.  There are some type of notes that are risky,

12   not what we are in.  For your eyes only, I think these

13   notes are super solid to Mr. Jannetti.

14         What else did he tell Mr. Jannetti?  By the

15   way, none of those are communicating high risk.  They

16   are communicating the exact opposite, the exact

17   opposite.  I asked Mr. Ekdahl, do you agree that these

18   are money good?  No.  Are they solid?  No.  Are they

19   almost like a substitution for bonds?  No.

20         Their own experts, their own experts, admit

21   that these beliefs are false, that these statements

22   are misrepresentations.  That's their own expert.

23         What does he say to clients after the

24   investments go down in 2022?  Nothing to worry about.

25   It's not a real decline.  The notes don't reflect the



1    downside protection.  I'm confident we are not going

2    down 25 or 30 -- 25 or 30 percent.  All good, pal.

3    These notes are doing what they're supposed to do.  We

4    have nothing to worry about, nothing maturing until

5    2023.  We own good stuff.  We will get there.  Call me

6    back to Mr. Jannetti.

7            What else did he tell Mr. Jannetti?  He

8    documented text messages, which I will remind you.  He

9    deleted every single text message with David Jannetti.

10   Not only did he engage in illicit texting, he then

11   deleted them.  He deleted what he thought would be the

12   evidence against him.

13           Here's what he tells -- here's what he tells

14   Mr. Jannetti.  How would you invest your money very

15   carefully when he's talking about investing $6

16   million?  That's not what happened here.  Solid.  Very

17   solid.  I'll double the whole ball of wax.  Their own

18   manager said, and we'll show you the testimony, that

19   is an impermissible representation about a projection

20   of future return.

21           Super solid.  Where here is he communicating

22   that these are high risk?  Nowhere.  Nowhere.  So why

23   are these texts so powerful?  Anybody can come in

24   here, in a hearing room, put their hand up, take an

25   oath, and say, I'm going to tell you the truth, and



 1 | they're going to tell you what they want to tell you.
 2 |         You can't change a text message, can't alter
 3 | a text message, can't spin a text message.  What you
 4 | said, you said; it's in writing.  It is a virtual
 5 | reporting of what you thought, what you represented.
 6 | It is extremely powerful, which is why Mr. Hillis has
 7 | filed a motion in limine.
 8 |         They've sought time after time to block the
 9 | admission of text messages with third parties.  He
10 | didn't want you to see the totality of the evidence.
11 | Stifel didn't want you to see the totality of the
12 | evidence showing just how much Chuck Roberts
13 | misrepresented the level and return of these
14 | structured notes.
15 |         And those aren't subject to memory loss or
16 | mischaracterization.  They're a real-time transcript
17 | of what Chuck Roberts believed and was represented to
18 | his clients.  He admitted that his text messages is
19 | what he believed and that he made representations to
20 | Mr. Jannetti consistent with those text messages.
21 |         The text messages contain false and
22 | misleading information about risk, yield, return, and
23 | pricing of structured notes.  That is the core of this
24 | case.  If you accept Stifel's answer, if you accept
25 | Mr. Krichevsky's testimony, if you accept Mr. Loger's



 1   (phonetic) testimony, and we'll show you other

 2   evidence, Mr. Heller's testimony, Mr. Ekdahl's

 3   testimony, Mr. Kennedy's testimony.  These are high

 4   risk.

 5           Ask yourself, where in a single text message

 6   did Dave Jannetti or anybody does Mr. Roberts ever

 7   communicate high risk?  He never does.  I even asked

 8   Mr. Connolly, you ever hear Mr. Roberts tell a client

 9   that those are high risk?  He said no.

10           The evidence is overwhelming, and there's no

11   contradictory evidence.  That's why they pivoted to a

12   new position.  They're not high risk because when they

13   saw the mountain of evidence, and the first two cases

14   were adjudicated, and they realized we can't escape

15   this evidence, they tried to change their story, and

16   now they're trying to sell you -- sell you, the way

17   they sold Mr. Jannetti that the notes are not high

18   risk.

19           It is shameless, and we will ask for relief

20   based on everything that's been transpired in this

21   case.  Chuck Roberts's text messages and admitted

22   verbal representations all pertain to risk, which, as

23   I said, pertain to two things, the quarterly coupon

24   and the repayment of capital at maturity.  There is no

25   defense to the text messages.



 1          The texts that he sent to Mr. Jannetti are
 2   consistent with the texts that he sent to all his
 3   clients, telling him, they're solid, they'll be
 4   careful, they're very solid, they're prudent, double
 5   whole ball of wax.  Nothing is disclosing high risk.
 6          When you tell someone it's very solid, super
 7   solid, real solid, you are communicating stability and
 8   safety.  And Mr. Roberts even admitted it, and we'll
 9   show you that testimony.
10          By representing yield in those structured
11   note allocations month after month, he is creating an
12   expectation and misleading Mr. Jannetti in a way
13   that -- remember, Ms. Charny, you looked at Mr. Tom
14   Lee, you said, Mr. Lee, was he allowed to send those?
15   And Mr. Lee said, no, he was not.
16          When I ask the question, I don't get such
17   direct answers.  Arbitrator asks a question, you get a
18   direct answer.  Not allowed to send it.  Mr.
19   Stevenson, Ms. Lucarelli all admitted that the
20   representations that Mr. Roberts made to Mr. Jannetti
21   and others were prohibited.
22          David Jannetti consolidated almost all of
23   his investments with Chuck Roberts and Stifel based
24   upon the false and misleading documented and admitted
25   misrepresentations of Chuck Roberts.



1          Why did David Jannetti, who sold his

2     business, had several accounts, was sitting on cash,

3     had houses that were unencumbered, why did he suddenly

4     consolidate virtually 95 percent of his investable

5     assets with Chuck Roberts?  Because of the things that

6     he said to him, in addition to fermenting a very close

7     relationship with Mr. Jannetti, intentionally bringing

8     him in close, making him feel flattered and special,

9     like he was a friend, paying a lot of attention to

10    him, which Richard Roberts admitted what his modus

11    operandi.

12         Why did Mr. Roberts or why did Mr. Jannetti

13    react that way and bring in all of his assets?

14    Because Mr. Jannetti brought in assets because Mr.

15    Roberts misled him with the level of security and

16    safety.

17         Why did he agree to concentrate in

18    structured notes versus very little equity exposure at

19    Stifel?  Because he believed that was the safe way to

20    go.  That's what Mr. Roberts was telling him.  The

21    more notes you have, the safer you are, the more

22    conservative you are.

23         What's their defense to some of these text

24    messages with other people?  Out of context.  Not out

25    of context.  Mr. Roberts testified for four days or



 1  five days.  You got all the context, and there's no

 2  out of context in this case.  We have 18 days of

 3  evidence.  18 days of evidence.

 4         When I pressed their expert on text messages

 5  between Chuck Roberts and David Jannetti, he claimed

 6  out of context, forgetting that the out-of-context

 7  argument is for text messages with third parties, not

 8  with Mr. Roberts, where you have all the contact with

 9  Mr. Jannetti, where you have all the context of the

10  case, but they're just claiming this out of context.

11         Well, it's not out of context.  16 days of

12  fact witness testimony, 18 days of total testimony.

13  You have all the context to understand how these text

14  messages were communicated.

15         Stifel actually has not even tried to defend

16  these text messages.  They put Chuck Roberts on and

17  didn't even show him a single text message.  They put

18  on their experts, didn't show him a single text

19  message because they are so deathly afraid of

20  highlighting the communications that Mr. Roberts made

21  to Mr. Jannetti, which they know is prohibited,

22  misleading, false, and violative.

23         They know it, which is why they chose to

24  ignore it.  We're not ignoring it.  You're not going

25  to ignore it.  That's where the truth lies.  You want



 1  to know what Mr. Roberts said to Mr. Jannetti?  Text

 2  message.  That's what he said.  The text messages,

 3  that's what he believed.

 4          Mr. Hillis examined Jonathan Heller for five

 5  hours and did not ask him, our expert, a single

 6  question about a text message from Chuck Roberts.

 7  It's just astounding.  The most important evidence in

 8  the case was intentionally ignored by Stifel because

 9  they have no answer.  They have no response.

10          They didn't put on a single witness that

11  said what Chuck Roberts texted was permitted, was

12  honest, was truthful, was accurate disclosure.  They

13  put on no evidence.  They couldn't, and they didn't.

14          Think about this for a moment.  What did Mr.

15  Hillis go to with every witness?  The white paper, the

16  new account booklet, the prospectus, none of which was

17  ever written by Chuck Roberts.  None of which there is

18  evidence that Chuck Roberts is communicating what's in

19  those documents.

20          And then Mr. Hillis, in an effort to mimic

21  what the Claimants are doing goes, hey, Mr. Roberts,

22  did you make representations to Mr. Jannetti

23  consistent with what's in the white paper?  Chuck

24  thought it was a good answer, so he said, yes, I did.

25  Trying to mimic the questioning that we made of Mr.



1   Roberts saying, did you make representations

2   consistent with the text messages you wrote?  The

3   difference is Mr. Roberts wrote the text messages.  He

4   didn't write the white paper.

5            There's no evidence that he ever

6   communicated things that were in the white paper, and

7   the white paper is completely different than what Mr.

8   Chuck Roberts wrote.  Nothing in the white paper says

9   that these are solid, very solid, super solid, not

10  risky, almost like a substitution for bonds.  That's

11  what Chuck Roberts really believed and said to people,

12  not what's in the white paper.

13           They're complaining about the text messages

14  at the beginning of this case.  They have all the text

15  messages.  I only have the one -- a subset of my

16  client's with Mr. Roberts and what they produced

17  pursuant to a discovery agreement.  They have all the

18  text messages that Mr. Roberts turned over, ones that

19  I don't have.

20           Did they show you a single text message that

21  supports their point of view that exculpates Mr.

22  Roberts?  Not one.  Believe me, if they had

23  exculpatory text messages, something that was helpful,

24  when Mr. Roberts was saying to a client, by the way,

25  these notes are really risky, and you should be



 1   careful, you might lose a lot of your money, they

 2   would show them to you.  They don't have them.

 3            This is Chuck Roberts's own real-time words.

 4   He's caught in the act.  These are false and

 5   misleading representations.  And he knew what he was

 6   doing because he was doing it on a private device,

 7   knowing that it wasn't monitored or supervised.  He

 8   tells clients like Mr. Jannetti, don't pass the sheet

 9   around, for your eyes only.

10            Chuck Roberts admitted he misled Stifel for

11   years by texting regarding firm business and telling

12   them that he's in compliance every year in an

13   attestation.  And he misled the firm itself, but

14   they're responsible for his conduct.  They are

15   vicariously responsible, whether they knew what he was

16   doing or not, for everything that he did.

17            But what happened?  What happened with the

18   structured notes that we proved in this case, in your

19   materials that we gave you?  This is what happened.

20   What tab is that?  Tab 2.  Chuck Roberts falsely

21   believed and represented that his high risk structured

22   notes were not high risk.

23            Here's what went down.  Mr. Roberts falsely

24   believed he possessed the skill and expertise to

25   create custom structured notes that were not high



 1   risk, generating existing yield and reserve capital.

 2   Here's his own -- here's the evidence.  I'm confident

 3   we are not going down 25 percent or 30 percent.  The

 4   protection has been the barrier, which is always new

 5   to volatility.  You are massively protected.

 6          Question, did you think that you were

 7   sophisticated and experienced in putting these notes

 8   together that you knew how to create the right mix of

 9   barriers and underlying to generate the double digit

10   yield and get capital back at maturity?  Yes.

11          Did you consider that the note high risk?

12   No.  Did you disclose to Jannetti it was high risk?

13   No.  Did you -- and I asked him that for every single

14   one.  So he thinks that he's got the skill to use

15   these custom notes that he's created, use the barrier,

16   which he always thought would protect against loss of

17   capital.  That's what he thinks in 2020, 2021, up

18   until the end of 2021.

19          What representation did he make before the

20   end of 2021?  A structured note for significant

21   downside protection is prudent.  Conservative double

22   digits.  I will make you double digits to Mr.

23   Jannetti.  The notes are super solid.  The structured

24   note strategy is really solid.

25          So he thinks he could conserve capital, use



 1   the barrier, pick the right underlying.  He does the

 2   back testing, and he understands the risk of the

 3   underlying, and he could predict that it's not going

 4   to go down more than the barrier amount.  That's what

 5   he believes.  That's what he represents.

 6           What happens?  By the end of 2021, the

 7   structured notes begin to default.  They go below the

 8   barrier in December for the first time.  Coupon

 9   payments are not being made.  What happens?  Nataliya

10   Popel, the structured products desk, is alerted.

11   She's concerned.  Mark Stevenson says, there were

12   meetings that went up to the highest level.  Chuck

13   Roberts denies it.

14           Mr. Roberts makes a decision.  XBI and

15   single stock structured notes, which are defaulting in

16   late 2021, early 2022, he determined no longer have a

17   reasonable basis suitability.  Sir, you made a

18   reasonable basis suitability determination that you

19   should no longer offer single stock and XBI note to

20   your clients in January 2022?  Yes.

21           He believed XBI single stock note is not

22   suitable for anybody.  Mr. Jannetti is sitting on over

23   $20 million of those notes.  He doesn't tell him to

24   sell.  He doesn't recommend to mitigate.  He doesn't

25   tell him I've lost confidence; these aren't suitable



1   for anybody.

2           He just stops offering them, which is a

3   complete admission because the only thing that changed

4   is not the risk, is Mr. Roberts's understanding of the

5   risk.  He now understood that it was not what he

6   thought it was previously, and he changed his

7   behavior.

8           You don't change your behavior unless you

9   realize that what you were doing before was incorrect

10  or you had a false understanding before.  If the S&P

11  goes down 30 percent, you don't stop selling the S&P.

12  The S&P doesn't change because it went down.

13          It's Mr. Roberts's understanding of the risk

14  that led him to stop offering those notes, and then

15  when KRE went down, he stopped offering those and

16  hasn't offered a single stock or sector note since,

17  not since 2022.

18          Okay.  He didn't think they were high risk.

19  He doesn't represent their high risk.  He tells

20  clients they're not high risk.  He has an epiphany, a

21  realization, determines they're not suitable for

22  anybody.  And what's the evidence?  They were high

23  risk.  Answer.  We saw the answer.  The answer in this

24  case, in this case, the structured notes fit the

25  Claimants' risk profile perfectly, high degree of



1   risk.

2            In this case, Ron Krichevsky, the single

3   stock notes, obviously high risk.  Chuck Roberts in

4   the DeLuca case, high risk.  Mark Stevenson, high

5   risk.  Chuck Roberts in the Muhlbauer case, high risk.

6   Not high risk, high risk.  This is what he knows now.

7   This is what everybody admits.  This is what he

8   believed before.  That is what happened in this case.

9   That is the evidence.

10           That is a violation of the suitability rule.

11  That is a violation of Reg BI.  Mr. Roberts admitted

12  he never disclosed to Mr. Jannetti that any of the

13  structured notes were high risk, never disclosed that

14  the strategy was high risk, never disclosed that

15  anything that was taking place at Stifel was high

16  risk.

17           Now, let's take a look at Tab 4.  Tab 4 is

18  the SEC settlement with Stifel.  And if we go to the

19  fourth page, you'll see a Tab No. 18.  Stifel failed

20  to implement a system reasonably expected to determine

21  whether all personnel, including supervisors, were

22  following Stifel's policies and procedures regarding

23  texting.

24           While permitting personnel to use approved

25  communications methods for business communication,



1  Stifel failed to implement sufficient monitoring to

2  ensure that its recordkeeping and communications

3  policy were being followed.  That's Stifel admissions.

4         Tab 5.  Chuck Roberts erroneously believed

5  he could create custom structured notes with a barrier

6  that would preserve capital and generate yield.  We

7  put in Tab 5, the testimony that you see on the left

8  panel on this blow up.  Exactly what we just went

9  through is in Tab 5, and you can see the testimony

10 both in this case and the impeachment.

11        We also show you the text message he wrote

12 in December 2021.  He says, I'm confident we are not

13 going down 25 percent to 30 percent, a 10 to 12

14 percent correction could happen at any time.

15        That tells you everything you needs to know.

16 He never thought the barrier was going to be breached.

17 The barrier is the 25 to 30.  I'm confident we are not

18 going down.  Then it goes down, then he determines

19 it's no longer suitable for anybody.

20        Tab 6.  We went over some of these text

21 messages to Dave Jannetti.  They are all solid.

22        Next page.  Very solid.  Next page.  With

23 the structured note allocation, I think these are

24 super solid.  And then I asked him, on Page 132, would

25 you agree with me that what you were communicating and



 1   the strategy you were recommending in structured notes

 2   will pay the coupons that you're representing and

 3   investors will get their capital back?  Yes.  That's

 4   what he's communicating to Mr. Jannetti.  You're going

 5   to get your coupons.  You're going to get your capital

 6   back.

 7           Page after page of testimony by Chuck

 8   Roberts.  Solid implies you believe these notes will

 9   pay all their coupons and pay part maturity, correct?

10   Absolutely.  That's my intention.  And we have page

11   after page of evidence of what Chuck Roberts believed

12   was the risk.

13           Let's go to Tab 7.  Chuck Roberts.  Tab 7.

14   Chuck Roberts and Tyler Connolly admitted that Chuck

15   Roberts never represented the structured notes were

16   high risk to Dave Jannetti or any other clients.

17   Chuck Roberts's testimony right here.  Second page.

18           In regards to the sector notes, you did not

19   disclose to Mr. Jannetti that they were high risk or

20   aggressive, correct?  Correct.  Next page, Chuck

21   Roberts.  Did you disclose to Mr. Jannetti it was a

22   high risk note?  No.  Next page.

23           Next page at the bottom.  So if they're not

24   high risk and they're not speculative, you would agree

25   with me you did not disclose to Mr. Jannetti that



 1   these particular structured notes that he bought in

 2   August were high risk or speculative?  I did not.

 3          There's no dispute.  He never believed,

 4   according to him, nor disclosed that people were high

 5   risk.

 6          Tab 8, Stifel, Chuck Roberts, Mark

 7   Stevenson, Lori Lucarelli, and Tyler Connolly admitted

 8   and swore that the structured notes were high risk.

 9   And Chuck Roberts testified it was absurd for David

10   Jannetti not to believe they were high risk.  He gave

11   that testimony in this case.

12          So here's their answer.  Tab 8.  Here's

13   their answer.  Third page.  Mr. Jannetti represented

14   to Stifel that the investment objective was

15   speculation, which is defined as accepting a high

16   degree of risk.  And on the page before, on the page

17   before, investing in structured notes and high growth

18   potential stocks fit Claimants' risk profile

19   perfectly.  That's what I had on the board before.

20          Then you have Chuck Roberts's testimony.

21   Let's go to Lori Lucarelli.  I'm sorry.  Mark

22   Stevenson.  Mark Stevenson, in the DeLuca case, Page

23   1328.  Do you agree structured notes, the auto call

24   contingent notes he sold were high risk?  Yes.  So

25   before the award comes out in DeLuca, he says they are



 1   high risk.

 2          Then the new strategy by Stifel, let's deny

 3   they're high risk because we can't win a case if we

 4   say that, changes his testimony.  Lori Lucarelli, in

 5   the Jannetti case, the structured notes that Mr.

 6   Roberts sold to clients in 2021, do you believe that

 7   they are high risk?  Single stock notes are high risk.

 8          The single stock structured notes, would you

 9   consider them high risk?  Yes or no?  Yes.  Higher

10   risk.  No.  I'm asking high risk.  Answer, yes.  Lori

11   Lucarelli, the manager.

12          Again, all this testimony is contradicting

13   Stifel's position in this case that the notes are not

14   high risk.  They said it was in the answer.  They said

15   it was through their witnesses in every prior case.

16   Some other witnesses in this case said it was, yet

17   they're going to get here and for many hours and tell

18   you the structured notes are not high risk.

19          Let's move on to Tab 9.  Tab 9.  Chuck

20   Roberts testified that in January 2022, he determined

21   that the single stock and XBI structured notes lacked

22   reasonable basis suitability.  It failed to recommend

23   that David Jannetti sell his single stock and XBI

24   notes and admitted that his prior beliefs were

25   incorrect.  He actually admitted it.

1          Take a look at Page 647.  Contrary to

2    your -- contrary to the belief in which you are

3    confident that the underlying security such as XBI and

4    KRE would not go down 25 to 30, that is exactly what

5    happened.  Yes.

6          Contrary to your prior belief and

7    representation, the structured note strategy

8    recommended did not work, did not work nicely,

9    correct?  During the period of time, the specific

10   notes that Jannetti bought did not work nicely.

11         Contrary to your prior belief and

12   representations, the structured note strategy you

13   recommended was not solid, very solid, or super solid,

14   correct?  The witness, no, it wasn't super solid

15   during the finite period of time the notes Mr.

16   Jannetti decided to buy.

17         Contrary to your prior belief and

18   representation, the structured notes you created and

19   sold to Mr. Jannetti were not like a substitution for

20   bonds, correct?  Answer, they were not like a

21   substitution for bonds, correct.

22         Mr. Roberts, in his own admission, is

23   admitting that the representations he made to Mr.

24   Jannetti to buy these notes were not truthful, were

25   not accurate.  He's admitting it.  These are his



 1  admissions.

 2          Let's go to Tab 10.  Tab 10, we show that --

 3  and by the way, this is meant for you to have access

 4  to when you're deliberating, so I'll hit some

 5  highlights, but this is all here for you to review in

 6  making your very important decision in this case.

 7          No. 10, Stifel, Chuck Roberts, and Mark

 8  Stevenson changed her previous position and sworn

 9  testimony and now contend the structured notes were

10  not high risk.  And we show you in Tab 10, contrary to

11  positions and testimony in the DeLuca case and the

12  Muhlbauer case, the same witnesses are contradicting

13  themselves, which caused me to impeach them.

14          And here it is.  Chuck Roberts, in the first

15  few pages, denying that they're high risk.  Moving

16  forward, Mr. Stevenson, Page 749, you agree the auto

17  call contingent notes that Mr. Roberts sold his

18  clients were high risk?  No, I don't believe that.

19  Well, that's in the Jannetti case.

20          I then had to impeach him with his testimony

21  in Muhlbauer and DeLuca, where he did say they were

22  high risk.  All part of an effort of Stifel, in this

23  case, desperate to win this case, will say anything to

24  win, including changing all of its prior positions and

25  testimonies and trying to convince you of what they



 1   convinced Mr. Jannetti, that the notes weren't high

 2   risk.

 3            Let's keep going.  Tab 11.

 4            CHAIRPERSON SALIS:  You have two minutes

 5   left.

 6            MR. EREZ:  Before the break time?

 7            CHAIRPERSON SALIS:  Yes.

 8            MR. EREZ:  I'm happy to take a break.  Tab

 9   11.  Chuck Roberts admitted he never disclosed any

10   structured note underlying security implied volatility

11   with Dave Jannetti.  Implied volatility is the single

12   most important metric of risk that Stifel uses, that

13   Nataliya Popel uses, that Chuck Roberts's team uses.

14   It's the only metric that they use.

15            And I asked Chuck Roberts, did you ever

16   communicate or discuss with Dave Jannetti implied

17   volatility?  Answer, no.  Number 12.  And then I'll

18   take a break.  Chuck Roberts admitted he knowingly

19   intentionally sent David Jannetti prohibited yield

20   representation on structured notes.

21            I asked him about the structured note

22   allocation, and on Page 144, I said, you understood

23   that you were not permitted to communicate to your

24   client any projection or prediction of future

25   investment results.  Yes.  You were prohibited from



 1   providing a prediction of future investment results

 2   because it is misleading to your client.  He then says

 3   yes.

 4           Next page.  Page 158.  He admits that when

 5   he joined Stifel, he sent the structured note

 6   allocation with yield.  He was told he couldn't send

 7   it.  And then Page 300, question, when you sent this

 8   document, you knew you weren't supposed to send to Mr.

 9   Jannetti.  You violated the rule in the Stifel manual

10   against communication regarding securities pending

11   distribution.  Answer, yes.

12           This document that contains a yield column

13   also violates the rule against projecting or

14   predicting future investment results.  Answer, yes.

15   These are all admissions.  It's one admission after

16   another.  And when you put all the admissions

17   together, they prove all the Claimants' claims.  I'm

18   happy to take a break there.

19           CHAIRPERSON SALIS:  Very well.  Go off the

20   record.

21           (OFF THE RECORD)

22           (ON THE RECORD)

23           MR. EREZ:  And let's go back to Tab 8 for a

24   minute.  And I wanted to go -- I wanted to make sure

25   that the panel had a chance to review Dr. McCann and



```
 1   Stifel's information on implied volatility because

 2   we've all come to see how important this information

 3   is.

 4            And at Tab 8, in the back, I've included Dr.

 5   McCann's portion of his presentation on implied

 6   volatility.  And I wanted you to understand it's not

 7   just that the CEO, the experts, Chuck Roberts, and the

 8   prior cases are saying that it's high risk.  This is

 9   the factual background.  This is the information that

10   supports what everybody says that the single stock

11   notes, the XBI notes are high risk.  Take a look at

12   this.

13            Got the implied volatility for the S&P and

14   the implied volatility for the XBI in orange, it's

15   double -- it's double as risky as the S&P.  Then if

16   you turn the page, you get to the single stocks.

17   They're double and triple as risky as the S&P.  So I

18   wanted to -- and then if you go stock by stock, and

19   you could see the level of risk is implied volatility

20   measurement that everybody's using to measure risk.

21            And this substantiates exactly what Heller

22   said, exactly what Chuck Roberts said in prior cases,

23   what Mr. Krichevsky said in this case.  These are high

24   risk investments.

25            So now having done that, let me go back to
```



 1   Tab 13, and I'm going to run through this a little bit

 2   quicker now.  Starting on Tab 13, we have the tax

 3   (inaudible) and the testimony regarding Chuck Roberts

 4   telling David Jannetti to cherry pick.

 5          So this whole issue about, well, you didn't

 6   buy the full basket of structured notes, you cherry

 7   picked.  Well, cherry picking was a strategy that Mr.

 8   Roberts told Mr. Jannetti about in a text message.  He

 9   confirms it, and he confirmed that he told him he

10   could do about 13 percent if he cherry picked.  That

11   was Mr. Roberts's strategy.

12          Tab 14.  Wanted to show you again, the way

13   that these notes are supposed to be created.  And it

14   says right here on the client's unique market views,

15   the client's market views.  But what do we see in this

16   case?  That Mr. Roberts created that based on his

17   views, and it was so telling.

18          I wanted to skip to Nataliya Popel's

19   testimony, which is on the second page and at Page 48.

20   And remember, she's the head of the structured

21   products desk.  And I asked her, did you know that the

22   custom notes that Mr. Roberts was creating were not

23   tailored to be the particular client's personal market

24   theme or idea, but tailored to meet Mr. Roberts's

25   ideas?



```
 1              Objection.  Answer, witness, so I didn't
 2    know, and I don't believe that's the case.  I asked
 3    her, you don't believe what's the case?  Well, the way
 4    you asked the question, that it's not based on client
 5    views; it should be.  That's the head of the
 6    structured products desk contradicting Stifel's own
 7    position in this case.
 8              Chuck Roberts inverted the whole process.
 9    Custom notes, speak to your client, find out what they
10    want, find out their concern, solve for those
11    concerns, create a note based on what the client
12    wants.  Mr. Roberts created a note based on what his
13    views were and then sold it to everybody, including
14    Mr. Jannetti.
15              That creates a conflict of interest.  That's
16    not suitability.  That's not Reg BI.  That's not
17    customizing for the client.  That's inverting the
18    entire process.  And what you find on the next page is
19    that when Mr. Krichevsky was asked about this in the
20    very first case, when he wasn't prepared for it,
21    didn't know what was coming, I asked him the same
22    thing.
23              I said, are you familiar with this process?
24    And he goes -- look at his answer.  His answer is, I
25    think you're misstating the process, counsel.  And if
```



1   I may, structured notes are sold by prospectus, and

2   they're done with the input of the clients, the input

3   of the clients.  That's --

4           CHAIRPERSON SALIS:  What page?

5           MR. EREZ:  That's Page 1960.  It's on the

6   screen right now.

7           The input of the client.  So you got a

8   structured product test.  You got the CEO saying that

9   the entire process -- the entire process by which Mr.

10  Roberts customizes and sells notes is against Stifel

11  policy.

12          Tab 15.  Chuck Roberts admitted that the

13  only way he can make over 5 percent ROI, return on

14  investments, meaning commission level, is by selling

15  structured notes.

16          Tab 16.  Tab 16, Mr. Roberts wrote in text

17  messages and said he had a belief that the price of

18  the structured notes on the Stifel system don't take

19  into account the downside protection.

20          Well, when I asked Mr. Stevenson at Page

21  782, he disagreed with him.  So when you have to

22  determine, does Chuck Roberts understand what he needs

23  to understand about structured notes, the answer is

24  no, according to their own manager.

25          Tab 17.  Chuck Roberts admitted that the new



1    account forms that Stifel hangs its hat on in their

2    answer -- in this case and said, look, the client want

3    us trading a speculation.  Chuck Roberts admits that

4    had nothing to do with David Jannetti.  That was

5    Stifel policy.  That was his internal procedure.

6            David Jannetti never told him that's what he

7    was interested in.  And more importantly, what we saw

8    was the way he presented the strategy, low risk, 12

9    percent to 13 percent return, yield, not high risk,

10   not speculative, he admits he never presented a

11   speculative.

12           And what did Mr. Heller and Mr. Kennedy both

13   admit?  You can't represent a strategy as being low

14   risk and then document it as high risk in the new

15   account forms.  That's a violation of the suitability

16   rule.  That's what happened here.

17           Tab 18.  You know, there's a big effort here

18   to blame Mr. Jannetti.  You should have read the

19   prospectus.  You should have read the white paper.

20   You should have known Chuck Roberts was misleading

21   you.  You should have known that Mr. Roberts was

22   telling you time and time again things that were not

23   true.

24           Consider this.  Consider this.  Stifel is

25   the seventh largest bank -- seventh largest



HEARING                                    January 24, 2025
JANNETTI V. STIFEL, NICOLAUS & CO.                    49

1  broker/dealer in the country, in the country, $11.7

2  billion market cap.  It has thousands of employees,

3  compliance personnel.  They have a legal obligation to

4  supervise Mr. Roberts and Mr. Roberts's

5  communications.

6           But Dave Jannetti, Dave Jannetti, sole

7  individual investor, he should have figured out that

8  Chuck Roberts was misleading him better than Stifel,

9  who had a legal obligation to supervise Mr. Roberts.

10          So Stifel couldn't figure out that Mr.

11  Jannetti (sic) was misleading clients, but Mr.

12  Jannetti should have figured it out.  That's literally

13  impossible to accept that proposition, but that is the

14  Stifel defense.  You, Mr. Jannetti, should have

15  figured out that Mr. Roberts was telling you something

16  wasn't true.

17          And by the way, you should have understood

18  the risk better than Mr. Roberts.  And I asked their

19  own witnesses, and I asked their expert this week.

20  Did Mr. Jannetti have an obligation to understand the

21  risk better than Mr. Roberts?  The answer was, of

22  course not.

23          Tab 19.  Tab 19, Mr. Connolly admits that he

24  puts all of his -- that he puts his clients in -- he

25  puts his clients in structured notes, that he



```
 1   concentrates them in structured notes.  There was
 2   nothing unusual about -- nothing unusual in this case
 3   about Mr. Jannetti being concentrated in structured
 4   notes or concentrated in XBI notes.
 5           Tab 20.  Chuck Roberts admitted that he
 6   recommended that clients borrow on margin and that
 7   he -- recommended that Dave Jannetti invest on margin.
 8           This is his own testimony, his own
 9   testimony, in this case where I asked him, did you
10   recommend that he invest on margin?  Here.  Second
11   page.  Page 460.  These were all solicited trades.
12   Yes.  You recommended that David continue investing
13   using margin, correct?  Yes.  He recommended the
14   margin.
15           Page 513.  You always counsel your clients
16   to hold the structured notes to maturity.  Yes.  Your
17   strategy for him was to hold the leveraged portfolio
18   of structured notes.  Yes.  I was telling him to hold
19   the structured notes whether he maintained leverage or
20   not.  That was his testimony.
21           And then if you go to the very last page of
22   Tab 20, Page 62, this is when they brought Mr. Roberts
23   back.  Did you recommend that David Jannetti continue
24   investing using margin, correct?  Yes or no?  Yes.  As
25   he was investing, I knew that he was investing on
```



1    margin, so that is a recommendation, yes.

2           All the structured note strategies was

3    solicited, recommended.  Use of margin was

4    recommended.  Mr. Roberts admits it despite their

5    denials.

6           Tab 21.  Chuck Roberts admitted that his

7    management of the Solutions account was not consistent

8    with strategic allocation models, unsuitable and

9    inconsistent with David Jannetti's documented risk

10   tolerance objectives and risk assessment.  So we went

11   over this.  I won't spend much time, but here is what

12   the Solutions account should be.

13          You have to have a well-defined approach.

14   You have to have a philosophy statement.  Here's the

15   philosophy statement for the Solutions account.  It's

16   supposed to be a blended portfolio, income and equity,

17   75 percent third-party managers, moderate.  And here's

18   the benchmark.  Here's the benchmark.  Meaning, here's

19   what it's supposed to mimic.

20          And Mr. Roberts admits, not even close.  He

21   admits it.  It's a discretionary account.  A

22   discretionary account.  He has complete control, buy

23   and sell, what to buy, what to sell, how much, when,

24   complete control.  And they've got all of these built-

25   in safeguards to protect clients who give complete



1   faith to a broker.

2            And he's supposed to follow solutions and

3   the philosophy statement, and he completely disregards

4   it.  Their own experts admit it.  However, Mr. Kennedy

5   misrepresented something to you.  He said that Mr.

6   Jannetti rejected a Solutions account proposal for a

7   different type of investment.  He rejected it.

8   Completely false.

9            There is no solutions proposal that Mr.

10  Jannetti projected.  There were other proposals they

11  showed that had the word "strategic allocation", but

12  it was for the entirety of the portfolio, not specific

13  to Solutions.

14           And there's testimony about why that was

15  implemented or not.  Had nothing to do with the

16  Solutions account.  That was a misrepresentation by

17  their expert, and I defy them to show you a Solutions-

18  based proposal for the Solutions account that Mr.

19  Jannetti rejected.  Did not happen.

20           Tab 22.  Here's the philosophy statement.

21  It's right there.  Put it right there at the beginning

22  of Tab 22, and you could see it was not managed in

23  accordance with the philosophy statement.

24           Mark Stevenson, Tom Lee, Lori Lucarelli, all

25  admitted that Chuck Roberts's Solutions strategic



1  allocation model was required to be based on the
2  philosophy statement.  Required.  Stifel will have you
3  believe that philosophy statement is meaningless.
4  That's not the evidence in this case.

5          Tab 23.  Tab 23, testimony by Chuck Roberts
6  admitting that he knowingly violated Stifel's policy
7  prohibiting texting.  Knowingly violated.  Consistent
8  with bad actor behavior, intentionally evading the
9  rules.

10         Tab 24.  Mark Stevenson and Lori Lucarelli
11 admitted that Stifel's hiring of Chuck Roberts,
12 contingent upon being placed on heightened
13 supervision, was unprecedented.  People have you
14 believe, oh, this is business as usual, hiring someone
15 with Chuck Roberts's regulatory record.

16         And here it is.  Here's his regulatory
17 record.  Sorry.  Here it is.  Here's when they hired
18 him, 2016.  All of this is before.  This is what you
19 call a bad actor.

20         When you hire someone with this level of
21 complaints, you're taking a known risk.  You're taking
22 a known risk that that person has demonstrated an
23 intent to defy the rules of the industry.

24         They knew it when they hired him, and he
25 performed exactly in conformance with that



1   demonstrated intent and that bad actor proclivity

2   because when they put up on double heightened

3   supervision in 2016, State of Colorado, State of New

4   Jersey, what did he do?  He immediately started

5   texting.  Immediately.  Even while under double

6   heightened supervision.

7          Tab 25.  Tab 25, Mark Stevenson admitted it

8   is a misrepresentation that structured notes are

9   almost like a substitution for bonds.  So we're

10  showing you in Tab 25, showed Mr. Stevenson, the

11  representation that Mr. Roberts made and asked him,

12  was he permitted to make these representations?

13  Answer, no, he's not.  No, he's not.  If I would have

14  seen it, I wouldn't have allowed it to be said.

15         All of these communications designed to

16  communicate safety and security were all prohibited

17  communications.

18         Tab 26, Mark Stevenson says that senior

19  management was involved in the decision to stop

20  selling single stocks in XBI structured notes.  That

21  was his sworn testimony.  Chuck Roberts denies it.

22  Well, someone's not telling you the truth.  It doesn't

23  really matter because at the end of the day, he

24  stopped selling those XBI single stock structured

25  notes because he determined they weren't suitable for



 1   any clients, and he failed to take any action.

 2          And by the way, Dave Jannetti wouldn't have

 3   lost 12 million out of 13 million in notes had he

 4   liquidated his notes in January of 2021.

 5          Tab 27.  Mark Stevenson admitted that David

 6   Jannetti lacked the financial ability to cover margin

 7   calls linked to his leveraged structured note

 8   strategy.  The issue of financial ability, the issue

 9   of financial ability is part of suitability.

10          This portfolio was unsuitable for so many

11   different reasons, but one of the reasons is when you

12   use the leverage, Dave Jannetti had no ability to meet

13   meaningful margin calls.  If you can't meet margin

14   calls, you can't financially handle the portfolio or

15   the strategy.

16          The strategy should never have been

17   implemented with $11 million of margin, $5 million of

18   mortgage leverage because Mr. Jannetti lacked outside

19   resources, and they knew it was all, you know, liquid

20   net worth, net worth.  It was all documented that his

21   entire liquid net worth was at Stifel.  That's what

22   their documents said.

23          Well, that means he didn't have the

24   financial ability to meet a margin call, and sure

25   enough, he didn't.  So what did that do?  He got



1   margin called out and liquidated.

2          What does Stifel say?  Well, if you would

3   have held on, you would of been $2 million better.

4   We'll get to the law on that, but your employee caused

5   the loss and the margin and the liquidation, and then

6   you come back and blame David Jannetti before

7   liquidating.  That's Stifel's position in this case.

8   Wrap your brain around that.

9          No. 28, Mark Stevenson admitted that sending

10  the concentration letter to David Jannetti was an

11  important part of supervision, although he didn't even

12  know that it wasn't sent.  At first, he thought it was

13  sent.  He was sure of it.

14         29, Mark Stevenson admitted he never knew

15  that Chuck Roberts was texting under heightened

16  supervision and has imposed no disciplinary action for

17  texting violation.  Mark Stevenson is not going to do

18  anything.  Stifel is not going to do anything about

19  Chuck Roberts.

20         He is the goose that laid the golden egg,

21  and they're hoping he lays another golden egg in the

22  future.  $48 million of commissions, Number 1 seller

23  of structured notes.  They have too much invested in

24  him.  They're not going to reprimand him.  They're not

25  going to hold him to account.



 1          It is up to arbitration panels like this one

 2    to do that.  Mark Stevenson said, I would hire him

 3    today.  That's who you're dealing with.  Mr. Kennedy,

 4    their expert witness that they paid an obscene amount

 5    of money to, he says not eligible for hire.

 6          Did you see the reaction from Justin Arpey

 7    when he said not eligible for hire?  He looked at

 8    Wayne Hillis like he couldn't believe it.  Did you see

 9    that?  It was incredible.  An absolute pinnacle of

10    this case that Mr. Kennedy denies that Stifel did

11    anything wrong, Chuck Roberts did anything wrong.

12          I asked him the ultimate question.  Would

13    you hire him?  Could you hire him today?  Absolutely

14    not.

15          Tab 30.  Mark Stevenson admitted that Chuck

16    Roberts's text messages were prohibited.  We went text

17    by text by text with the manager.  Can't send it,

18    won't send it, wouldn't be allowed to send it.  It's

19    all there for you to review.

20          Tab 31, Lori Lucarelli admitted that Chuck

21    Roberts violated FINRA and Stifel compliance rules

22    against projecting future returns and could not

23    supervise the text communication.  All the admissions

24    are right there in Tab 31.

25          Tab 32, Lori Lucarelli admitted that Chuck



 1  Roberts was not allowed to provide information
 2  regarding structured notes not contained in the
 3  prospectus.  By the way, so did Tom Lee.  So what does
 4  that mean?  Well, the prospectus says there's a
 5  contingent coupon.  What does Mr. Roberts do month
 6  after month?  He tells Mr. Jannetti and others that
 7  it's a yield.
 8         Well, that's contradicting what's in the
 9  prospectus.  That violates the rule in the compliance
10  manual that says you can't make a writing about an
11  upcoming IPO, which is every structured note is an
12  IPO.  Tom Lee admitted it.  Lori Lucarelli admitted
13  it.
14         What was Chuck Roberts's excuse?  The word
15  "contingent coupon" didn't fit in the structured note
16  allocation sheet.  That's what he came up with.  This
17  is not serious.  It's just not serious.
18         No. 33, concentration limit.  Put it right
19  there for you.  10, 20, 30, no more than 30.  Lori
20  Lucarelli admitted that the concentration limit was
21  for customer protection.  The client should be advised
22  by Stifel of high concentration and that she never
23  sent a concentration letter to Mr. Jannetti.
24         Not only did they not send a concentration
25  letter, the evidence is clear.  No discussion or



 1   disclosure in the April 2021 phone call of the risk of
 2   concentration.  No letter sent.  No disclosure in the
 3   prospectus or the white paper or the client agreement
 4   or any document that Mr. Hillis wants to point to on
 5   behalf of Stifel of disclosing the risk of
 6   concentration.
 7            That's why the concentration letter was
 8   unique.  It's the only document that could potentially
 9   disclose the risk of concentration.  They made a
10   decision not to send it, despite the fact that he was
11   highly concentrated for a long period of time.  And
12   then after he loses $16 million, they called him.
13   They called him.
14            Mr. Stevenson was interested to share notes
15   about sailing because he has a house in Rhode Island,
16   in Providence, which is a very affluent area where
17   sailors sail, and he wanted to share his hobby passion
18   with Dave Jannetti.  Well, that was very kind to him.
19   It was a complete failure of supervision.
20            Tab 34.  Oh, and by the way, they want to
21   complain.  Well, Mr. Jannetti didn't complain in that
22   phone call about what happened to him.  He filed his
23   lawsuit within two months.  I don't know how much
24   quicker he could have filed the case.  Two months
25   later.



1          Well, the one thing that I've come to learn,

2    I think, is obvious about Dave Jannetti, he doesn't

3    like confrontation.  If you read the text messages,

4    you could see it.  He's very careful with his words.

5    He doesn't like confrontation.  But when you lose $16

6    million in three years and you get wiped out on margin

7    calls, you need to seek justice, and this is what

8    we're doing.

9          Tab 34.  When you have a mortgage that's

10   being used to invest, the rule of Stifel is you've got

11   to get manager approval.  That never happened.

12         Tab 35.  Lori Lucarelli admitted that from

13   June 2020 to April 2023, she was based in New York,

14   and Chuck Roberts was in Florida, and she not once

15   visited or supervised Mr. Roberts in person.  So this

16   is a bad actor who's got a propensity for violating

17   Stifel and FINRA rules.  You hire him on double

18   supervision.

19         You take him off heightened supervision.  He

20   then goes to Florida in June 2020.  He is

21   unsupervised.  He's working primarily out of his

22   house, according to Tyler Connolly.  Nobody's

23   supervising what he's saying on the phone or what he's

24   texting.  Nobody.  Nobody has visibility.

25         And even though the State of New Jersey and



1  Colorado said, for this type of person, you should be

2  in the same office to supervise him, there's no one

3  supervising him.  There's nobody supervising.

4         Tab 36.  Again, not only is Mark Stevenson

5  taking no action against Chuck Roberts, Lori Lucarelli

6  is taking no action to retrain him, for example, on

7  texting, to retrain him on the content of what is

8  permissible to say in a written communication to a

9  client or not.

10        We will talk about punitive damages.  We'll

11  show you the law.  And part of the need for punitive

12  damage in this case is that, as you can see from the

13  totality of evidence, Stifel cannot be trusted to

14  supervise, discipline, or reign in Mr. Roberts.

15        And he's still -- he's still there.  He's

16  still there.  He's still employed.  They've taken no

17  significant action other than put them on heightened

18  supervision at 2023.

19        Now, I want to turn to Tab 38.  This is

20  important on damages -- on damages.  We went through

21  this with Dr. McCann.  I'd like to review with you in

22  closing.  Okay.  There's two components to damages,

23  structured products and the Solutions account.

24  There's only one Solutions account.

25        We start with structured products because



1    they were owned primarily, you could see, in the Dave

2    Jannetti account, the first one at the top.  And then

3    there's other accounts, including the kids' accounts,

4    that have structured products.  The capital loss,

5    meaning the loss excluding any dividends or coupons,

6    is $16.3 million.  The net out of pocket is 13.1

7    million, meaning if you include all the quarterly

8    coupons that were paid.

9           Okay.  So what did we do?  We did two things

10   for the panel.  Benefit of the bargain damages.  So

11   recall that text message from Mr. Roberts?  You will

12   make 12.25 percent, 13 percent if you cherry pick.  We

13   didn't even use the 13 percent.  We used the lower

14   number.

15          Giving David Jannetti the benefit of the

16   12.25 percent that Mr. Roberts represented in writing

17   that he would receive, the damages, meaning had he

18   been invested and achieved the 12.25 percent return,

19   is $20,567,172.  That's the benefit of the bargain

20   damages.  And we'll show you the case law to support

21   that theory and damage model.

22          The second one that we showed you is 517.

23   517 is a Florida statute.  We'll go over it.  It's the

24   Investor Protection Act, and it has a formula.  What

25   did you invest?  You get interest on your money, less



1   any dividends, and then you get attorney's fees under

2   the statute.

3            So we did the 517 calculation, and it comes

4   out to $21,175,600.  This is the structured product

5   damages sheet.

6            Second page, the Solutions account.  Only

7   one Solutions account.  If you accept that the

8   fiduciary duty was breached, that he deviated from the

9   philosophy statement, which Chuck Roberts admitted he

10  did, no one's disputing it, you could see that the

11  out-of-pocket loss is 3.1 million.

12           But what we did in trying to be

13  intellectually honest and correct is we said, okay,

14  there's a benchmark in Solutions, right?  They have a

15  benchmark.  In the philosophy statement, there's a

16  benchmark.

17           So we ran the same dollars in the benchmark

18  because the market could have gone up or down or the

19  various indices within the benchmark.  That's the

20  $2,561,622 number.  Meaning, had Dave Jannetti's money

21  been invested in the benchmark, he would have lost

22  money, but he would have lost around $500,000, not 3.1

23  million.  The difference is $2,561,622.

24           So again, it's this benchmark right here.

25  It's right into the philosophy statement.  40 percent



1  S&P, 15 percent Russell.  That's the benchmark.

2  Running that money in that benchmark, this is -- he

3  would have done this much better than what he did, so

4  those are his damages.

5          Alternatively, you can also find a 517

6  violation, meaning you can look at every stock

7  purchased and give the losses back, plus interest,

8  less any dividends, and that's the $5,328,692.

9          Panel has discretion to determine which

10 damages model it believes are more accurate and more

11 warranted.  If any, it is entirely your decision, of

12 course.

13         The last page, we just do it by the

14 Claimant, the last page.  Well, you could see here,

15 Dave Jannetti is, of course, the majority of the

16 damages, and then Leah Jannetti, Adam Jannetti, Sarah

17 Jannetti have structured note damages.  So you can see

18 by Claimant what the damages are.

19         That is our presentation of the evidence,

20 and I want to segue now to the law.  And I just want

21 to, you know, remind the panel, everything that we've

22 just shown you is in evidence.  This is the evidence

23 when you are deliberating and applying law.

24         Please consider that closing binder and the

25 evidence that we've shown you.  Not argument.  That's



1    evidence.

2           Now, we have the cases and authority binder.

3    I'm going to spend half an hour now before we break

4    again and start going through the case law.

5           So what we've done is we've organized the

6    case law in this binder called Cases and Authorities.

7    And these are cases that we've put into our briefs,

8    and we've also put a little yellow sticky for the page

9    where the highlighted portion that we're going to

10   focus is on.

11          We're also going to put on the screen if you

12   like, but I'm going to go pretty fast.  So feel free

13   to jump to the stickies or follow along on the screen.

14          So the very first part is in case there's

15   any debate about which law applies, and I don't know

16   if there is or there's not, but our contention is it's

17   Florida law.  There is a Missouri choice of law

18   provision in the customer agreement.  And what we're

19   showing you on Tab 1 is that that's not enforceable

20   because FINRA rules don't allow that.

21          And by the way, even if Missouri law

22   applied, 517 would also apply.  You get the benefit of

23   the Blue Sky law where the client is and where the

24   broker is.  You get two -- Blue Sky law, but -- and

25   that's the 517 section.



1            But in any event, Florida law doesn't even

2    allow a choice of law provision that prevents you from

3    having the rights that you would have in court.  And

4    that's what we're showing you.  Here's the Rule 2268

5    at one.  At Tab 2, we're showing you a disciplinary

6    action on the second page of Tab 2.  Disciplinary

7    action against Prudential for doing this exact same

8    thing.

9            Prudential was disciplined by FINRA for

10   trying to have a choice of law provision, and FINRA

11   says, you can't do that, and we're going to punish

12   you.  That Missouri law, should they choose to pursue

13   that, is invalid.

14           No. 4, if you do a choice of law analysis,

15   Florida law applies.  Dave Jannetti lives in Florida.

16   Chuck Roberts was in Florida.  So doing any kind of

17   analysis, and we show you that in Tab 4 at Page 5.

18   Florida courts apply the significant relationship

19   test.  I don't think this is very controversial.

20           I'm going to move on to Tab 5.  Tab 5 is

21   important.  It's the Florida Statute 517.  So what the

22   statute says, and we'll show you the damages numbers,

23   what the statute says is, it's unlawful in connection

24   with the rendering of any investment advice or in

25   connection with the offer of sale or purchase of any



1   investment to employ any device, scheme, or artifice

2   to fraud, to obtain money or property by means of any

3   untrue statement of a material fact or any omission to

4   state a material fact, and to engage in any

5   transaction practice or course of business which

6   operates or would operate under fraud or deceit upon a

7   person.

8           We believe that we've met the elements, and

9   we'll go through the elements, of 517 for the

10  structured notes and for the Solutions account.

11          So failure to disclose to Mr. Jannetti that

12  every single structured note is high risk is a

13  violation of 517.  Every time he sells them a

14  structured note and you determine that is a high risk

15  structured note and Mr. Roberts either doesn't

16  understand that it's a structured note, he violates

17  the suitability rule, reasonable basis, or two, he

18  failed to disclose to Mr. Jannetti that it's high

19  risk, or he misrepresent that it's low risk by telling

20  him it's prudent, solid, very solid, super solid, I'm

21  going to invest your money, very, very safely, any of

22  those representations, it's almost like a substitution

23  for a bond, any of those would satisfy 517.

24          So every time he sells him a note and you

25  determine that it's high risk and there's admitted no



 1   disclosure is high risk, no understanding, that's a

 2   violation of 517.

 3             Failure to disclose concentration risk is a

 4   violation of 517.  Use of the structured note

 5   allocation.  Every time he sends him a structured note

 6   allocation in a violation of Stifel and FINRA rules

 7   and he tells him that there's a projected yield,

 8   that's a 517 violation.

 9             If you believe that the structured note

10   strategy with the leverage was beyond Mr. Jannetti's

11   financial capability because of the leverage and the

12   risk of margin calls, that's a 517 violation.  Any of

13   those, one of those, triggered -- all you need to find

14   is one.  If you find one violation for any

15   transaction, that's a violation of 517.

16             On the Solutions side, putting a client into

17   a discretionary program that's got internal parameters

18   that are supposed to be followed to protect the client

19   and blatantly violating the risk assessment, the

20   objectives, the risk tolerance, the philosophy

21   statement, all of that is a violation of 517.

22             If you believe that to be a practice or

23   course of business, which would operate as a fraud or

24   deceit upon Mr. Jannetti, if you believe there is an

25   omission to tell Mr. Jannetti that the Solutions



 1   account is not being invested according to Stifel

 2   policy, any of that triggers a 517 violation.

 3            If you go to the second page of the statute,

 4   I'm sorry.  We'll go to the next one, which is -- so

 5   that's 517.301.  And then what we have here at Tab 6

 6   is some of the interpretation by the courts of how to

 7   apply 517.  So I'm going to go kind of kind of quick.

 8            But in Tab 6, you have a case called

 9   Gottschneur (phonetic).  And in the Gottschneur case,

10   the court says it's a mere negligence standard.  You

11   don't have to prove intent.  You don't have to prove

12   fraud.  It's a negligence standard.  So we don't have

13   to prove that Mr. Roberts intentionally sought to

14   deceive Mr. Jannetti.  It's a negligence standard.

15            Next case, EF Hutton case, Page 4.  Bottom

16   of the page.  Loss causation has never been required

17   for 517.  You don't have to prove that the

18   misrepresentation caused the loss.  No loss causation

19   requirement.

20            Tab 8.  No loss.  Tab 8 is the Waters case,

21   and it says no loss causation and no reliance in the

22   middle of the highlighted portion.  Court finds that

23   there is no reason why a plaintiff proceeding under a

24   517 cause of action for violations should be required

25   to prove reliance.  No reliance requirement.  You just



1   have to prove the violation.

2          Once the violation is proven, meaning

3   misrepresentation, unsuitability, omission, course of

4   conduct that misled or defrauded Mr. Jannetti, any of

5   those trigger it, no loss causation, no reliance, no

6   intent requirement.

7          You go to Tab 9.  Tab 9 is the Newsome case.

8   The Newsome case says, an unsuitability trading

9   violation violates 517.  So if you find that Mr.

10  Roberts failed to understand the risk under the

11  reasonable basis suitability standard, that's a

12  violation of 517.

13         If you find that he made a recommendation

14  against the financial capability of Mr. Jannetti,

15  that's a 517 violation.  So that's unsuitability.

16         Tab 10.  The remedies.  The remedies.

17  Second page, Subsection 4, in an action for damages,

18  you get the consideration paid for the security plus

19  interest, less the value of the security or

20  investment, the time it would dispose of, plus any

21  income received from the security.  That's exactly

22  what Dr. McCann did in his 517 calculations.

23         And then you go to the next page, Section 6,

24  and any action brought under this section, including

25  an appeal, the court shall award reasonable attorney's



```
 1   fees.  And we are seeking reasonable attorney's fees.

 2              And let me say this.  I saw their

 3   application for fees.  It's approximately $1.7 million

 4   total with cost, 1.4 for fees, $250,000 approximately

 5   for cost.  That's their application.  That's their

 6   desire.

 7              Our application is the following.  Mr.

 8   Jannetti has hired my firm and Ed Rose on a

 9   contingency fee basis.  The contingency fee is 25

10   percent.  And I'll tell you about the cost, as well.

11              The costs that we have incurred and have a

12   calculation for is $122,772.  So we are asking that

13   pursuant to 517 and applicable law that you -- if you

14   find for Mr. Jannetti under 517, that you increase his

15   award by an amount of 25 percent and specify that is

16   for attorney's fees under Section 517.211.

17              So a $20 million award, for example, 25

18   percent would be an additional amount of $5 million of

19   attorney's fee because the idea of 517 and the

20   attorney's fees provision is to make the client whole.

21   You're compensating for the fact that the victim had

22   to hire an attorney to prosecute the case to get the

23   recovery, and the intent is to make the client whole

24   after payment of attorney's fees.

25              So pay the attorney's fees, and the net
```



 1  should be the damages that he incurred.  That's 517.

 2  And we show you at Tab 11 that you have the ability to

 3  award attorney's fees under the Florida arbitration

 4  code.

 5          CHAIRPERSON SALIS:  Excuse me.  Were the

 6  costs paid already to you?

 7          MR. EREZ:  The costs were incurred and paid.

 8  Meaning, the -- and the three biggest components of

 9  the costs are Mr. Heller, Dr. McCann, and the court

10  reporter.  Those are the three main components of the

11  $122,000, and they have all been paid.

12          CHAIRPERSON SALIS:  Thank you.

13          MR. EREZ:  Section 12.  This is not really a

14  very big issue in this case, but it is something of an

15  issue.  The 517 calculation that you see in the

16  damages that we went over under the structured note

17  and the Solutions account, the 517, is a no netting

18  number.  What does that mean?

19          It means that under the law, when Mr.

20  Jannetti invested in structured notes in 2020 and

21  remember, he got one coupon, and then it got called,

22  then he got a coupon, it ended up called.  He didn't

23  lose any money, and he made income, at first, for a

24  short time.

25          What 517 and the applicable law says is you



 1   don't have to aggregate or net those profitable trades

 2   against the structured notes that he held in 2021,

 3   which were unprofitable.  So you don't have to net.

 4   In other words, none of the income that he got on the

 5   structured notes that were profitable should offset

 6   against the losses in the structured notes that were

 7   unprofitable.

 8           So when you see our -- and Dr. McCann

 9   testified to this and his calculations are in

10   accordance with it, that in essence, the 517

11   structured note and Solutions damages, you can think

12   of it as losers only.  It doesn't aggregate with the

13   winners.

14           So the net out of pocket on the structured

15   notes is $13 million.  The capital loss excluding

16   dividends is $16 million.  The 517 damages -- put that

17   up for a second.

18           The 17 damages for the structured note is a

19   higher number because it includes interest through the

20   time the claim was -- this case was set to begin

21   and -- put up on the screen, please.  No, no, no, from

22   the closing binder, please.  From the closing binder,

23   the damages -- there we go.

24           And so you could see that the 517 damages,

25   there's 26.5 million because it doesn't net.  It



1    doesn't include any of the income, hypothetically,

2    from a note that Mr. Jannetti bought in 2020, that he

3    sold in 2020, and he made $50,000 in, it doesn't

4    offset it because -- and here's why.

5           Here's the case law.  Tab 12.  Tab 12,

6    Florida law.  So I believe this is -- yes.  United

7    States Court of Appeals, Eleventh Circuit.  Kane is

8    correct when he states there is no support to be found

9    under federal or Florida law for the netting theory

10   Shearson argues for.

11          What is found under both federal and Florida

12   law is the intent to have securities anti-fraud

13   provisions enforced stringently (inaudible) fraud.  As

14   a district judge noted, if the methodology espoused by

15   Shearson in the brokerage firm were adopted, it could

16   serve as a license for broker/dealers to defraud their

17   customers with impunity up to the point where losses

18   equal prior gains.

19          So you have a whole body of law, which goes

20   back to a case called Lost Garden (phonetic) in the

21   Supreme Court of the United States, which we have for

22   you, as well, at Tab 14, which all explains how there

23   is no netting.

24          Let me move on to Tab 15.  Tab 15, we're now

25   talking about breach of fiduciary duty.  So we have



1   several counts, and we've gone over the 517 one, which

2   we believe is, you know, our most important count, but

3   they're all important.

4            And this one is breach of fiduciary duty.

5   Mr. Roberts owed a fiduciary duty to Mr. Jannetti.

6   And what this case says is that you could a fraud by

7   omission, and it says fraud also includes the

8   intentional omission of a material fact.  And that's

9   what we have here.

10           Every time Mr. Roberts fails to tell Mr.

11  Jannetti this is high risk, you have a concentration

12  risk, you can -- this is beyond your financial

13  capability, these are solid, super solid, very solid,

14  all of those misrepresentations -- I'm sorry -- when

15  he fails to -- well, that's a misrepresentation.  But

16  when he fails to disclose that they're high risk,

17  that's fraud by omission.

18           Let me go to No. 16.  And recall that the

19  Solutions account is an advisory account.  So what

20  we're showing you in 16 is that under federal law, as

21  opposed to Florida law, under the federal law, there's

22  a federal fiduciary standard.  That's what the case

23  law says.

24           Please go to Page 5.  And you could see that

25  is the law.  So in the advisory account, there's a



 1   separate analysis, which also takes into account that

 2   there's -- investment binder.

 3          Tab 17, this is Stifel's own compliance

 4   manual.  And if you look at the bottom of the page, it

 5   says, as a registered adviser, the firm and its FA

 6   have a fiduciary obligation to act in the best

 7   interest and owe duties of loyalty and care to the

 8   firm's advisory clients.

 9          That's in relation to the Solutions account.

10   In relation to the brokerage account under Florida

11   law, there's also a fiduciary duty, but there's two

12   separate analyses.  I want to talk about negligence,

13   Tab 18.

14          Tab 18.  Talk about negligence.  Negligence

15   is a deviation from the standard of care.  You have

16   duty, breach, damages.  Was there a deviation from the

17   standard of care?  Well, in this case, what the courts

18   say and the way you need to look at it is, the courts

19   say that you should take into account the FINRA rules

20   and the compliance rules.

21          And we have at Tab 20, we have the best

22   interest obligation, which was owed to Dave Jannetti

23   in the brokerage account where a structured notes were

24   held and in the advisory account, and shall act in the

25   best interest of the retail customer at the time the



1   recommendation is made without placing the financial

2   or other interest of the broker or dealer ahead of the

3   interest of the retail customer.

4          You have to decide with determining

5   negligence, for example, did Mr. Roberts place his own

6   interest ahead of Mr. Jannetti's when he sold him

7   structured notes?  And the obvious answer is he did.

8   His whole methodology for -- his whole system for

9   creating notes was violative of Stifel's own policies.

10         Remember, Popel and the CEO thing, it's got

11  to be based on client input.  So what he did is

12  created notes, and then he's under pressure to sell

13  them.  He sells them to David Jannetti, misrepresents

14  them.  He makes $48 million in commission that year

15  when all these notes are virtually sold in 2021,

16  putting his own financial interest ahead of the

17  client.

18         And don't just take it from me.  This is Mr.

19  Roberts's own words.  Glad we did this round of notes

20  with the client's 15K.  I'm calling and chiseling

21  every MF.  That is not a broker that's putting the

22  interest of their client ahead of their own.  That is

23  a disgusting and reprehensible absolute admission of

24  violation of Reg BI.  This is what Reg BI is talking

25  about.  Don't put your interest ahead of your clients.



 1              Tab 21.  This is a case that says, at Page
 2    19, FINRA rules set the standard of care.  So like I
 3    was saying, you look at the suitability rule, you look
 4    at Reg BI, you look at other FINRA rules, you're going
 5    to look at compliance rules, they set the standard of
 6    care.
 7              So you determine was 2111 suitability
 8    breached, was Reg BI breached, were the other FINRA
 9    rules breached, was Stifel's compliance manual says
10    you can't project on future return breached?  When you
11    determine that the FINRA rules were breached, that's
12    evidence of negligence.
13              Tab 22, Page 6 of the decision.  Under
14    Florida law, internal rules and procedures governing
15    employees may be used as evidence to determine the
16    correct standard of care and a negligence cause of
17    action.
18              So again, Florida law tells you, you can
19    look at FINRA rules.  You can look at Stifel rules.
20    If you find a violation of either one, that is
21    evidence of the breach of the standard of care,
22    evidence of negligence.
23              Then we have the suitability rule, Tab 23.
24    And we've seen this quite a few times, but it's worth
25    stating.  It says, on the second page -- well,



HEARING                                            January 24, 2025
JANNETTI V. STIFEL, NICOLAUS & CO.                              79

1   starting over there, in general, what constitutes

2   reasonable diligence will vary depending on, among

3   other things, the complexity of risks associated with

4   the security or investing strategy, and the member or

5   associated person's familiarity with the security

6   investment strategy.

7          A member or associated person's reasonable

8   diligence must provide the member or associated person

9   with an understanding of the potential risk and reward

10  associated with the recommend recommended security or

11  strategy.  The lack of such an understanding of

12  recommending a security or strategy violates the

13  suitability rule.

14         That is critical in this case.  Mr. Roberts,

15  as we laid out, thought he understood the risk, then

16  realized he didn't understand the risk, testified it

17  was high risk, then he said it's not high risk.

18         The reason there's so much confusion by Mr.

19  Roberts is because he didn't understand the risk, then

20  he admitted to the risk, then there was an

21  adjudication, and then him and his counsel decided we

22  can't win that case.

23         And if you determine that Mr. Roberts failed

24  to understand that these are high risk, that's a

25  violation of the suitability rule.  That's proof of



1   violation of 517.  It's proof of negligence.  It's

2   proof of breach of fiduciary duty and other claims.

3         Here's a regulatory notice at Tab 24, Page

4   14.  Reasonable basis suitability.  Brokers cannot

5   fulfill their suitability responsibilities to

6   customers when they fail to understand the securities

7   investment strategies they recommend.  There's no

8   dispute about that.

9         Tab 25, FINRA Rule 2020.  No member shall

10  affect any transaction in or induce the purchase or

11  sale of any security by means of any manipulative,

12  deceptive, or other fraudulent device or contrivance.

13        Mr. Heller testified that Mr. Roberts did

14  violate this.  When you fail to disclose this high

15  risk, you violate 2020.  When you represent that as

16  solid, very solid, super solid, prudent, almost like a

17  bond, you violate 2020.  When you send text messages

18  that contain prohibited yield information, you violate

19  2020.

20        When you fail to disclose to clients that

21  these structured notes are high risk or that the

22  strategy is high risk or that the concentration

23  increases risk, that's a violation of 2020.

24        Fair dealing with customers, 2310-2.

25  Implicit in all member and registered representative



 1 | relationship with customers and others is the
 2 | fundamental responsibility for fair dealing.  Sales
 3 | efforts must therefore be undertaken only on a basis
 4 | that can be judged as being within the ethical
 5 | standards of the associated rules with particular
 6 | emphasis on the requirement to deal fairly with the
 7 | public.
 8 | The evidence is overwhelming.  Mr. Roberts
 9 | did not deal fairly with Mr. Jannetti or his other
10 | clients.
11 | 2010, standard of commercial honor and
12 | principle of trade.  A member in the conduct of its
13 | business shall observe high standards of commercial
14 | honor and just and equitable principle of trade.  The
15 | evidence is that Mr. Roberts did not do that.  He was
16 | the exact opposite.  He had no honor.
17 | Tab 28, failed material and oral
18 | presentation regarding nonconventional investments,
19 | which would include structured products, must present
20 | a fair and balanced picture regarding both the risks
21 | and benefits of investing in these products.
22 | Mr. Roberts failed horribly in this
23 | obligation.  He never disclosed risks.  Solid, very
24 | solid, super solid, prudent, almost like a bond, not
25 | risky, money good.  He only presented his view that we



 1  showed you before that he thought the barrier would

 2  always protect.  That's the key to this case, that Mr.

 3  Roberts created custom notes.  He picked the

 4  underlying.  He picked the barrier level, and he

 5  believed that the barrier would always protect.

 6          He told Mr. Jannetti, I've never lost money

 7  in a note.  He doesn't deny that.  He admitted it's

 8  what he told him.  He always believed the barrier

 9  would protect.  He was wrong.  He didn't appreciate

10  the risk until the end of 2021.

11          And you know how you know that for a fact,

12  because he changed his conduct.  He stopped selling

13  the notes.  You don't change your behavior unless you

14  realize something is not consistent with your prior

15  understanding.

16          Tab 29.  2210, communications with the

17  public.  Going to Section D, content standards.  No

18  members may make any false, exaggerated, unwarranted,

19  promissory, or misleading statement or claim or any

20  communication.  Communications may not predict or

21  project performance, imply that past performance will

22  recur, or make any exaggerated or unwarranted claim,

23  opinion, or forecast.

24          That is precisely what Mr. Roberts did with

25  Mr. Jannetti and with every client, telling them that



1  there is a yield, that you're going to get a specific

2  amount of money.  We even saw reports that his office

3  put out where they multiplied the yield against the

4  cost of the investment and showed an annual income.

5          And what does Stifel -- remember, those one-

6  page reports even did it in the Jannetti account.

7  Then we saw in the official reports on a compliance

8  approved report, what does Stifel say?  No yield.  No

9  yield.  No yield.

10         When you represent to clients that you're

11 going to get a specific yield, that is a violation of

12 2210.  Mr. Roberts knew he was violating it, and it

13 just sounds so attractive, right?  Sir, you're going

14 to make a 12 percent yield.  It's so misleading.

15         And by the way, look at all these rules.

16 Look at all these rules.  This is a highly regulated

17 industry.  Mr. Roberts is a fiduciary.  Stifel is a

18 licensed broker/dealer that has obligations that come

19 along with getting that license.

20         All of this is designed to protect against

21 these exact violations and this exact harm.  All of

22 this, Mr. Roberts completely ignored, intentionally,

23 all of these customer protection rules.

24         Tab 30.  Here's the Stifel compliance rule,

25 retail communications.  Retail communications must



 1 | meet the general standard of good taste and accuracy
 2 | and should fairly represent the products or services
 3 | included in the retail communication.  Truthfulness is
 4 | required.
 5 |         Second page, communications regarding
 6 | security subject to pending distributions are
 7 | generally not permitted.  That's the part where Mr.
 8 | Lee says, you can't make a statement in writing to a
 9 | client that contradicts the prospectus.  The
10 | prospectus doesn't say 12 percent, 15 percent yield,
11 | but he sent a structured note allocation monthly to
12 | Mr. Jannetti that contradicts the prospectus.
13 |         CHAIRPERSON SALIS:  I think that will be the
14 | last point.
15 |         MR. EREZ:  Okay.  I'll come back after the
16 | break.
17 |         CHAIRPERSON SALIS:  Okay.  Off the record.
18 |         (OFF THE RECORD)
19 |         (ON THE RECORD)
20 |         MR. EREZ:  I'm going to go about 20 minutes
21 | now.  So till around 11:16.
22 |         CHAIRPERSON SALIS:  Thank you.  Whoever
23 | helps me keep track.
24 |         MR. EREZ:  Starting back up on Tab 31, this
25 | is the FINRA rule that requires supervision, and we



```
 1   believe we've proven a negligent supervision and for

 2   the following reasons.  One, Mark Stevenson and Lori

 3   Lucarelli admitted they cannot supervise Chuck Roberts

 4   without the text messages.  You've got Chuck Roberts

 5   receiving and sending tens of thousands of text

 6   messages.

 7           You've got the entire team texting, all

 8   intentionally violating Stifel FINRA rules, and you've

 9   got no visibility by management or anyone at Stifel to

10   those text messages.  And they've admitted you can't

11   supervise them.  We went over the FCC order.  Stifel

12   admitted there was widespread failure to implement its

13   policies and procedures that prohibit texting.

14           Stifel, they have also admitted there that

15   it failed to implement the system reasonably expected

16   to determine whether all personnel, including

17   supervisors, were following the policies regarding

18   texting.  That's a complete admission on negligent

19   supervision.

20           Ms. Lori Lucarelli knew the structured note

21   concentration was triple that of the 30 percent limit,

22   decided not to send a letter, made no communication

23   with Mr. Jannetti about the concentration risk.  And

24   they both admitted, Mr. Stevenson and Ms. Lucarelli,

25   that when shown any single text message by Chuck
```



 1  Roberts to clients, including Dave Jannetti, that

 2  those communications were prohibited, and they would

 3  not allow them to go -- to be sent to a client because

 4  they were prohibited.  All of that proves a failure to

 5  supervise.

 6          Did I show you the Rule 3110?  Tab 32.  This

 7  was a rule on texting, cannot text.  Chuck Roberts

 8  completely violated that rule.

 9          Moving on to 33.  33 is fraud.  Fraud.  You

10  can have fraud by omission.  You could have fraud by

11  commission, representing that these are not high risk.

12  They are solid, very solid, prudent, failure to

13  disclosure for high risk.  All of that is fraud,

14  failing to disclose the concentration risk.  The high

15  overall risk of the portfolio with concentration,

16  instructor notes, concentration in XBI, concentration

17  in single stocks, leverage.  All of that is fraud.

18          Tab 34.  And one of the things to focus on

19  in Tab 33, Page 9, is when dealing with a fiduciary.

20  A defendant's knowing concealment or nondisclosure of

21  material fact may only support an action for fraud

22  whether it's a duty to disclose.  Such duty arises

23  when one party has information, and the other party

24  has a right to know because of a fiduciary or other

25  relation of trust or confidence between them.



1          Well, obviously, Mr. Roberts was a fiduciary

2    for all accounts.  And when he fails to disclose

3    information, he's obligated to disclose and has a

4    superior position of knowledge, that is fraud.

5          Tab 35.  Breach of contract.  If you look

6    at -- let's just go to 30.  Let's go to 35.  If you

7    look at the agreement, it says all transactions in

8    your securities account are subject to applicable law.

9    So they've incorporated by reference all applicable

10   law into the contract.

11         Then if you look at the top of Page 9, it

12   says, shall be governed by Stifel general rules and

13   regulations.  And so they've also incorporated by

14   reference all of their policies into the contract.  So

15   a violation of Florida law, a violation of their

16   policies, a violation of FINRA rules also amount to a

17   violation of a breach of -- or all amount to a breach

18   of contract.

19         So I'm just going through the various counts

20   that we have so you can make an informed determination

21   about whether or not those counts have been met by the

22   Claimants, which we submit they have.

23         I want to go to 37.  This is important

24   because there's a series of cases.  So Stifel has

25   spent a lot of time focused on the disclosures and the



 1 │ prospectus, the disclosures in the white paper or in a
 2 │ client agreement.  And there's a body of law on this
 3 │ issue, and it starts at Tab 37.
 4 │          Members are advised -- this is FINRA --
 5 │ members are advised that the prospectus and sales
 6 │ material of fund include disclosures on many matters.
 7 │ Oral representations by sales personnel that
 8 │ contradict the disclosures in the prospectus or sale
 9 │ literature may nullify the effect of the written
10 │ disclosures and make the member liable for rule
11 │ violations and civil damage to the customers that
12 │ result from such representations.
13 │          Exactly what happened here.  You can't tell
14 │ someone not risky, almost like a bond, solid, very
15 │ solid, super solid, and then say, well, I gave you a
16 │ prospectus and -- or tell them to have a yield and
17 │ give them a prospectus that says otherwise and say,
18 │ hey, I gave you a prospectus.  You should have known
19 │ better.
20 │          FINRA rules, FINRA interpretations, SEC
21 │ rules, SEC interpretation, case law, all of it rejects
22 │ that premise that Stifel has been advancing throughout
23 │ this case.
24 │          Tab 38, firms offering bonds and bond funds,
25 │ substitute structure notes should provide investors



 1 | with any prospectus and other disclosure material.

 2 | I'm just going to skip forward.  However, NSD reminds

 3 | firms that simply providing prospectus does not cure

 4 | unfair or unbound sales or promotion material whether

 5 | prepared by the firm or the issuer.

 6 |         And I asked their experts, and I asked Mr.

 7 | Heller.  Everyone agrees.  You can't make a

 8 | misrepresentation or omission or unsuitable

 9 | recommendation and then cure it by sending a

10 | disclosure document.

11 |         39.  Let me skip to 40 actually.  40 is an

12 | SEC -- SEC material.  I'm sorry.  FINRA material on

13 | Page 12.  The SEC has held that in the enforcement

14 | context, a registered representative may be found in

15 | violation of NASD's rules and the federal securities

16 | laws for failure to disclose risk to customers, even

17 | though such risks may have been discussed in a

18 | prospectus delivered to the customer.

19 |         Go to 41.  At the expense of -- and this is

20 | the SEC release.  At the expense of restating the

21 | obvious, we emphasize that compliance with these

22 | requirements for delivery of prospectus or offering

23 | circular does not, however, license broker dealers or

24 | their salesman, Mr. Roberts, to indulge in false or

25 | fanciful oral representations to their customers.



1          Last sentence, those who sell securities by

2    means of representations inconsistent with it do so at

3    their own peril.

4          Tab 43, same idea.  SEC.  Klein's delivery

5    of a prospectus to Towser does not excuse his failure

6    to inform her fully of the risks of the investment

7    package he proposed.

8          So telling someone verbally or omitting

9    information and then giving a disclosure document

10   doesn't cure anything.  As we saw in Stifel's own

11   compliance manual, that Mr. Kennedy said that he

12   favored very highly, the bottom of the page said, it

13   is the FA's obligation to educate the client about the

14   risks.

15         And what is amazing here is we've

16   established what Mr. Roberts believed.  We've

17   established it.  Not high risk, solid, very solid, not

18   risky, almost like a bond, money good.

19         And now Stifel wants you to hold Mr.

20   Jannetti to a higher standard than Chuck Roberts.  Mr.

21   Jannetti should know better than Chuck Roberts.

22   Obviously, that's not acceptable, not under the law in

23   our country.

24         The courts have addressed this issue at No.

25   46, Page 5.  On the other hand, where the information



1   is provided after the fraudulently induced purchase

2   occurs, such closures cannot be used to cure the

3   alleged prior fraud.  Those are the cases.

4          Let's talk about damages.  Case law on

5   damages at 47, Page 11.  In tort actions, the goal is

6   to restore the injured party to position it would have

7   been in had the wrong not been committed.

8          Then it goes into saying, most cases, the

9   measure of damages, which will accomplish its goal

10  provided by the out of pocket.  However, in some

11  cases, the measure of damages before by that rule

12  proved inadequate to address those later cases --

13  latter cases in which the claim is for fraud, what has

14  been described as a flexibilities theory has been

15  developed.

16         The flexibility theory permits the court,

17  the panel to use either the out of pocket or the

18  benefit of the bargain rule.  Benefit of the bargain

19  here, we provided you with an alternative to 517.

20         Benefit of the bargain on the structured

21  notes, and we put it right in those pages in the

22  closing binder.  Had Mr. Jannetti gotten the 12.25

23  percent that Mr. Roberts represented, we gave you

24  those damages, for the Solutions account, benefit of

25  the bargain, right here, the benchmark.  We gave you



 1   those damages.  Case law supports that exact remedy.

 2            Tab 49.  FINRA arbitrator guide puts benefit

 3   of the bargain right into the guide, 67.  The benefit

 4   of the bargain measure seeks to give the Claimant the

 5   expected value of the investment.  This is exactly

 6   what FINRA contemplated.  Give Mr. Jannetti the

 7   benefit of what Mr. Roberts represented about the

 8   structured notes, 12.25, even set up the 13 if you

 9   cherry pick, but even using a lower number.

10            And then the benchmark, there is no better

11   benefit of the bargain than what the benchmark is.

12   Now we acknowledge the benchmark lost $500,000.  We

13   acknowledge that.  Meaning, some money would have been

14   lost, but $2.5 million better than how Mr. Roberts

15   actually managed the account.

16            I want to turn to 52, punitive damages.

17   Now, punitive damages is critical in this case, and

18   let me tell you why.  This is the third case we're

19   litigating to a trial involving Chuck Roberts.  And

20   I've shown to this panel, even after the

21   adjudications, they have taken no additional action to

22   retrain or discipline Mr. Roberts.

23            Stifel will not do anything to discipline

24   him for the conduct that they know that he's engaged

25   in over the course of years, damaging and harming 20



1   clients that have come forward, two adjudications.

2   They will not do anything.

3          And as we sit here right now, Mr. Hillis is

4   about to embark on a three-hour lecture on why his

5   client did nothing wrong, and that they have no

6   liability, and that not only did they wipe out Mr.

7   Jannetti, who came from nothing.  He came from a very

8   humble beginning, worked by himself, moved to New York

9   as a young man, didn't have enough money to rent a --

10  to buy a suit, had to rent a suit, made it on his own.

11         Nobody gave him a hand up.  He made it on

12  his own, and he sold his business in a one-time

13  liquidity event.  And he gives that money to Mr.

14  Roberts.  And Mr. Roberts, in three years, wiped out

15  $16 million, not only of his money, his children's

16  money, and he has to sell assets to support himself.

17         In the text messages, I have no more money.

18  He testified, I have to sell assets.  What will they

19  say?  He's an investor.  He's rich.  It shouldn't

20  matter.  They wiped out all of his liquid net worth,

21  all of it.  Six-plus margin calls.  Stifel knows no

22  bounds.  They will not take any action.

23         It is up to this panel to send a message to

24  Stifel.  If you employ people like Chuck Roberts and

25  you don't discipline them and you don't retrain them



1   and you don't take action to supervise or make sure

2   that investors aren't harmed, that FINRA panels under

3   Florida law, empowered by FINRA rules, empowered by

4   Florida law, which we'll go over right now, will send

5   a message to Stifel.

6            Send the message.  This is not acceptable.

7   And here it is, right in the arbitrator guide.

8   Arbitrators may consider punitive damages.  There's no

9   debate about that.

10           53, Florida law, Florida Statute 768.737, we

11  have two arbitrators and two lawyers and an

12  experienced arbitrator.  Where punitive damages are

13  available as a remedy in the arbitration proceeding --

14  when an award of punitive damages made in an

15  arbitration proceeding, the arbitrator renders the

16  award must issue a written opinion setting forth the

17  conduct which gave rise to the award and how the

18  arbitrator applied the standards in 768.72 to such

19  conduct.

20           So when you render an award, if you render

21  an award for punitive damages, Florida law requires

22  that you make findings of fact sufficient to support

23  your award of punitive damages.

24           So when you're deliberating and should you

25  reach the conclusion that punitive damages are



 1    warranted, you have to include findings of fact.  You

 2    know, the panel finds that Mr. Roberts engaged in --

 3    and I'll show you what the standard is right now.  I

 4    don't want to put words in your mouth.  I don't want

 5    to invade the province of the panel, but here it is.

 6            768.72, Tab 54.  In any civil action, no

 7    claim for punitive damages shall be permitted unless

 8    there's a reasonable showing by evidence in the record

 9    or proffered by the Claimant, which would provide a

10    reasonable basis.

11            A defendant may be held liable for punitive

12    damages only if the trier of fact, that's the three of

13    you, based on clear and convincing evidence, that's

14    the standard, finds that the defendant, that's Stifel,

15    was personally guilty through Chuck Roberts of

16    intentional misconduct or gross negligence.

17            Intentional misconduct, the defendant had

18    actual knowledge of the wrongfulness of the conduct

19    and high probability that injury or damage to the

20    Claimant would result and despite that knowledge,

21    intentionally pursued the course of conduct.  We have

22    that here.

23            Gross negligence means the defendant's

24    conduct through Chuck Roberts was so reckless or

25    wanting in care that constituted a conscious disregard



1   or indifference to the life, safety, or rights of

2   persons exposed to such conduct.

3            In the case of an employer, Stifel,

4   principal corporation, other legal entity, punitive

5   damage may be imposed for the conduct of an employee,

6   Chuck Roberts, if the conduct of the employee, Chuck

7   Roberts, meets the criteria below.

8            The employer, Stifel, or other legal entity

9   actively and knowingly participated.  Two, the

10  officers, directors, or managers, Chuck Roberts, Lori

11  Lucarelli, condone, ratified, or consented to the

12  conduct.

13           Or No. 3, the employer, Stifel, or other

14  legal entity engaged in conduct that constitute gross

15  negligence.  Did Lori Lucarelli and Mark Stevenson and

16  Stifel engage in gross negligence that contributed to

17  the loss, damages, or injuries suffered by the

18  Claimant?  Yes, they did.

19           They failed to supervise.  They admitted it

20  in the SEC settlement.  They said they failed to have

21  a system of supervision in place to carry out its

22  obligation to monitor text messages.

23           What is the case law?  Tab 55, Page 8.

24  Mastrobuono.  Oddly enough, this is one of the cases

25  that Mr. Stevenson was involved in.  If you look at



 1  Mr. Stevenson's CRD, he is the manager of record in

 2  this Mastrobuono case that went up to the Supreme

 3  Court of the United States -- Mark Stevenson.

 4          And the Supreme Court made a determination

 5  because there was a challenge to whether or not the

 6  arbitrators had the authority to award punitive

 7  damages, and they said, yes, they did.

 8          The NASD's code of arbitration procedure

 9  indicates that arbitrators may award damages and other

10  relief.  NASD code of arbitration, while not a clear

11  authorization of punitive damages, this provision

12  appeared broad enough to at least contemplate such a

13  remedy.

14          Thus, the text of the arbitration clause

15  itself surely does not support, indeed, it contradicts

16  conclusion that the parties agreed to foreclose claim

17  for punitive damages.  Arbitrators are allowed to

18  award punitive damages in cases just like this.

19          Tab 56, Page 7.  A breach of fiduciary duty

20  under Florida law will support an award for punitive

21  damages.  So there's a special line of pages that deal

22  with fiduciary duties.  And if you have a fiduciary

23  duty and a breach of that duty, that supports an award

24  for punitive damages.

25          57.  I'm sorry.  Let's go to 58.  Florida



1   statute 768.73.  This tells you the amount that you

2   can award under Florida law, and here it is.  Punitive

3   damages may not exceed three times the amount of

4   compensatory damages awarded to the Claimant.  That is

5   the general standard.  You're allowed to go up to 3X

6   the compensatory damages.

7          So if you find that the damages are 25

8   million, you can award up to three times the

9   compensatory amount as punitive damages.  Remember,

10  this is an $11.7 billion market cap company.  The

11  message has to be meaningful for it to get the message

12  that hiring and retaining people like Chuck Roberts

13  that caused damage to investors is not acceptable.

14         You can also go up to four times where the

15  fact finder determines the wrongful conduct proven

16  under this section was motivated solely by

17  unreasonable financial gain and determines that the

18  unreasonably dangerous nature of the conduct together

19  with the high likelihood of injury resulted from the

20  conduct was actually known by the managing agent,

21  director, officer, or other person responsible for

22  making policy decisions, it may award an amount of

23  punitive damages not to exceed greater of four times

24  the amount of compensatory damages.

25         So three times is the standard, four times



```
 1   under certain circumstances.

 2           Tab 59, Page 8.  In determining the amount

 3   of punitive damages or exemplary damages to pecuniary

 4   circumstances of defendant are material, it must be

 5   considered since an amount would be pecuniary

 6   punishment to a man of small means would not

 7   necessarily serve as punishment to one of larger

 8   means.

 9           It follows that imputed damage of the award

10   is insufficient to serve as punishment, it cannot

11   serve as warning to deter him from committing similar

12   offense or engaging in similar conduct in the future.

13           The message must be calibrated to be

14   meaningful to Stifel.  Their market cap today, today,

15   11.7 billion.  In evidence in this case, are their

16   profits in 2023 and 2024.  This is a hugely profitable

17   company with an 11.7 billion market cap.

18           The punitive damage award, should you find

19   one, under Florida law, must be calibrated to send a

20   message or a warning to the defendant.  And we give

21   you that information at Tab 60.  2024 third quarter

22   results.  Stifel reported net revenues of 1.2 billion

23   for the three months ended September 2024.  Through

24   the first quarters of 2024, net revenue was up 13

25   percent to a record $3.6 billion.
```



1           That's who the defendant is.  That's who

2    Stifel is.

3           And I want to draw your attention to this,

4    Tab 64, Page 26.  And just finishing up here, there

5    was an argument that had Mr. Jannetti held on to those

6    structured notes, his loss would have been diminished

7    by $2 million.  I'm sure everyone recalls that.

8           Here's the law in Florida on that issue.  In

9    determining whether a victim's conduct was reasonable,

10   Mr. Jannetti, a court must consider the necessity for

11   decision making that was thrust upon him by the

12   defendant, Stifel, and judgments made at times of

13   crisis, margin calls, and are subject to human error

14   and should allow the injured party, Dave Jannetti, a

15   wide latitude in determining how best to deal with the

16   situation.

17          You can't put an investor in a precarious,

18   dangerous situation where they're going to have to

19   margin call liquidate their assets and then complain

20   that the investor would have had fewer losses had he

21   not had a margin call that you caused.  That's Florida

22   law.  That is Florida law.

23          I'll turn it over to Mr. Hillis on behalf of

24   Stifel in just a moment, but I'll end with this.  It

25   is imperative that arbitration panels like yours apply



1   the facts of the law and send a message where you deem

2   it appropriate to Stifel that the kind of conduct that

3   has been proven here, where brokers call their clients

4   MFs and openly say that they're chiseling their

5   clients and engage in intentional wrongdoing, and

6   brokerage firms knowingly hire bad actors to maximize

7   their profit and disregard the risks to their clients,

8   that those persons, those companies realize that there

9   are ramifications for that kind of behavior.

10          And only when you send the message in the

11  form of punitive damages, above and beyond, a warning

12  as the court put it, a warning, will that type of

13  conduct be diminished.  Thank you for your attention.

14          CHAIRPERSON SALIS:  Okay.  Are you ready to

15  go, Mr. Hillis?

16          MR. HILLIS:  We're ready.

17          CHAIRPERSON SALIS:  Okay.

18          MR. HILLIS:  So we have a few things that

19  we'll pass out as well.  We have on the tape.  No. 1

20  is what we call our closing binder.  It has the

21  PowerPoint that I intend to use.  It also has behind

22  the second tab, the blow ups and demonstratives that

23  we've used (inaudible).

24          We're going to put the PowerPoint on the

25  screen.  So I'm welcome to hand out the notebooks if



1  you'd rather view it in paper.  Or --

2           CHAIRPERSON SALIS:  I want to take them all.

3           MR. HILLIS:  So what I was going to say is I

4  can hand them out.  You can have them in front of you,

5  if you want to view it in paper, or I can put them

6  here and you can have them when you leave, either

7  way --

8           CHAIRPERSON SALIS:  Put them here or I'll

9  forget them.

10          MR. HILLIS:  No problem.

11          CHAIRPERSON SALIS:  Some one of you or two

12 of you or three of you need to carry this to my car.

13          MR. HILLIS:  So we have that closing binder.

14 We also have a case authorities notebook with an index

15 and some of the key cases that we've cited.  I don't

16 plan to go through that case notebook.  We also

17 include another copy of our hearing brief.

18          And of course, we've already uploaded our

19 hearing brief and everything cited in our hearing

20 brief to the portal.  But those are some of our key

21 cases.  They're in there alphabetically, so you can

22 look at the index.  If there's a case you want to look

23 at, you can pull it up alphabetically.

24          We also have everything on a flash drive

25 that we'll pass out.  It does have a password which



1  we'll provide to you.  We also went ahead and put all

2  of the hearing transcript on that flash drive.  We'll

3  still upload that to the portal, but we'll provide

4  those to you, as well.

5           And just for my planning purposes, Madam

6  Chairman, it's 11:22.  Will we go to 12:22 or are we

7  going to break?

8           CHAIRPERSON SALIS:  We're going to break at

9  noon.

10          MR. HILLIS:  We're going to break at noon.

11  Okay.  Thank you.  Okay.  May I proceed?

12          CHAIRPERSON SALIS:  Yes, please.

13               RESPONDENT'S CLOSING STATEMENT

14          MR. HILLIS:  Thank you.  Great.  Well, on

15  behalf of Stifel, we'd also like to thank the panel

16  for serving in this case, for the attention that

17  you've given the case.  I've watched you very

18  carefully; you have paid very close attention.  You've

19  taken a lot of notes.  You've taken your role very

20  seriously, and Stifel appreciates it very much.

21          What I'd like to do is try to give you the

22  other side of the story.  We've had 18 days of

23  hearings.  It's a lot of testimony, a lot of exhibits,

24  and it's impossible for anybody to remember all of

25  that.  So what I'm going to do is try to show you some



 1   of the key documents, key text messages from Mr.

 2   Jannetti, key testimony from Mr. Jannetti and others,

 3   because it's impossible to remember all that.

 4            And most of what I'm going to be showing

 5   you, the other side didn't mention, didn't show you at

 6   all.

 7            So I told you in opening that this is the

 8   case about a smart, sophisticated, successful

 9   businessman and an experienced and aggressive, detail-

10   oriented investor who refuses to take any

11   responsibility for his investment and financial

12   decisions that he alone made and controlled and who is

13   simply trying to shift to Stifel market risks that I'm

14   going to show you.

15            He understood that he willingly chose to

16   assume in order to chase higher yields and higher

17   returns from strategies that were suitable for him,

18   that had performed well for years up until 2022, that

19   he loved when they were performing well, that suffered

20   losses in 2022 solely caused by a broad market

21   collapse driven by the Federal Reserve rapidly and

22   dramatically increasing interest rates to combat the

23   worst inflation in 40 years and strategies that have

24   performed well since 2022.

25            And that's exactly what the evidence has



1   proven.  The evidence has proven that Mr. Jannetti was

2   an aggressive investor, chasing higher potential

3   yields and higher potential returns.  He wasn't

4   looking for a safe, conservative, diversified

5   portfolio that would preserve his principal like he

6   claimed in this hearing.

7         And let's look at three text messages that

8   prove the point.  This is a text message from

9   September from Mr. Jannetti to Mr. Roberts.  I just

10  freed up about $2.5 of bullshit investments that I'm

11  going to move over soon.  U.S. Trust just left crappy

12  investments wither on the vine, not being attentive to

13  unproductive positions.

14        Now, Mr. Jannetti testified about this

15  account, and he testified similarly about the Merrill

16  Lynch account, diversified, conservative.  And I'll

17  show you the holdings in those accounts later.  That's

18  what his experience had been.  He didn't want it.

19        Let's go to the next slide.  This is a text

20  a few weeks later from him to Mr. Roberts.  By the

21  way, it's our anniversary, and you didn't even send

22  flowers.  One year up, 30 percent, plus not a miss on

23  notes.  One million dollar start to $34 million today.

24        Go to the next text.  This is a few weeks

25  later.  Hey, Eric.  Eric is his hard dollar lender.



1    This is the guy who does the hard dollar lending with.

2    He's introducing him to Chuck Roberts.  He says, you

3    both made me money.  Chuck manages a bunch of my money

4    and a significant amount of money for friends and

5    family.  I'm not complaining about his 35 percent

6    return last year.

7            These three texts show you what Mr. Jannetti

8    wanted, why he consolidated his assets at Stifel.

9    Because he was chasing higher returns, higher yield.

10   He didn't want bullshit, crappy, and unproductive

11   diversified conservative portfolios like he had at

12   Merrill Lynch and at U.S. Trust.  He was chasing

13   substantially higher returns, primarily to fund his

14   private investments away from Stifel.

15           He wanted investments that could potentially

16   generate 30 to 35 percent return.  And given his

17   education, business experience, investment experience,

18   his own text messages, do we really think he thought

19   he could get 30 to 35 percent return in one year from

20   a safe, conservative strategy that would preserve his

21   principal?  Of course, he understood the risks he was

22   taking to get 30 to 35 percent in one year.

23           The evidence has proven that Stifel and Mr.

24   Roberts disclosed the risks of structured notes,

25   orally and in writing, repeatedly.  There's



 1  overwhelming evidence of it, and I'll review that with

 2  you later.

 3           The evidence has proven that Mr. Jannetti

 4  understood the risks he was taking investing in

 5  structured notes.  His spreadsheet, which I'll show

 6  you later, his own text messages, and his testimony

 7  prove it.

 8           When safe, low risk investments like

 9  treasuries are yielding less than 2 percent, when

10  investment grade bonds, which he held, were yielding 3

11  to 4 percent, an investor with his experience

12  understands that a structured note potentially

13  offering a 15 percent yield has considerably more

14  risk.

15           Pull up Respondent's 148, Page 11.  This is

16  a chart that Mr. Ekdahl testified yesterday.  And on

17  cross, Mr. Erez ripped him a new one for including in

18  this chart a comparison of the structured notes with

19  three -- the S&P 500 index dividend yield, the BBAL,

20  and the bankrate.com U.S. two-year CD national average

21  because those had such low risk, and he ripped him for

22  comparing in this chart to the structured note.

23           But that's the whole point of this chart.

24  That's the whole point.  If Mr. Jannetti had wanted

25  safe, conservative investments that would preserve



 1  principal that pay less than less than 2 percent, then

 2  those are the types of investments he would have been

 3  investing in.

 4          No, he was offered structured notes with a

 5  potential yield of 13, 14, 15 percent and wants you to

 6  believe that he thought it was the same level of risk.

 7  His testimony under oath.  I didn't think there was

 8  any risk to my principal.  That's what he expects you

 9  to believe.

10          He clearly understood the risks of investing

11  in structured notes.  When you strip away all the

12  granular details that he attempts to overcomplicate

13  these notes, what is the market risk of these notes?

14  The market risk of a structured note is the risk that

15  the underlying drops significantly in value.

16          The risk that an ETF or an individual stock

17  drops significantly in value, drops below the barrier.

18  It's stock market risk.  It's as simple as that.  Mr.

19  Heller admitted that that was the market risk of a

20  structured note, the risk that the underlying drops in

21  price.

22          And investing in a structured note carries

23  no more market risk than investing directly in the

24  underlying.  You invest in a structured note linked to

25  a particular stock, you're taking no more risk than if



1  you invested in that particular stock directly.  It's

2  stock market risk, and it's actually less risk until

3  you reach the barrier.

4          And of course, as Mr. Ekdahl shows, you can

5  certainly do better than the underlying, particularly

6  if you've gotten dividends.  But you're taking no more

7  market risk than you do investing in the underlying.

8  If you understand the risk that a stock ETF or an

9  individual stock can go down, then you understand the

10  risk of investing in a structured note.

11          And the risk that an ETF or a stock can drop

12  in price, can drop significantly in price, is a risk

13  that even a novice investor, which Mr. Jannetti

14  clearly is not, understands.

15          And his experience losing $3 million of the

16  4 million he received from the sale of his first

17  company in ICG Communications stock and other

18  technology stocks that he selected and bought taught

19  him that lesson.

20          And Mr. Heller conceded, and I'll show you

21  this testimony, that he had no doubt in his mind that

22  Mr. Jannetti understood the risk that the underlyings

23  can drop significantly.

24          Yet Mr. Jannetti is here asking you to give

25  him 20-plus million dollars in damages, claiming that



 1   he didn't understand the risk that an ETF or an

 2   individual stock like Dynatrace can drop significantly

 3   and can drop below the barrier.  It's simply not

 4   credible.

 5           And there's another important point to

 6   remember.  There's a big difference between a broker

 7   expressing an opinion or belief that something is a

 8   good investment or an investment that they think will

 9   perform well, a big difference between that and a risk

10   disclosure.

11           And the Claimants in this case, in our view,

12   seriously conflate these concepts.  A broker

13   recommends an investment only if he reasonably

14   believes it's a good investment, an investment that he

15   thinks will perform well for his client.  Otherwise,

16   he or she wouldn't recommend it.

17           A customer certainly doesn't expect their

18   broker to recommend something that he doesn't or she

19   doesn't think is a good investment.  That's just

20   common sense.

21           But so when Mr. Roberts expressed an opinion

22   that structured notes were solid or super solid or

23   things just like that, he's expressing his opinion

24   that he thinks these are good investments.  It's not a

25   guarantee.  It's not a risk disclosure.  It's not, as



1   they argue, a disclosure that these investments have

2   no risk to principal.  It's not a statement of low

3   risk or no risk.

4          It's a statement of opinion that Mr. Roberts

5   thought these were good investments.  But he

6   understood the risk of what could happen.  He

7   explained that to Mr. Jannetti.  Stifel explained it

8   in written documentation, and Mr. Jannetti understood

9   the risk of what could happen.

10         His spreadsheet and his text messages, which

11  I'm going to walk you through, prove it.  The evidence

12  has proven that the structured notes were suitable for

13  the Claimants.

14         Now, suitability, as you've heard, has two

15  components, reasonable basis and customer specific.

16  Let me talk a little bit about reasonable basis.  This

17  is not a product case.  Structured notes are clearly

18  suitable for retail investors.  That's been the

19  evidence from the experts that it really hasn't been

20  rebutted.

21         They've been offered to retail investors for

22  many years.  Thousands of structured notes are issued

23  every year, billions of dollars' worth.  They're

24  issued by most of the major financial institutions,

25  recommended and sold to retail clients by most of the



 1  major broker dealers, all of whom have concluded that

 2  structured notes meet the reasonable basis to

 3  suitability test, suitable for some retail investors.

 4          Even Mr. Heller admitted that he was not

 5  here to opine that structured notes were not suitable

 6  for retail investors.

 7          Now, Mr. McCann, who's a pure academic, no

 8  real-world experience at all, never seen a product

 9  that he liked, he clearly didn't like structured

10  notes.

11          And he tried to mislead this panel when he

12  testified with no backup, zero backup, no analysis, no

13  data, not even a handwritten note on a whiteboard that

14  every single one of the notes Mr. Jannetti bought had

15  an expected negative return, and it was known at the

16  time it was recommended.  Blatant attempt to mislead

17  you.

18          And they ripped Mr. Ekdahl for writing notes

19  on a board when Mr. McCann sprung that opinion on us

20  with zero notice, zero documentation, no data

21  whatsoever.  It's a double standard.  Mr. Ekdahl, who

22  does have real-world experience and is a structured

23  products expert, completely rebutted Mr. McCann's

24  opinions.

25          He ran the Monte Carlo simulations.  10,000



1    simulations on the Palantir note.  79 percent of the

2    time, it's projected to have a positive return.  But

3    to believe Mr. McCann, you have to believe that all

4    these issuers, all these broker/dealers have been

5    duping the entire world of retail investors and the

6    regulators for years.  It's just pure nonsense.

7            The SEC and FINRA have not barred the sale

8    of structured notes to retail clients.  There's no

9    evidence of any regulatory action against issuers,

10   broker/dealers, to prohibit the sale of structured

11   notes.

12           On the contrary, FINRA provides training on

13   the sale of structured notes to retail investors.  So

14   this is not a product case.

15           Now, the Claimants make three reasonable

16   basis suitability arguments.  First, they argue that

17   Mr. Roberts didn't understand structured notes.  They

18   have not proven that.  The evidence has proven that

19   Mr. Roberts clearly understood the structured notes.

20   He was trained on them at Morgan Stanley, trained on

21   them at Stifel, including FINRA trading.

22           He sold them since 2014.  He sold many

23   hundreds of them, read countless prospectuses, works

24   with the structured note desk virtually every month to

25   structure these notes.  It's clear from his testimony



 1  that he understands these products.

 2         Their argument that he didn't is based

 3  solely on a handful of text messages, mainly to other

 4  people, out of hundreds of clients who bought

 5  structured notes.  A handful of clients, out of

 6  hundreds who bought them, with no context whatsoever

 7  to suggest that those few text messages sent to a

 8  handful of clients somehow encapsulates everything Mr.

 9  Roberts knows about structured notes is absurd.

10         Their second argument is that he stopped

11  offering single stock notes and XBI notes in January

12  of 2022.  That is irrelevant.  It's in the nature of a

13  subsequent remedial measure.  If we were in court, it

14  wouldn't even come in.

15         The fact that he decides in January of 2022

16  to no longer offer new and different structured notes,

17  which each one is a completely separate security,

18  linked to single stocks -- what single stocks?  We

19  don't know -- or XBI.

20         But the fact that he makes that decision

21  based on a different risk reward analysis caused by a

22  dramatically different market doesn't change the

23  reasonableness of his recommendation of separate

24  structured notes offered six months earlier.

25         Suitability is determined at the time of the



```
 1  recommendation, not months later.  And there's no

 2  question that Mr. Jannetti knew that Mr. Roberts

 3  stopped offering single stock notes and notes linked

 4  to XBI because Mr. Roberts continued sending him the

 5  menu of notes each month in 2022, and they didn't

 6  include any single stock notes, and they didn't

 7  include any XBI.

 8          So he knew that Mr. Roberts was no longer

 9  offering those types of notes.  Now he didn't buy any

10  notes in 2022.  But he under -- he saw those menus

11  that Mr. Roberts continued to send, and those types of

12  notes were not there.

13          The third argument is this argument somehow

14  Mr. Roberts did something wrong with the way in which

15  he customized and hedged his notes.  The evidence in

16  the case is that the sole reason for customizing the

17  notes was to get better terms for the clients.  Mr.

18  Roberts could've sold the calendar notes.  He would've

19  gotten paid the same thing.

20          He did it to get better terms for the

21  client.  Their argument is he customizes based on his

22  view, not the client's view.  Well, that's just

23  factually wrong because the evidence is that Mr.

24  Roberts talks to his clients all the time.  Many

25  clients have signed on to the strategy.  He talks to
```



 1 | them all the time.

 2 |         He understands what they want.  He

 3 | understands their view of the markets.  He understands

 4 | that custom notes will be attractive to them based

 5 | upon their view and their knowledge of the market.

 6 | There's no requirement, no rule.  They didn't show you

 7 | one -- that the only way you can do a customized note

 8 | is when a client calls you up and says, hey, I'd like

 9 | to buy a structured note because I've got this

10 | particular view.

11 |         They haven't shown you anything to support

12 | that argument.  Mr. Roberts knows his clients.  He

13 | talks to them all the time.  He knows what they want.

14 | He knows what their objectives are.  He knows what

15 | they're interested in.  And he customizes this note

16 | based upon his knowledge of his own client.

17 |         There is absolutely nothing wrong with the

18 | manner in which he did it.  Mr. Lee testified to that.

19 | And Ms. Popel testified to that.  Nothing wrong with

20 | that process.

21 |         The evidence has proven that the notes were

22 | suitable for the Claimants given their investment

23 | profile.  The test is, did Mr. Roberts have a

24 | reasonable basis at the time he recommended the notes

25 | to believe that they were suitable for Mr. Jannetti,



1   not based on hindsight, not based on how they

2   ultimately performed, that's not relevant, at the time

3   he makes the recommendation.

4            And the evidence has proven that he did have

5   a reason to believe they were suitable based upon Mr.

6   Jannetti's age, his education, his business

7   experience, his aggressive investment objectives and

8   risk tolerance, which I'll tell you, his net worth of

9   $70 million, but most important because it's what Mr.

10  Jannetti wanted, which he made clear repeatedly.

11           Concentration.  With respect to

12  concentration, the evidence has proven beyond any

13  dispute that Mr. Jannetti is responsible for it.  Mr.

14  Roberts didn't recommend that he concentrate his

15  accounts only in structured notes.  Mr. Roberts

16  recommended a diversified portfolio multiple times,

17  and Mr. Jannetti rejected it every single time.

18           I'll go over that evidence in a little

19  while.  Mr. Roberts didn't recommend that he

20  concentrate his structured note holdings and notes

21  with the highest potential yield, such as single stock

22  notes.  Mr. Roberts recommended a menu of notes every

23  month, broad-based index notes like the Dow, NASDAQ,

24  vector notes.

25           And starting in June of '21, only because



1   Mr. Jannetti was unhappy with the yields and expressed

2   the desire for notes that had higher yields, he

3   started offering -- including in his menu single stock

4   notes with relatively small allocations to the single

5   stock notes.

6           Mr. Jannetti rejected Mr. Roberts's

7   recommended menu every time.  He chose to concentrate

8   in notes with the highest potential yield, and he

9   decided how much to invest every time.  And starting

10  in June of '21, he is the one that chose to

11  concentrate his investments in single stock notes,

12  rejecting the menu and picking the one or two single

13  stock notes with the highest yields.

14          He knew those notes had the highest risk

15  and, in turn, the highest potential coupon because he

16  knew they were tied to underlyings that were more

17  volatile.  I'll show you the text message as the man

18  follows the VIX, which is the volatility index.  He

19  understands the relationship between volatility and

20  the potential yield and the underlying.

21          And a note with a 15 percent contingent

22  coupon when really safe investments are paying 2 to 3

23  percent and a barrier of 40 percent tells you that the

24  underlying is volatile.  If it wasn't, why would you

25  need a 40 percent barrier to protect you?



1           Mr. Jannetti knew that diversification

2    reduces risk, and he knew that concentrating increases

3    risk.  He decided to concentrate in structured notes.

4    He decided to concentrate in structured notes with the

5    highest potential yield that he knew had the higher

6    risks.

7           Just like he decided to take half the cash

8    from the sale of his first company and invest it all

9    in risky technology stocks.  Just like he decided to

10   concentrate $3.5 million in Braven, a one speculative,

11   illiquid private investment that he bought because his

12   former close friend told him he would double his money

13   in three months.

14           That tells you what he's looking for.  He

15   ain't looking for safety.  He's not looking to

16   preserve principal.  He's looking to double a $3.5

17   million investment in three months.  Just like he

18   decided to concentrate $7 million in one spec real

19   estate development project with Mr. Caine (phonetic).

20           And let me just make one other point.  He

21   didn't need Mark Stevenson or Lori Lucarelli to tell

22   him over the phone or in a letter that his accounts

23   were concentrated in structured notes.  He knew it.

24   He testified to it.  He testified that he knew it, and

25   he knew the risks he was taking by concentrating, and



 1   he continued to ask for more and more structured

 2   notes.

 3           Leverage.  The evidence has proven that Mr.

 4   Jannetti is very experienced with debt and lending, as

 5   a borrower and a lender.  He testified he brought up

 6   the idea to Mr. Roberts of getting a mortgage and

 7   investing the proceeds to earn -- simple arbitrage is

 8   what he said.  He asked to use margin before he had

 9   even opened a margin account at Stifel.

10           And of course, he had used the very same

11   strategy at U.S. Trust, a $3.5 million line of credit

12   there, secured by his brokerage account, which he used

13   to invest in private deals.

14           The evidence is proven he drove the use of

15   margin, not Mr. Roberts, to fund his withdrawals, to

16   fund his private investments, just like he did at U.S.

17   Trust with the $3.75 million credit.

18           Margin calls.  The evidence has proven that

19   Mr. Jannetti is solely responsible for the margin

20   calls in 2022, and his decision to sell notes to meet

21   those margin calls.  He chose to overcommit himself to

22   outside private investment.  Mr. Roberts didn't

23   recommend that he commit $7 million to a spec real

24   estate deal with Mr. Caine.

25           He didn't recommend that he take $3 million



1  on margin and invest in Braven.  Mr. Roberts didn't

2  recommend that he take $2.1 million on margin for a

3  down payment on an $11.5 million investment property

4  in Sunset Harbor after his accounts had dropped $10

5  million.

6          Mr. Jannetti chose to withdraw $12 million

7  from his Stifel account between March of '20 and the

8  end of '22, much of that on margin to fund these

9  outside investments.  He chose to withdraw over $6

10 million from the account in 2022 alone when the

11 accounts were losing millions and he was getting

12 margin calls.

13         He chose to withdraw over 3.5 million after

14 receiving the first margin call, between then and

15 January of 2023.  All those withdrawals led directly

16 to the margin calls he received in 2022 and

17 (inaudible).

18         Imagine how this account would have

19 performed had the $12 million not been withdrawn.  I

20 would offer to you, he wouldn't have gotten any margin

21 calls.  It's the $12 million he withdrew from the

22 account.  It's the $6 million he withdrew in 2022,

23 that it led to or at least exacerbated the margin

24 calls.

25         Mr. Roberts's structured note and stock



1  strategies performed well for years before 2022.

2  They've performed well since.  He had one bad year,

3  2022, as I said, due to the dramatic rise in inflation

4  and Federal Reserve interest rates.  The S&P in 2022

5  went down over 19 percent.  The Russell 2000 went down

6  over 21 percent, and the NASDAQ dropped over 33

7  percent.  All of that happened in one year.

8           That's not Mr. Roberts's fault.  Every long

9  term investment strategy has a bad year.  No strategy

10 goes up every year.  And unfortunately, that's the

11 market risk that caused Mr. Jannetti significant

12 losses in 2022.  So it's a case about one bad year in

13 the market, not a bad strategy.

14          Now, Stifel and Roberts, Mr. Roberts, we

15 obviously regret that Mr. Jannetti suffered these

16 losses.  We don't want to see any client suffer market

17 losses.  It's not good for Mr. Jannetti, obviously.

18 It's not good for any client.  It's not good for

19 Stifel's business.  It's not good for Mr. Roberts's

20 business.

21          Our job is to make people money, not have

22 them lose money in the market.  But we didn't cause

23 it.  We didn't cause that market downturn, which is

24 the sole reason these structured notes went down in

25 value.  The sole reason.  Downturns in the markets



 1   happen.  This one was severe, unfortunately.

 2          But that's a risk an investor accepts and

 3   agrees to assume.  No firm, no FA can guarantee the

 4   markets.  No firm, no FA can guarantee the performance

 5   of any particular strategy or particular investment.

 6   That's a fundamental precept of investing.

 7          So much so that it's incorporated into the

 8   client agreement, which is the contract between Stifel

 9   and Mr. Jannetti.  And it's on the very first page of

10   the account agreement.  There are risks in investment.

11   The performance of your investments cannot be

12   guaranteed by Stifel.

13          If you choose to invest in products that are

14   not insured by the U.S. government, there is a risk to

15   your principal.  If you're not comfortable with this

16   risk, you should not purchase such investments through

17   Stifel.  Some investments are riskier than others.

18   Before making any investment, you should understand

19   the investment product and the associated risks.

20          This is fundamental to investing.  The

21   investor has to understand the risks, which he did,

22   and if he genuinely chooses to assume those risks,

23   that is on the investor.

24          He's not entitled to recover simply because

25   the market declined and he lost money, simply because



1   he lost a lot of money.  Simply because Mr. Roberts's

2   recommendations did not perform like he and Mr.

3   Jannetti thought they would and hoped they would.

4   That's not enough.

5          We acknowledge that the loss is large in

6   this case, but that's not enough for him to recover.

7   Yet Mr. Jannetti, this experienced businessman,

8   professional investor, comes in here and asks you for

9   all his money back.  A do-over, a market guarantee, an

10  insurance policy, make Stifel the guarantor of the

11  markets, taking zero responsibility for anything.

12         In his world, he gets to -- he could decide

13  to concentrate his account in structured notes, reject

14  Mr. Roberts's multiple recommendations to diversify

15  the portfolio with other investments.

16         He can reject Mr. Roberts's diversified

17  structured note menu every month, choose to cherry

18  pick the structured notes with the highest potential

19  yield, those linked to the ETFs and stocks that he

20  knows have higher volatility, he can receive a

21  structured investments disclosure, a white paper, a

22  portfolio review, and over 40 preliminary and 40 final

23  prospectuses, all of which disclose the risks in

24  detail, and if you believe him, which I don't, choose

25  to be completely irresponsible and not read any of



1    that.  Not even look at it.

2         He can keep a live spreadsheet of every

3    single structured note with a live feed so he can

4    track the market risk of each note every single day.

5    So that on a daily basis, he can look at whether the

6    price of the underlying is above or has dropped below

7    the barrier, which he knows determines whether coupons

8    will be paid and how much principal is returned at

9    maturity.

10        And he uses it to track how far below the

11   starting price the underlying has dropped.  I'll show

12   you that spreadsheet in a little bit.  He could decide

13   to reinvest proceeds from structured notes that are

14   called into new structured notes, knowing full well

15   that Stifel and Mr. Roberts will receive an additional

16   1.75 percent commission on each note sold.  He knew

17   that.

18        This experienced professional lender and

19   borrower can decide to use leverage to enhance his

20   returns, knowing full well the risk of the doing so,

21   netting him almost $3 million in structured note

22   coupons above the margin interest that he paid.

23        He can commit millions of dollars to private

24   investments away from Stifel, withdraw over $12

25   million from his accounts, much of it on margin, to



1   fund those investments, which presumably have been

2   profitable, and those decisions leading directly to or

3   at least exacerbating his margin calls, he can praise

4   Mr. Roberts when the strategies were performing well,

5   praising for earning 30 to 35 percent in one year,

6   making me six figures in one day, making me $500,000

7   in less than three months with only $1 million

8   invested most of that time, knowing full well the

9   risks he is assuming to get such outsides returns.

10          He could decide to put $6 million in a

11  structured note linked to Dynatrace, admitting that he

12  had trepidation when he did so, which is proof

13  positive he understood the risk.  He can decide over

14  the course of two months to invest $5.5 million in two

15  structured notes linked to Palantir, then invest

16  $600,000 directly in Palantir stock, 400 of that in

17  two unsolicited trades that he initiates for a total

18  of $6.1 million invested in Palantir-related

19  securities, knowing all that time that the price of

20  Palantir is dropping by 33.5 percent.

21          He can follow his accounts, his structured

22  notes, his stocks on a daily basis, knowing exactly

23  what he holds, how concentrated his accounts are in

24  structured notes, that stocks have been bought in the

25  Solutions account, that the Solutions account holds



1  only growth stocks, how his investments and accounts

2  are performing, he could do that.

3           And for over a year starting in late 2021,

4  he can watch those investments drop in value by

5  millions of dollars, sell securities to meet margin

6  calls, incur millions of dollars in realized losses.

7  And during that time, he never accuses Mr. Roberts of

8  anything throughout 2022.  Never accuses Mr. Roberts

9  of having misrepresented the risks or anything else.

10          You would think that someone who thought and

11  was led to believe that the notes had a guaranteed 12

12  to 15 percent yield and no risk to principal would

13  have accused Mr. Roberts of misleading him in 2022

14  when he saw the exact opposite.  Never did.  Never

15  accused him of that.  Never accused him of

16  recommending unsuitable investments.

17          And we're supposed to believe that the guy

18  you watched on cross, as combative as he was with me,

19  felt sorry for Mr. Roberts, and that's why he didn't

20  accuse him of any wrongdoing?  In his world, after all

21  of that, he demands that you give him all of his money

22  back plus a huge return as if none of that ever

23  happened.

24          Just completely absolve him of any

25  responsibility at all.  Not a result supported by the



1  law or the facts, and it would be unfair and unjust.

2  The law and federal arbitration are intended to

3  provide a means for innocent victims to recover

4  compensation for losses they didn't cause, losses

5  caused by the wrongdoing of the Respondent.

6      The law and FINRA arbitration are not

7  intended to give a professional investor like Mr.

8  Jannetti, who understands the risks, who knowingly

9  takes those risks chasing higher returns, who follows

10  his accounts and holdings closely, and knows exactly

11  where he stands at all time, and whose losses were

12  caused by his own conduct and decisions and the market

13  risks he chose to take a market guarantee or do over.

14      That's not what the law and federal

15  arbitration is about.  And that's why we have legal

16  principles and defenses like comparative fault.  In

17  Florida, you find that Mr. Jannetti was at fault,

18  negligent, then you must reduce any recovery on his

19  negligence claims by the amount of losses caused by

20  his own fault.

21      And if you find that his fault was more than

22  50 percent responsible for the losses, then you must

23  award him nothing on his negligence claims.  That's

24  why we have reasonable and justifiable reliance, which

25  is an element of the fraud claims and the 517 claim,



 1 | which I'll come back to later.

 2 |         Now, Mr. Erez doesn't like that law, but the

 3 | law is that it's not enough for him to prove an

 4 | alleged misrepresentation or an omission.  He has to

 5 | prove that he relied on it and that he was reasonable

 6 | in relying upon it.  And you're not reasonable in

 7 | relying upon alleged omissions when the documents to

 8 | disclose those facts are sitting right in front of

 9 | you.

10 |         That's why we have assumption of the risk.

11 | The law doesn't compensate one for losses caused by a

12 | risk that they knowingly assume.  That's why we have

13 | ratification.

14 |         An investor can't sit by knowing exactly

15 | what's happening in the account, exactly how

16 | concentrated the account is in structured notes,

17 | exactly how many structured notes he has that are

18 | linked to XBI.  He knew it.  Exactly how leveraged the

19 | account is, that only stocks have been bought in the

20 | Solutions account, accept all that, and then complain

21 | only after incurring losses.  The law does not allow

22 | you to do that.

23 |         CHAIRPERSON SALIS:  Mr. Hillis, are you okay

24 | completing that after 1:00?

25 |         MR. HILLIS:  I'm glad to take a break now.



```
 1            CHAIRPERSON SALIS:  Okay.  Good.

 2            MR. HILLIS:  Thank you.

 3            (OFF THE RECORD)

 4            (ON THE RECORD)

 5            MR. EREZ:  I would like to just state the

 6    obvious, which is, on the current trajectory, we're

 7    not going to be done at 4:00.

 8            CHAIRPERSON SALIS:  My first recommendation

 9    was that we finish on Zoom if it's not finished.  I

10    don't want to stay late.  I don't have a babysitter

11    for my dog.

12            MR. EREZ:  I'm not in control of this

13    process, but either we recalibrate the time and cut it

14    down on both sides or we stay till 5:00.  I mean, it's

15    your decision, but --

16            MR. HILLIS:  Shorter breaks a little bit --

17            MR. EREZ:  Shorter breaks.

18            MR. HILLIS:  I'm want to get through this.

19    I'm going to try to go through it as quickly as I

20    possibly can.

21            CHAIRPERSON SALIS:  You both have very good

22    at that.

23            MR. HILLIS:  But we have, you know, I want

24    to make sure I've got time.  I mean, obviously, he's

25    got some rebuttal time.  So you know, we're 30 minutes
```



1   away, and it's 4:00.  I don't know.  But let's just

2   get going, and I'll try to get through my pieces.

3          CHAIRPERSON SALIS:  Let's see where we are

4   at the next break, but I do have two house cleaning

5   things.  I just double checked about the withdrawal of

6   the (inaudible) request.  Is that with or without

7   prejudice?  Because it's before October, so you would

8   have an opportunity to file again if you want to.

9          MR. HILLIS:  I'll have to admit I'm -- I'll

10  have to look at the rule on that.  My understanding

11  was that in a case where the broker's not named and

12  the firm asks for it, that's the opportunity.  But

13  given that we're withdrawing it, I don't know enough.

14         CHAIRPERSON SALIS:  It might have to be a

15  separate file.

16         MR. HILLIS:  I don't know enough.  Yeah.

17         CHAIRPERSON SALIS:  Okay.

18         MR. HILLIS:  I'll have to look.

19         CHAIRPERSON SALIS:  Yes, please look into

20  that.  No, don't apologize.  So I'm learning about

21  this, too.  I never had that happen.

22         The second thing is, just so you know, the

23  ruling is not going to be immediate because one of our

24  members is going out of the country on a trip.

25         MR. HILLIS:  Understand.



1           CHAIRPERSON SALIS:  So but we are scheduling

2    several times to convene and discuss the case.

3           MR. HILLIS:  Understand.

4           CHAIRPERSON SALIS:  All right.  Please

5    proceed.

6           MR. HILLIS:  All right.  It's 1:10.

7           Now, what's the Claimants' primary strategy

8    to taking attention off of his own responsibility and

9    fault in this case, and that is to try to demonize Mr.

10   Roberts.  That's been their primary strategy from Day

11   1.

12          Screw him as a bad actor, convince you he's

13   got bad business character, so you will conclude that

14   he acted in conformity with it in this case and acted

15   wrongfully in this case and that he shouldn't be

16   believed.

17          They focus on customer complaint many years

18   before Stifel even hired him.  We objected to that

19   prior bad acts evidence in our motion in limine, and

20   that was denied, which I respect.

21          But we made the argument because prior bad

22   acts evidence offered to prove that a defendant acted

23   in conformity with it should not be admitted.  And

24   that is the exact argument that he made in his closing

25   argument, that Mr. Roberts shouldn't have been hired



1  because of those prior complaints and that he acted in

2  conformity with it in this case.  And that's why that

3  evidence is so prejudicial unfairly and should not

4  come in.

5          They bring up a FINRA settlement many years

6  before Stifel hired Mr. Roberts.  They bring up the

7  fact that 2 states out of 30 required heightened

8  supervision as a condition of transferring his

9  registration to Stifel, even though 28 states didn't

10 require it, even though both Colorado and New Jersey

11 both approved lifting that heightened supervision in

12 2018, well over a year before Mr. Jannetti opened his

13 first account.

14         Even though there were no new customer

15 complaints filed or regulatory issues on Mr. Roberts's

16 record from 2010, when the FINRA AWC was entered,

17 until the end of 2021; that's 11 years with that.

18         And the pending complaints, all of which

19 came in after Mr. Jannetti's account was closed, most

20 of which are filed by Claimants' counsel, those

21 pending complaints are completely irrelevant.  They

22 were filed after Mr. Jannetti's account left, after

23 all of the alleged conduct in this case.  They're

24 totally irrelevant.

25         And of course, they bring up the fact that



1   Mr. Roberts texted.  They're literally obsessed with

2   this texting, and I'm not minimizing what he did.

3   Federal rules and Stifel policies clearly prohibit

4   texting with clients on a personal device about

5   business.

6           He admitted it was wrong.  He shouldn't have

7   done it.  He takes responsibility for having done it.

8   He doesn't make any excuses for it, but it's the

9   regulator's job to address that violation.

10          The SEC has addressed Stifel's role with

11  respect to texting, including every issue on texting,

12  including Mr. Roberts, and fined Stifel $35 million.

13  It has paid that price for its role with respect to

14  texting.

15          And yes, they made findings in that SEC

16  settlement about supervision of texting, not

17  supervision of Mr. Roberts, not supervision of

18  anything other than texting.  The FCC fined Stifel and

19  made those findings just like it has done to over 70

20  other different investment firms making exactly the

21  same findings.

22          And FINRA is currently investigating Mr.

23  Roberts, as the panel heard, and it will address the

24  issue of texting with him as it has with other

25  registered representatives.



 1              But clearly, this has been an industry

 2      issue.  It doesn't make Mr. Roberts's texting right.

 3      It doesn't excuse it.  We're not saying because

 4      everybody speeds, it's okay for him to speed.  That's

 5      not our argument.

 6              But it doesn't make him unique.  It doesn't

 7      make him a bad actor or a rogue broker when this is

 8      clearly an industry issue.  And it doesn't make Stifel

 9      a rogue firm, either.

10              Most important, the mere fact that Mr.

11      Roberts texted in violation of federal rules and

12      Stifel policies does not give Mr. Jannetti any legal

13      claim.  The law is clear he has no private cause of

14      action for violating a federal rule or a Stifel

15      policy.

16              That's the in re January 2021 Short Squeeze

17      Trading litigation and the De La Torre case, both

18      Florida cases that we cite in our briefs.  And you

19      can't backdoor a claim for violation of a private -- a

20      federal rule or a Stifel policy through a negligence

21      or breach of contract claim.  And the case law is

22      cited in our brief.

23              The fact that Mr. Roberts texted does not

24      support any fraud-related claim.  It didn't breach any

25      duty owed to Mr. Jannetti.  It didn't breach any



 1  contract with Mr. Jannetti.  And the mere fact that

 2  Mr. Roberts texted, particularly with other clients,

 3  didn't cause Mr. Jannetti any harm at all.

 4         Why is this important?  How much time did

 5  the Claimant spend in this case on the fact that Mr.

 6  Roberts used the word "yield" in text messages and

 7  sent structured note allocation sheets to Mr. Jannetti

 8  by text and WhatsApp with a column that had the

 9  heading "yield"?

10         Now, regardless of whether sending that is a

11  violation of Stifel policy or not, it doesn't support

12  any legal claim.  Why?

13         Because the evidence, which I'm going to

14  review later, proves beyond any doubt whatsoever that

15  whether Mr. Roberts used the word "yield" or "coupon"

16  or "interest", Mr. Jannetti knew that it was

17  contingent, contingent on the performance of the

18  underlying asset, contingent on the price of that

19  asset staying above the barrier.

20         He testified to that.  He knew the yield did

21  not mean the final effective yield, which you can only

22  know at the two year maturity of the note.  So Mr.

23  Roberts use of the word "yield" in a text message did

24  not, as a matter of law, mislead -- or fact mislead

25  Mr. Jannetti in any way.



```
 1              One more point on texting.  Claimant spent a

 2    lot of time on Chuck Roberts's text with other

 3    customers.  We objected to that -- respect to ruling

 4    that you allowed it.

 5              Claimants' counsel was laser focused on the

 6    words in the text messages.  Short phrases and a

 7    handful of text messages with a handful of clients out

 8    of the hundreds of structured notes.  No context

 9    whatsoever.  FINRA says in its communications rule

10    that context is important.

11              Go to the next one.  Rule 2210.  No member

12    may omit any material fact or qualification if the

13    omission in light of the context of material presented

14    would cause the communication to be misleading.

15              Members must ensure the statements are clear

16    and not misleading within the context in which they

17    are made.  Members must consider the nature of the

18    audience to which the communication will be directed

19    and provide details and explanations appropriate to

20    the audience.

21              So FINRA says context is important.  Mr.

22    Heller, Claimants' expert, agrees.  I asked him, when

23    assessing communications under the federal rule, FINRA

24    says context is important, right?  Yes.  And you agree

25    with that?  And he said yes.
```



```
 1            You don't have any context for text messages
 2     with other clients.  You don't know who these clients
 3     are.  You don't know what their background is.  You
 4     don't know what their investment experience is.  You
 5     don't know whether they bought structured notes before
 6     that particular text message or not, how many
 7     structured notes they bought, whether they've looked
 8     at the prospectuses for any of those notes.  You have
 9     no context whatsoever.
10            Such as the context you have in this case
11     about Mr. Jannetti's spreadsheet and his understanding
12     of exactly what the yield is, a contingent coupon
13     dependent upon the performance of the underlying.
14            You have that context in this case that
15     explains that the text messages to him with the word
16     "yield" aren't misleading in any way.  You don't have
17     any of that context for these other clients.
18            And I hope you caught the Claimants' pure
19     hypocrisy on this issue, right?  Counsel repeatedly
20     boxed in Mr. Roberts and other witnesses into the
21     literal words in the text messages.  Did everything he
22     could to prevent Mr. Roberts from providing the
23     context that's necessary for you to assess those
24     communications, like phone calls or prior
25     communications with the client.
```



 1          But when Mr. Jannetti is presented with a

 2   text on cross that's devastating to his claims, he

 3   says you can't take the text messages at face value.

 4   You have to look at the phone calls.  Let's look at

 5   some examples.

 6          First of all, counsel argued, I mean, he

 7   objected.  All the phone calls are being completely

 8   glossed over.  This is when I'm crossing Mr. Jannetti

 9   on his own text messages.  And note that Mr. Erez in

10   his case, he didn't show you a single one of Mr.

11   Jannetti's text messages.

12          So I'm crossing him on text messages, and

13   he's objects.  I mean, all the phone calls are being

14   completely glossed over that are taking place before

15   any of those texts.  So it's not accurate to say, and

16   then you did this and then you did that.  The tens of

17   minutes of phone calls on every round are being

18   omitted.

19          Look at what Mr. Jannetti did.  Time and

20   time again, difficult for me to answer because we've

21   had so many conversations, and so I really can't tell

22   you.  I mean, when you look at these texts, they don't

23   include the support for the phone calls.  So it's very

24   difficult for me to give an answer on these.

25          But again, I could have been responding to a



1  phone call.  So I'm just -- do I do it on my own?  I

2  might have.  Did he call me?  Did he mention it?  Just

3  trying to provide the proper context.

4          Another text I show him.  He says, can we

5  read the phone calls at the same time to maybe draw

6  clarity?

7          Next one, Brittany.  I'd like to -- I wish

8  we could review the phone records.  Well, again, we're

9  completely ignoring phone calls.  He says if it's an

10  involved conversation, then texting, I think, is

11  you're going to build calluses on your fingers.  So if

12  they're more substantive or involves more discussion,

13  then you have to have a phone call.

14          So when it's Mr. Roberts's texts, you can

15  ignore the context and just focus on the words on the

16  page.  But when it's Mr. Jannetti's texts, you can't

17  take those at face value.  You need context.  Another

18  double standard at play.

19          But again, I'm not minimizing the importance

20  of complying with federal rules and Stifel policies on

21  texting, but it's important to remember your role.

22  You do not sit as a regulator.  You're not a FINRA

23  disciplinary panel.  You're not a regulatory

24  enforcement panel.  This is not an enforcement action.

25          Your role is not to sanction Stifel or Mr.



1   Roberts for texting.  That's already been done to
2   Stifel.  Your job is to decide the Claimants' legal
3   claims.  Have they proven all of the elements of their
4   claims and have we proven affirmative defenses for
5   their claims in whole or in part.
6           Now one of the ways you do that, according
7   to the arbitrator's guide, is by assessing the
8   credibility of the witnesses.  We've heard a lot of
9   attacks on the credibility of our witnesses and on me
10  personally for unethical conduct in the case.  I'm
11  going to try to ignore that.
12          Let's look at Mr. Jannetti's credibility
13  because his credibility is at issue, as well.  And the
14  evidence in this case has proven that he's not
15  credible.  His testimony is not credible.  His story
16  is not credible.  In fact, in many cases, it's
17  downright dishonest, and I'm going to show you
18  numerous examples.
19          The first is this claim that Mr. Roberts
20  somehow groomed Mr. Jannetti.
21          CHAIRPERSON SALIS:  Groomed?
22          MR. HILLIS:  You know, grooming is defined
23  as befriending a vulnerable adult for the purpose of
24  abuse or manipulation.  Any claim that that is what
25  Mr. Roberts did is just false.  It's an insult to our



1    intelligence.  Mr. Jannetti is not vulnerable.  He's a

2    grown man.

3            You saw him on cross, very combative, rude.

4    He knows how to take care of himself, and evidence has

5    proven that Mr. Jannetti actively pursued friendship

6    with Mr. Roberts as much or more than Mr. Roberts did.

7    Invited him to go on his boat.  Invited him to dinner.

8    Invited Mr. Roberts and his son to play ping pong.

9            Let's look at some examples.  These are all

10   texts from Mr. Jannetti.  Thanks for the classy text,

11   but even more so for the photo.  You and Claudia are

12   welcome anytime.  You always make any group better.

13           The feeling is mutual.  Just think.  About a

14   year from now, you will have another little person at

15   your family table.  So cool.  Please give Claudia a

16   hug from me and have a wonderful day with your growing

17   family.

18           December of '20, just wanted you to know I

19   appreciate our friendship and your attentiveness to my

20   financial well-being.  Good thing you made me six

21   figures today.  Otherwise, our friendship is in

22   question if this doesn't happen on a daily basis.

23           Wow.  That wasn't preeminent impression, I

24   should say.  Merry Christmas, Chuck.  You're working

25   today, right?  This is on Christmas Day.  He sends him



1  a text message.  And this next part is interesting.

2  Can you please carve out or carve three to four hours

3  out of your family day to discuss structured notes?

4          Now, that's a joke sent on Christmas Day,

5  but what's the reference to three to four hours to

6  discuss structured notes?  Could that be an indication

7  of how much he and Mr. Roberts discussed structured

8  notes?  Seriously, thanks for our friendship.  It's

9  one of the best things to come out of 2020.

10         Thanks very much for such a fun celebration

11  of Claudia's birthday and the New Year.  Can you

12  believe next year you'll be adding another baby girl

13  Roberts to the mix?

14         Saw this one earlier.  I won't go over it

15  again.  Good idea, Chuck.  Sorry to vent earlier.

16  It's just been -- this is just October of 2022, after

17  he's incurred a lot of losses.  And Mr. Jannetti says

18  then, you're a great guy, and I entirely appreciate

19  your friendship.

20         The second example showing Mr. Jannetti's

21  lack of credibility is he tried to mislead this panel

22  about his level of investment experience, knowledge,

23  and sophistication.  In other words, he tried to play

24  dumb, to dumb himself down, the Forrest Gump routine.

25  It's an insult to our intelligence.



```
 1              What do we know about him?  A college
 2    graduate with a degree in finance.  Now, he, of
 3    course, had to tell you he didn't make good grades.
 4    Why is Mr. Jannetti trying to -- telling you that he
 5    didn't make good grades?  Why does he want you to
 6    think he isn't smart?
 7              Business experience, started and owned and
 8    sold two private companies.  AT Conference, the second
 9    one.  He built it into one of the leading providers of
10    conference call web conference and services in the
11    country.  Ranked multiple times by Inc. Magazine as
12    one of the fastest growing private technology
13    companies.
14              He led four separate asset acquisitions of
15    other companies, sold his company in 2016 for $48
16    million plus a $3 million earn out.  Investment
17    experience.  He's had accounts with Charles Schwab
18    since at least 1996.  He had accounts with Merrill
19    Lynch and U.S. Trust.
20              In his brokerage accounts, he invested in
21    large -- this is all before Mr. Roberts -- large cap
22    stocks, mid cap stocks, international stocks, emerging
23    market stocks, technology, communications companies,
24    30 percent of his Merrill account was in those,
25    exchange traded funds or ETFs, corporate bonds, both
```



1    investment grade and below investment grade, municipal
2    bonds, investment grade and below investment grade,
3    preferred stocks, closed end mutual funds, government
4    securities, other mutual funds, including high yield
5    bond funds, alternative investments, and a hedge fund
6    strategies fund.
7            In addition, he used 3.75 million in a
8    letter of -- of a line of credit at U.S. Trust, which
9    we talked about.
10           In addition, he's invested in real estate,
11   including income producing real estate, spec real
12   estate construction and development, hard money
13   lending, typically $800,000 per project with interest
14   rates well over 10 percent, much higher risk than
15   traditional lending, much higher.
16           He's a private lender.  He invested in pro
17   funders SoFi, a pool of residential mortgages.  The
18   man is investing directly in residential mortgages.
19   And of course, 4- to $500,000 during the same time
20   he's doing business with Mr. Roberts in
21   cryptocurrency.
22           He follows the market, follows his holdings,
23   does his homework.  Let's look at just a few examples.
24   Slide 26.  These are all texts from him.  Got to love
25   Palantir.  I'm watching the investments that you're



 1 | making on my behalf.

 2 |        Can you go back to the one before that?  I'm

 3 | watching the investments that you're making on my

 4 | behalf, and it looks good.  He sends Mr. Roberts an

 5 | article on Aurinia, one of the stocks that he bought

 6 | and one of the stocks that had a significant loss.

 7 |        He's sending screenshots of his account,

 8 | online, his wealth tracker.  Why does FinTech show a

 9 | loss?  So he's paying close attention.  He says, hey,

10 | buddy, sorry I couldn't make your weekend, but I have

11 | a couple of questions about my account.  They are low

12 | level.  I just need to know about two transactions.

13 | Can you please have someone call me?  Paying close

14 | attention.

15 |        Chuck says our stocks are ripping, my

16 | friend, while you splash in the Mediterranean Sea.

17 | Let me know when you're back so we can chat.  David

18 | Jannetti's response, I'm watching every minute.  We

19 | can chat in a few hours if that works for you.  He's

20 | in the Mediterranean.  He's still following his

21 | account closely.

22 |        Text from Mr. Jannetti, September 3rd.

23 | MongoDB ripping today, December 16, 2021.  Square is

24 | down 33 percent since October 28.  You know what

25 | October 28 is?  That's the day he buys the Square



 1 | note.  I'll show you this later.

 2 |         Mr. Roberts recommended a menu of notes,

 3 | which included Dynatrace and Square and a lot of

 4 | others.  And he picks Dynatrace and Square, and he

 5 | sends the text messages.  Square's down 33 percent

 6 | since October 28th.

 7 |         Then he -- here's another one.  Checking his

 8 | Aurinia order.  Got filled at $24.40 according to the

 9 | dashboard, but the daily has $22.70.  Doesn't make

10 | sense.  Then he realizes he's looking at the wrong

11 | purchase.

12 |         So I could -- go to the next one  That one

13 | there is -- can you scroll down just a little bit?

14 | Let's see the whole thing.  You can't see the bottom,

15 | but Mr. Jannetti says in response to the June 22 text

16 | message, I watch it daily.  Thanks, Chuck.

17 |         In spite of all that evidence about his

18 | investment experience, how closely he's paying

19 | attention, he's obviously paying close attention, when

20 | he testified, he claimed not to understand the general

21 | concept of risk reward, what investment grade means,

22 | what high yield means, what a long term bond is, what

23 | an ETF is.

24 |         In fact, he claimed he didn't know that ETF

25 | stood for exchange traded fund even though he had



 1   invested in ETFs, and he bought ETFs when he and Mr.

 2   Roberts had their stock picking contest.  He claimed

 3   not to know what a start-up is even though he's had

 4   two.

 5            He claimed not to know how to read the

 6   account statement, what speculation means, even though

 7   he signed subscription documents for multiple private

 8   deals acknowledging his understanding that the

 9   investments were speculative, claimed not to

10   understand that margin increases risk.

11            I encourage you to read Mr. Jannetti's text

12   messages.  Those are Respondent's Exhibit 128 and 129.

13   128 and 129.  And I encourage you to read his emails

14   to Stifel.  Exhibits -- Respondent's Exhibit 120 and

15   121.

16            And when you do that, you will see a very

17   different person from the man that he tried to portray

18   himself in this hearing.  You will see a very

19   different level of investment sophistication and

20   knowledge from what you witnessed in his testimony in

21   this case.

22            He also tried to mislead this panel about

23   his investment objectives and his risk tolerance.  He

24   claims under oath that he wanted safety to preserve

25   principal, that he would not have even discussed



1    investing anything in high risk.

2           That testimony is just untrue.  And I'll

3    show you the evidence later that he is an aggressive

4    investor, willing to take higher risks.

5           There are numerous other examples of

6    inconsistent, untruthful, misleading testimony from

7    him, and I want to go through those now.

8           He testified, I'm not an investor.  And yet

9    in the personal financial statement that he filled out

10   in his own handwriting and submitted in order to get a

11   mortgage from Stifel Bank, he lists his occupation as

12   investor.

13          Go to the next one.  He falsely denied

14   understanding risk reward.  When he was first asked

15   about it, am I correct that you had a general

16   understanding of risk reward, Mr. Jannetti?  No.  That

17   was his answer.

18          Okay.  I asked him again, if you understood

19   that you were going to get an investment with a

20   potential yield of 12 to 15 percent, that you were

21   going to have -- you're going to be taking more risks

22   than an investment paying you 6 percent.  Common

23   sense.  6 percent has less risk than something with 12

24   to 15 percent.  His answer, no.

25          Then he testifies later, inconsistently,



1   meaning the more potential reward, the more risk you

2   have to take.  You said you understood that, right?

3   Now he admits, yeah, I do, and I think my adviser

4   should know even more than me.

5           Next slide.  He falsely denied watching

6   Kramer.  I asked him, did you watch CNBC, Kramer?  No,

7   I probably watched it here in the waiting room more

8   than I did.  Didn't watch it to any degree, and yet he

9   sends a text to Mr. Roberts, January 31, 2022, telling

10  Mr. Roberts that the CEO of Silvergate, which is one

11  of his largest holdings, is coming on Kramer if he's

12  interested.

13          So the guy doesn't watch Kramer, but he just

14  so happens to see that the CEO of one of his largest

15  holdings is coming up on CNBC.  Doesn't make any

16  sense.

17          He falsely denied knowing what in the round

18  means.  He sends a text message to Mr. Roberts.

19  They're talking about an investment in GLBE.  And Mr.

20  Jannetti asked, at the bottom, are you personally

21  invested?  If so, in the round or in the public

22  sector?

23          And then I asked him on cross what he meant

24  by in the round.  I don't know what the round means.

25  Go to the next one.  He falsely denied knowing about



1   the wash sale rule.

2          I asked him, are you familiar with what the

3   rules, the IRS rules, say about when you can buy back

4   stock after you make a sale for tax purposes?  No.

5   And yet look at the text he sends to Mr. Roberts.

6   FYI, per our conversation regarding crypto, they do

7   not apply to the wash sale rule.  No need to wait 30

8   days.  Cryptos are treated like capital gains on real

9   property when sold.

10          He knows exactly what the cash sale -- what

11  the cash -- that -- what that rule is.  He falsely

12  denied seeing the fee, the 1.75 percent fee, in the

13  prospectus.  I asked him, you knew the 1.75 percent

14  fee from looking at the prospectus; isn't that true?

15  No.

16          Then I showed him the email that he sends to

17  Mr. Roberts and his team.  He says, also, I believe

18  there's no additional fee to the notes above and

19  beyond the amount stated in the prospectus, correct?

20  And then I asked him about that.  So you did see the

21  fee in the prospectus, did you not?  And his answer

22  then was, well, perhaps.

23          He falsely denied understanding what the

24  principal barrier was.  I asked him, what was your

25  understanding then, Mr. Jannetti, of the principal



 1  barrier?  I'm not sure.  I'm not sure because I wasn't

 2  keeping a chart for it.

 3          But then he testified.  I asked him, Mr.

 4  Roberts told you that the notes had a coupon and a

 5  principal barrier; did he not?  And he said a

 6  principal, well, principal, yes.  A downside barrier,

 7  yes.  Then I showed him the email below, April 27th,

 8  2020, right after he buys the first notes, can you

 9  please confirm that the coupon and principal barrier

10  rates are the same?

11          So he does -- he claims not to know what the

12  principal barrier is, but here he is sending an email

13  to Mr. Roberts asking exactly what the number for the

14  principal barrier is.

15          Next slide.  He says he lied in the

16  subscription documents.  So he's had to sign

17  subscription documents for these alternatives, these

18  private investments.

19          And in there, he represents -- he signs that

20  he represents that he's read the offering memorandum,

21  that he understands the investment is speculative, and

22  that he has the sufficient knowledge and expertise to

23  be able to evaluate that investment.  That's what he

24  represents in writing in order to induce the general

25  partner to accept his investment.



1           But when he testified, he admitted that he

2    lied.  You read the off- -- go back.  You read the

3    offering memorandum before you signed it?  No.  Well,

4    you signed this saying that you did.  Your testimony

5    is that you actually did not read it?  That's right.

6           Goes on to say the subscriber confirms that

7    he has sufficient knowledge and expertise to be able

8    to evaluate the merits and risk of investing in the

9    fund.  And that was true at the time you signed it,

10   correct?  No.  So here he is admitting that he lies in

11   written documents to induce a general partner to

12   accept his investment.

13          Next slide.  He falsely claimed to take

14   responsibility for his investment in Braven.  Mr. Erez

15   asked him whether he took responsibility for the

16   Braven investment.  He says yes.

17          But then on cross, we find out, he doesn't

18   take responsibility for it at all because he hired a

19   lawyer, sent a demand letter, accusing Mr. Marino of

20   having misled him about that investment and demanded

21   all of his money back.  So he didn't take

22   responsibility for it.

23          He also falsely claimed that he just blindly

24   trusts and relied upon Mr. Roberts.  And I'm going to

25   show you some examples of that testimony.  He did this



```
 1   many, many times.  It was his common fallback.

 2            It was important for me to trust my adviser.

 3   Did you not review the prospectuses because they were

 4   long?  No, I didn't -- I did not.  The reason I didn't

 5   is because I trusted my conversation with Mr. Roberts.

 6   I didn't really give them much regard because I relied

 7   on Chuck.

 8            You never took the advice in the email to

 9   read the prospectus?  No, I took the advice of my

10   broker.  You never took the advice to read the

11   prospectus, did you?  I thought it was unnecessary to

12   read the prospectus if my broker was honest with me.

13   I assume that he was.

14            It was my understanding that the principal

15   was not at risk, so there was no need to look at the

16   prospectus because I believed Mr. Roberts.  I wanted

17   to pay my bills.  I don't care about -- I just wanted

18   to listen to someone and pay my bills.  I don't care

19   about learning about them as much.

20            Plenty of testimony that directly conflicts

21   with all that.  Did you -- and most of this is on

22   direct.  Did you look at your accounts online?  Yes.

23   Why?  Because I was very interested in it.  I found it

24   fascinating.  Were the accounts meaningful?  Yes.

25            To me, that sound very archaic, and I wanted
```



1   to be on top of my finances more.  This is a product.

2   I put a lot of faith in him.  I'm putting a lot of

3   money into the product per his doing, and I want to

4   have more of a current, an online idea what's

5   happening in real time, so I created a spreadsheet

6   with this exact information.

7          Why such a lengthy call after receiving a

8   structured note allocation?  Because I wanted an

9   explanation, and I was clueless in terms of what these

10  were, and I wanted him to talk to me about them.  Were

11  you asking questions?  Well, I'm concerned about my

12  investments.  I want to understand my investments, not

13  just blindly relying upon Mr. Roberts.

14         Were you interested in obtaining information

15  from Stifel about the investments that you ultimately

16  invested $64 million in?  Yes, of course.  Were you

17  interested in the information that you were

18  communicating about the investments you had?  Of

19  course.  Was this account important to you in your

20  mind?  Very.

21         Here he is asking Mr. Connolly to see

22  prospectuses, preliminary prospectuses, for the notes

23  that are being offered at that point.  He's not just

24  relying upon Mr. Roberts.  This man is doing his own

25  homework.  He's reading the material.



1           Here he is emailing with his Merrill Lynch

2    broker, asking him questions about structured notes.

3    He's not just blindly relying upon Mr. Roberts.  He's

4    asking his Merrill Lynch broker questions about

5    structured notes.

6           Go to the next one.  Here's another email.

7    This one from his Merrill Lynch broker.  He says, this

8    is one of the structured notes that we had spoken

9    about last Friday that you had asked me to send some

10   details to you on.  And if you remember this email,

11   there was a prospectus and some -- in a brochure

12   behind it.

13          Mr. Jannetti is not just blindly relying on

14   his broker.  He's not just trusting his broker.  He's

15   digging into the details.  He's doing his own

16   homework.  He's reading.  He wants the details.

17          With respect to alternatives, he was

18   asked -- I'll switch to a different topic.  Do you

19   recall Mr. Roberts recommending that you invest in

20   private placements with Stifel?

21          Yes.  I mean, I pretty much blindly followed

22   his advice.  I don't know much about them other than a

23   conversation that he would invest in them, too.  He

24   may be investing in.  I believe he was investing in

25   them.  They're good investments.



1           Well, that's just false because Mr. Roberts
2    recommended five other alternative investments, and
3    Mr. Jannetti rejected each of those recommendations.
4    So he wasn't just blindly following Mr. Roberts's
5    advice.  That's not true.  He falsely denied knowing
6    about technology stocks.

7           I asked him about Dynatrace and the other
8    stocks, the ones that are underlie the single stock
9    notes and the stocks in the Solutions account.  He
10   claimed not to know any of them were technology
11   stocks.  I didn't know what they were.

12          What does the other testimony and evidence
13   show?  First of all, I asked him, you knew that Mr.
14   Roberts focused on technology companies.  He told me
15   that that was -- that he was good at technology.

16          Did Mr. Roberts tell you that the individual
17   stocks you would buy on the Solutions account would be
18   focused on technology stocks?  He said he was a
19   technology guy.  I don't recall him saying that.

20          Next slide.  Here he is sending Mr. Roberts
21   a screenshot of the market performance of Square.
22   Thanks, Scott.  Here he is sending another screenshot
23   of the market performance of all the other stocks.

24          And we're supposed to believe that he is
25   looking these stocks up online on his phone, has them



```
 1  saved in his Apple stock app, and he doesn't know that
 2  a single one of these stocks is a technology stock?
 3          Again, if you read his text messages and you
 4  conclude that he doesn't know that these are
 5  technology stocks, I'll be shocked.
 6          Go to the next slide.  He falsely claims
 7  that Mr. Roberts convinced him to forego the 1031
 8  exchange to invest in structured notes.  Now, you see
 9  the allegation there in the statement of claim.  And
10  his allegation is that Roberts was so convincing that
11  he successfully solicited Mr. Jannetti to withdraw
12  11.2 million of the 1031 exchange intermediary from
13  the sale of property, forego the tax benefits, and
14  invest in structured notes.
15          That's just false for a couple of reasons.
16  Number one, the reason that Mr. Jannetti was
17  struggling and ultimately decided not to do the 1031
18  exchange is for two reasons.  Number one, and you can
19  see the testimony on the right, he knew he would have
20  to buy additional real estate in order to effectuate
21  the exchange.
22          I knew that would require a lot of research.
23  I wanted income-producing properties for sure, but I
24  didn't know really where to look or how to go about
25  it.  In addition, prices were high.
```



1          One of the reasons that you were struggling

2     over whether to do the 1031 exchange was, Number one,

3     locating the property.  He says, yeah.  That was one

4     reason.  And another reason was that the real estate

5     values were pretty high at the time; isn't that

6     correct?  And he says that was probably a secondary

7     reason.

8          Those are the reasons he didn't do the 1031,

9     but the allegation is false for another reason.  The

10    evidence has proven that Mr. Roberts didn't recommend

11    that he invest those proceeds in structured notes.

12    Mr. Roberts recommended that he invest those proceeds

13    in a diversified portfolio.

14         July 20, 2021, he sends an email to Mr.

15    Jannetti in which he recommends mutual fund equity --

16    equity mutual fund managers, structured notes which he

17    already held, tactical ETFs, broad based ETFs, dogs of

18    the Dow.  He's got his growth stock component there,

19    alternatives, and closed end funds.  That's what he

20    recommended in July of 2020.

21         Go to the next slide.  He sends it to him

22    again on August the 9th, 2021.  I said 2020.  I meant

23    2021.  He sends it again on August the 9th, 2021.  Not

24    exactly the same, but the same diversified portfolio,

25    tactical allocations, broad based allocation ETFs,



1   dogs of the Dow stocks.  That's what he recommended,

2   not structured notes.

3          He denied receiving that diversified

4   portfolio recommendation from Mr. Roberts.  I asked

5   him, and do you recall Mr. Roberts recommending this

6   diversified portfolio that we've just gone through,

7   Mr. Jannetti?  No.  Do you remember him sending this

8   to you?  No.

9           Then we look at his text messages.  August

10  of '21.  That's less than two months after those two

11  emails that I just showed you with the recommendation.

12  Jannetti says, I got an offer of 26 million for my

13  Hamptons land which is a different property.  I may be

14  in a similar situation soon, trying to figure out

15  whether to pay tax or 1031.  We can chat tomorrow.

16          Maybe you have thoughts or just invest as we

17  discussed across a more diverse spectrum.  We may not

18  need to chat if I already know your thoughts.

19  Diversify as you recommended earlier.

20          And I asked him about that text message.

21  Does that message refresh your recollection, Mr.

22  Jannetti, about discussions you had with Mr. Roberts,

23  about the recommended diversified portfolio that I

24  showed you before the break?  Does that refresh your

25  memory?  He says, okay.  That may -- okay, that, we



 1  may have discussed.

 2          He falsely claimed that margin was Roberts's

 3  idea.  Whose idea was it?  Chuck's.  Tell the panel

 4  how it came about.  So how the word came up, margin,

 5  in the discussion, I don't know.  But I remember him

 6  telling me, I said, do you use margin?  He says, I do.

 7  So Mr. Jannetti brought it up.

 8          Go to the next slide.  We know he had

 9  experience with it because he had used a line of

10  credit at U.S. Trust or Bank of America.  He used it

11  secured by his brokerage account.

12          He used it to invest in real estate.  He

13  testified to that.  We know it was at least $3.75

14  million.  So he had experience with this concept

15  before he ever came to Mr. Roberts.

16          Go to the next slide.  Here's this text to

17  Mr. Roberts, September of 2020.  Other mortgage money

18  just hit my account.  Cannot buy anything on margin

19  today and fund tomorrow.  Roberts says, we can send

20  you -- go back.  Roberts says we can send you a

21  document to sign you up for margin.  He doesn't even

22  have a margin account, and he's asking about margin.

23          Go to the next slide.  This is the

24  application that opened the margin account signed

25  September the 28th, 2020.  After the first text, we



1    see where he's asking Mr. Roberts about margin.

2            He falsely denied knowing that the Solutions

3    account secured the margin loan.  Did you know that

4    the stock account -- that the Solutions account was

5    placed as collateral for the structured note account?

6    No idea.  Did you authorize that?  No.  I didn't know

7    it was a possibility.

8            When you sent this text in November of '20,

9    did you understand that your structured note account

10   and the solution stock account were linked for

11   purposes of the margin?  His testimony, no.  That's on

12   direct.

13           Go to the next slide.  That's just false

14   testimony.  The client agreement, which he agreed to

15   in writing, the agreement and contract that they're

16   relying upon in this case specifically says in the

17   section on margin, you agree that all securities held,

18   carried, or maintained by Stifel for any of the

19   accounts you maintain at Stifel and all other property

20   you maintain at Stifel shall be collateral for such

21   extensions of credit to you by Stifel, period.  It's

22   in the very contract that they rely upon.

23           Next slide.  He got account statements every

24   month for his solutions or stock account.  This one is

25   November of 2020.  Every single stock in the account



HEARING                                          January 24, 2025
JANNETTI V. STIFEL, NICOLAUS & CO.                           163

 1   has the word "margin" out to the right of it.

 2   Clearly, he knows that they're margin.

 3          Go to the next -- look at his text message.

 4   This is his text message, November the 16th.  I don't

 5   want to max out my margin, but what is the limit?  I

 6   intend on staying well under.  Now, that's a pretty

 7   good indication that the man knows that there's risk

 8   associated with margin.  Otherwise, why would he worry

 9   about staying under the limit?

10          But again, he says, I suppose you would add

11   the million in my brokerage account.  And he means the

12   stock account, the Solutions account.  I suppose you

13   would add the million in that account, plus the

14   approximately 10 million in notes to determine margin.

15          That text right there shows you that his

16   testimony that he didn't know the Solutions account

17   was linked to the margin is false.

18          Go to the next slide.  He falsely accused

19   Mr. Roberts of recommending he get mortgages for the

20   purpose of investing in structured notes.  Now, put

21   the statement of claim allegation right in front of

22   you, and the allegation is that Mr. Roberts

23   recommended he get mortgages to invest in structured

24   debts.  It's not true.

25          Go to the next slide.  What did he testify



1 │ to?  This is on direct.  This is his own lawyer asking

2 │ the question.  In regard to mortgages, did you have a

3 │ conversation with Mr. Roberts about taking mortgages

4 │ and investing the proceeds?  Yes.  Can you tell the

5 │ panel definitively who initiated that conversation?

6 │         Now, he thought he was going to say Mr.

7 │ Roberts, but he didn't.  He says we were talking about

8 │ the yields on the notes, and it was -- we were talking

9 │ about the notes are returning 15 percent roughly.

10 │         Now, that's a false statement because the

11 │ conversation about the mortgages happened in March of

12 │ 2020, right after he buys the first couple of

13 │ structured notes.  They haven't paid anything.  We

14 │ haven't even gotten to an observation date.  They

15 │ haven't paid a coupon.  They're not yielding anything.

16 │ So that's a false statement.

17 │         But then he goes on.  He says, well, I think

18 │ it was me.  And I said, Chuck, my houses are paid off,

19 │ but the interest rates are lower, like, the interest

20 │ rates or whatever they are now, 3 percent.

21 │         Does it make sense to take mortgages on the

22 │ house and put them into structured notes?  It seems

23 │ like -- is it that simple arbitrage?  So Mr. Jannetti

24 │ is the one that brought it up for the first time.

25 │         Go to the next slide.  Then when he gets the



 1   mortgage proceeds -- remember, it took several months

 2   to actually close on the mortgages, started the

 3   process in March, and now we're at September 2020.  So

 4   we're about six months later.

 5          He sends a text to Mr. Roberts.  We should

 6   probably either grab a biz lunch or set aside some

 7   time to discuss how to invest the proceeds from the

 8   mortgages.  Well, if Mr. Roberts is alleged to have

 9   recommended that he get mortgages to invest in

10   structured notes, why are these -- Mr. Jannetti

11   sending a text saying we need to sit down and talk

12   about how to invest?

13          He then says, your choice, let me know.  I'm

14   coming into a bunch of money following the mortgages

15   and would appreciate the investment discussion.

16          Go to the next slide.  Believe this was on

17   cross.  I said, let me ask a more specific question.

18   In February, March of 2020, before you applied for the

19   mortgages, yes, did Mr. Roberts recommend that you get

20   mortgages to invest in structured notes?  February,

21   March 2020.

22          His answer, at that time, I can't tell you

23   specifically whether he did or did not.  But he did

24   say I will get the mortgages and give me the money and

25   I will invest it for you.



1          So his allegation in his statement of the

2     claim that Mr. Roberts recommended he get mortgages to

3     invest in structured notes is simply not true.  That

4     testimony establishes it.

5          Go to the next slide.  Now let's talk about

6     this claim about the Solutions account.  Their claim

7     is that Mr. Roberts did not manage the Solutions

8     account consistent with the 2017 strategic allocation

9     philosophy.  And I'm going to say that claim is

10    dishonest and misleading.

11         Go to the next slide.  What is the argument?

12    He signs a client agreement confirmation.  And

13    under -- next to portfolio, it says CR team strategic

14    allocation.  And the argument is that that means the

15    investment philosophy statement from 2017, which is

16    what I have up on the right.

17         And their argument is that that philosophy

18    statement is the definition, even though it's three-

19    plus years before, is the definition of the CR team's

20    strategic allocation.  And Mr. Roberts didn't follow

21    that, and therefore, that's unsuitable.  That's a

22    breach of contract.

23         It is a false and dishonest claim because

24    Mr. Jannetti never saw the philosophy statement.

25    That's proven.  He never saw the philosophy statement.



 1 | He has no idea what is in that philosophy statement.

 2 | And I guarantee it, he never looked at CR team's

 3 | strategic allocation and had any question or idea

 4 | about what that was.

 5 | He -- oh, before I get to that, even if he

 6 | had seen it, the philosophy statement itself says it

 7 | can be modified per the client.  The Stifel -- the

 8 | client agreement says exactly the same thing.  The

 9 | wrap fee disclosure brochure says exactly the same

10 | thing, that it can be modified based upon what the

11 | client wants.

12 | What did he testify that he knew would be in

13 | this account?  Go to the next slide.  I asked him, you

14 | understood from the very beginning of the Solutions

15 | account that what Mr. Roberts was going to be buying

16 | in that account were individual stocks, right?  And

17 | his answer, yes.

18 | So what is the argument?  That Mr. Roberts

19 | should have invested in all those other things that

20 | are set forth in the strategic allocation, philosophy

21 | status from 2017 when his client knows that the only

22 | thing he's going to be buying is stocks.

23 | He knew exactly what was in the accounts.

24 | He knew it exactly that they held only stocks.  He

25 | knew it from Day 1.



1              Is there any evidence in this case that he

2    ever called up Mr. Roberts and says, Chuck, where are

3    the mutual funds?  Where are the closed end funds?

4    Where are the ETFs?  Where are the dividend paying

5    stocks?  The dogs of the Dow?  These other components

6    that are in your strategic allocation model, where are

7    those things?

8              There is zero evidence of it because he

9    always knew that stocks would only be bought.  That's

10   all he ever expected to be bought in the account.  And

11   I won't go through this again, but Mr. Roberts tried

12   to get him to invest in other things.

13             Again, he sent him a diversified portfolio.

14   These are all -- not all because he didn't want a bond

15   component, but these are most of the components of the

16   strategic allocation portfolio.  He sent it to him two

17   different times.

18             And contrary to what he said in his closing,

19   Mr. Roberts testified this would have been in the

20   Solutions account.  So it is not separate from the

21   Solutions account.  He sends it to him two different

22   times, and the man doesn't want it.

23             And we're supposed to have implemented a

24   2017 model portfolio that the man clearly didn't want,

25   knew he wasn't getting, never expected, and never



 1 │ questioned.

 2 │        Go to the next slide, Slide 95.  He falsely

 3 │ accused Mr. Roberts of selling stocks in the Solutions

 4 │ account without authority to generate cash because it

 5 │ had a higher margin release.

 6 │        Go to the next slide.  I'm assuming that you

 7 │ remember that that testimony.  He questioned Mr.

 8 │ Jannetti about it.  He crossed Mr. Roberts.  It's a

 9 │ false allegation which I showed on my redirect of Mr.

10 │ Roberts.

11 │        What do the text messages show?  December

12 │ 30, 2021, Roberts sent a text to Mr. Jannetti.  I've

13 │ been working since 8:00 a.m. in case you want to call

14 │ on tax loss selling.  And then they have a call,

15 │ December the 30th.  Can you go back?  December the

16 │ 30th.  Five-minute call after that text message.

17 │        Then we go to December 31.  He sends another

18 │ text.  Hi.  Is there any tax loss selling you want to

19 │ do?  There's only three more hours to do so.  They

20 │ then have another call.  This one on December 31,

21 │ three-minute call.

22 │        And then what happens that same day?  We see

23 │ in the Solutions account numerous stocks sold on 12/31

24 │ to generate realized losses for tax purposes, offset

25 │ the gains that Mr. Jannetti had from his other



1   investments in 2021.

2          So the suggestion that Mr. Roberts sold

3   those stocks without authority in order to generate

4   cash for the margin purposes is simply false, and it's

5   certainly wasn't done to free up margin to buy more

6   structured notes.

7          This is December 31 of 2021.  He didn't buy

8   any structured notes in 2022.  So it clearly wasn't

9   done for that purpose.

10          He then pivots to, well, complaining about

11  the Solutions account staying in cash.  Go to the next

12  slide.  And remember the argument.  This came up --

13  sorry.  You can take that down.

14          This came up during Mr. Roberts's testimony

15  the last time we were here.  And counsel for the

16  Claimant showed Mr. Roberts an April 2022 account

17  statement that shows $2.6 million in the Solutions

18  account in cash.  You might remember that.

19          Then he skipped to October of 2022.  Didn't

20  show him any of the ones between there, skips to

21  October.  And he shows him that account statement.  It

22  still shows $2.6 million of cash in the account

23  implying that that $2.6 million had sat in that

24  account, a solutions fee based account, for six

25  months.



 1              False.  Misleading.  I didn't show you the

 2    May, June, July, August, September account statements

 3    where the cash dropped to $900,000 because Mr.

 4    Jannetti transferred a 1.7 million of the cash from

 5    solutions to the structured note account and then out

 6    the account to fund the real estate project with Larry

 7    Caine.

 8              Then we go to the October statement.  The

 9    cash is back to $2.6 million.  That's correct.  But

10    it's because Mr. Jannetti decided to sell $1.6 million

11    more in stocks that month.  And then that cash was

12    transferred to the structured note account and then

13    transferred out again to continue funding his

14    projects.

15              So the suggestion that Mr. Roberts took the

16    account to cash and had that same cash sit there for

17    six months is just not true.  It's not true.

18              Let's go to the next slide.  Let's go to --

19    let's talk about this implied volatility issue.  This

20    came up during the cross of Tom Lee.  And if you

21    remember on cross, Mr. Erez was grilling Mr. Lee on

22    the change to the implied volatility limits at Stifel

23    for single stock notes.

24              And he grilled Mr. Lee on whether a -- is

25    there a document that exists that evidences that



 1    change to the policy?  They knew the whole time there

 2    was a document that documented the change to that

 3    policy.  It was produced in discovery, and it was

 4    sitting in Claimants' Exhibit 17, which was already in

 5    evidence in the case.

 6              So here he is crossing Mr. Lee, implying

 7    that there's no document to document this change in

 8    the implied volatility limit and the very document is

 9    in their own exhibits.  And then he rattles off on

10    cross implied vol numbers that supposedly came from

11    Mr. McCann.

12              If you remember, crossed Mr. Lee on these

13    implied vol numbers.  Didn't provide him on the

14    document.  Didn't provide him with any data, any

15    background, any backup at all, just rattles off these

16    numbers.

17              And then we have to find -- we have to go

18    get Ms. Popel to go back and actually check the

19    implied vols on each of these single stock notes.  And

20    we find out that Mr. McCann looked at the wrong date.

21    And the implied vol numbers for the single stock notes

22    all complied with Stifel's implied volatility limits,

23    an intentional effort to mislead this panel.

24              I could go on.  There are numerous other

25    examples showing that Mr. Jannetti and his case is not



1    credible.  But in the interest of time, I'll move on.

2            Now, on their legal claims, they've got

3    negligence, breach of contract, breach of fiduciary

4    duty, fraud, 517.  I'm not going to spend too much

5    time on the elements.  We briefed it very well in our

6    hearing brief.  We've given you a case notebook, as

7    well.

8            But I do want to highlight a few key points.

9    On negligence, breach of fiduciary duty, they have to

10   prove that Stifel, Mr. Roberts breached the duty of

11   reasonable care or fiduciary duty owed to Mr.

12   Jannetti.  Not a duty owed to some other customer, not

13   some duty Mr. Roberts owes to Stifel, not some duty

14   owed to the regulators under their rules, but a duty

15   owed to him.

16           And they have to prove that Stifel and Mr.

17   Roberts's breach of duty proximately caused his loss.

18   It's not enough to prove a breach.

19           They got to prove that that alleged breach

20   is what caused the loss.  And if you find that

21   something else caused some or all of the loss, such as

22   the market, which is which is the cause of the loss in

23   this case, or Mr. Jannetti's own conduct, his own

24   fault, then the negligence breach of fiduciary duty

25   claims fail.  And I would submit to you, they have not



1    proven proximate cause on any of their claims.

2              On their breach of contract claim, you've

3    got to prove an existence of a contract.  It's been a

4    long time since I was in law school, but my

5    recollection is you have to prove an offer and

6    acceptance and a meeting of the minds on what the

7    terms of the contract are and then a breach of those

8    terms.

9              Let's talk about the Solutions account

10   claim.  Is there evidence in this case of a meeting of

11   the minds that Mr. Roberts would invest in that

12   Solutions account in all of the components of his

13   philosophy statement from 2017?  No, there is zero

14   evidence, as I said earlier.

15             All he ever told him he would invest in, all

16   he ever wanted, all he ever saw, all he ever expected

17   was individual stocks.  There's no breach of contract

18   claim that somehow Mr. Roberts breached the contract

19   to invest in those other components when that was

20   never a meeting of the minds, and Mr. Jannetti

21   rejected his attempts to get him to invest in those.

22             Let me talk about the fraud claim.  They

23   have to prove that the -- Mr. Roberts made a false

24   statement of an existing material fact to Mr.

25   Jannetti, not just somebody else, but to him or



 1 | omitted a material fact that the next statements made

 2 | not misleading.

 3 |         Now, what is a material fact?  It's one that

 4 | that would be important to the investor, one that

 5 | would change the total mix of information the investor

 6 | has, which includes, of course, all the documents he

 7 | has sitting on his desk or in his email inbox.

 8 | Puffery, opinions, statements as to future events

 9 | cannot support a fraud claim as a matter of law

10 | because they are not material and they're -- no

11 | reasonable person would rely upon.

12 |         Now we cite the Carbelli (phonetic) case,

13 | Eleventh Circuit case, in our brief.  It says

14 | excessively vague, generalized, and optimistic

15 | comments.  The sorts of statements that constitute

16 | puffery aren't those that a reasonable investor

17 | exercising reasonable care would view as moving the

18 | investment needle.

19 |         That is, they're not material.  In that

20 | case, the Court recognized that the statement you

21 | cannot lose was puffery on which the investors fraud

22 | could not be based.

23 |         We cite the Silver case, a Southern District

24 | of Florida case in our brief.  In that case, they

25 | found the statements that the value of the Plaintiff's



 1   home would continue to rise and she would not have a

 2   problem refinancing were clearly statements of opinion

 3   and projections about future events.  And as such, did

 4   not constitute statements of existing material fact,

 5   which is a prerequisite for actionable fraud.

 6          So these alleged statements by Mr. Roberts

 7   not alleged, some he did make -- solid, super solid,

 8   slow and steady, like watching paint dry, I'll double

 9   the whole ball of wax in two years, others like it --

10   pure puffery.  Statements of opinion, statements about

11   future events under the case law cannot support a

12   fraud claim as a matter of law.

13          The second element they have to show on

14   their fraud claim is that Mr. Roberts knew the

15   statements were false and made them anyway with the

16   attempt to defraud Mr. Jannetti.  I don't believe

17   there's any evidence here that Mr. Roberts acted with

18   an intent to defraud this man.

19          They have to show that Mr. Jannetti relied

20   on any alleged false statement or omission and that

21   the Plaintiff's reliance was reasonable.  That is an

22   element of their claim that they have a burden of

23   proving.  We don't have to disprove it.  They're a

24   burden, and they have to prove proximate cause as I've

25   said.



1          Now the elements of Section 517 are very

2   similar.  He cites the Gottschneur case.  Look at the

3   quote he cites.  They're the same elements as

4   10(b)(5), which is based on common law fraud.  All the

5   same elements, but there are a couple of minor

6   differences.

7          Number one, under 517, the misrepresentation

8   or omission of material existing fact must have been

9   made in connection with the purchase or sale of -- of

10  a security.  So that's a little different from the

11  common law fraud claim.

12         It's not enough to prove that Mr. Roberts

13  made some statement that they claim is false or -- or

14  omitted some.  It has to have been done in connection

15  with Mr. Jannetti buying or selling a specific

16  security.  And a Florida law says negligence is enough

17  under 517, so that's clearly different from common law

18  fraud.

19         All the other elements are required.  The

20  Claimant is still required to prove reasonable

21  reliance under 517.  He cites one case that says no.

22  We cite several cases in our brief that say reasonable

23  reliance is required under 517.  And a Plaintiff's

24  reasonable reliance on an alleged misrepresentation is

25  not reasonable if the Plaintiff with the exercise of



1   reasonable diligence could have discovered the truth.

2   That's from the Gottschneur case, which he cites.

3            So even if you find that Mr. Roberts made

4   some misrepresentation or omission of existing

5   material fact in connection with Mr. Jannetti buying a

6   security, which we don't think they've proven -- but

7   even if you find that, if he could have discovered the

8   truth simply by reading the white paper, reading the

9   structured investment disclosure, reading the

10  prospectuses, any of them, then his fraud and 517

11  claims fail.

12           Now, let me address this one point he makes

13  about the federal rule and the SEC say that just

14  delivering a prospectus doesn't cure an alleged

15  misrepresentation.  Well, a regulator wants to make

16  that argument in an enforcement proceeding, fine.

17  This is not an enforcement proceeding.  They're not

18  FINRA.  They're not the SEC.  They are a private

19  litigate who has a burden of proving every element of

20  their civil claims.

21           And one of those elements is reasonable

22  reliance.  And you can't just turn a blind eye to the

23  other material and information that's put in front of

24  you that would tell you exactly what you now claim you

25  weren't told or exactly what you now claim was



1    misrepresented.

2            That's what the law says.  I don't care what

3    FINRA's policy is in an enforcement action.  That

4    doesn't control this case.  And proximate cause is

5    also required under 517.  He cites the Rousseff

6    (phonetic) case, and we've cited the Compamia

7    (phonetic) case and the Barnett case in our brief.

8            The Rousseff case, the Claimants sought

9    rescission.  They still own the security, and the

10   remedy they sought was rescission.  This is a damages

11   case.  The cases we cite say that even under 517, when

12   you're seeking damages, you have to prove proximate

13   cause.

14           CHAIRPERSON SALIS:  (Inaudible) about time

15   to take a break, but I didn't want to interrupt you.

16           MR. HILLIS:  Yeah.  It -- it is, and I'm

17   happy to take it now.

18           CHAIRPERSON SALIS:  Okay.  Very good.

19           (OFF THE RECORD)

20           (ON THE RECORD)

21           CHAIRPERSON SALIS:  It's 2:25.

22           MR. HILLIS:  What is the Claimants' fraud

23   related claims under common law, negligent misrep,

24   517?  The claim is that that Mr. Jannetti was told he

25   would get 12 to 15 percent yield or coupon.  He was



1   told he would get it at no risk to principal.  That's

2   his -- that's his claim.  That's always been his

3   claim.

4           He testified under oath that Mr. Roberts

5   represented he would get 12 to 15 percent with no risk

6   to principal.  They have not carried their burden of

7   proving that claim.  The evidence had proven

8   conclusively that Stifel and Mr. Roberts disclosed the

9   risks.  Ms. Jannetti understood the risk.

10          And his claim that he believed the

11  structured notes were super safe with no risk to

12  principal is not credible.  He understood the risks in

13  his -- as I said in his testimony that he thought they

14  were super safe with no risk is not credible.

15          Again, the primary risk of structured notes

16  is stock market risk, the risk that the underlying

17  security, the ETF, or the stock will drop in price

18  below the barrier.  And as a result, no coupon gets

19  paid under the law of principal maturity.  He clearly

20  understood that risk, and his own expert, Mr. Heller,

21  conceded it on cross.  The evidence is overwhelming.

22          He knew it from his own education, business,

23  investment knowledge, and experience before Stifel.

24  I'm not going to go through all that again.  But he

25  certainly understands that a stock ETF and an



1  individual stock can -- can drop in value and can drop

2  substantially in value.  Remember what happened after

3  he sold his -- his first company, NikoNET.

4         He gets $4 million, 2 million of it in ICG

5  stock, 2 million in cash.  He puts a million in one

6  stock, Microsoft, and then he puts the other million

7  in some other technology stocks that he picked.  The 2

8  million in ICG stock went to zero.

9         The billion he invested in the other

10  technology stocks went to close to zero when the tech

11  bubble collapsed in the early 2000s.  After that

12  experience alone, he certainly understood that

13  technology stocks are risky and can drop dramatically

14  in price.

15         Stifel and Mr. Roberts disclosed the risks.

16  Mr. Roberts testified that he explained how the

17  structure notes work.  He explained the risks.  He

18  explained that you can lose principal at maturity if

19  the price of the underlying drops below the barrier.

20  He explained that you can miss coupons if it drops

21  below the barrier.

22         Stifel disclosed the risks in writing

23  numerous times.  Let's look at the first slide, 106.

24  This is in the account agreement in the structured

25  products section.  Now, the account agreement is



 1   certainly lengthy, but it also has a very good index

 2   where you can look at exactly what you want to look

 3   at.

 4          He opens an account.  He's investing his

 5   structured products.  All he's got to do is look at

 6   the index and note -- and go right to the page.  Tells

 7   you right there what the risks of investing in

 8   structured products are, including principal risk.

 9          Let's go to the next slide.  A structured

10   investment's disclosure.  Stifel sent this to him

11   multiple times before he bought the first structured

12   note.  It tells Mr. Jannetti what the risks of

13   investing in structured notes is.

14          Next slide.  The white paper, called the

15   Illustrative Enhanced Shield Structured Investment.

16   We call it the white paper for short.  This was sent

17   to Mr. Jannetti February the 10th, 2020.  February the

18   10th, 2020, before he has bought the first structured

19   note.  Let's take a look at it.

20          CHAIRPERSON SALIS:  If you could (inaudible)

21   figure on the screen, it'd be great.  Just that way, I

22   can see --

23          FEMALE VOICE:  Oh, sure.

24          MR. HILLIS:  Sure.  Can you make it bigger

25   (inaudible)?



```
 1              Now, his is -- this is a two page document.

 2   Not as long as the Bible that Mr. Jannetti referenced

 3   when he's referring to the prospectus.  This is --

 4   this is a two-pager.  Let's see what it says.  They --

 5   they want you to ignore this document.  They don't

 6   think it's important at all.  We think it's critically

 7   important.

 8              Yield security strategy.  Potential for

 9   enhanced yield in the form of a contingent coupon in

10   exchange for full principal at risk with contingent

11   downside protection.  Then it goes on to tell you what

12   happens at maturity.

13              At maturity, the principal payment will be

14   equal to -- basically, number one, the -- the first

15   bullet says all your money back plus the final coupon

16   if the price of the underlying is above the barrier.

17              But if it's not below the barrier, then what

18   you get back is your original investment less than --

19   the negative -- the work -- the return of the -- of

20   the worst performer, basically.  If the worst

21   performer is down 60 percent, then you lose 60

22   percent.  That's what the second bullet point tells

23   you.

24              And it says an investor will be fully

25   exposed to negative performance of the worst
```



 1   performing reference assets and will lose some or all

 2   of the principal investment.  Then it gives you a

 3   simple little chart to follow.  That's security is the

 4   closing level of the worst performing reference asset

 5   at or above 75 percent of its initial level.

 6   (Inaudible) barrier in this particular example.  If

 7   the answer is no, the investor receives principal

 8   amount invested plus the negative return as a worse

 9   performer.  Investor will lose some or all of the

10   principal invested in the note.

11            Now, he didn't just send this.  What was in

12   Page 2, which has risk disclosures.  Here it says,

13   payment at maturity, and tells the investor again, the

14   payment at maturity is based on the value of the

15   reference asset at maturity.  If the closing value of

16   the reference asset is lower than a predetermined

17   barrier, the note exposes investors to the same

18   downside risk as the reference asset.  If the value of

19   the reference asset drops specifically at maturity,

20   investors could lose some or all of the principal

21   invested, and any two funds paid may not be sufficient

22   to offset any principal loss.

23            Market risk down here.  If the closing value

24   of the reference asset at maturity is lower than the

25   predetermined barrier, the note exposes the investor



 1   to the same downside risk as the reference asset.  So

 2   the investor could lose some or all of the principal

 3   invested in the net.  Past results don't guarantee

 4   future results, which everybody knows.

 5            Now, if it was Mr. Roberts's desire and

 6   intention to mislead this man, to make him think that

 7   structured notes, they are guaranteed to yield with no

 8   risk to principal, why in the world does he send in

 9   this document?  It makes no sense whatsoever.

10            And not only does he send it to him, but he

11   sends it to him before he has bought any structured

12   note.  And then he has a telephone call where Mr.

13   Roberts testified that they went over.  This document

14   tells you everything you need to know about structured

15   notes and the risks involved.

16            What else did we send in writing?  Well,

17   Roberts's team sends a portfolio review.  Let's go to

18   slide 111.  Now this is an email that Mr. Connolly

19   sends March 16th, 2020 -- can you make it bigger?

20   Just doesn't look bigger on our -- on the screen,

21   but -- sorry it's not bigger.  Maybe it's -- you can

22   see it on the big screen.

23            But in any event, Tyler Connolly sends this

24   March 16, 2020.  This is right after Mr. Jannetti buys

25   the first few structured notes.  And he says, as



```
 1   discussed with Chuck, please find a report detailing

 2   the primary data points.

 3          Let's go to the next slide.  And here's the

 4   portfolio review.  And it's hard to read, and I'm

 5   sorry.  But it lists each of the structured notes that

 6   Mr. Jannetti has just bought.  And in the column to

 7   the right of each one, it gives a description.

 8          And at the bottom of the description for the

 9   first note -- but it's the same for every other

10   note -- it says, at maturity of the final level of

11   neither underlying has fallen below 70 percent of its

12   initial level, the product offers a capital return of

13   a  percent.  Otherwise, the product offers a capital

14   return of a  percent, minus 1 percent for every 1

15   percent fall in the worst performing underlying.

16          Tells Mr. Jannetti right there for each of

17   the notes that he bought that if at maturity, the

18   price of the underlying, which he knows full well can

19   drop, drops below that barrier, he's going to suffer a

20   loss.  Tells him right there.

21          Go to the next slide.  Now, they -- they

22   want to -- before I get to that, so prospectus -- I

23   mean, he buys 44 different notes.  Actually, there

24   are more than 44 transactions because he bought a few

25   notes in multiple accounts, but 44 structured notes.
```



1   He gets a preliminary prospectus for every one.  He

2   gets a final prospectus for everyone.

3           Here he asked Mr. Connolly to send him

4   preliminary prospectuses.  I showed you this one

5   earlier.  Let's look at the prospectus.  I'm not going

6   to go through a lot of these.  You've -- you've seen a

7   lot of these disclosures.  But on the first page of

8   each prospectus, and most of them on the first half of

9   the first page, it tells the client that if the price

10  of the underlying drops below the barrier, you're

11  going to suffer a loss.

12          And the amount of that loss is going to

13  depend upon how far below the barrier it has dropped.

14  But you could lose some or all of your principal.  All

15  of the perspectives just tell Mr. Jannetti that and

16  all he had to do was look at the first half of the

17  first page to understand exactly what the risk was.

18          Now, they want to pretend these disclosures

19  weren't made.  Their argument is that these documents

20  don't matter because he allegedly chose to be

21  irresponsible, to be negligent, and not look at them.

22  That's what he claims under oath.  It is incredible.

23  He asked for prospectuses, but then under oath says he

24  didn't look at it.  What sense does that make?

25          He admits he saw the fee in the prospectus.



 1   I finally got him to admit that on cross.  He admits

 2   he pulled observation dates from prospectuses so he

 3   could put them in his live spreadsheet.  So he clearly

 4   looked at prospectuses, despite his claim that he

 5   didn't read them.  All we had to do was look at the

 6   first half of the first page.

 7            The FCC and FINRA require these prospectuses

 8   and disclosures to be provided, and they advise

 9   investors to read them.  If they didn't think it was

10   important, they wouldn't require it, and they wouldn't

11   advise investors to read it.

12            Stifel advised Mr. Jannetti to read these

13   documents repeatedly.  In the structured investment

14   disclosures, we -- Stifel advises to read the

15   perspectives in the client agreement, in the white

16   paper, and in every single email sending him a

17   preliminary prospectus and a final prospectus, it

18   advises him to read the prospectus.  He agreed to do

19   so, if you read the client agreement.

20            He agreed to look at and read the documents

21   provided.  He can't nullify these written disclosures,

22   pretend they weren't made, simply because he comes in

23   here and claims he didn't read them.  The law is

24   clear.  He is charged with knowledge of the content of

25   these documents regardless of whether he reads them.



1          Cited the HCM High Yield Opportunity Fund

2    Case, Southern District Of Florida case, in our brief.

3    Court said the securities laws do not encourage or

4    reward investors for throwing caution and prospectuses

5    to the wind.  Besides the Dolbridge (phonetic) case,

6    which is a Tenth Circuit case, an investor has a duty

7    to read all disclosures, prospectuses, and similar

8    documents, and knowledge of information contained on a

9    prospectus or an equivalent document should be imputed

10   to investors who fail to read such documents.

11          These disclosures are important for another

12   reason, and it's justifiable reasonable reliance,

13   which I touched on earlier.  I told you it's not

14   enough for them to prove that Mr. Roberts made some

15   alleged misrepresentation or omission.  We haven't

16   they haven't proven it.

17          But even if he had, it's not enough.  They

18   have to prove that Mr. Jannetti relied upon that and

19   that he was reasonable and justified in doing so.

20   That's not some technical argument.  That's a

21   substantive element of their claim that they have to

22   burden the proof, and they have failed.

23          The law is clear that a reasonable investor,

24   particularly one with Mr. Jannetti's experience and

25   expertise, is not justified in relying on alleged



 1   misrepresentations and omissions that are contradicted

 2   by disclosures and prospectuses and other documents

 3   that are provided.  That's the Rhodes (phonetic) case,

 4   which is Southern District Of Florida case, and the

 5   First Union case, which is Eleventh Circuit case that

 6   we cited in our brief.  But there are numerous other

 7   cases across the country say the same thing.

 8            The white paper, the prospectuses, the other

 9   documents disclosed the risks.  He is charged with

10   knowledge.  So any alleged reliance that he wants to

11   claim on verbal statements by Mr. Roberts -- these are

12   super safe, super solid, no risk to principal -- is

13   unreasonable as a matter of law.

14            These documents were sitting right in front

15   of Mr. Jannetti.  That email was sent to his email

16   box.  He admitted those prospectuses initially were

17   mailed to his house.  He admitted receiving every

18   single one of those emails, a set of preliminary

19   prospectus and a final prospectus.  And according to

20   him, he was negligent, irresponsible in not reading

21   them.

22            So either he reviewed those documents and

23   knew what they said, and therefore, how can we have a

24   fraud claim?  Or he was negligent in not reviewing

25   them, in which case his alleged reliance on these



 1    alleged conflicting misrepresentations and omissions

 2    is not reasonable as a matter of law.

 3              His live spreadsheet proves he understood

 4    the risk.  He understood that the underlying asset

 5    (break in audio) can jeopardize the note as a result.

 6    This is his live spreadsheet.  Now, it's not just one

 7    page.  There are lots of pages.  There are lots of

 8    pages.

 9              He had a lot of structured notes spreadsheet

10    for every structured note he held.  Mr. Roberts

11    testified he didn't have a single other customer that

12    did this, not one.

13              Now, I'm going to ask you.  If -- if the

14    customer thinks that the yield is fixed, he's going to

15    get it, no question.  It's guaranteed.  I'm going to

16    get the yield.  I'm going to get 12/13 percent.  And

17    if the customer thinks there's no risk to my

18    principal, why can the world does he take the time to

19    prepare and monitor on a daily basis a live

20    spreadsheet?

21              And what does this live spreadsheet serve to

22    do?  It serves to show him what the current price of

23    each underlying is, whether it is below or above the

24    barrier.  And if it's below the barrier, it goes in

25    red.  And the reason he does that is because every day



 1  he wants to know where is the price of the underlying

 2  relative to the barrier.

 3          Why does he want to know that?  Because he

 4  knows that if the underlying is below the barrier on

 5  the observation date, which he has down here, he gets

 6  no coupon.  And he knows that if it's below the

 7  barrier at maturity, he loses principal.  That's the

 8  sole reason he keeps the chart.  So he -- he monitors

 9  that.

10          Then he then he does another thing.  He

11  says, in the money -- ITBM.  That's what that means,

12  in the money.  So he knows whether it's above or below

13  the barrier.  He also keeps track of how far down the

14  underlying has dropped from the original price.  So in

15  this case, for example, XPI is 44.17 percent down from

16  where it started.

17          And again, he didn't just do this in late

18  2021.  He's doing this every day.  He sees it change

19  every day.  He sees the price of the underlying go up

20  and down every single day.  He knows exactly what the

21  risk of these notes is.

22          His text messages, his other statements, his

23  testimony confirm that he understood the price -- that

24  the price of the underlyings could drop below the --

25  the barrier, which is the market risk of a note.



 1 | Let's look at some of this testimony.

 2 |         You knew that the underlying indexes or the

 3 | underlying stocks later, did those fluctuate in price?

 4 | You knew that, yes?

 5 |         Yes, I believe that's fair.

 6 |         Here's a text February 23, 2021 from Mr.

 7 | Jannetti: I hope they keep tanking until prices are

 8 | struck Friday.

 9 |         What's he talking about?  He's talking about

10 | the prices of the underlyings.  He knows they can drop

11 | go up and down.

12 |         Another testimony:  When you said I hope

13 | they keep tanking, you were -- you're referring to the

14 | prices of the underlying and the structured notes that

15 | you were considering so that when you bought those

16 | notes on Friday, the underlying prices would be lower.

17 | That's what you're referring to, right?

18 |         Again, Chuck shared with me that it's better

19 | if they drop before they are priced, so reflection of

20 | our many conversations.  Yes.

21 |         Another text from Mr. Jannetti: New notes

22 | forthcoming, seems like an opportune time.  Prices are

23 | down.  Let's get those notes striped in the lows.

24 |         December 3, 2021, key month.  Last month he

25 | buys any structured note.  The bad news, I'm out of



1  the money on three notes, which means he knows he's

2  got three notes.  The price of the underlying is below

3  the barrier.  The good news, it's a great day to

4  strike new pricing.

5           Testimony:  By out of the money, you

6  understood that three of your notes, one of the three

7  underlying was below the barrier, correct?

8           Sure.

9           Here's a text from August of '20 giving Mr.

10 Roberts instructions on which notes to buy.  Mr.

11 Roberts says, confirm, sounds great.  You're becoming

12 a structured notes guru.  He says, fingers crossed.

13          Well, I'm sorry.  If there's no risk to the

14 principal, why would you need to have fingers crossed?

15 That shows he understands the risk.

16          Next.  Here's another one.  Another text

17 where he gives instructions on which notes to buy out

18 of the menu and how much to put in each one.  Chuck

19 says, I like the way you think.  Just haven't been

20 burned yet.

21          Well, if there's no risk, why would you be

22 making a comment about haven't been burned yet?  We

23 already saw this text at the bottom.  Let's go to the

24 next one.

25          These are the notes from Mr. Stevenson and



1  Ms. Lucarelli's call with Mr. Jannetti in April of

2  2021.  During that call, according to the notes, Mr.

3  Jannetti says, I have a significant amount invested in

4  notes, and Chuck's been about 30 for 30 so far.  Every

5  observation and role has been good.  I know it is not

6  always going to be that way, but so far, so good.

7         Clearly an indication that he knows there's

8  risk.

9         And then there's this testimony.  This was

10 on direct.  Mr. Erez asked him:  Sir, did you tell Mr.

11 Roberts that you wanted him to offer you structured

12 notes linked to single stocks?  This is the June 2021

13 time period when Mr. Roberts first offers structured

14 notes to him and anybody in response to a conversation

15 they had.

16        And he -- Mr. Jannetti testified:  We had a

17 discussion about single -- well, the genesis of this

18 discussion was there were three, and I know there are

19 three sectors as he was explaining, and the discussion

20 came up of offering were only one.  So as I recall,

21 any of those sectors -- any of those three sectors

22 could potentially jeopardize that investment.

23        Well, I'm sorry.  If there's no risk to

24 principal, which what he -- which is what he said

25 under oath he thought was the case, then how could one



```
 1   of the of the three sectors potentially jeopardize
 2   everybody?
 3              Let's go to the next slide.
 4              This is the testimony on the Dynatrace note.
 5   I asked him: And given the amount that you invested,
 6   which was 6 million, is it fair to say from your
 7   testimony yesterday that you had some trepidation
 8   about investing that amount in this note?
 9              And his answer is yes.
10              Again, if there's no risk to principal,
11   which is what he said he claimed he -- he thought, why
12   would you have any trepidation about investing any
13   amount in that note?  Clearly, he knew there was risk.
14              December 3rd -- I'm sorry.  December 30,
15   2022, this is late in the game.  But he sends a text
16   message:  The structured note maturing on January 6th
17   will not be in the money.
18              Clearly, he understands the market risk and
19   what can cause him to lose principal at maturity.
20              Mr. Jannetti's own expert, Mr. Heller,
21   admitted that he understood the market risk.  I asked
22   him: You would agree with me that the market risk
23   associated with these structured notes is the risk
24   that the underlying drops in price below the barrier,
25   right?  That's the market risk?
```



```
 1            Mr. Heller says yes.

 2            It might have to drop 25 percent, 30

 3   percent, but the basic market risk is that the

 4   underlying dropping in price, right?  That's the basic

 5   risk?  Yes.  And you don't have any doubt in your mind

 6   that Mr. Jannetti understood that the underlyings of

 7   these structured notes can drop in price?  You don't

 8   have any doubt, do you?  No.  No, you don't have any

 9   doubt?  I don't have any doubt that Mr. Jannetti

10   understood that the underlying could drop in value.

11            Go to the next slide.  Mr. Jannetti

12   understood that higher yields meant higher volatility

13   and higher risks.  Let's look at the evidence.

14            This is his testimony:  Did you understand

15   that the prior -- I'm sorry -- that the higher

16   potential return, the higher the risk you have to

17   assume to get it?  Did you understand that basic

18   concept?

19            He says, I'm not an investor.  So he didn't

20   want to answer that question.

21            I didn't ask you if you were.  I asked you,

22   did you understand that basic concept?

23            And he says, In general, I would say that

24   usually risk is tied to reward, yes.

25            Next slide.  Now, he had held bonds in his
```



 1  Merrill portfolio and some in his U.S. Trust

 2  portfolio, as well.  The account statements are in

 3  evidence.  This is just one example.

 4          These are bonds that he held in his Merrill

 5  Lynch account.  Look at the yields on these bonds.

 6  These are long term bonds, by the way.  Fifteen,

 7  twenty year bonds.  Very different from a two-year

 8  bond or a two-year structured.

 9          But look at the rates.  This man -- his

10  experience, if you read through his text messages,

11  there's no way that he thought he could get a

12  potential 13-to-15-percent coupon on a 2-year

13  structured note without taking more risk than what he

14  was taking on bonds yielding 4.66 percent or about

15  there.  No way.

16          Let's go to the next slide.  We talk about

17  volatility.  Want to talk about implied volatility?

18  Well, let's look at Mr. Jannetti's own texts.

19          April 20, 2021.  Hey, Chuck, educate me,

20  please.  The VIX -- now, what's the VIX?  The VIX is

21  the ticker symbol for the Chicago Board of Option

22  Exchange volatility index, and it is a measure of the

23  volatility of the stock market.  That's what the VIX

24  is.

25          He says, the VIX has increased considerably



1   since the last round of notes was priced.

2         So this guy who testified in front of you,

3   trying to act like you didn't understand anything, is

4   following the VIX on his phone or online and says it's

5   increased considerably since the last -- last round

6   last round of notes was priced, meaning the market is

7   more volatile.  I'm thinking I'd rather have you price

8   a new round of notes as I expect the yield to be much

9   higher; am I wrong?

10         He knows the yield relates to volatility.

11   He knows the higher the volatility, the higher the

12   yield.

13         He then sends another text message.

14   October -- that's a -- that's a misprint.  I'm sorry.

15   That's his testimony.  Sorry.  October 2024.

16         Question: You understood that the more

17   volatile the market, the higher potential yields on

18   the notes, right?  That's what Chuck told me.  Let's

19   go to the next one.

20         Here's a text from Chuck where he says,

21   Well, the good news is the VIX has jumped nicely, so

22   next round of notes should be a higher yield.

23         Mr. Jannetti, June 3rd:  I'm still

24   interested in notes, but looking for yields to

25   improve.  I can invest at 10 percent with almost zero



 1  risk, and I get paid interest upfront.

 2          That's a very revealing text.  First of all,

 3  there's no way he's getting 10 percent with -- with

 4  zero risk, but let's -- let's take it at face value.

 5  What he's basically saying here to Mr. Roberts is,

 6  hey, I'm taking this additional risk with these notes.

 7  I need to get a higher yield for that.  I can invest

 8  I can get 10 percent with almost zero risk on these

 9  hard money loans, I guess, is what he's talking about.

10          He's wanting higher yields because he needs

11  higher yields because of the higher risk he's taking.

12  That's what that text that text reveals.

13          Chuck says, understand.  Hopefully, the next

14  round will be better.

15          June 7, 2021, Jannetti asks:  Has the

16  pricing for notes changed at all?  Chuck says, not

17  yet.  Very little volatility.

18          Let's go to the next one.  Okay.  So he

19  understood that higher potential yields means higher

20  volatility, and therefore, higher risk.  Mr. Jannetti

21  ratified his understanding of the risks.

22          Let's go to the next slide.  Number one, he

23  gets an account statement every month for the

24  structured note account.  This is June of '30 [sic].

25  It shows an unrealized loss of $120,000.



 1            Go to the next slide.  This is September of

 2    '20.  It shows an unrealized loss of $174,000.

 3            Go to the next one.  October of '20,

 4    $189,000 unrealized loss on the structured notes.

 5            Go to the next one.  July of 2021, $854,000

 6    of an unrealized loss.

 7            Go to the next one.  September '21,

 8    1,059,000 unrealized loss.

 9            Next one.  November 2021, $2.7 million

10    unrealized losses.

11            All right.  Go back to the one before that.

12    He doesn't complain.  He doesn't accuse Mr. Roberts of

13    misrepresenting the risks.  This man came in here and

14    claims under oath he thought these had zero risk to

15    principal.  He's looking at $2.7 million in an

16    unrealized loss.

17            He doesn't call Mr. Roberts.  He doesn't

18    accuse him of lying to him.  And we're supposed to

19    believe that the reason he does it is because he's

20    worried about the guy?  He feels sorry for him?

21            I mean, he doesn't accuse him of

22    misrepresenting the risk.  He doesn't accuse him of

23    recommending unsuitable securities.  He doesn't

24    complain about concentration in these securities for

25    which he's got a $2.7 million unrealized loss.  No.



 1   No.  He continues buying more structured notes.  He's

 2   down $2.7 million at the end November, and he buys

 3   more structured notes in December of 2021.

 4          Next slide.  He goes, if there's anything

 5   that demonstrates his understanding of the risks and

 6   his ratification of his comfort and willingness to

 7   assume those risks, it's what he did with Palantir.  I

 8   mentioned this earlier.  This is a chart that we put

 9   together.

10          If you can -- can you make it any bigger at

11   all?  I guess not.  Minutes are precious, so -- thank

12   you.

13          This is Palantir.  As you could see earlier,

14   there was some Palantir bought in the Solutions

15   account, but I want to focus your time period on

16   September 2021.  First of all, September the 24th, he

17   buys the first Palantir note in the brokerage account,

18   $4 million.

19          Price goes down pretty dramatically.

20   September 29, he buys $200 grand -- invests $200 grand

21   in the Palantir stock directly in the Solutions

22   account.

23          Price goes down again.  October, he buys

24   Palantir, unsolicited, in the brokerage account.  Two

25   hundred thousand dollars he puts into the stock at



1    that point after it's dropped.

2              November the 9th, the price ticks up just a

3    little bit, and he makes another unsolicited purchase

4    of Palantir in the broker's account, 200,000 more in

5    Palantir then.

6              And then on December the 3rd, after the

7    price has dropped again substantially, he puts another

8    $1.5 million in another Palantir note.  I guess he's

9    happy at this point because he's striking in the lows.

10             Palantir has dropped.  So he puts $6.1

11   million in the course of, really, two months in

12   Palantir stock and structured notes linked to Palantir

13   all while -- you know, we know he's following.  You've

14   seen the text messages.

15             You know he's following the price of the

16   stock, dropping by 33 percent during this time period.

17   Now that shows you that the man is aggressive.  That

18   shows you that he understands the risk.  That shows

19   you that he's comfortable with the risk.

20             Let's go to the next slide.  May of 2022.

21   This is when he sells his -- he gets his first margin

22   call, and he sells structured notes to meet the margin

23   call, and he incurs a $2.2 million realized loss.  Now

24   this is May of 2022.  Not theoretical at this point.

25   2.2 million in realized losses to meet a margin call.



1              But he certainly knows the risk of margin at

2     this point.  He certainly knows that there is risk to

3     principal on a structured note at this point.  Does he

4     is there any evidence at all that he calls Mr. Roberts

5     or anyone else's at Stifel and accuses Mr. Roberts of

6     lying about structured notes, misrepresenting --

7     making unsuitable recommendations of structured notes,

8     making unsuitable recommendations of margin, overly

9     concentrating his account?  Doesn't -- doesn't happen.

10    There's no evidence of it at all.

11             And what that proves is that Mr. Jannetti

12    knew all of that stuff.  If he really thought that Mr.

13    Roberts had really led him to believe that there was

14    no risk to principal, if he really didn't understand

15    there was any risk using margin, the man would have

16    been going crazy after he incurred $2 million-plus in

17    realized losses to meet margin calls.  But we don't

18    see a single complaint at all.

19             In the face of all this evidence, his claim

20    that Mr. Roberts presented structured notes, which

21    were safe, little-to-no-risk to principal, or that he

22    thought they were super safe but little-to-no-risk to

23    principal, is not credible.

24             Now, how does he deal with this?  We -- we

25    have this whole high risk argument.  Structured notes



1    are high risk.  Chuck didn't say they were high risk.

2    Well, if Mr. Jannetti thought they had zero risk --

3    zero risk to principal is what he said.  Then what

4    difference does it make whether they got moderate

5    risk, moderate-high risk, higher risk, speculative

6    risk?   He claims he bought it because he thought they

7    had no risk, and clearly, the evidence has disproven

8    that.

9          Whether something is high risk or not is

10   subjective.  It's an opinion.  It depends on many

11   factors.  You can ask different people.  You're going

12   to give different answers.  Mr. Roberts gave different

13   answers in the first case than he testified in this

14   case after thinking about it.  But he had a different

15   view.  I can't explain it, but that's what he said.

16          But the bottom line is, it's stock market

17   risk.  Some people think the stock market's high risk,

18   some people don't.  It's stock market risk.  It's as

19   simple as that.

20          But what does high risk mean?  What's the

21   definition?  I haven't seen one.  Is it the chance

22   that you can lose principal?  Well, that was

23   disclosed.  He certainly understood that.  Because

24   there's a chance that you could lose all your

25   principal, and that was disclosed.  He certainly



1  understood that can happen.

2          Is it the chance that the underlying can

3  drop below the barrier, which means dropping in some

4  cases, 30 percent, 35 percent, 40 percent, well, that

5  was disclosed.  You certainly understood that the

6  underlying could drop 30-40 percent.

7          Is it an indication of how likely it is that

8  the underlying will drop below the barrier?  Well, who

9  knows how likely it's going to be?  But one thing's

10  for sure.  He understood that the higher yield was

11  because of the higher volatility.  He understood that

12  the lower barrier was because of the higher

13  volatility.

14          And the prospectuses -- I showed you

15  several -- they show you the price history.  He knows

16  how to pull it up on his phone.  He sent screenshots

17  of price history on -- on individual stocks.  He knows

18  how to look at the price history and see how volatile

19  it's been.  He knows what the VIX is.  He can look at

20  that prospectus and see how many times the price of

21  that underlying has dropped below that barrier.  This

22  is not complicated.

23          And the rules and the law requires people to

24  disclose what the risks are, and they did that.  I

25  haven't seen a single rule, law, notice to members, or



1  anything else put in front of you in this case that

2  requires putting some sort of risk label on.  What

3  you're obligated to do is disclose what the risks are,

4  and we did that.

5          Indeed, the Claimants' counsel points out

6  repeatedly that not one of the prospectuses says that

7  the structured notes are high risk.  Not one.  So Mr.

8  Roberts sold these notes consistent with what the

9  prospectuses said.  And there's no claim in this case

10  that the prospectuses were false or that they were

11  misleading or that they were not fair and balanced.

12          And there's no evidence of any action by a

13  regulator against any of the issuers for a false or

14  misleading prospectus because the prospectuses don't

15  use the words high risk.  There's no evidence of any

16  class action against any issuer making that claim.

17  Zero.

18          The bottom line is that Stifel and Mr.

19  Roberts told Mr. Jannetti what the risks were -- what

20  the market risks were.  He knew what they were.  He

21  knew the risk that the underlying could drop below the

22  barrier, and he knew that a 15 percent potential

23  coupon and a 40 percent downside barrier had told him

24  that the underlying is volatile and that there's risk.

25          Now, let's go to the next slide.  I don't



1  want to spend a ton of time on this, but he clearly

2  understood the coupon or the yield or whatever you

3  want to call it was contingent.  We told it to him in

4  writing.  It's in the same disclosures that we covered

5  before.  It's in the account agreement.  It's in the

6  structured investment disclosure, income risk, and

7  it's in the white paper.

8          And I won't take the time to put that back

9  up there and highlight it again, but that document

10  says the potential for an inch yield in the form of a

11  contingent coupon.  Then it shows what the contingent

12  coupon is.

13          Coupon frequency, quarterly.  Coupon payment

14  is contingent on the performance of the reference

15  asset.

16          Payout schedule.  If the closing level of

17  any of the referenced assets is less than the coupon

18  barrier, no coupon payment will be made.  It tells him

19  right there.

20          Next slide.  It tells him in the portfolio

21  review that Mr. Connolly sent him next to every single

22  structured note that he had just bought.  The product

23  offers a quarterly coupon as long as each underlying

24  is greater than or equal to 70 percent of its

25  respective initial level.  Otherwise, no coupon is



 1  paid for that period.

 2          Next slide.  Now, it tells him in the

 3  prospectuses.  First half of the first page tells him

 4  that the coupon is contingent.  And I won't go through

 5  this again.  But if this doesn't prove that he knew

 6  the coupon or yield or income or whatever you want to

 7  call it is contingent, I don't know what -- what does.

 8          Let's look at his testimony.  Did Chuck tell

 9  you that the yield payment was guaranteed?  That you'd

10  get it every time without exception ever?  You'd

11  always get it?  Did he tell you that?

12          He inferred it.  I asked you, did he tell

13  you that?  No.  That's the reason that you tracked the

14  price of the underlying relative to the barrier so

15  that you could keep up with whether the yield payment

16  would be paid, correct?  That's fair.  That was his

17  testimony.

18          Let's go to the next slide.  Mr. Jannetti

19  understood that yield meant coupon, and the evidence

20  proves that he and Mr. Roberts and Mr. Roberts's team

21  used the terms yield, coupon, interest

22  interchangeably.  Let's go through the -- the

23  testimony.

24          Mr. Connolly sends you an email: Please find

25  today's structured notes.  See that?  I do.  And he



1  gives you the list with the CUSIP, the issuer, trade

2  date, maturity, note name, coupon.  See that?  Yes, I

3  do.  You see the column heading coupon?  Yes.  You

4  understood that to be the yield, right?  Yes.

5          Next slide.  His testimony: Email from you

6  to Tyler, November of '19.  I just invested 1 million

7  in the latest round -- last round of structured notes.

8  Can you please convey the strike prices and final

9  interest rate for my investment?  You see that?  Yes.

10  When you referenced interest rate, you meant the

11  coupon or the yield, right?  I believe so.

12          Next slide.  Let's look at some emails.

13  From Jannetti: Can you please confirm that the coupon

14  and principal barrier rates are the same?

15          Tyler answers -- go to the next slide.

16  Here's -- go to the next slide, please.

17          Here's Jannetti's email to Tyler:  I just

18  sent the following in a text to Chuck but haven't

19  heard back.  It's only been ten minutes, but I wanted

20  to cover my bases.  Please invest in the following:

21  1.3 million in the BAML, 13 yields.  Here he's using

22  the word yield.

23          Go to the next slide.  Can someone please

24  call and give me yields?

25          Go to the next slide.  One more thing.  Can



1  you please send the final coupon pricing?  Now he's

2  using the word coupon.

3          Go to the next slide.  Down at the bottom,

4  he's asking about the final interest rate for his

5  structured note investment.  And Mr. Tyler Connolly

6  responds and gives him the coupon rate.

7          Go to the next slide.  Here's his testimony:

8  When he used -- when he and his team used the word

9  yield with you, you understood they were referring to

10  the contingent coupon in the note; isn't that correct?

11          I didn't know contingent coupon, but I

12  understood that the yield was contingent upon a

13  barrier, right.  That's Mr. Jannetti's testimony under

14  oath.

15          What's the next one?

16          CHAIRPERSON SALIS:  Thank you.

17          MR. HILLIS:  And I don't have a slide on

18  this one.  But during his direct examination, Mr. Erez

19  asked Mr. Jannetti this question.  This is Volume

20  VIII, Page 1,459, Line 25.  Were you aware that the

21  contingent coupons were going down on the ETFs and on

22  the sectors and the indices and that Mr. Roberts was

23  including single stock notes to get a higher

24  contingent coupon?

25          And Mr. Jannetti says, yes.



```
 1              Even Claimants' expert admitted that Mr.

 2     Jannetti understood that the coupon or yield was

 3     contingent.  I asked him:  Regardless of whether the

 4     word coupon was used, yield, or interest rate, you

 5     don't have any doubt that Mr. Jannetti knew that that

 6     that was contingent on the performance of the

 7     underlying security; isn't that correct?

 8              Generally speaking, yes.

 9              That's why he kept the spreadsheet, the live

10     spreadsheet, so that he could keep track on a daily

11     basis whether the underlying price was below or above

12     the barrier and, therefore, whether he would expect to

13     get a coupon; isn't that correct?

14              And Mr. Heller says, That is correct.

15              So why in the world do we waste so much time

16     in this hearing on Mr. Roberts's use of the word yield

17     in text to Mr. Jannetti and in text to other clients

18     and structured note allocation sheets that Mr.

19     Jannetti asked for and Mr. Roberts sent?

20              The evidence is undisputed that Mr. Jannetti

21     was not misled by the use of the word yield.  He knew

22     it was the contingent coupon.  He knew it was not the

23     final effective yield, which you can only know at the

24     end of the two-year maturity.  He knew the yield or

25     the coupon or the interest rate or whatever else you
```



 1   want to call it was contingent on the price of the

 2   underlying being above the barrier.

 3            Here's a big question.  Mr. Jannetti claims

 4   he had no structured note experience, and there's no

 5   evidence that he did.  He claims he never read any of

 6   the disclosure documents.  Never looked at a single

 7   one.  That's what he said.  Claims he never did any of

 8   his own homework.

 9            Even though we have a text messages where

10   he's looking at the underlyings and saying I'm

11   analyzing the notes.  That was a joke.  So he never

12   did us any of his own homework, never -- never dug

13   into the details, just claims he trusted Chuck.

14            If that's true -- which it isn't, but let's

15   suppose it is -- how -- how does Mr. Jannetti know the

16   coupon's contingent and dependent upon the performance

17   of an underlying?

18            How does he know about the principal barrier

19   that he emailed about?  How does he know that if the

20   underlying drops below the barrier, you don't get a

21   coupon and you can lose principal?  How did he know in

22   late 2021 that a structured note was going to mature

23   not in the money?  How did he know that the higher the

24   volatility, the higher the risk, means the higher the

25   risk, the higher the coupon, higher the yield.  How

1    did he know all that?

2            How did he understand the risks enough to

3    create a live spreadsheet so he could track the

4    market's risk every day?  Maybe Mr. Roberts actually

5    did spend hours talking to Mr. Jannetti, the three to

6    four hours that he joked about on Christmas Day.

7    Maybe Mr. Roberts did explain these notes to him.

8            And if he explained them to Mr. Jannetti,

9    maybe he explained them to all these other people that

10   Mr. Roberts sent text to that they want to obsess

11   about --

12           Let me move to the suitability-related

13   claim.  And I think there -- there really is one

14   oh, well, I guess, three -- three key questions here.

15   Were the structured notes and stocks consistent with

16   Mr. Jannetti's investment objective and risk

17   tolerance?  Was his account too concentrated?  And did

18   Mr. Roberts recommend that?  Was that suitable?  And

19   did Mr. Roberts recommend excessive use of leverage

20   and was that -- those are really the three issues.

21           If we go to the next slide, the evidence has

22   proven that Mr. Jannetti aggressively sought higher

23   returns, the highest potential yield, was willing to

24   assume higher risks to get those higher yields and

25   returns, and he drove the concentration.  And his



1    claim that he wanted safety and to protect his

2    principal and would not have invested in a high risk

3    or aggressive strategy is just not supported by the

4    evidence, and it's not true.

5              Let's go to the next slide.  Again, I want

6    to blow through these a little bit quicker.  He had

7    accounts at Merrill and U.S. Trust.

8              He testified here:  So Mr. -- Erez asked

9    him, Before we get into this, you have an account at

10   Merrill and an account at U.S. Trust.  Why are you

11   splitting it like that?  I didn't want to put all my

12   eggs in one basket.

13             He understands diversification.  He

14   understands risk when you concentrate, when you put

15   all your eggs in one basket.

16             Go to the next slide.  He testified about

17   his accounts with -- with Merrill.  He's just sold his

18   business.  I wanted a conservative portfolio.  I

19   wanted something that's secure and diversified.  I

20   don't have to worry about it.

21             Is this not worrying about it?  Is -- is

22   this an investment, this right here, that he's not

23   worried about?  No.  No.

24             I want something secure, diversified.  I

25   don't want to have to worry about it.  So basically --



1   so he put me in -- mostly, he put me in a, I mean, a

2   broad mix.

3            Go to the next slide.  And I'm going to blow

4   through these, but the Merrill account was very

5   diversified.

6            Look at the next page.  Fixed income, 71

7   percent.  Seventy-four percent of that is in long term

8   bonds, nineteen percent in cash, nine point seven four

9   percent in equities.

10           Next slide.  This is The U.S. Trust account,

11  also very diversified.  Cash, equities, fixed income,

12  private equity.  Cash is 4 percent.  Equities, almost

13  80 percent.  Sixty-eight  percent of that is large

14  cap.  And you see the fixed income and the other

15  investments there.

16           So he's got two accounts with these other

17  firms, diversified, conservative, a broad mix.  Not

18  what he wanted.  Not what he wanted.  Considered it to

19  be bullshit, the slide we covered earlier.

20           U.S. Trust just lets crappy investments

21  wither on the vine.  I just freed up about 2 and a

22  half million of bullshit investments I'm going to move

23  over soon.  He wanted higher yields.  That's why he

24  consolidated.

25           Go to the next slide.  Now we've gone over



```
 1    this before.  I won't do it in detail.  But Mr.

 2    Roberts recommended a more diversified portfolio.

 3    This is critically important.  It reflects his true

 4    investment objectives and risk tolerance.  It's

 5    relevant to the concentration.  It's critically

 6    important to that.  It's critically important to the

 7    claim on the Solutions account.

 8            Mr. Roberts recommended a more diversified

 9    portfolio at least five different times.  Initially,

10    he testified in February of 2020 that he went over all

11    of his investment buckets with Mr. Jannetti, all the

12    components of the strategic allocation approach.  And

13    Mr. Jannetti only wanted structured notes at that

14    point.

15            December the 4th, 2020, Mr. Roberts sends

16    him a proposal for two ETF proposals, tactical

17    allocation and a broad based allocation.  Those are

18    two components of the strategic allocation portfolio.

19    Mr. Robert sends that to Mr. Jannetti.  He rejects it.

20            December the 7th, 2020, Mr. Robert sends it

21    to him again.  Rejects it again.

22            Let's go to July 20, 2020.  Went through

23    this earlier.  Mr. Jannetti -- I mean, Mr. Roberts

24    sends him most of the components of the strategic

25    allocation model, mutual fund managers, ETF
```



1   allocations, broad based ETFs and sector ETFs,

2   dividend paying stocks or dogs of the doubt,

3   alternatives, closed end funds.

4           Sent it to him again on August 2021.

5   Revised, but basically the same proposal.  Mr.

6   Jannetti rejected it both times.  So he complains

7   about concentration, and yet Mr. Roberts is the one

8   trying to get him to diversify the account, and he

9   rejects it every single time.

10          He wanted to continue to concentrate in

11  structured notes and high growth stocks.  He knew he

12  was taking more risk by being less diversified.  It

13  shows he was aggressive.  It shows he's not an

14  investor seeking safety or to preserve principal, and

15  it proves that Mr. Roberts didn't recommend the

16  concentration about which he now complains.  He tried

17  to get him to diversify, and he wouldn't.

18          His other investments also show a tendency

19  to -- to concentrate.  He put $7.6 million in five

20  speculative private equity deals, three at Stifel,

21  Braven, which had nothing to do with Stifel, and at

22  least one other outside Stifel private investment.

23          And each of those, he represented, he

24  understood they were speculative.  He invested 4 to

25  $500,000 in cryptocurrency.  He concentrated $7



1  million in one spec real estate deal with Larry Caine.

2  Hard money lending, private lending, lending to

3  individuals at rates in excess of 10 percent when

4  traditional mortgage rates are below 3 percent,

5  investing directly in a pool of residential

6  mortgages -- all of these things are very risky.

7          This is not a man looking for safety.  Not a

8  guy looking to preserve principal.  In his

9  communications with Mr. Roberts and his trading

10  decisions, including the unsolicited trades that he

11  made in both accounts, show that he was aggressive,

12  not risk averse, not someone looking for safety.

13          Let's look at some of his text messages.

14  I'm totally fine with the volatility.  Short American

15  Airlines, it's up 78 percent.  He's suggesting

16  shorting American Airlines.  Markets are down

17  significantly.  Do you have a recommended buy before

18  the close of business?  So prices are dropping, and

19  he's wanting to buy.

20          I hope they keep tanking until price are

21  struck Friday.

22          Go to the next one.  Market seems beaten

23  down a bunch.  That means prices have dropped, which

24  he understands.  Good time to invest?  Perhaps we

25  should move a million into the equity account and buy



 1 | more now.

 2 |        Next slide.  Portfolio -- this is really

 3 | interesting.  Portfolio went from low of 12 percent

 4 | down to 17 percent up in the last month.  Now that's a

 5 | 29 percent change in one month, 29 percent.  That's

 6 | not safe, conservative, low risk.  That's pretty

 7 | volatile.  He says, She's a keeper.  He likes it.

 8 |        The stock has been bouncing around.  Check

 9 | out the last week volatility.  Let's wait a couple of

10 | days to see how things shake out and then invest.

11 |        Next slide.  Hey, Chuck.  Can you please buy

12 | 200,000 of RV and Revance, I think it is, at the open

13 | provided you buy it under $26.5 a share?  I think I

14 | can make a pretty quick 20 percent.  Let's wait until

15 | they take a 10 percent hit.  I like investing in the

16 | dips.

17 |        What do you think of my decision to buy

18 | Silvergate Capital back on September 21 at 104?  Let's

19 | sell it.  I only wanted to make a quick 10 percent.  I

20 | don't want to be greedy, and I'd still have 500,000 in

21 | Silvergate after the sale.  We can buy something else

22 | when the opportunity presents itself.

23 |        Chuck, December '21:  The world ain't going

24 | to zero, thank God.  We'll look back in six months and

25 | realize this downturn was just one big damn head fake.



 1  Now, he was certainly wrong about that.

 2          But what does Jannetti say?  Well, that's my

 3  hope and why I invested today.  Market is down.  Is he

 4  running from the market, running from the risk?  No,

 5  no, he's investing more.

 6          Next slide.  These are not statements and

 7  actions of a conservative investor.  Those are

 8  statements and actions of an aggressive investor, what

 9  he was.  He also drove the concentration within

10  structured notes and those with the highest potential

11  yield, including the single stock notes.

12          Remember that Mr. Roberts always sent a menu

13  of notes.  This is one example right here that was

14  sent in October of 2021.  Large market indices notes

15  like the NAS -- I'm sorry -- NASDAQ, Dow, S&P, sector

16  index notes starting in June, single stock notes with

17  relatively small allocations.

18          Let's look at the next slide.  Mr. Roberts's

19  testimony: More than 95 percent of my clients would

20  take our broad allocation, diversified allocation.

21          Next slide.  Mr. Roberts's testimony:  But

22  not Mr. Jannetti.  I've had an enormous dialogue with

23  Mr. Jannetti.  We would go through the notes.  He was

24  never satisfied with the lower contingent coupon

25  notes.  Never.  He wanted the highest contingent



1   coupon, which you'll see going forward.  That's what

2   he wanted.  And so to bring up the average yield, the

3   only way you can do that is to cherry-pick.  That's

4   it.

5            Next slide.  All right.  This is his

6   testimony: Did you recall being dissatisfied with the

7   yields of structured notes he was offering in June of

8   twenty one?  You recall that, correct?

9            I was mostly drawn to hirer yields.

10           And you would agree with me, sir, that there

11  were times when you would not purchase all the notes

12  in Mr. Roberts's menu?

13           That's correct.

14           Let's go to the next slide.  He says,

15  Looking at the notes now, which is your fav?  No

16  politically correct comments, like, sprinkle across

17  the board, please.  That shows you what Mr. -- what

18  Mr. Roberts tried to get him to do, diversifying

19  across the entire menu.  Do you want to do it?

20  Excellent.

21           Each time Mr. Roberts would send him a menu,

22  each time Mr. Jannetti would look at those

23  underlyings -- this is one example.  He sends a

24  screenshot to Mr. Roberts.  Starting to analyze the

25  notes.  How does he explain this away?  It was just a



```
 1   joke.  It was just a joke.  I didn't really look at

 2   it.  He did his own homework.

 3            Go to the next slide, please.

 4            CHAIRPERSON SALIS:  Mr. Hillis, is this a

 5   good time?

 6            MR. HILLIS:  Sure.  We're at 3:26.

 7            (OFF THE RECORD)

 8            (ON THE RECORD)

 9            CHAIRPERSON SALIS:  We cannot say later than

10   5:00.  So I think we need to coordinate something to

11   continue here or on Zoom.  But it's --

12            MR. HILLIS:  I think we'll finish by 5:00.

13            CHAIRPERSON SALIS:  You think you will?

14            MR. HILLIS:  Yeah.

15            MR. EREZ:  He's got fifteen more minutes --

16            MR. HILLIS:  No, no.  I've got 24 minutes

17   according to my watch.

18            CHAIRPERSON SALIS:  Nine minutes short.

19            MR. EREZ:  Okay.  Twenty-four minute --

20            MR. HILLIS:  Come on, man.

21            MR. EREZ:  -- and then I'll go.

22            CHAIRPERSON SALIS:  Okay.  Then let's

23   proceed.  That's wonderful to hear.

24            MR. EREZ:  I've got 3:36.

25            MR. HILLIS:  Six, is that right?
```



```
 1              MR. EREZ:  Yeah.

 2              MR. HILLIS:  Okay.  All right.  So, again,

 3    every month, Mr. Roberts makes a recommendation of a

 4    menu.  This is the one in October.  He recommends

 5    approximately ten or more notes.  What does Mr.

 6    Jannetti do every single month?  He picks the ones

 7    with the highest shield.  He decides how much to

 8    invest.

 9              He sends text after text, email after email,

10    giving specific instructions on which note he wants

11    and how much to invest.  I'm not going to go through

12    those, but they're in your demonstration and behind

13    Tab 2 in the demonstratives of the closing binder.

14              In this particular case, he recommends

15    several -- ten-plus notes.  Mr. Jannetti decides to

16    buy Dynatrace and Square, two out of the menu that was

17    put there.

18              Now this is a critically important point.

19    Mr. Roberts had no financial incentive to concentrate

20    Mr. Roberts in Dynatrace.  No financial incentive at

21    all.  He would have gotten the same -- he got paid the

22    same thing had Mr. Jannetti invested that $6 million

23    across all these notes.  It doesn't benefit Mr.

24    Roberts financially for him to concentrate it in the

25    Dynatrace note or any other note with the highest
```



 1   yield.

 2           Mr. Jannetti didn't need a concentration

 3   letter to tell him he was concentrated.  Look at slide

 4   197.  This is his testimony: After the phone call with

 5   Mr. Stevenson and Ms. Lucarelli, you know that your

 6   account continued to be concentrated in structured

 7   notes, right?  Yes.  You knew that from that point

 8   until the very end, correct?

 9           What does that mean?  I don't know what you

10   mean.  Until the very end of the relationship, you

11   knew that your account was concentrated in structured

12   notes, correct?  I knew I had a lot of structured

13   notes as far as concentration.

14           You knew that structured notes represented

15   virtually a  percent of this account, correct, of the

16   structured note account?

17           Yes, sir.  I understood that structured

18   notes and the structure in my structured note account,

19   there were -- it was a 100 percent structured notes.

20   Yes.  So he understood that.

21           Leverage and withdrawals -- let me just talk

22   about that briefly.  Again, the evidence has proven

23   that he's experienced with debt as a lender and a

24   borrower.  He brought up the mortgages and margin to

25   Mr. Roberts first.  He drove the use of margin.



 1   There's text message and email after text message

 2   after email telling Mr. Roberts's team to use margin.

 3           Those are also behind Tab 2 in the

 4   demonstratives that we used in opening.  I'm not going

 5   to go through them now, but there's plenty of evidence

 6   Mr. Jannetti that drove the use of margin.  Every time

 7   he gave instructions to Chuck's team to use margin, to

 8   fund withdrawals, to fund capital fall, he drove.

 9           And it was his decision to withdraw $12

10   million from the account, much of that on margin.  His

11   decision to withdraw 6 million from the account in

12   2022, and those are -- those were withdrawals

13   attributed mightily to the margin calls that he got.

14           And the clearest example that he was in

15   control of leverage and drove that aggressive approach

16   is -- is the December '21 through February 2022 time

17   period.  His accounts dropped $10 million during that

18   time period.

19           He added $2.1 million in margin debt for the

20   down payment on the Sunset Harbor House.  He added a

21   $9 million mortgage on that property, $11 million in

22   new debt with his Stifel accounts down $10 million.

23   Mr. Roberts didn't recommend that strategy.  It shows

24   you how aggressive he is and how he's the one driving

25   the leverage.



1          Now let me talk briefly about supervision.

2   You don't get to supervision unless they prove an

3   underlying claim.  Okay?  That's -- that's clear.  The

4   evidence we believe has proven that Stifel's

5   supervision was reasonable.  You've seen the policies

6   and procedures, which no one has criticized.  They

7   provided education and training on structured notes.

8   They have eligibility criteria for claim -- for

9   customers to invest in structured notes.  They have

10  parameters and guidelines on the types of notes that

11  can be offered, implied volatility limits, and other

12  things.

13          Mr. -- Ms. Lucarelli testified about her

14  supervision, her review of branch scorecards, her two

15  year heightened supervision plan with Mr. Roberts

16  where she met with him monthly and had heightened

17  scrutiny, central supervision reviewing every single

18  structured note trade, two manager calls.  There's

19  plenty of evidence in this case of reasonable

20  supervision.

21          And Ms. Lucarelli is highly experienced,

22  highly credentialed.  She obviously cares about her

23  job.  She obviously takes it serious.  She's a serious

24  person, and she does her best to protect the firm and

25  to protect clients.



1              Now, is the supervision perfect?  Of course
2    not.  It never is, but perfection is not the standard.
3    Reasonableness is the standard.  You have to have
4    reasonable policies, policies reasonably designed to
5    prevent violations, and you have to reasonably follow
6    those policies.
7              You can't catch everything.  You can't be
8    perfect.  You can still have reasonable policies and
9    supervision and still have customers lose money and
10   have customer claims.  Just ask Mr. Heller.  He's --
11   he's supposedly one of these great supervisors at UBS.
12   He has customer claims on his -- his CRD as a
13   supervisor.
14             The concentration -- let me talk about that
15   briefly.  You know, Ms. Lucarelli made a judgment.
16   Now, you may disagree with her.  And it's certainly
17   easy in hindsight to look back and say, well, gosh,
18   you know, she should've sent that letter.  And if she
19   was only focused on protecting Stifel -- she was just
20   worried about Stifel's butt, then she would've said
21   it.
22             What's the downside, right?  But she didn't
23   send it.  She made a judgment because she had just
24   talked to Mr. Jannetti a few months before when the
25   account was more concentrated in structured notes than



1  it was at the time they were looking at the

2  concentration letter.

3          You -- you may disagree and say that she

4  should have said it.  But just because she makes a

5  judgment we disagree with now in hindsight, doesn't

6  mean that it was a lack of supervision, doesn't mean

7  that it was unreasonable supervision.  She made a

8  judgment.  She had just spoken to the guy a couple of

9  months earlier.  That's not a proof of lack of

10  supervision.

11         Now, I want to talk about comparative

12  negligence, which is the law in Florida, 768.81, which

13  basically says that you can reduce any amount of

14  alleged losses proportionate to the amount of fault

15  that you find with Mr. Jannetti.

16         So if his fault caused some portion of the

17  loss, you are entitled to a portion of damages based

18  upon that.  And if you find that his conduct was more

19  than 50 percent at fault for the losses, then you can

20  award zero damages.

21         And the evidence has proven only a fault on

22  Mr. Jannetti's part.  If you believe him, he admits he

23  didn't read the structured investments disclosure, the

24  white paper, the portfolio review, the account

25  agreement, the margin disclosures, the prospectuses,



1    all of which disclose all the risks that he claims

2    weren't disclosed and that he didn't know.

3            He drove the concentration.  He rejected Mr.

4    Roberts's recommendations to diversify the account.

5    He drove the leverage.  He committed to these outside

6    private deals, which created the liquidity crisis that

7    he found himself in.  He chose to withdraw 12 million

8    from the account, which led to the margin calls and

9    forced sales.

10           He chose to withdraw the 6 million in 2022.

11   The evidence has proven that he is largely responsible

12   for the losses in this count -- in this case, and the

13   law requires you to reduce any recovery proportionate

14   to his own fault.

15           Now, let me talk a little bit about his

16   damages.  We don't think he's proven his claims, but I

17   have to say a few things about damages.  Benefit of

18   the bargain.  On structured notes, that damage theory

19   assumes that the Claimant had invested in an

20   investment with zero risk to principal and a

21   guaranteed return of 12.25 percent.  That's absurd.

22           He knew that there was no such investment

23   like that.  He knew the coupon was not guaranteed, was

24   contingent, and he knew there was a risk to principal.

25   I just went through all that stuff.  So a benefit of



1  bargain damages based upon a guaranteed return of

2  12.25 percent on an investment with no risk is simply

3  not appropriate.

4           Solutions account -- he uses -- he bases

5  that damage on the benchmark for the strategic

6  allocation portfolio as described in 2017.  But as

7  I've demonstrated to you, that is not what Mr.

8  Jannetti wanted.  It is not what he expected, and you

9  can't base damages on a theoretical portfolio that the

10  evidence proves he did not want.

11           517 damages.  Now, we don't think they've

12  proven 517.  But even if they have, the damages --

13  their damages calculation ignores the structured notes

14  and the stocks that made money.  But he argues that

15  netting is not permitted.  We disagree with that.

16           The KC cites is dealing with two

17  transactions.  The Plaintiff was complaining about

18  one, and the Defendant claimed that you have to offset

19  the gain on the other.  That's not this case, and we

20  cite law in our hearing brief.

21           When you're complaining about the entire

22  strategy, which is exactly what this case is about,

23  they're not complaining about four notes, five notes.

24  They're not complaining about five stocks in the

25  Solutions account.  Their complaint is about the



```
 1   entire strategy.

 2           And when your complaint is about the entire

 3   strategy, you should look at the entire performance of

 4   the account.  You should net the gains against the

 5   losses because you're complaining about the whole

 6   strategy.  We cite case law in our brief on that

 7   point.

 8           Attorney's fees -- maybe I've forgotten.

 9   It's been a long hearing.  I don't remember any

10   evidence of any attorney's fees.  I don't remember

11   seeing any evidence of attorney's fees.  I don't

12   remember seeing a contingent fee agreement.  I don't

13   remember seeing any evidence of cost -- cost.  I don't

14   remember seeing a single thing.

15           Punitive damages.  They seek punitives on

16   their breach of fiduciary duty and fraud claim.

17   That's it.  They don't seek punitives on any of the

18   other claims, and you can't hit punitives on any of

19   the other claims.

20           Fraud, breach of fiduciary duty.  Fraud

21   requires proof of contempt to defraud, all the other

22   elements that we talked about.  Punitive damages are

23   recovered for truly culpable behavior and intended to

24   express society's collective outrage.  They're

25   required to prove that the Defendant's conduct was
```



```
 1   outrageous due to defendant's evil motive or reckless
 2   indifference to the rights of others.  We cite that in
 3   our hearing brief.
 4            The statute is very clear if you look at it.
 5   When you're seeking punitive damages against an
 6   employer -- employer for the acts of the employee, you
 7   have to prove -- essentially, they have to prove by
 8   clear and convincing evidence that Mr. Roberts knew
 9   his structured note and strategies and recommendations
10   were wrongful, knew it.  Would -- knew it would cause
11   the Claimants harm and intentionally made the
12   recommendations to the Claimants anyway.
13            If you track the language of the statute,
14   that's what they have to prove.  And that he was so
15   reckless in wanting and care that he had a conscious
16   indifference to the Claimants' rights, life, and
17   safety.  In other words, they have to prove that he
18   made the recommendations knowing he would harm the
19   Claimants, and he made the recommendations anyway.
20            For he made them so grossly -- he was so
21   reckless, so grossly negligent that he didn't care if
22   his recommendations harm Mr. Jannetti.  I think
23   there's just no evidence in this case to support that.
24   Yes, his recommendations did not perform because we
25   had one of the worst markets in decades, but there's
```



1   no evidence that he made these recommendations with an

2   intent to defraud him, knowing that it would harm him,

3   didn't care if it would harm him.  That is not what

4   has been proven in this case.

5          And then on the second element, they have to

6   prove his people actively, knowingly participated in

7   such wrongdoing by Mr. Roberts, that we condoned it,

8   ratified it, consented to it, and that we were grossly

9   negligent, and it caused his loss.  There's no

10  evidence that Stifel knew or participated in or

11  condoned or ratified a broker making recommendations

12  knowing they would harm the Claimants and made them

13  anyway.  There's just no evidence of that.

14         And I got to say this about punitives.  You

15  can't get punitive damages just because Stifel is

16  defending on these cases.  And, you know, we -- we

17  tried to offer some evidence yesterday through our

18  expert to defend Stifel's handling of these cases and

19  Mr. Roberts in light of these cases.  And we drew an

20  objection, and that objection was sustained.  And we

21  were not permitted to put that evidence on.

22         And I told you that he would make the

23  argument that he made: that you should award punitive

24  damages because Stifel doesn't take it seriously; they

25  haven't done anything to Mr. Roberts; he's still



 1   employed; they haven't disciplined him other than a

 2   height supervision plan.  And we were not permitted to

 3   put the evidence in through our expert on the

 4   reasonableness of Stifel's conduct.

 5          But Stifel is not required to terminate Mr.

 6   Roberts simply because Mr. Erez files a bunch of

 7   claims.  We are entitled to defend.  We don't agree

 8   with the allegations.  We dispute the claims.  That's

 9   why we're trying this case.  Punitive damages can't be

10   based upon that.  We're entitled to put on a defense.

11   We don't have to agree simply because he files a

12   number of statement of claims with allegations.  We

13   are entitled to dispute it.

14          So let me just say in conclusion, based on

15   all the evidence, we -- we think you should dismiss

16   this case.  We think you should hold him responsible

17   for his financial decisions and conduct which drove

18   the losses in this case.  Hold him responsible for his

19   decisions to concentrate in structured notes against

20   Mr. Roberts's advice.

21          He concentrated the notes with the highest

22   yield against Mr. Roberts's advice, for rejecting Mr.

23   Roberts's recommendations to diversify, for

24   overcommitting himself to these outside private deals,

25   for over leveraging himself and making huge



 1  withdrawals that exacerbated the margin situation.

 2  Don't let him shift to Stifel market risk that he

 3  understood and that he chose to assume chasing higher

 4  returns.

 5              And we also ask that you give us our

 6  attorney's fees.  And I'll put in an affidavit showing

 7  the proof of that of a million 7 in attorney's fees

 8  and cost.  Now, I'm not stupid.  You -- you may

 9  disagree with me.  He's told you a number of times.

10  We've had two awards.  You may disagree with me.  And

11  if you do, I still urge you to hold Mr. Jannetti

12  responsible for his culpability, for his share of the

13  fall in this case.

14              You can do that under comparative

15  negligence, comparative fault.  You could do it just

16  to enter a fair and just award in the case.  Is it

17  fair and just after all the evidence I've reviewed for

18  you for him to get all of his money back or more?  No.

19  We ask you to enter a result that is fair, just, given

20  all of the facts of this case only, no other case, of

21  a result that holds him responsible for his losses,

22  for his -- his share of the fault.

23              And I would suggest to you that all the

24  losses on the single stocks are his responsibility.

25  That's $9.5 million all on him.  He's the one that



1  concentrated in those single stocks.  He's the one

2  that rejected Mr. Roberts's recommendation of a

3  diversified menu.  He made that decision.  He made the

4  decision to put $6 million in Dynatrace.  That wasn't

5  Mr. Roberts's recommendation.  You saw his

6  recommendation, a menu of ten notes with relatively

7  small allocations to the single stocks.  He made that

8  decision.

9         The losses on the other stock -- on the

10  other notes, three and a half million dollars.  And

11  you can apportion that between Stifel and Mr. Jannetti

12  based upon what you -- what you see as the share of

13  the fall.

14         If you're concerned about the margin, as we

15  proved, the fact that he had margin and had to sell

16  structured notes to meet margin calls caused only 2

17  million.  That was it.  You can apportion that based

18  upon relative fault between Stifel and Mr. Jannetti.

19         You can look at December of 2021.  Between

20  October -- the end October and December 2021, Mr.

21  Jannetti's accounts dropped $7.5 million in less than

22  3 months.  His unrealized loss at the December on

23  structured notes, in that account, just the ones, he

24  held, $4.3 million.

25         That's the last month he bought anything.



1   It's the first month the coupons were missed on

2   structured debt.  Before he did the Sunset Harbor deal

3   and added 2.1 million in margin debt.  It's before he

4   withdraws 6 million in 2022.

5          If you -- you can look at December of 2021

6   he had sold everything at the December 2021, all the

7   structured notes he held.  His overall NOP on the

8   structured notes as of that time was $1.725 million.

9   So if he sells all the notes at the end of December of

10  2021, that's his structured note overall loss from

11  start to finish, $1.725 million, and you can apportion

12  that number according to the relative fault.

13         And that doesn't even include the fact that

14  at the December, his Solutions account was up 635,000.

15  Not even including that.  If you take both accounts

16  into account and say that he liquidated everything at

17  the December of 2021, his total NOP, at that point, a

18  loss of a million and one.

19         So this is not a zero or 20 or 16 million or

20  26 million -- or whatever the number is -- case.  You

21  are entitled to a portion of the laws according to the

22  relative fault, and you are entitled to end result in

23  an award that's fair and just based upon the fact of

24  this case.

25         I want to, thank the panel for listening to



1  me for almost three hours.  I appreciate your

2  attention.  I appreciate how serious you took your

3  jobs in the case, how respectful you were to me and

4  our team, and frankly, to both sides.  These are not

5  easy cases.  The lawyers are fierce advocates.

6          I hope that I didn't do anything during the

7  case that crossed any particular line.  I'm doing the

8  best I can, fighting as hard as I can for my clients.

9  I know you -- you all understand that.  So I just want

10  to thank the panel for serving on this case and for

11  your attention.  Thank you.

12          CHAIRPERSON SALIS:  You need a moment?

13          MR. EREZ:  I don't.  No.  (Inaudible).

14          MR. HILLIS:  I want it noted that I had one

15  more minute.

16              CLAIMANTS' REBUTTAL STATEMENT

17          MR. EREZ:  Okay.  Thank you, Mr. Hillis.

18          Comparative fault.  No comparative fault

19  under Florida Statute 517.  That's the law.  No

20  comparative fault, no defense, no ratification, no

21  apportionment.  No apportionment of fault under

22  intentional torte, breach of fiduciary duty, fraud.

23  No apportionment of fault.

24          So everything he just said does not apply to

25  517.  517 has a formula.  You meet the statutory



```
 1   requirements.  You get recessionary damages.  I just
 2   want to address that off the bat, and I'm going to go
 3   quickly through the various items that Mr. Hillis
 4   mentioned because I want to start with the first
 5   thing.
 6           Mr. Hillis's closing just gutted the entire
 7   securities industry.  He literally said out loud, it
 8   doesn't matter what the risk is.  He literally said
 9   that on behalf of the seventh largest brokerage firm
10   in the country.  He literally eviscerated the entire
11   industry.
12           This is their manual.  You have to record
13   your client's objectives, conservative, moderately
14   conservative, moderate, moderate growth, moderately
15   aggressive, aggressive, know your customer,
16   suitability.
17           What are all these rules based on?  You
18   understand your client and the levels of risk, and you
19   understand the product and the levels of risk, and you
20   match them.  That's the entire securities industry.
21   That is the FA, the financial advisor's entire
22   obligation.  That is the nuts and bolts of this
23   industry.
24           What did Mr. Hillis not address at all in
25   three hours?  The elephant in the room, the change of
```



1   testimony, the intentional manipulation of testimony

2   and proof in this case, which I've proven previously,

3   not high risk, in this case, high risk because the

4   level of risk -- not just, we disclosed a risk; we

5   disclosed this risk -- it's the level of risk that

6   matters.

7          And that level of risk, as you've all seen

8   in every single new account form, every single manual

9   that's ever been written in the securities industry,

10  is all about the calibration of the level of risk

11  because the broker has to know how much risk does this

12  client want to take.

13         He has to understand the precise level of

14  risk, low, moderate, high, somewhere in between.

15  They've got five different levels here at Stifel, and

16  then he's got to match it with the client.

17         If what Mr. Hillis was saying was true, it

18  wouldn't matter what the level of risk the client had,

19  risk tolerance, or the level of risk of the product.

20  Everything he just told you is not supported.  They

21  did not put on a single expert witness that supported

22  what he just said in his closing argument, that the

23  level of risk doesn't matter.

24         This entire case is about Mr. Roberts's

25  misunderstanding the level of risk, presenting this as



1   solid, very solid, super solid.  That's not puffery.

2   Those are precise representation communicating the

3   level of risk.

4         I asked Mr. Roberts, what do you mean by

5   that?  I believe you're going to get your coupons and

6   you're going to get your money back in maturity.  We

7   saw all those text messages, not risky, almost like a

8   substitution for bonds, you know, the more structured

9   notes you have, the more conservative you are.  So his

10  $28 million in structured notes, he believed that was

11  conservative.

12        According to Mr. Rob -- Mr. Hillis in

13  Stifel's closing, it doesn't matter what the level of

14  risk was.  That can never be the case.  These were

15  high risk note.  And you know how you know that Stifel

16  knows how critical that is?  Because they changed

17  their entire testimony.  They changed it in this case.

18        In their answer, they said high risk.  In

19  previous cases, high risk.  And then in this case,

20  it's not high risk.  Why did they do that?  Why did

21  they cover up?  Because they knew that it was sold to

22  Mr. Jannetti and other clients as being low risk,

23  safe, solid, conservative, money good.  These are all

24  things that Mr. Roberts believed and used for

25  suitability and represented.  It is critical that he



1   understood it -- that Mr. Roberts misunderstood the

2   risk and misrepresented the risk.

3           Then he says, Mr. Jannetti understood that

4   higher yield meant higher volatility and that, you

5   know, he had to understand that he was getting a

6   higher potential coupon, not a -- not a -- not a

7   required coupon -- a higher potential coupon,

8   contingent coupon, 15 percent -- that he had to

9   understand and meant higher risk.  Didn't want to use

10  the word high risk because it contradicts the entire

11  theory of his closing.

12          You know who believed that you can get 15

13  percent with a low level of risk?  Mr. Roberts did.

14  Chuck Roberts definitely believe that you can get a 15

15  percent contingent coupon or yield without a high

16  level of risk.  Yet his entire closing, the core of

17  it, is that Mr. Jannetti must have understood that he

18  couldn't get 15 percent yield without a high level of

19  risk.  Again, Mr. Jannetti should not have an

20  obligation to understand the risk better than Mr.

21  Roberts.  That can't be the case.  This entire case is

22  about the level of risk.

23          Again, what did you not hear from Mr.

24  Roberts -- from Mr. Hillis?  He talks about the

25  prospectuses, the white -- the white paper, the



1  disclosure.  What -- what did the evidence in this

2  case actually reveal?  That the risk is based on the

3  underlying.  If it's an S&P note, if it's a sector

4  note, if it's a Dynatrace note, every time you have a

5  different underlying with a different implied

6  volatility, that's what drives the risk.

7          So it was up to Mr. Roberts to -- who

8  created these notes, to calibrate his understanding of

9  the risk and disclose it.  And the evidence is

10 unrebutted.  He didn't think these were high risk.  He

11 didn't disclose these were high risk.  And every time

12 he fails to understand that, that is a violation of

13 517.  That is a violation of his fiduciary duty.

14         They talk about the law, and then they cite

15 it.  You heard him say, In Re Short Squeeze.  It's a

16 perfect example because there's a fire hose of

17 misinformation coming from Stifel in his three-hour

18 closing, a literal fire hose of misinformation.  But

19 I'm going to show you that the source of this, both

20 the facts and the law, is misleading you.

21         This is the Short Squeeze case.  He said it

22 out loud:  Look at the Short Squeeze case.  The Short

23 Squeeze case is a clearing broker case -- not a full

24 service case, a clearing firm case -- and it's

25 interpreting New York law.  That's their case.  And



1  Mr. Hillis said out loud: This is a case that you
2  should rely upon.  It's controlling in this case.
3          Look at it.  Read their cases.  New York
4  law, not applicable.  A clearing firm case -- not an
5  introducing broker, a clearing firm case.
6          Then Mr. Hillis gets up there and says, oh,
7  517.  I know he's a Georgia attorney.  He's not a
8  Florida lawyer.  I get it.  I get it.  The 517 isn't
9  something that he deals with in a Georgia case because
10 it's Florida law.  But if you're going to come down to
11 Florida, you better know Florida law and you better
12 represent it accurately to a panel.
13         He said to you in closing, 517 only applies
14 in connection with this purchase of an investment.  It
15 says it right there in the statute, in connection with
16 the rendering of any investment advice.  It could be
17 margin.  It could be strategy.  It could be
18 concentration.  In the rendering of any investment
19 advice.
20         Then as I said to you, Mr. Hillis tells you,
21 this is proof positive -- this document at Number 94,
22 this is proof positive that Mr. Jannetti rejected the
23 Solutions account that he wanted him to have with --
24 that that mimic the philosophy statement.  Proof
25 positive.



```
 1              Look at the sleight of hand.  Look at the
 2    sleight of hand.  Jannetti rejected the strategic
 3    allocation portfolio.  Stifel, those fine people right
 4    there, are telling you that this pertains to strategic
 5    allocation to the Solutions account.  Take a look.
 6    Dave Jannetti's tactical allocation -- tactical
 7    allocation is not strategic allocation.
 8              The amount is $30 million.  He had $8
 9    million in Solutions.  This is not for Solutions.
10    This is not for Solutions.  But what did Mr. Hillis
11    put in writing and say to you as an attorney who was
12    bound to be upright and ethical with this panel?  He
13    said, Jannetti rejected strategic allocation
14    portfolio.  Sleight of hand trying to trick you into
15    believing that tactical allocation is strategic
16    allocation and that this was somehow a rejection of
17    the Solutions account.
18              Regrettably, that is literally what is
19    happening every single -- they did it again here.  Did
20    it again here, suggesting to you that this was a
21    rejection of the Solutions account.  This is a $40
22    million proposal.  This is not for the Solutions
23    account.  There was $8 million in Solutions.
24              Any -- and their expert repeated it, too.
25    There was never a rejection of the philosophy
```



1    statement or of any proposal on strategic allocation

2    for the Solutions account.  Never.

3           Then they show you a December 30, 2022, text

4    from David Jannetti talking about selling a note

5    because it will not be in the money.  Do you know what

6    happened on December 30th, 2022?  Mr. Jannetti lost

7    $16 million.  All of the losses were sustained by

8    December 2022.  Information that he has about his

9    accounts after he sustained all the losses, this is

10   proof positive of what he understood in 2020 or 2021?

11          Then he goes on -- and -- and we got to

12   spend a moment on this because there's an argument

13   that he should have mitigated.  There's an argument

14   that he should have mitigated.  What's the argument?

15   He's down -- he's down 1 million.  He's down 2 million

16   in unrealized losses, and Mr. Jannetti should have

17   sold and mitigated.

18          What does Mr. Roberts tell his clients,

19   including Mr. Jannetti, in this late 2021 when this is

20   happening?  The value fluctuates, but you are

21   massively protected, so nothing to worry about.  It's

22   not a real decline.  If the markets go down, the notes

23   don't reflect the downside protection.

24          We are all good.  These stocks are -- will

25   find their footing very soon.  We will look back in



 1   six months and realize the downturn was just a head
 2   fake.  The notes are doing what they're supposed to.
 3   We have nothing maturing in 2023 and nothing to worry
 4   about.  No money has been lost.  All of our notes
 5   mature in '23.  No money has been lost.  We own good
 6   stuff, climbing back little by little.  The system
 7   doesn't take into account the downside barrier
 8   protection.

 9           So while Mr. Robert is telling Mr. Jannetti,
10   everything is consistent in his text messages and
11   believes what's in these text messages Mr. Jannetti
12   should be selling.  And then the height of hypocrisy,
13   Mr. Hillis advances an argument that in December 2021,
14   right when Mr. Roberts makes the realization that
15   there's no reasonable basis suitability for XBI single
16   stock notes and doesn't disclose it to Mr. Jannetti,
17   Mr. Hillis says Mr. Jannetti should have sold.

18           Well, I mean, I agree with him, but it would
19   have been up to Mr. Roberts to tell him, hey, all the
20   structured notes that you own, I don't believe they're
21   suitable for you anymore.

22           Instead, he sits quietly and tells them
23   nothing to worry about until 2023.  It's all good.
24   They're coming back.  I recommend that you hold.  Then
25   they said, it's Mr. Jannetti's fault.



1          I asked -- I asked Mr. Roberts.  You felt

2    responsible?  I was the manager.  I was the manager of

3    his accounts.  And you felt responsible for the

4    performance?  Listen to what he said.  I felt

5    partially responsible.  All right.  He didn't give me

6    100 percent.  Chuck Roberts.  But even Chuck Roberts

7    had to concede that he was responsible to a degree.

8    Even Chuck Roberts said, I'm the manager.  I was

9    partially responsible.

10         What is their counsel saying here now?  We

11   have no responsibility.  It was all him.  We didn't do

12   anything wrong.

13         Evidence is very clear, and it's

14   undisputable.  If it wasn't for Chuck Roberts, we

15   wouldn't be here right now.  If it wasn't for Chuck

16   Roberts, Dave Jannetti wouldn't be here right now.

17   This is all Chuck Roberts doing.

18         I asked him every single trade: Did you

19   recommend it?  Yes.  Did you solicit it?  Yes.  What

20   does Stifel say?  It's Dave Jannetti's fault.

21         We're all also asking -- I want to make sure

22   we're clear about this -- that all foreign fees are

23   assessed against Stifel.  Attorney's fees -- we put it

24   on the record that we have a contingency fee

25   agreement, 25 percent.  If the panel wishes to see it,



 1   we can put it in evidence.  Just let me know.  We --

 2   we are submitting to you that the bill is a $122,000.

 3   I got it right here.  Happy to put it in evidence.

 4   Here's the bill right here, $122,000.

 5           But it's not required on the Florida law.

 6   Those are -- those -- those are the numbers.  That is

 7   the information.  Panel under 517 shall award

 8   attorney's fees under the statute if you find that the

 9   elements of the statute have been met.

10           Mr. Hillis wants to diminish all of the many

11   text messages and misrepresentations made by Mr.

12   Roberts in all the text message we reviewed.  Here's

13   the problem.  Mark Stephenson, Lori Lucarelli, the

14   actual manager that supervised Mr. Roberts, all said

15   they couldn't be sent.

16           They violate the policies of FINRA and

17   Stifel.  It -- had they seen them in advance, they

18   cannot be sent.  They're false and misleading.  If it

19   were just puffery or just inconsequential, as Mr.

20   Hillis wants to suggest, why would the managers and

21   their own -- and their experts say that you cannot say

22   those things?

23           The withdrawals.  Let's talk about the

24   withdrawal.  I asked Chuck Robert: Does a withdrawal

25   cause a loss?  No, withdrawing money from your account



1  does not make your structured note go down value.

2  That's simply not the case.

3         Concentration, nowhere, nowhere.

4  Prospectus, white paper, anywhere, does Stifel ever

5  advise Mr. Robert -- Mr. Jannetti that the level of

6  concentration he had increased the level of risk.  Mr.

7  Jannetti believed exactly what Mr. Roberts believed

8  because he relied on Mr. Roberts.

9         He never invested in structure notes before.

10  He never invested in structure notes before.  Mr.

11  Jannetti knows nothing about the XBI.  He doesn't --

12  he's not a biotech.  I asked him, are you some kind of

13  biotech investor that you've got 45 percent of $28

14  million invested in XBI?  He knows nothing about

15  Dynatrace, nothing about any of those stocks that were

16  the underlying.  All he knows is that Mr. Roberts

17  recommended them, made representations about them, and

18  he accepted that and invested in them.

19         Mr. Hillis wants to talk about crypto.  They

20  love to talk about hard money lending, Braven.  None

21  of those have anything to do with this case.  They are

22  all red herrings.  There's simply no connections.

23  Objections were even sustained when Mr. Hillis sought

24  to elicit more testimony on -- on these issues, when

25  he sought to elicit more testimony about stocks not at



1    issue in the structured note account.

2              The evidence -- the objections were

3    sustained.  The evidence didn't come in, and yet Mr.

4    Hillis, on behalf of Stifel, wants to plow that

5    ground, try to score some superficial points.

6              And then Mr. Hillis says, well, Chuck --

7    well, Dave Jannetti was really aggressive.  He was a

8    really aggressive guy, and he was aggressive at

9    Stifel.  Hold on a minute.  He's got 80 percent of his

10   assets at Stifel in structured notes.  Chuck Roberts

11   says that when you go to structured notes, you're

12   being more conservative.

13             Do we pull from building those equities and

14   increase the note allocation?  I feel very comfortable

15   with the note strategy for you.  Chuck Roberts -- I'm

16   going to opt towards more conservative.  And he said,

17   the more notes you have, the more conservative you

18   are.  Yet Wayne Hillis, on behalf of Stifel, is

19   telling you, no, he's being aggressive by being 80

20   percent in structured notes.

21             Just want to be clear.  You have 80 percent

22   of the funds in structured notes and 20 percent in

23   Solutions.  You got to ask yourself why?  Why is he 80

24   percent in notes?  For the opposite reason that Mr.

25   Hillis is trying to convince you of.  Because the



1  evidence is that what Mr. Roberts told him is, the

2  more you go to structured notes, the more conservative

3  you are.  That's his word.  I'm trying to get you a

4  conservative double digits.

5          Mr. -- Mr. Roberts texted.  He wrote these

6  words.  He wrote these words, and he testified on the

7  road that he believed them.  He believed that the

8  structure note strategy was conservative.  The

9  evidence is that it's high risk.  When they are

10  confronted with this paradox, and they can't square

11  they can't square it.

12          But what did they do?  They covered it up,

13  and they came into this trial and contradicted their

14  prior positions in this case and in other cases and

15  said, you know what?  It's not high risk.  And the

16  risk -- and now we heard the new position.  The risk

17  doesn't matter.  The risk doesn't matter.  Mr. Hillis

18  said it loud and clear.  The risk doesn't matter.

19          CHAIRPERSON SALIS:  I need a --

20          MR. EREZ:  Sure thing.  Sure.

21          (OFF THE RECORD)

22          (ON THE RECORD)

23          MR. EREZ:  I want to continue where I was,

24  if I might.  This whole argument that it doesn't

25  matter what level of risk the notes were is completely



1   contradicted by their own expert witness because I

2   asked him, can you represent to a client that an

3   investment is low risk or conservative and then

4   document that account as high risk and sell high risk

5   investments?  And the expert said, absolutely not.

6   That contradicts People's entire closing, and that is

7   what happened here.

8           And by the way, I'm happy that Mr. Hillis

9   spent the time to go through all those text messages

10  and reinforce what was communicated between Mr.

11  Roberts and Mr. Jannetti because when you take all of

12  that into account -- and I was paying close

13  attention -- and you take into account all the text

14  messages we've shown that are in evidence in this

15  case, what you will never find and what Mr. Hillis

16  failed to ever show was any disclosure to Mr. Jannetti

17  that the structured notes were high risk, that the

18  Solutions account was not being managed in -- in --

19  consistent with strategic allocation, that the account

20  with the concentration, with the leverage, was a very

21  high risk account.  You don't see any of that

22  anywhere.

23          And Mr. Hillis had three hours to show you

24  every single text he want to show you.  And when you

25  have a lack of disclosure to that effect, you have met



1   every single count the Claimants have brought.

2   Because in order for Mr. Roberts to have discharged

3   his disclosure obligations and Stifel to disclosure --

4   to discharge disclosure obligations, they would have

5   had to tell Mr. Jannetti:  Mr. Jannetti, the

6   structured note linked to Twilio, like the Dynatrace

7   linked to XPI, that is a high risk investment.

8           And it is very highly unlikely that you get

9   all of your coupons and that there is a high

10  likelihood that you will have a significant loss of

11  capital.

12          That's what a disclosure looks like that

13  would be in conformance, in compliance, with Mr.

14  Roberts's obligations.  Mr. Jannetti, you are heavily

15  concentrated in structured notes.  That increases your

16  level of risk.  Mr. Jannetti, the level of

17  concentration plus the level of margin makes your

18  account a very high risk account.

19          That's what disclosure looks like.  You

20  didn't see any of that.  And, again, I'll repeat.  And

21  you've seen over the course of 18 days the exact

22  opposite side of the spectrum.  Safe, super solid,

23  very solid, not conservative, not risky, I'll invest

24  very carefully.

25          None of that is conveying a high level of



 1   risk.  It is conveying a low level of risk, and that's
 2   what this case is about.  You can't tell someone, I've
 3   got these notes that pay 12-13 percent.  It's got a
 4   low level of risk.  And in fact, it's very risky,
 5   which Mr. -- which Mr. Roberts himself admitted in two
 6   other cases and then in -- and so did there were other
 7   witnesses and experts, and then in this case, seek to
 8   deny it.

 9           Because if you accept that testimony of Mr.
10   Roberts from DeLuca and Muhlbauer, which is in
11   evidence -- if you accept their own expert testimony
12   with impeachment from Deluca and Muhlbauer and you
13   accept the CEO's testimony, these are high risk, every
14   single claim -- 517, negligent -- negligent
15   misrepresentation, fraud -- every single claim --
16   breach of fiduciary duty -- every single claim, all
17   the elements of the claim, are met.  That is why Mr.
18   Roberts -- Mr. Hillis says the level of risk isn't
19   important.

20           It was so important that he conspired with
21   Mr. Roberts to alter their testimony in this case.  We
22   showed it to you.  We showed you how they use the same
23   words, pyramid of risk.  Where -- where did you see
24   Mr. Roberts in the impeachment testimony Deluca and
25   Muhlbauer use the word pyramid of risk?  Never.  He



 1  never used that word.  That was a brand new word that

 2  Mr. Hillis shot up, said he met with Mr. Roberts, and

 3  they conspired -- they conspired to mislead you and to

 4  come up with this brand-new story and try to convince

 5  you of what they convinced of Mr. Jannetti, that the

 6  structured notes are not high risk.

 7          I want to mention something.  People that

 8  have been misled and that are victims of investment

 9  fraud don't know they're being defrauded at the time

10  they're being defrauded.  Otherwise, you'd never be a

11  victim.

12          Every single person that's a victim of

13  investment fraud is unaware they're being victimized

14  or defrauded at the time they're being defrauded.  Mr.

15  Jannetti filed this case within two months of getting

16  wiped out.  Within two months.  Apparently, that's not

17  fast enough for people.  They would have preferred

18  something earlier.

19          When another client complained to Mr.

20  Roberts, what did Mr. Roberts do?  He buried it,

21  didn't forward the text, didn't want his -- his

22  managers to see the complaint.

23          I already mentioned -- and I think it's

24  important to repeat -- no ratification on the 517, no

25  defense to 517, no apportionment of fault under 517,



1    no apportionment of fault under breach of fiduciary

2    duty or fraud, no apportionment of fault under

3    intentional torts.  That's Florida law.

4              Again, not a single text message in this --

5    he's got a 200-page PowerPoint -- 200-page PowerPoint.

6    Did he show you a single text from Mr. Jannetti where

7    Mr. Jannetti said -- either received this information

8    and said these are high risk or conveyed and said, I

9    understand this is a very risky investment in regards

10   to the structure note?  No, he did not.

11             The spreadsheet.  The spreadsheet took 15

12   minutes to put together on Google.  All he did -- we

13   saw it in the first day of -- of -- of testimony by

14   the client.  He got a -- he got a spreadsheet from the

15   Chuck Roberts's office, and he said it took him 15

16   minutes to put them on a -- to put it on Google and to

17   put the live feed in there.  Fifteen minutes.  And it

18   replicated -- we saw.  It replicated exactly what

19   Tyler Connolly had sent him.  Took him 15 minutes.

20             That spreadsheet doesn't distinguish between

21   underlyings.  There's no discussion of implied risk,

22   implied volatility.  There's no discussion of risk.

23   There's no -- nothing in there that talks about XBI or

24   the level of implied volatility risk for Twilio or

25   Dynatrace.  It's just tracking the information that



 1 | they gave him because Mr. Jannetti was interested in
 2 | getting his coupon payments, and he wanted to be
 3 | assured all the time that he was getting those coupon
 4 | payments.  It was critical to him to get those coupon
 5 | payments, and he was assured just like Mr. Roberts
 6 | believed, that this was not a high risk way to get
 7 | these coupon payments.
 8 |          Listen, Mr. Roberts believed that he had
 9 | this strategy.  And I put it up there before.  He was
10 | very confident that he could use the barrier, pick the
11 | underlying, that he was sophisticated and experienced
12 | enough to do all that to conserve capital and get the
13 | coupon.  That's what he believed.
14 |          Mr. Hillis said it was unreasonable for
15 | David Jannetti to rely and believe what Chuck Roberts
16 | told him.  That's part of their defense, that it was
17 | unreasonable for him to rely on Chuck Roberts.  The
18 | entire fiduciary duty is based upon trust and
19 | confidence.  And all you have to do is look at the
20 | testimony that we've given you in the text messages by
21 | Chuck Roberts and then ask yourself, did Chuck Roberts
22 | understand the risk of single stock and XPI structured
23 | note when he sold them to Dave Jannetti?
24 |          If you conclude that he did not understand
25 | the risk, you must find for the Claimant on all



 1    counts, including and especially 517.  Their position,

 2    Dave Jannetti, who never invested in a note before,

 3    not a Series 7 broker, not in the securities industry,

 4    not customizing notes, doesn't know what implied

 5    volatility means, never traded option before, that he

 6    should understand the risks better than Chuck Roberts.

 7    That is an untenable position.

 8             Then he said, Jannetti had the -- listen

 9    carefully to what he said -- the experience and

10    expertise to understand the risk.  As opposed to Chuck

11    Roberts?  Chuck Roberts is a licensed professional,

12    Series 7, managing $1.5 billion.  He is a licensed

13    securities professional, and he didn't understand the

14    risk.

15             And, again, I go back to January 2022.  I go

16    back to this.  Don't stop selling the notes.  You

17    don't change the action that you're taking if you

18    didn't come to a realization that what you thought

19    before was not accurate.  That is the key.  This is

20    why we took the time to demonstrate this flowchart to

21    you, what he believed, what he represented, what

22    happened in January 2022, and what the testimony is.

23             What Mr. Hillis is doing is conflating the

24    mechanics of a structured note with the risk of a

25    structured note.  You could understand the mechanics



1  of a structured note.  It's got a barrier.  It's a

2  two-year term.  It's linked to an underlying.  You can

3  understand all that without understanding the risk

4  because the risk is driven by the underlying.  And the

5  underlying is XBI, KRE, Dynatrace, Twilio, Palantir.

6  That's what drives the risk, not the structure, not

7  the framework.

8           So you can understand the mechanics, you can

9  put on a chart and understand if it goes 35 percent

10  below, without understanding or fully appreciating the

11  risk because the risk is driven by the underlying.

12          And there is no evidence that Mr. Hillis can

13  point to that Dave Jannetti understood the risk of XBI

14  versus Dynatrace versus Palantir.  No single scintilla

15  of evidence.

16          And the evidence is Mr. Roberts didn't

17  understand it.  Yes.  Mr. Roberts understood the

18  mechanics of structured notes:  two-year term,

19  barrier, linked to an underlying, worst of.  He

20  understood that.

21          But what he failed to appreciate because of

22  his arrogance and his belief -- his belief, his

23  confidence.  Confidence.  It's not going down 25 or

24  30.  He was so confident and arrogant that he believed

25  he could put these notes together, pick that



1   underlying, pick that barrier, customize it, which is

2   why he customized the notes.

3          When Hillis said, why didn't you sell the

4   calendar notes, he didn't sell the calendar notes

5   because he wanted to create custom notes based on his

6   views.

7          By the way, the representation by Mr. Hillis

8   that Mr. Roberts was relying upon Mr. Jannetti's input

9   and Jannetti's views to create these notes is

10  laughable.  Not a scintilla of evidence.  Not a shred

11  of evidence that Mr. Jannetti told him he wanted XBI.

12  Or had a view on XBI.  Or believed XBI was a good ETF.

13  Or believed that Dynatrace was a good ETF.  That was,

14  again, part of an ongoing effort to mislead this

15  panel.

16         So you can understand the mechanics without

17  appreciating the risk of the underlying.  And that is

18  what happened here with Chuck Roberts.

19         We're not saying he doesn't understand the

20  nuts and bolts of the structured notes.  He did.  But

21  if you read his own words and listen to his own

22  testimony, he didn't appreciate the risk.  And when he

23  did, it was too late.  And what did he do?  He

24  concealed it.

25         He didn't got to Mr. Jannetti and say, Mr.



1   Jannetti, you know what?  I've lost confidence in

2   single-stock notes.  I've lost confidence of an XBI.

3   It's time to pivot and get out.

4           That never happened.  If that happened,

5   we're not sitting here.  That never happened.

6           The white paper, the white paper, the white

7   paper:  How many times have we heard about this white

8   paper?  The white paper is generic, doesn't speak to a

9   single underlying.  Doesn't calibrate the risk for the

10  underlying.

11          What does their own expert admit?  It's up

12  to the broker to look at the underlying of the note,

13  understand the level of risk that's being driven by

14  the underlying, and make a suitability determination,

15  and based on that particular level of risk -- and

16  disclosure has to be made based on that level of risk.

17  So there's nothing in the white paper that tells Mr.

18  Jannetti that the -- the Dynatrace note -- or the

19  Palantir note has an implied volatility of 50.  That's

20  a very high risk note.   There's nothing in there.

21          Yes, it does a fine job of explaining the

22  nuts and bolts of the mechanics.  We don't dispute

23  that.  But that's not the issue in this case.

24          You cannot conflate mechanics and risk.  It

25  is the risk of the underlying the drove the risk of



 1   the notes.

 2          Mr. Hillis, on behalf of Stifel, tries to

 3   recast the claim.  The claim is, according to the --

 4   their closing argument, that Mr. Jannetti's claim is

 5   that he was told there was no risk, and he would 100

 6   percent get every coupon.  That's not what we claim --

 7   the (inaudible) claim.  That's not what the evidence

 8   is.

 9          It's not -- it's not that extreme.  The

10   evidence is he was told that it was solid, very solid.

11   Almost like a bond.  Not risky.  Conservative.  He

12   understood, mechanically, a coupon could be missed,

13   and he was tracking for that.  But he was told the

14   level of risk was very low.  Never told that the level

15   of risk, risk of missing coupons, risk of losing

16   capital, was very high.

17          Stifel ignores the level of risk, which is

18   why I started with the compliance manual, and I said

19   they gutted and eviscerated the entire securities

20   industry because the entire industry is about the

21   calibration of risk.

22          He says the 517 is the same elements as 10

23   v. 5?  Not true.  No intent requirement.  It's a

24   negligent standard.  He says that in the Rousseff case

25   that it's a different standard for -- different



```
 1   standard of proof and damages because it was a
 2   rescission case.  And a different standard of proof.
 3            I've been practicing law for 28 years, and
 4   arguing 517 cases for 28 years.  I've never heard,
 5   besides Mr. Hillis, a lawyer even attempt to make that
 6   argument.  It is a blatantly false and misleading
 7   argument.  The standard of proof under 517 does not
 8   vary based on the type of relief you want.  That is
 9   just something that Mr. Hillis deemed important to
10   make up.
11            Sense would do.  No meeting of the minds on
12   the Solutions account.  That's a new one.  I give Mr.
13   Hillis credit for origination of a new idea.  That is
14   completely false and misleading.  They have a signed
15   contract that this is going to be a Solutions account
16   with strategic allocation.  They have internal
17   procedures and guidelines that say that this is going
18   to be a model based on -- based on a philosophy
19   statement, and we show you the philosophy statement.
20            Philosophy statement said no more than 10
21   percent in single stock.  This account?  100 percent
22   single stocks.  Then it generated alert, alert, alert
23   after alert, over 60 alerts.
24            What did Lori Lucarelli say who takes her
25   job very seriously?  I don't have to address those
```



```
 1   alerts.  I don't have to address those alerts.  So not
 2   only do they violate the philosophy statement, being
 3   invited -- they violated the Solutions parameters,
 4   which has a 50 percent limit on sector compensation,
 5   which has a limit on how -- how long you can hold
 6   cash.
 7            It is preposterous to argue that the was no
 8   meeting of the minds.  It is literally a signed
 9   contract.  A signed contract where Mr. Jannetti signed
10   to -- to enlist in the strategic allocation Solutions
11   program, which, according to their own documents, has
12   to follow a proscribed philosophy statement.  Their
13   own witnesses, and we've given you that testimony,
14   their own witnesses say that.
15            Then he says, well, the cash is being held
16   in 2022 in the Solutions account for the -- for the --
17   for the tax sale at the end of 2022.  That's not true.
18   We saw month after month after month of $2 million in
19   cash, and then we saw the internal calculations by
20   Tyler Connolly and the Chuck Roberts's team where they
21   were using the cash to get a higher release to have
22   more margin in the structured note account.
23            Then he said, oh, Dave Jannetti knew the
24   accounts were linked.  He knew they were linked.  And
25   the proof is here's the client agreement that says
```



 1   we're going to link it.  That -- that doesn't prove

 2   that he knew it was linked.

 3          They have no defense to the Solutions

 4   account.  It's a discretionary account.  This is

 5   what -- this is what Stifel says.

 6          I guess this one won't rip.  Oh.  Maybe it

 7   will.

 8          This is what Stifel says.  Solutions program

 9   managed on pre-screened investment approach.  That's

10   the philosophy statement.  To have a well-defined

11   investment approach.  That's the philosophy statement.

12   Here's the philosophy statement:  Blended, 40 to 50

13   holdings, 75 percent third-party managers, moderate

14   risk.  Here is the benchmark.  Violated every single

15   aspect of solutions.  Every single aspect.

16          Mr. Hillis says here's the testimony from

17   Mr. Jannetti about the mortgage loan.  And I asked

18   them who originated it.  He said I asked them.  And

19   then he said, in the testimony, Page 888 if you want

20   to bring it up, and then he said he's -- I asked him

21   is this something I should do?

22          And he said yes, you should do this and

23   invest the money.

24          And then Mr. Hillis says, I didn't get the

25   answer I was expecting.  I got the exact answer I was



 1   expecting.  I got the exact answer.  I knew the story.

 2   Mr. Jannetti brought it up on the mortgage loan and

 3   said, what do you think?

 4           And -- and Mr. -- this was their 88.  Their

 5   88.  Put it up, please.  And Mr. Roberts said to him,

 6   according to the testimony that Mr. Hillis wants to

 7   point to, you should do that, and give me the money to

 8   invest.

 9           It doesn't matter that Mr. Jannetti had the

10   idea first.  If Mr. Roberts endorses it, says you

11   should do this, agrees with it, that is a

12   recommendation.  I asked that of Mr. Heller; he

13   agreed.  Mr. Hillis did not elicit any testimony from

14   any expert that contradicted Mr. Heller's testimony.

15   He never asked.  He never asked his own expert is that

16   recommendation?  That is a recommendation.  That's

17   something that I'd recommend, he says.  But we can

18   help you.  I can help you get a  -- get mortgaged with

19   that.  And that is a recommendation.  That -- that --

20   that's what it -- recommendation is in the securities

21   industry.

22           Chuck Roberts admitted he recommended

23   margin.  I won't show you the testimony.  We have a

24   whole tab on it in -- in -- in the closing binder.  He

25   admitted he recommended the use of margin.  According



1  to Mr. Hillis's closing on behalf of Stifel, Chuck --

2  Dave Jannetti created the notes, bought them on an

3  unsolicited basis, did everything himself; Chuck

4  Roberts had nothing to do with it.

5            That -- that -- this is not the case.  Every

6  single note was a custom note created by Chuck Roberts

7  without ever talking to David Jannetti.  Not once did

8  he talk to David Jannetti in advance and get, hey,

9  David, I'm thinking about doing a note, what -- what

10  do you want to solve for?  What do you think the

11  market's going to do?  There was never anything like

12  that.

13            He created the notes.  He hedged the notes.

14  He then sold them across his book of business.

15            He said David Jannetti is sophisticated.

16  Ask yourself, is he more sophisticated than Chuck

17  Roberts?

18            Then he says David Jannetti was very engaged

19  in the relationship with Chuck Roberts; you know what

20  we call that?  We call that taking the bait.  Yes,

21  Chuck Roberts engaged with David Jannetti, flattered

22  David Jannetti, showed a lot of interest in David

23  Jannetti, invited David Jannetti.

24            And I asked him, is that something you do

25  with your clients?  You try to get close to them in



 1    order to accumulate -- to -- to collect their assets?

 2              And he goes, that's part of my job.

 3              He didn't deny it.  He said that's part of

 4    my job.

 5              Again, I just want to revisit the text

 6    messages between Chuck Roberts and -- and David

 7    Jannetti.  You have all the context.  You've seen all

 8    the communications.  What did he tell him?

 9              Solid.  Very solid.  Prudent.  Admitted he

10    told them it was almost a substitution for bonds.

11    Told all the clients that they were not risky.  He

12    told clients that the more you go towards notes, the

13    more you go towards conservative.

14              These are all false and misleading

15    statements.  If you accept that these notes are high

16    risk, all those as representations are false and

17    misleading.

18              Then this:  Mr. Hillis says that the

19    Claimants are obsessed with the texts.  And that

20    they've been punished for the texts.  And you should

21    overlook the texts.

22              We're obsessed with the texts because the

23    texts reveal the truth about what happened.  It

24    reveals the truth about what Mr. Roberts was saying at

25    the time in real time, not subject to



1  mischaracterization and in the contents of those text

2  messages, not just the act of texting.

3          That $35 million fine?  That doesn't deal

4  with the content of the texts.  That deals with the

5  act of texting.  It is the content in this case that

6  is equally important.  The misleading nature of the

7  representations.

8          Then he says only 2 states out of 30 require

9  heightened supervision.  I asked Stevenson, Lucarelli,

10  Peck, Kennedy.  Nobody's ever heard of two states

11  requiring heightened supervision.

12          What does Stifel say?  Well, 28 didn't, so

13  that's -- that's pretty good.  That's the type of --

14  of logic that they're trying to apply to this case and

15  trying to convince you of.  Blame David Jannetti.  His

16  own responsibility.

17          There's a fiduciary relationship here.  He

18  is a legal fiduciary under the law.  No need for

19  concentration letter according to Mr. Hillis because

20  he knew the risk of concentration.  There was no

21  evidence that he understood that Stifel's got a limit,

22  a concentration.  That concentration in structure

23  notes increased risk, that he's exceeding their

24  internal guidelines.  None of that was disclosed to

25  him.



1          Then he kept saying, it's -- I don't think

2    you remember this far back, but it was, like, four and

3    a half hours ago.  He started out saying in Dave

4    Jannetti world, and he kept on saying you could invest

5    to track your investments, and then you get your money

6    back.  He kept saying in David's world.  In David's

7    world.

8          Well, I'm going to talk about this world

9    that we're in, in FINRA arbitration.  Yes, if you make

10   misrepresentations of the risk of the investment,

11   you're liable.  If you fail to understand the risk of

12   an investment, you're liable.  If you fail to disclose

13   risk concentration, you're liable.  There is

14   accountability in liability.  Not in David's world; in

15   this FINRA arbitration that we're in, in the legal

16   system.  There is accountability.  There are

17   consequences for employee Chuck Roberts.

18          Part of their closing was, don't reimburse

19   David Jannetti for market losses.  This is not a

20   market loss case.  This is a blowout case -- a margin

21   blowout case.  Performance from inception to close,

22   and the 2022, negative 86 percent performance.  That's

23   not the market.

24          I showed you during the same period of time,

25   whether you take all of the accounts or just a



1  structure product account, everything is positive if

2  you were in the marked, which is the SNP 500.

3         This is not a market decline case.  He would

4  be ahead by millions if he was in the market and

5  taking market risk.  Blame the market is not a defense

6  in this case.

7         He kept talking about outside investments,

8  brave in, hard money like -- we're not suing on those

9  investments.  Those investments, as the panel knows,

10  not at -- not at issue.

11         Then he talks about other accounts.  U.S.

12  Trust says he's -- he's -- he's used to doing margin.

13  Again, sleight of hand.  No margin at U.S. Trust.  A

14  credit line loan that we use to invest in real estate.

15  Not the same used to invest in the securities account

16  that is the collateral for the loan.

17         Two different things.  Never did margin

18  before.  Never did structured notes before.

19         Again, I go back to this is all due to Chuck

20  Roberts.  Every single investment was recommended;

21  everything was solicited.

22         Two more minutes and I'm done.

23         Bring up -- bring up July 10, 2024.  The

24  DeLuca testimony that's in the impeachment binder.

25  Bring it up.



 1          A big part of Mr. Hillis's closing was based

 2   upon the fact that Mr. Jannetti rejected the full

 3   menu, and that the full menu was being recommended.

 4   Show us the language for a van door.

 5          What did -- what did -- what did Mr. Roberts

 6   say in the DeLuca case, where -- I'll just leave it at

 7   that.  What did he testify in the DeLuca case?  We

 8   customized this -- highlight it.  Show it.

 9          So it really depends.  These are -- the

10   allocation is customized.  It's not cookie cutter.

11   This is in the impeachment tab.  Mr. Hillis spent a

12   lot of time in his closing saying that Mr. Jannetti is

13   the one that wanted cherry picking or individual

14   stocks, and then he rejected the full menu.

15          How many times do we hear that?  Rejected a

16   full menu.  And I cross-examined Mr. Roberts and used

17   this impeachment.  And I showed him in the other case

18   he testified no, it's not cookie cutter, that he

19   customizes, based on that list for the client.

20          And then I showed him -- I said, you ever

21   use the word cherry picking?  He goes, I don't use

22   that word.  Then I showed him his text message with

23   Dave Jannetti.  He goes, if you cherry pick, you get

24   13 percent.  He goes, yes, I -- I guess I do use that

25   word.



HEARING                                                    January 24, 2025
JANNETTI V. STIFEL, NICOLAUS & CO.                                    275

1          Selecting individual notes is what Mr.

2    Roberts says he does.  He customizes.  It's not cookie

3    cutter.  Those are his words.

4          And I'll leave you with this.  This is a, as

5    you all know, a very serious case.  Mr. Jannetti has

6    been harmed very significantly only and because of

7    Chuck Roberts and Stifel.  The evidence is clear.  We

8    ask that you sent the message, apply the full force of

9    the law to this case, to the facts and the evidence

10   that we presented, and award 517 damages.  Send a

11   message in the form of very significant punitive

12   damages, which we will leave to your discretion and

13   good judgment.  Thank you.

14          CHAIRPERSON SALIS:  We'll come back in a few

15   minutes to get the books that's (inaudible).

16          (End of Audio Recording)

17

18

19

20

21

22

23

24

25



```
 1              CERTIFICATE OF TRANSCRIPTIONIST

 2

 3        I WENDY K. SAWYER, hereby certify that I was

 4   authorized to and did transcribe the provided

 5   recording and that the foregoing transcript is a true

 6   transcript of said electronic recording to the best of

 7   my ability.

 8        I FURTHER CERTIFY that I am not a relative,

 9   employee, attorney, or counsel of any of the parties,

10   nor am I a relative or employee of any of the parties'

11   attorneys or counsel connected with the action, nor am

12   I financially interested in the action.

13

14        DATED this 17th day of March, 2025.

15

16

17   _____

18   WENDY K. SAWYER, CDLT

19

20

21

22

23

24

25
```

